```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                          MIAMI DIVISION
                    CASE NO. 20-CV-21961-DPG


VIVIAN RUGGERI,                          Miami, Florida

     Plaintiff,                          November 6, 2023

          vs.                            2:33 p.m. to 4:56 p.m.

NCL (Bahamas) LTD, doing
business as NORWEGIAN CRUISE
LINE,

     Defendant.                          Pages 1 to 101
_____


                      EXCERPT OF JURY TRIAL
              BEFORE THE HONORABLE DARRIN P. GAYLES
                   UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:          JOHN HEYWARD HICKEY, ESQ.
                            LISA C. GOODMAN
                            HICKEY LAW FIRM
                            1400 Brickell Avenue, Suite 510
                            Miami, Florida 33131


FOR THE DEFENDANT:          RICHARD J. MCALPIN, ESQ.
                            MATTHEW STREET, ESQ.
                            80 SW 8 Street
                            Suite 2805
                            Miami, Florida 33130
                                  -and-
                            BRETT BERMAN, ESQ.
                            IN-HOUSE COUNSEL
                            NORWEGIAN CRUISE LINE
```

STENOGRAPHICALLY REPORTED BY:

PATRICIA DIAZ, FCRR, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue
11th Floor
Miami, Florida 33128
(305) 523-5178

I N D E X

                                    Direct   Cross   Red.

WITNESSES FOR THE PLAINTIFF:

HENDRIK KEIJER
(BY MR. MCALPIN)                      3

(EXCERPT OF PROCEEDINGS)

THE COURT:  All right.  Cross.

MR. MCALPIN:  Yes.

CROSS-EXAMINATION

BY MR. MCALPIN:

Q.   Good afternoon, Captain Keijer.

A.   Good afternoon.

Q.   Yes, sir, my name is Richard McAlpin, and I am here on behalf of Norwegian Cruise Lines.

You and I haven't met before, have we?

A.   We have.

Q.   Oh, we have.

Okay.  When was that?

A.   SEALI.

Q.   At SEALI?

A.   Yeah, you gave a nice presentation on -- what was it?

You gave a presentation at the last SEALI.

Q.   On the delivery statute, yes.

A.   Yes.

Q.   Okay.  Good.  Good.

Nice to see you again.  Thank you for coming in.

I wanted to talk to you first about your training and background and your fees.

As I understand it, you are charging $455 per hour for your time here today.  Correct?

A.   Incorrect.

Q.   What's wrong with that?

A.   Right now it's up to 475 an hour.  It's not something that I charge.  It's a fee that my company charges, Robson Forensic.

Q.   Okay.  Well, the reason I said 475 is, I guess we had an old fee schedule that said 455 on that, so it's actually 475 per hour?

A.   Right now it's 475, correct.

Q.   How many hours have you devoted into the case until coming to court today?

A.   I'm not sure.  I haven't reviewed the billing records.

Q.   You haven't brought the billing records?

A.   No, we did not.

Q.   Do we have the billing records, because I asked for the billing records?

A.   You asked for the billing records?

Q.   Yes, sir.

A.   I have not seen that request.

Q.   Can you give us an estimate?

A.   No, I can't.  I need to see the billing records in order to provide you a correct billing figure.

Q.   What would it take for you to get the billing record?

A.   I need to contact my firm.  The accounting needs to pull that together and get the billing records, so to say.

MR. MCALPIN:  Your Honor, maybe we can arrange for the

captain to do that after we are finished and supplement the

record with that, because we did ask for that information.

THE COURT:  Okay.

BY MR. MCALPIN:

Q.   How much do you charge or does your company charge for your

testimony in court?

A.   The same fee, $475 an hour.

Q.   Now, you told us before that you haven't testified on

behalf of any cruise line in the past.  Correct?

A.   Norwegian Cruise Line, I testified for them, yes.

Q.   Did you actually testify?

A.   Sorry, I provided deposition testimony, yes.

Q.   You have been retained by Norwegian Cruise Line in one

prior case.  Right?

A.   Yes, correct.

Q.   That case has been resolved.  Correct?

A.   Correct.

Q.   Separate and apart from that, no cruise line has sought out

your services.  Isn't that true?

A.   That's correct, yes.

Q.   So then your testimony in this arena of maritime expert has

been on behalf of the plaintiff.  Correct?

A.   That's correct, yes.

Q.   So you make a living now working for Robson Forensics

testifying against maritime operators like cruise lines.

Correct?

A.   I have, let's see, 79 percent plaintiff cases, 21 percent defense cases.

Q.   Right.

You have been doing this as a full-time occupation since 2018.  Is that right?

A.   That is correct, yes.

Q.   That's about five years now?

A.   Yes.

Q.   All right.  Good.

So we know that -- let me see if we can establish a few things.  Can we agree that in order for the guest to get from the tender to the cruise ship, the cruise has to make contact with the tender platform?

A.   The cruise ship makes contact with the tender platform because it's part of the cruise ship.

Q.   Yes, sir, and the tender has to make contact with the tender platform.  Correct?

A.   That is correct, yes.

Q.   In order for the tender platform to come alongside -- in order for the tender to come alongside the tender platform, it has to make a turn.  Right?

It has to present one of its sides to the tender platform?

A.   Yes.

Q.   So that starboard turn that you mentioned, that's a

necessity for the tender to get alongside the platform.

Right?

A.   I would agree with that, yes.

Q.   Just because it's kind of like an airplane, at least in my view, can't we agree that there are soft landings, and can't we agree that there are harder landings based on various factors?

A.   I would agree that there are unacceptable landings.  It is what we have seen here.

We have seen soft landings, which are reasonable landings.

Q.   Sure.  It's a continuum; isn't it?

A.   Yes.

Q.   So just because a tender comes in contact with a platform and it may be a hard landing, that doesn't mean it's a negligent landing or that the ship operator failed to exercise a reasonable care.  Correct?

A.   No, not necessarily.  I would say uncorrect.

Q.   So you are saying that every time there is a hard landing that is due to some fault on the part of the ship's operator?

A.   I'm saying a hard landing needs to be avoided in order to minimize risk or injury.  This was a hard landing that could have been avoided.

Q.   Yes, sir.  But I am asking you, as a general proposition, isn't it true that just because there is a hard landing doesn't automatically follow that the tender operator or the cruise line was at fault and acted unreasonably?

A.   In this instance --

Q.   I am talking about in general, sir.

     We will get more to the incident in a minute.

A.   In general, I need more details as to your general approach, approach speed, sea conditions.

Q.   Sure.  Do you automatically equate hard landing to unreasonable operation of the vessel?

A.   No, I do not.

Q.   Thank you.  That's all I was getting at.

     It depends on the circumstances, doesn't it?

A.   It depends on the circumstances, yes.

Q.   So, this is a warnings case.

     You understand that.  Right?

A.   No, I don't.

Q.   What do you believe this case is about ultimately?

     It's about tender operation in your view?

A.   This is about training.  It's about warning.  As you mentioned, yes, I do understand that this is about warning, the warning that wasn't provided.

     What else would you like me to say?

Q.   No, because of your 13 opinions, 10 of them go to tender operation as opposed to warnings.

A.   They're related to the training that was not provided aboard that vessel.

Q.   Training as it pertains to warnings, as it pertains to the

notions of warning.  Correct?

That's what this case is about?

A.   We are talking about warning that wasn't provided.  We are talking about a serious lack of training that was provided and that resulted in the actions of this tender.

The tender operator did not possess the knowledge that he should have been provided by NCL in order to handle this situation reasonably.

Q.   Right.  In order to, you say, "handle this situation," you mean dock the tender in this situation, properly dock the tender?

A.   No reasonably dock or board or slow down, handle the effects of the wake that was following his boat.

Q.   And that is a function of your belief that the tender operator was inadequately trained and that he was not acting reasonably in operating the tender.  Isn't that true?

A.   He was not reasonably trained.  He did not possess the knowledge to handle the situation.

Q.   When you say, "handle the situation," I'd like to be more specific.  Are you talking about tender operation, steering, maneuvering the tender?

A.   I'm talking about boat handling.

Q.   Yes, sir, boat handling, operational fault, operational negligence is what you're talking about?

A.   I call it a lack of training.

The guy was not aware of how to handle a boat reasonably.

Q.   That's what at least ten of your opinions deal with,
Correct, if we look at page 17 of your report?

Do you have that in front of you?

A.   Yes, I do.  Which numbers are you referring to?

Q.   I am referring to, on page 17 of your report, the first
ten, 5.1 through 5.10 go to operational issues in terms of
handling the tender.  5.11 through 5.13 arguably talk about
warnings.  Correct?

A.   5.2 is not warning.

Q.   No, listen to my question, Captain.  5.1 through 5.10, all
of those, what you call Captain Hendrik J. Keijer findings,
those go to operational issues with the handling of the tender
in various ways that, you know, he slowed down too quickly; he
failed to let the wake pass; he failed to -- he turned too
quickly, those sorts of things.  That's all encompassed in 5.1
through 5.10, and those are all operational opinions.  Correct?

A.   5.2 states that, "Plaintiff followed cruise lines
instruction and did not contribute to and/or cause the incident
and her injury."

Q.   Right.

A.   She followed their instructions.  She remained seated.  She
followed the instructions of the crew, which were none.  There
was no warning.

That has nothing to do with you stating that this has to do

with operations.  This was the action that plaintiff took in response to the instructions that she received via safety video.

Q.  Fair enough.  You're saying 5.2.  You are basically opining Ms. Ruggeri did nothing wrong.

A.  Yes, correct.

Q.  Okay.  Fine.  Let's do it one by one then.

5.1, you say, "Norwegian Cruise Lines failure to evaluate the tender operator action and effects on the wake during a docking maneuver was the cause of the incident."

That has to go to do with Norweigian's failure to evaluate the tender operator.  Correct?

A.  Yes, that's correct.  Evaluate means training.

Q.  Training, okay.  And training with respect to the operator's ability.  Correct?

A.  Training with the respect to the boat handling ability, the knowledge of the tender operator.

Q.  To run the boat properly.  Correct?

A.  To reasonably both handle the tender.

Q.  Yes, thank you.

Let's skip on to 5.3, "Norwegian Cruise Line knew or should have known that wakes could cause a dangerous condition."

That has nothing to do with either warnings, does it?

A.  Warning results from the knowledge of being able to identify that wake can create dangerous position.

Q.   Does that opinion have anything to do with Norwegian's training about warning, supervision of warnings, or negligence in training about warnings?

A.   This has to do with a lack of training in wake that could create a dangerous condition.  If a tender operator is not aware that wake could create a dangerous condition, then NCL cannot expect that tender operator to take action as to minimize injury.

Q.   Okay.  Number 5.4, that's talking about failing to throttle down.  Correct?

A.   Correct.

Q.   That's purely vessel operation.  Correct?

A.   That's purely something that should have been part of the tender operator course.  That should have been knowledge that should have been provided to the tender operator.

Q.   We'll get to that in just a minute.

     I just want to know, Captain Keijer -- I want to get through this this afternoon -- whether these opinions have to do with, you know, certain aspects as opposed to other aspects like warnings and failure to monitor and supervise about warnings.  Okay?

A.   Sure.

Q.   Because otherwise -- I know you want to keep regurgitating your opinions in response to every question, but please follow me.

A.   Okay.

Q.   Thank you.

5.6, "Failure to let tender five's wake pass, creating a hazardous condition."

Again, that is with regard to a vessel operation issue. Correct?

A.   Training.

Q.   Correct, about vessel operation?

A.   It's about a lack of knowledge on the part of the tender operator how to deal with a wake that can reasonably be expected to pass his tender.

Q.   And that falls under the category of vessel operation. Correct?

A.   I call it the category of training.

Q.   Training of vessel operation.

A.   Without that knowledge the tender operator was not aware of this phenomena.  This affects only his tender.  To me this falls under the category of training.

Q.   In 5.7 it says, "Similar, talking about failure of the operator to reasonably let the vessel's wake pass, by slowing down and delaying the approach."

The same kind of thing, right?

You're talking about training with respect to vessel operation?

A.   Correct, yes.

Q. 5.9, "The decision to dock the tender with the resulting excessive roll and collision."

Again, you're talking about vessel operation there; aren't you, sir?

A. Again, this is how does a tender operate or respond to an emergency that he's presented with. That can be trained; that can be told. That wasn't trained on; hence the operator's decision to continue to dock his vessel despite the indicators that he had that a collision was imminent.

Q. Okay. Again, to be clear, you are talking about training with respect to vessel operation. Correct?

A. I am talking about the tender operator course.

Q. That goes to training about tender operation. Correct?

A. Yes.

Q. Thank you.

Number 10, "Exposure to hazardous conditions in tender five created a dangerous condition." What does that mean?

A. That means if plaintiff was not exposed to the hazardous condition, there would not have been a dangerous condition for plaintiff.

Q. Okay. Then that, again, goes to the dangerous condition having been created by, in your view, the tender operator's lack of training and lack of operating the tender correctly. True?

A. By lack of training on the part of NCL, yes.

Q.  Then we get to 5.11, and now we finally get to providing reasonable warnings, which deprived the plaintiffs the opportunity to brace herself.  Correct?

A.  Correct.

Q.  So we are talking about warnings there.  Right?

A.  Yes.

Q.  And the same with number 12, "Failure to warn Ruggeri of the impending collision and rolling."

Again, we are talking about warnings there?

A.  It says, failure to warn.  Yes, we're talking about warning.

Q.  Yes, sir.  Thank you.

Then 13, "Failure to include an evaluation."

You're talking about the training course here.  Right?

A.  This is training, yeah, but there is no training provided on when or how to warn passengers.

Q.  Right.

We will talk about that in just a minute, but can't we agree the last three of those issues go to failure to warn issues, failure to warn opinions, and the remainder go to issues other than failure to own?

A.  I would say 5.10, "Plaintiff's exposure to the hazardous conditions in tender number five created the dangerous collision," 5.10.

That's kind of also related to the failure to train these

tender operators, including the tender operator of tender number five, on how to handle a dangerous condition.  One would reasonably expect a warning to be the result of exposing a passenger to the dangerous condition.

All that is, you know, continued in findings 5.11, 5.12, and 5.13.

Q.   Okay.  I will move on.

Let's talk about warnings provided to Ms. Ruggeri.  Okay?

I'd like to put up Exhibit 32, the transcript of the video.

THE COURT:  This is Plaintiff's Exhibit 22.

MR. MCALPIN:  Yes, it's a transcript of the training video.  I believe there is no objection to it.

MR. HICKEY:  No objection.

Judge, while they are teeing that up, can we take a short bathroom break?

THE COURT:  Sure.  Why don't we take ten minutes.

You can step down.  We are in recess.

(Recess.)

MR. HICKEY:  Judge, can we take up something about the billing of experts.  I just found out what the facts were.  The defendant never properly requested the billing of Captain Keijer.  In fact, it was only four days ago that a lawyer from their office called my office and was told by Ms. Goodman that they have not properly requested the billing.  We are not required to get it.

So that's the real story on the billing, and if Your Honor wants us to run around and get billing, we will, no problem, but it should apply to all the experts then in the case, including the two on the other side.

It hasn't been requested as was represented.  It was not requested, and so that's where we are today.

THE COURT:  All right.  Well, that's not really an issue for this witness right now so we will take it up later.

MR. HICKEY:  Okay.  Thank you.

BY MR. MCALPIN:

Q.  Captain, we were talking about warnings, and I wanted to talk to you about some of the warnings that were given to the guests on board the ship.

Okay?

A.  Okay.

Q.  You have seen what I am going to call the long safety video, the video that's played in the cabins.

Did you review that in conjunction with your work in this case?

A.  I do recall that, yes.

Q.  And what we have in front of you is a transcript of the voice, the language that's used.  I just want to -- I'm not going to go over it line by line, but I want to go over a few things on the warnings to highlight them.

Do you see in the section there under in case of emergency

there is a reference to advising the guest that they can contact 911 in case of an emergency.

Correct?

A.  I see that, yes.

Q.  Okay.  So, the guest -- could we agree that the guests are advised that if they have an emergency on board they can call 911 just like you would at home from your home phone?

A.  On board the ship they have the ability to do this, yes.

Q.  And then on the page four, skipping over to page four, the second line on page four, there is a reference to even in calm seas or while docked in port the ship can move suddenly or the wind can change direction unexpectedly.

So, do you agree with that statement, number one?

A.  The ship, as in the Norwegian Epic, can move suddenly.  I agree with that while it's docked in port.

Q.  I'm sorry?

A.  It says, "even in calm seas while docked in port the ship." The ship is a large vessel, so they are referring to the Norwegian Epic.  That can move suddenly, sure.

Q.  You agree with that?

A.  Sure.

Q.  You have been on board ships that are fast to the dock, and the wind shifts, a storm comes up and those ships move quickly, right, pop lines, things like that?

A.  That could happen, yes.

Q. You agree that this is a warning about, you know, an unexpected movement on the ship. Although this is referring specifically to the Epic, it is a warning about the possibility of an unexpected movement of a boat?

A. Of a ship, yes.

Q. Finally, with respect to this exhibit, we see a section on page five dealing with the topic of going ashore. Do you recall where that video program introduced the topic of ships tendering, and it refers the guest to a separate tendering video which we played closer in time to when the ship actually gets to a tender port.

Correct?

A. Yes.

Q. Thank you.

Now, moving on to the next warning is the tender safety and instruction Exhibit 32. I will ask that that be put up on the screen as well.

MR. HICKEY: Could we have exhibit numbers on these, please?

MR. MCALPIN: It's 32.

MR. HICKEY: I didn't get the first one.

MR. MCALPIN: It's 32.

MR. HICKEY: Exhibit 32 is the video. This is the transcript you just did.

MR. MCALPIN: Will just make it part of 32. It's a

transcript.

THE COURT:  Just so I am clear, this composite Exhibit 32, it's listing a long video, a short video and the safety information recording and it says, "Tendering."

What is tendering?  What is the tendering?

MR. MCALPIN:  What is the tendering?

THE COURT:  Yes.

MR. MCALPIN:  I'm not sure exactly what the witness list is saying.

Can I see it, 32?

MR. STREET:  It's the tender audio.

MR. MCALPIN:  Oh, it's the audio of the tender.

THE COURT:  Oh, okay.

MR. MCALPIN:  What I am suggesting, Your Honor, to simplify things, we made transcripts of the words for the ease of the Court, and I don't think Mr. Hickey has an objection to it.

So what I would propose is simply append it to make it part of Exhibit 32 because Exhibit 32 is the actual video and audio recordings.

THE COURT:  That's what I was getting at.  I didn't know what it was.

Has the plaintiff seen the transcripts of these recordings?

MR. HICKEY:  We just now saw them a couple of days ago.

I haven't verified they are accurate, but if Mr. McAlpin says they are accurate, we will go with that.  I guess now we will have to go back at some later time and run through it and see if it is, but it was just presented to us a couple of days ago.

If he wants to show that, mark that, fine, but you know, we would appreciate an opportunity to go back and verify.

THE COURT:  Okay.  So to the extent you have any transcripts of these things, why don't you mark them as 32A and distinguish them that way.

MR. MCALPIN:  Very well.

MR. HICKEY:  Are all three transcripts now 32A?

THE COURT:  We will make them Composite 32A as all the -- as the videos and the voice recordings are all composite 32.  Okay.

BY MR. MCALPIN:

Q.   For the record, the one we were talking about before, which is part of Exhibit 32A is the transcript of what I'm calling the long video.

What we are going to talk about now is part of Exhibit Composite 32A is the transcript of the tender-specific video, and then finally we are going to talk about, as part of Exhibit 32A the composite, a transcript of the audio.

Okay.  Captain?

A.   Okay.

Q.   Referring to the tender safety instruction, Exhibit 32A, if

we go to the first page, again, I am not going through these one by one but I want to point out some of them and ask you some questions about them.

On page one we go to the section that begins, "a rucksack or backpack is great so you can keep your hands free and hold on to handrails as you are boarding and leaving the tender."

First of all, do you think that's a good idea?

A.   Yes, I do.

Q.   To instruct the guest to keep their hands clear so that they can hold on while they are moving around the tender or even while they are on the tender?

A.   Yes.

Q.   That's a good warning, in your opinion.  Correct?

A.   I do.

Q.   Next, on page two, the section beginning with, "Remember, the tender may be moving much more than the ship.  Use extra caution and watch your step when approaching and boarding the tender."

Do you see that?

A.   I see that.

Q.   Do you agree with that statement?

A.   When they are approaching and boarding the tender, I agree with that, yes.

Q.   Correct.  And the section that begins with, "Remember the tender may be moving much more than the ship," do you remember

that that voiceover accompanied a photograph or a video of the tender moving, vis-à-vis, the stationary, the relatively stationary Epic?

A.   I do not recall that.  I would like to see it.

Q.   Okay.  But do you agree from a general standpoint that a tender boat is going to be much smaller and much more subject to the wave action than the Norwegian Epic would be?

A.   Yes, I agree.

Q.   A tender would move much more than the Epic would in those conditions.  Correct?

A.   Yes.

Q.   And this is a warning simply telling the guests that fact. Correct?

A.   It's telling the guests, telling the crew to be especially cautious when on board a tender, yes.  Tenders move a lot more than big ships; that's for sure.

Q.   Correct.  And that's, I guess, the only point I was getting at.  This is a warning to let people who may be from -- and I'm not, you know, I don't want to pick up some state randomly but someone who has not been on board ships from Kentucky, let's say, that these little small boats move a lot more than big boats so be careful.  Right?

A.   Yes.

Q.   So the next section says, "When going downstairs and across a gangway, please watch your head.  Also, hold on to the

handrails and allow the crew on hand to assist you, if necessary."

Again, we're talking about asking in part the guest to hold on to handrails.  Correct?

A.  Yes.  This is during embarkation or disembarkation of a tender.  It does not pertain to this case where a passenger was actually seated in a tender and following those instructions to remain seated.

Q.  We will get to that in a moment, I promise.

Skipping down a few lines, "Always remember, we will only tender when it is safe to do so, and tenders, even the big ones, are much smaller than the ship and will be much more likely to move around, especially if the wind rises or the sea develops a swell."

Do you agree with this statement?

A.  I do.

Q.  Do you think it's a good idea to put a statement like this into a warning video for guests?

A.  It could be, yes.

Q.  It specifically references, again, the tender moving much more than the ship and especially when wind arises or the sea develops a swell.  Correct?

A.  Yes, and as we know, there was no wind that day, and with regards to sea developing a swell, not all passengers are able to identify a swell as being a problem because they can't see

it.

Q. But here we have a specific reference to the tenders moving in connection with what I'm going to call wave action, you call it a swell, we call it a wake, whatever you want to call it, it's a disturbance in the water. Right?

A. Yes.

Q. And we're warning the guests that be careful if there is this wind or a swell, that the ship can move, the tender can move. Correct?

A. Correct.

Q. Then two more lines down there is a statement beginning, "If there is a sudden movement, like a boat passing by and causing a wake, then crew may ask you to wait until things settle down before allowing you to embark. If this is the case, please be patient and follow the instructions."

I guess there is really nothing for you to agree upon in this one, but do you think that's an appropriate warning to give guests?

A. That would be an appropriate warning and one that we were missing in this instant. The crew did not ask them to wait for things to settle down.

Q. But this warning is given before the guests even get on a tender. Correct?

A. Yes.

Q. Right, so that warning has already been given. Right?

A.   That warning has been given during the embarkation, I believe.  That's what this video pertained to, embarkation, disembarkation of tenders.

Q.   Actually not, Captain.

Remember, the test -- let me ask you to assume that this video, the one we're talking about now, is begun to be played the day before the ship arrives in the tender port, and it is continuously played during the entire time the ship is in the tender port.  So for two days this video is continuously played in the cabins.

Okay.  So, based upon that assumption, can we agree that this warning would be a good warning to give with respect to the accident -- with respect to the facts as they developed in this case?

A.   This pertains to embarkation, and it also creates an expectation from passengers that the crew will provide information with regards to the settling down of a boat's movement.

Q.   Well, understand that embarkation and debarkation essentially would be the same thing.

You could have a swell or a wake, you know, that unsettles the tender during embarkation or debarkation.  Right?

A.   Yes.

Q.   And the same warning would apply.  Correct?

A.   And that warning is given despite this video being played.

So if there is boat movement and passengers, in addition to that video being played, are still provided with warning.

Q.   I don't follow you.  What do you mean "still provided with warning?"

A.   It states that crew may ask you to wait on things to settle down.  That will be on the spot, during embarkation when boat movement is being experienced by passengers during embarkation.  So it does not only rely on that video.

That video, hereby, is one means of providing information with regards to what passengers can expect when boats move, but in addition to that, when the movement is experienced, the crew may also ask passengers to wait until things settle down.  So that's additional information above what is provided through this video.

Q.   Right.  Let's just focus on the first sentence.  That is a good warning, isn't it?

A.   It is a good warning.  Any warning is good.

Q.   Thank you.

And this particular warning is not just a general warning.  It's a warning specifically about what could happen in this situation that has facts similar to those that we have in this case.  Isn't that true?

A.   I agree.

Q.   Thank you.

And the second part of that sentence, "please be patient

and follow the instruction," of course, that assumes that there is time to do it and that there would be some warning that would be effective.  I know we are going to disagree about that, and we will talk about that in a minute.

But doesn't that assume that, sir?

A.   Could you repeat that question, please?

Q.   Sure.  The second part that you made point of says, "If this is the case, please be patient and follow the instructions."

You said, well, yeah, the first part is that, you know, the swells and the waves could move the boat, and the second part is, well, and the crew is going to tell you something else. Right?

A.   The second part is the crew may ask you to wait until things settle down.  That's to prevent injury.

That's the reason why it's there.

Q.   Correct.  What I am saying is that, of course, assumes that there is time and that a separate additional warning would be effective.  Isn't that true?

A.   Yes.

Q.   Thank you.

Further down it says, "Although the tender may not be moving, remember that motion could only be a small wave away, so always take care when going to your seat and be sure to hold on to the handrails, poles or seat backs."

First of all, do you agree with that statement?

A.   I agree with that, yes.

Q.   And would you agree that that is a good warning to have, to give guests who are embarking on a tender?

A.   When guests are moving about a tender and moving towards their seats or for their seats, this would be a good warning to make, yes.

Q.   Don't you think those same principles would be applicable when the guest is seated?

A.   Motion could be expected.  That is being relayed to the guests.  That's good.

It also says that the crew may ask you to -- or the crew may provide information with regards to the settling down of that ship's movement or the tender movement.  That's also a good practice that is mentioned in this video.

Q.   We already talked about that one Captain Keijer.

I am talking about the one that's highlighted that says, "although the tender may not be moving," does it have that additional language you were just referring to?

A.   Yes.

Q.   Turning now to the third page of the tender-specific video, Exhibit 39A -- 32A, the first sentence says, "Remain seated at all times when the tender is in motion."

Do you agree with that is a good warning?

A.   It's a good warning and it's a warning that was followed by

Ms. Ruggeri.

Q.   And that's according to her testimony.  Correct?

A.   That's correct, yes.

Q.   Do you have any independent witness testimony corroborating that?

A.   I have no independent witness testimony that disputes that she was not sitting.  None of the crew members testified to her standing up that were in that tender.  I did not see that.

Q.   Well, that's not really the question I asked, sir.

I asked the question, "Do you have any testimony corroborating that Ms. Ruggeri was sitting at the time of the contact with the tender platform"?

A.   I have heard testimony under oath.  That's what I have.

Q.   So is the answer --

A.   So the answer is no.

Q.   Thank you, sir.  I appreciate that.

Next, a couple of lines down it says, "The tender can move unexpectedly when it is maneuvering or coming alongside, so please do not be tempted to stand up as the tender is approaching the dock or the ship, as it may come to a sudden stop."

First of all, do you agree with that statement?

A.   I agree with that statement.

Q.   Here we have a warning, which is specifically geared toward unexpected movement while the vessel is maneuvering or coming

alongside.  Correct?

A.   Yes.

Q.   Again, specifically referencing the facts in this case. Correct?

A.   Yes, and, again, she did not attempt to stand up.  She followed the instructions.

Q.   Can't we agree, Captain, that if she didn't follow the instructions, if the evidence shows that she didn't follow those instructions, that she will be violating at least several warnings that we have already seen about remaining seated in the tender?

A.   In that hypothetical scenario, yeah, I would agree with that.

Q.   Thank you.

Then, again, we have yet another warning about remaining seated until the crew tells you it's safe to disembark.

That's a good warning as well.  Right?

A.   It is.

Q.   Reiterating what we already talked about several times in the warning.  Right?

A.   Yes.

Q.   Then we have a few lines down, "Please be careful and remember that the tender can still move in the calmest harbor due to traffic, so when moving from the tender to the dock, remember to keep those hands free."

First of all, do you agree with that statement?

A.   I agree with that, but it's irrelevant because she was seated.

Q.   Yes, sir, but do you agree that that is, again, yet another warning about the potential of the tender moving suddenly?

A.   Yes, it is.

Q.   Thank you.

Finally, the audio, the audio, 32A, it's 40 something second audio, and we have a section that begins with, "Please be seated at all times when the tender is moving."  Yet another indication or warning to please stay seated.  Right?

A.   Yes.

Q.   You understand that this is played over the speakers when the tender is leaving the ship and when it is leaving the pier shore side.  Right?

A.   That's my understanding from reviewing the documentation, yes.

Q.   Then you have no information to contradict that, do you?

A.   No.

Q.   Then, again, we have a reminder, "Do not stand up and disembark until a tender is safely moored.  When disembarking the tender, please be aware of the motion of the tender compared to the jetty or tender platform."

Do you agree with that statement?

A.   I do.

Q.   Again, another warning to please be careful because these tenders can move unexpectedly.  Correct?

I didn't hear an answer?

A.   Yeah, I do not see the unexpectedly, but I do see the movement part, yes.

Q.   Thank you, sir.

Now, let's change gears, Captain, and let's talk about the training of the operator.

Right.  You have seen certain materials referencing the training of Jomar Buerano.  Right?

A.   Yes.

Q.   Did you also have a chance to review his deposition?

A.   I did.

Q.   And did you see in his deposition where he indicates that he has been operating life boats since 2013?

A.   I do not recall the exact year, but, yes, I have read it.

Q.   You recall that he joined Norwegian Cruise Line in 2013 as an OS?

A.   Not that particular year.

I don't recall that, but I have read his testimony, yes.

Q.   Okay.  Do you recall his testimony indicating that he began operating the boats in drills, in life boat drills sometime after that, after 2013?

A.   Yeah, I recall that, yes.

Q.   You know, of course, better than me, that the ships have

life boat drills on a periodic basis, even if everything is hunky-dory and fine.  Right?

A.   Yeah, one needs to be prepared for an emergency.  That's why drills are held, yes.

Q.   Part of those drills are actually lowering those life boats/tenders and motoring them around, making sure they're operational, giving the seamen, the sailors an opportunity to get familiar with them, dock them, helping figure out how to get people on board that may be on the water and so forth.

Correct?

A.   That's part of the drills on a certain occasion, yes.  Not every week, but, yeah, it's done.

Q.   So, operating those tenders and those life boats during drills is part of a proficiency, a competency training.  Isn't that true?

A.   It's more those drills are geared towards getting away from the ship.  That's the focus.

You simulate an abandon ship situation, which means lowering the boat, getting away.  The actual proficiency of returning to the vessel is of less importance.  It's more about getting away during the abandoning ship drills.

Q.   But as a secondary benefit, let's call it, the sailors get practice in driving the boats, don't they?

A.   They do.

Q.   And they get practice in encountering different sea

conditions and wind conditions and all kinds of other circumstances.  Right?

A.   Yes, except that it's not necessarily the AV who operates the tender, that that is the same guy that operates the tender during the lifeboat drill.  There are different crew members who operate the tender in those conditions.

Q.   But it can include the sailors, the ABs and OSs.  Right?

A.   The AB and the OSs generally are involved with the actual lowering of the lifeboats and the retrieving of the lifeboats.

They are not part of the crew that operates the lifeboats in case of an abandon ship drill.  They are the teams that lower the boats, that retrieve the boats, and once everybody is away in an emergency, those sailors then become part of the crew that disembarks the vessel together with hundreds of others via life raft, rubber dinghies.

Q.   Can we go to page 24, 001, please?

You have seen this document before, Captain?

A.   Yes, I have.

Q.   This is the certificate for tender boat operator for the operator in question, Jomar Buerano.  Correct?

A.   Correct.

Q.   You have seen certificates like this before in your career?

A.   Yes, I have.

Q.   And you have issued them presumably?

A.   I have issued them.  I have trained people in accordance

with the requirements as stipulated on the certificate.  I am very familiar with these types of certificates and the training that's involved.

Q.   Yes, sir.  And you're familiar with then the background in terms of the materials and the guidelines which are used in order to, you know, set forth the standards in order to get a certificate like this?

A.   Yes, I am.

Q.   And we can see from Exhibit 24.001 that the certificate states that, "The above-named person is trained in accordance with the provisions of the recommended standards of training for tender boat operator.  This certificate has been issued under the provisions of Cruise Line International Association (CLIA) MSC.1/Circ. 1417 requirements and the Flag State Letter of Acceptance."

Do you see that?

A.   Yes.

Q.   You know that means the -- I am going to call it the IMO circular?

A.   I thought I was not allowed to comment on that circular.

Q.   We are not going to get into any detail of it other than to say that those are guidelines, those are guidelines which set forth lots of different, you know, recommendations, including recommendations for trainer/operator certifications.

Isn't that right?

A.   As far as I understand these are requirements that actually need to be followed.  They are not just guidelines that can be ignored.  The cruise lines need to follow these requirements.

Q.   Okay.  I am not going to quarrel with you right now because that's a legal conclusion, whether they are guidelines or requirements.  I am just asking you if you are familiar with the underlying document that is referred to in Exhibit 24.001.  Right?

A.   Yes, I am familiar with that.  Yes.

Q.   That sets forth some, whether you call them requirements, whether you call them guidelines, it sets forth training aspirations, if you will.

     Correct?

A.   Correct.

Q.   Competency aspirations.  Correct?

A.   Yes.

Q.   What we are doing here by this certificate is Norwegian Epic is certifying that this sailor has passed those training -- that training course, and that he's certificated to operate the tender in accordance with the IMO circular.

     Right?

A.   That's alleged through the certificate, yes.

Q.   Do you have any reason to dispute that?

A.   Then I need to go into the details of it.  I have not seen evidence in the documentation that has been provided that these

requirements were actually covered in the training material.

Q.   Well, have you seen any documentation to dispute that Jomar Buerano passed the training requirements?

A.   No, he passed according to the certificate.

Q.   Have you seen any documentation to dispute the fact that the training course was approved by the flag state?

A.   I have not seen flag state approval to this training course.

Q.   But you understand that the flag state, in this case the Bahamas, that they approved the training materials.

Correct?

A.   I have not been provided with approval to the training material that you have provided.

Q.   Well, sir, you see here that the documentation indicates that BMA Approved Training Center Norwegian Epic.  You see that, right?

A.   No, I do not.

Q.   Look at the next line.  Maybe it can be highlighted.

A.   Yes, there it is.  Got it.

Q.   No problem.  You have been up there a long time.

So you know the BMA is the Bahamas Maritime Authority. Right?

A.   I do.

Q.   You know the Bahamas Maritime Authority is the regulatory body sanctioned by the Bahamian government to administer their

maritime regulations.  Right?

A.   Yes.

Q.   We know that the Bahamas -- that's also called the flag state.  Right?

The flag of the ship is Bahamas flag.  Right?

A.   Yes.

Q.   And we know that according to this certificate, that the Bahamas Maritime Authority, the flag state, has approved Norwegian Epic as a certified training center.  Right?

A.   That's what it says, yes.

Q.   So we made --

THE COURT:  I'm sorry, I don't understand what you said.

THE WITNESS:  Yes, I agree with the question that's asked about flag state and the Norwegian Epic being an approved training center.

THE COURT:  Okay.

BY MR. MCALPIN:

Q.   Let me just recap and summarize so we're clear.

We know that the flag state has to approve the materials that are being used to do the training.  Right?

A.   Yes.

Q.   And we know that the flag state also has to approve the training center.  Isn't that right?

A.   That's correct.

Q.   And we know from this document that the BMA has done all of those things.  Right?

A.   According to this document, they have, yes.

Q.   So it's not as if Richard McAlpin walks off the street and says, "I'm going to be a trainer now.  I'm going to work on Norwegian Epic and be a trainer."

That trainer center has to be approved and I have to be approved as a trainer.  Correct?

A.   Yes.

Q.   And according to this, BMA, the flight state, has approved the Norwegian Epic as an approved training center.  Right?

A.   According to this certificate, that is correct, yes.

Q.   Captain, you keep saying "according to this certificate."

Do you have anything to dispute the accuracy of this certificate?

A.   The documentation that I reviewed, the facts that were presented to me that covered the tender operator course are missing certain aspects that were required, and I'm not allowed to go into it, but according to Circular 1417 that was issued by the IMO.  I have not seen that documentation.

Q.   Follow my question, sir.

Do you have anything to dispute the accuracy of this certificate?

A.   No, I do not.

Q.   Okay.  So that's the first part.  BMA approves Norwegian

Epic as a training center.  The second part is crew member specific.  It's the top part, and it's certifying that the crew member is trained in accordance with that IMO Circular 1417.  Correct?

A.   Yes, that's what it says.

Q.   And you have nothing to dispute that either, do you, sir?

A.   Physical Norwegian Cruise Line trained their training tender operators in accordance with the circular, I would have expected to see a full document that covered the training requirements according to the circular and that has not been presented.

Q.   Sir, I'm not asking what you presume.  You understand that Ms. Ruggeri has the burden of proof here.  You understand that?  Right?

A.   Yes.

Q.   And that Norwegian Cruise Line isn't required to produce every document in its computers.  Correct?

A.   That I don't know.

Q.   Okay.  All right.  Back to my question, though.

You know that in order for Norwegian Epic to be an approved training center, the training materials, the training materials have to be reviewed; don't they?

A.   At the date of issuance of the certificate, February 7th, 2018, they seemed to have been in compliance, yes.

Q.   Yes, the training materials used to train Jomar Buerano

have to be approved by the BMA, don't they, sir?

A.   Yes.

Q.   Otherwise, we wouldn't have the certificate; would we?

A.   It needs to be approved, that's correct.  Yes.

Q.   Thank you.

When you talk about -- just to jump ahead for a second, when you talk about, you know, the test, and the test not containing certain questions.  Do you remember that testimony?

A.   I do, yes.

Q.   And you were critical of that?

A.   Yes, I am.

Q.   Sir, you know.  You're an educated guy.

You know that you are not always tested on everything.  You are taught.  Isn't that true?

A.   I do know that there are certain requirements in the circular that requires certain parts to be covered in the test.  So I did not see that in the test.  Hence, these question marks.

Q.   Follow my question, please.

You know from your life experience that you're not always tested on everything you are taught.

Isn't that right?

A.   You should be generally tested on everything that you're taught.

Q.   Do you know what is in the course-specific training

materials that Norwegian Cruise Line used to train Jomar Buerano?

A.   No, because that has not been provided.

Q.   Yes, sir.  Do you know if it was requested?

A.   I don't know if it has been requested.  I would assume so because part of the training material was provided, part of it, the final test, and then an SMS extract, which was irrelevant.

Q.   So you don't know what's in the training materials.  Right?

A.   It hasn't been provided, so the answer is no.

Q.   Correct.  Let me get a clean answer.

Do you know what was in the training materials that were used to train Jomar Buerano?

A.   No, I do not because it hasn't been provided.

Q.   Do you know what was contained, the practical training that was provided to Jomar Buerano?

A.   Again, it hasn't been provided so the answer is no.

Q.   But what we do know is that the training materials that were used to train Jomar Buerano were approved by the flag state.  Right?

A.   On February 7, 2018, they were, yes.

Q.   And we also know that the Norwegian Epic, the trainer, was certified as a trainer by the flag state.  Right?

A.   On February 2018, they were, yes.

Q.   Thank.

And that's before this incident?

A.   Yes.

Q.   About a year and a half?

A.   The date of the incident was October 25th, 2019.

Q.   Right, I remember because it was right around Halloween.

About a year and a half before he was certified.  Right?

A.   That's right.

Q.   All right.  Thank you, sir.

So, we talked about training.  Let's talk about experience.

Did you see in Mr. Buerano's testimony that he said he worked on the Norwegian Epic during the summer season -- that he had five contracts on the Epic and he worked on the Epic during the summers of 2018 and 2019?

A.   I do not recall the exact dates, but I take the word for it.

Q.   Okay.  And do you recall that he testified that he drove the tender boat every Friday while the ship was in Cannes?

A.   Again, I don't recall the specific or those details but, again, I take your word for it.

Q.   So taking my word for it if that's the testimony, that he worked -- that we know that this accident happened right around Halloween, that would be the end of the season.  Correct?

A.   Yes.

Q.   You know that the Epic goes to the Caribbean warm waters in the winter?

A.   Yeah, most cruise ships do.

Q.   That's a common sort of cycle.  Right?

A.   Yep.

Q.   So he would have worked two seasons because that happened at the end of the second season.  Right?

A.   It did, yes.

Q.   If the testimony is that the ship was there every Friday and made more than 50 calls during those two seasons and putting that together with his testimony that he drove the tender boat every Friday, that would be something like, you know, 50 weeks driving the tender boat.  Right?

A.   Yes.

Q.   If the testimony is that each day he would make about eight roundtrips, maybe more, when you do your math, and I know you are good in math, when you do your math that would be over 400 transits.  Isn't that right, sir?

A.   Sure.

Q.   Have you seen any evidence in this record that Mr. Buerano ever had a problem operating that tender boat numbered five?

A.   That information has not been provided to me.

Q.   So the answer is no?

A.   I haven't seen those facts.  I look at the facts.

I have not been provided with prior incidents that he may have had or may not have had.  I don't recall seeing that.

Q.   So listen to my question, please.

Do you have any information indicating that Mr. Buerano had

any problem operating the tender boat during those two seasons?

A.   No, I do not have that information.

Q.   Thank you.

Do you have any information suggesting that any guest complained about Mr. Buerano's operation of the tender boat?

A.   I have not.

Q.   Number five during those two seasons?

A.   Again, that information has not been provided to me.  I have not been able to review.  It doesn't mean that there were no complaints.  I just haven't seen it.

Q.   Thank you.

Let's change gears now and talk about supervision, Norwegian's supervision.

I will start out by asking you if you've seen the PowerPoint presentation which is port specific to Cannes?

A.   Would you mind pulling that up?

Q.   Yeah, Exhibit Number 17.

A.   I am familiar with that exhibit, yes.

Q.   Yes, sir, you understand that this is a PowerPoint presentation which is used in conjunction with the safety meetings which are held in the morning prior to the tender operations commencing.

Are you familiar with that?

A.   No, I was not familiar with that.  I know there was a safety meeting.  I did not know that this was their Power

presentation.

Q.   Yes.

You do recall testimony from Mr. Buerano that there are safety meetings before the tendering operations are begun. Right?

A.   Yeah, they are required to do that.  Yes.

Q.   Yes, sir, and it's between the officers, the deck officers, the bosun, the sailors and all the people that are going to be involved in the tendering operation.

Right?

A.   Yes.

Q.   And that testimony then would be in line with your background and experience in terms of the appropriateness of having a meeting like that.  In other words, you think that's an appropriate meeting?

A.   It's a requirement.  You need to have those meetings and I've done those meetings myself.  I've held them, yes.

Q.   And you have evidence in this case that those meetings were, in fact, held?

A.   Yes.

Q.   Assuming this PowerPoint presentation was used in conjunction of those meetings, in order to remind the sailors of certain things, that would be a good thing, wouldn't it be, Captain Keijer?

A.   Yes, definitely not a bad thing.  It's a good thing.

Q.   It's kind of like a checklist; it's a good thing?

A.   It is.

Q.   So let's just go through some of those slides that are used by Norwegian to supervise the sailors and the tender boat operator.

Here we have information of VHF radios and about what's inside the tender boat.  Correct?

A.   Yes.

Q.   Next, here we have information about personal protective equipment.  Correct?

A.   Yes.

Q.   This would be an appropriate thing to remind the sailors of, about the life jackets and their persona equipment.

A.   Yes.

Q.   Here we have reminders about the announcement being played on the tender.  We talked about that.  That's appropriate, isn't it?

A.   It is appropriate.

Q.   Next we have information about filling out the logbook.  Right?

A.   Yeah, the last one is very interesting.  I have not seen that special events that we're talking about here having been noted in the logbook.

Q.   You know the tenders have logbooks and they're checked before the operation.  They're checked and after the operation,

and any deficiency of the equipment is noted on the logbooks.
Right?

A.   Or special events, yes.  Yes, sir.

THE COURT:  I'm sorry, what exhibit is this?

MR. MCALPIN:  This is Exhibit Number 17, Your Honor.

BY MR. MCALPIN:

Q.   Then going on to the next page we have general reminders about flag etiquette.  That's appropriate?

A.   Yes.

Q.   You don't want to piss off the host country, do you?

A.   Not really, not advisable.

Q.   Next, how to display the flags.

Next, now you have information about the tender checklist. Right?

If there is any deficiencies, notify the bridge and that the deck wash will collect the tender checklist after the operation.  That's important to remind the sailors of.  Right?

A.   Yes.

Q.   And then some samples of tender checklist.

You can run through those?

A.   All technical, yes.

Q.   You can run through those.

Go ahead and run through that.

Next you have information reminding the sailors about the various communication equipment on board, the VHF, the UHF, the

PA system.  Do you recall that?

A.   I recall seeing the PA system, yes.  That was available to the tender driver and the crew.

Q.   And this would be, again, a good reminder for the company to supervise and remind the sailors of the equipment they have on board, although, they probably know it by heart by now if they were doing it two seasons.  Right?

A.   Yeah, including the intercom, they have the ability to make an announcement to the guests, as it states here.

Q.   You see here there is a reminder that in order to play the CD, that announcement, you need to have the intercom on the AUX, the auxiliary mode.  Right?

A.   That's what it says.

Q.   Do you remember from your inspection, your virtual inspection of the ship that the PA has to be toggled from the auxiliary mode to the intercom mode in order for someone to give an announcement over the ship's PA system, hailing system?

A.   I did not review the owner's manual of the actual PA system.  I knew that the PA system was there.

Then I had the option to use the intercom to make an announcement to the best.

Q.   All right.  We will look at a picture of that in just a minute.

Here, actually, you can see in the center where they have an arrow that says, "mode selector."

Do you see that?

Maybe you can Zoom in on that, Stephanie.

Do you see the mode selector switch there?

Right now it's toggled to Aug for auxiliary?

A.   I see it.

Q.   That would mean that based on the prior slide that when the operator plays that audio recording he has to have that toggle switch in the up position.  Right?

A.   At the time of departure from the tender pier, yes.

Q.   At the time what?

A.   Correct, when he departs the tender pier shore side and place that CD.

Q.   Well, either way -- because, remember, he is playing that CD when he leaves the ship to go to shore and he is playing that same CD when he leaves the pier going back to the port?

A.   Correct, at the time of departure, not the time of arrival.

Q.   So either way, in order to play, that he needs to have that toggle switched to AUX?

A.   Yes.

Q.   And in order to give someone an announcement or warning, the tender operator would have to reach up and move that toggle switch to the next notch, the next indent where it says, "Intercom."  Isn't that right, sir?

Sure, something that can easily be done prior to departure after playing the CD and before arrival at the tender

platform.

Q.   In order to change that setting from auxiliary to intercom, the driver would have to take away his or her attention from maneuvering the craft.  Isn't that true, sir?

A.   Like I said, if you are prepared for the eventuality of potentially having to notify the guest of some circumstance, once the CD has stopped playing at the departure point, which means the port of Cannes.  They departed, played their CD and then flipped that switch to the intercom to be prepared to make that announcement.

That's what a reasonable operator would do, be prepared for emergencies and minimize all the steps that need to be taken to operate your equipment.

Q.   Sir, can we agree or not agree that in order to get the system on these tenders from auxiliary to intercom you have to change the settings?

A.   Yes.

Q.   In order to do that, you have to divert your attention from driving the ship to looking up at the PA system control board.

A.   Sure, it could be diverting attention.  It could be because this guy has done it 4, 5 -- 800 times.

He knows where that switch is.  It's just a flick of a switch.

Q.   Continue with the slide, please.

We know that you mentioned a speed limit, a speed limit of

three knots, and we know, of course, Captain, that the speed limit of three knots pertains once the tender is inside the breakwater?

A.   At the breakwater there is a diagram, I believe it's on this document, that shows where that speed limit actually starts.

Q.   Yes, sir.  So it's not correct to suggest that there is a speed limit as the ship has cleared the breakwater on its way to the Epic.  There is no speed limit there, is there?

A.   No, that's correct.

Q.   But the company has its own speed limit; doesn't it?

A.   I haven't seen documentation that states that tenders need to adhere to a certain speed when they are transiting back to the Norwegian Epic.

Q.   We will get there.

The last bullet point there, number seven, talks about the speed underway, keeping it at 80 percent of the load or 3200 rpm.  Do you see that?

A.   I do.

Q.   There is a supervision, there is a regulation that the company is giving the sailors about how fast or how much they can load the engine?

A.   Yep, there is.

Q.   You think that's a good idea.  Right?

A.   Eighty percent load is accurate whether you are operating a

ship or a tender.  Eighty percent load is fairly normal.

Q.   In the operator's discretion, depending on the sea conditions, the operator may want to go slower, have less load than at 70 and 80 percent.  Right?

A.   He could, or in case of an emergency he can go faster.

Q.   Right.  It's up to the discretion of the operator.  Isn't that true?

A.   Yes.

Q.   There isn't any rule, regulation, speed sign on the way from the pier to the dockage, the anchorage area saying, you have to go certain miles per hour or knots, is there?

A.   There is a requirement to proceed at safe speed, as we call it.

Q.   Safe speed, and that's whatever is safe within the discretion of the operator.  Isn't that true?

A.   As long as it's safe, safe speed, yes.

Q.   Thank you.

Next.  Here we see that diagram we are talking about.

So here we're telling -- the cruise line is telling the sailors, "Look, this is your course.  This is how you're going to go, and this is exactly where you are going to dock."

Isn't that right, sir?

A.   Yes.

Q.   Next.

Here, the same thing, just from an actual overhead visual

view, telling the sailors where they're going to dock where the elevator is in case of the -- the alternate landing site is where the blue arrow is.  Right?

A.   That's right.

Q.   Thank you.  Next.

And then here just a different view of the same thing.  Correct?

A.   Yes.

Q.   And this would all be appropriate information to give the sailors before the tendering operation begins so they're properly supervised.  Isn't that true?

A.   So they are properly provided with knowledge that three knots does not create a wake and is a safe speed to pass by landing areas, docks.  Boats that are moored, three knots is a very safe speed that does not result in excessive wake.

Q.   Next, a view of the landing area in Cannes.

Correct?

A.   Yes.

Q.   Next, another view of the landing area.

Here we have the speed limit, the company-imposed speed limit of ten knots sailing from the cruise ship to the shore pontoon.  Do you see that?

A.   I do.

Q.   That's a good idea, right, to impose a speed limit on the sailors so they are not going too fast and not speeding.

Correct?

A.   Going slow is always good.

Q.   But the other side of that is you got to get to where you are going safely and reasonably.  Right?

A.   Safe speed, yes.

Q.   Yes, sir.

How far was the Norwegian Epic from the pier?

A.   I believe it was about a mile.

Q.   About a mile, yes, sir.

And at ten knots, how long would that take?

A.   A tenth of an hour, six minutes.

Q.   Yeah, six minutes.  I told you you were good in math.

So that transit, if he's going the maximum speed, would take ten minutes.  Correct?

A.   If he was doing ten knots, yes.

Q.   Okay.  Thank you.

Well, we know that when we first see the tender in the video, and we will get to the video in just a minute -- when we first see the tender in the video, according to your view of the case, he was going much slower than that.  Right?

A.   He was going six knots, according to my analysis, approximately six knots.

Q.   Here we have, yet another diagram showing the sailors where not to go, the no-go zone.  Right?

A.   Yes.

Q.   The waiting area.   Next.   And this is a summary overview.

The way this works is -- you've seen this before -- the way it works is, there is always going to be a tender at the ship, and there is always going to be a tender at the loading area at pier in Cannes, so the guests can just wait for the tender.  Right?

A.   Yes.

Q.   According to the information we have in evidence.

And you see here that at the end of the day when the tour buses arrive, all the tenders have to be there.  All hands on deck to get everybody back to the ship because you have a big surge of people.  Right?

A.   Yes.

Q.   And that's why all seven tender boats have to be on the pier side at the end of the day.  Correct?

A.   That's what it says, yes.

Q.   Oh, by the way, these tenders that we're talking about in this case, they're really a dual design, aren't they?

They are designed to be tender boats and life boats.

Isn't that true?

A.   They are both, that's correct, yes.

Q.   So to suggest that using this vessel, this craft as a tender boat would somehow be inappropriate is just not accurate.  Correct?

A.   Could you repeat that?

Q.   To suggest -- if somebody suggested that Norwegian's use of this boat, number five, as a tender boat -- because sometimes people call it life boat, to suggest that using this boat as a tender boat is inappropriate, that would be incorrect?

A.   That would be incorrect.  This was a tender boat.  It was being operated as a tender boat.

Q.   Right.  It has dual uses is what I am getting at?

A.   Yes, it can function as a lifeboat, it can function as a tender boat.

Q.   Have you seen the owner specifications in the owners manual for this vessel?

A.   I have.

Q.   And you know that the maximum capacity that's being used in the tender boat is about 230 guests?

A.   That's correct, yes.

Q.   And when it's being used as a lifeboat in an emergency, you can pack more people in, you got 260.  Correct?

A.   Correct.

Q.   And the testimony on this case is that the tender boat was full or nearly full on this transit that we are going to talk about in just a minute.  Correct?

A.   Yes.

Q.   Next, then the final parting words, "safety first," you agree that's a good thing to remind the crew of?

A.   Yes, I do.

Q.   Thank you.

Let's change gears, Captain, and talk about the actual operation and the events of October 25th.

MR. HICKEY:  Judge, I'm sorry to interrupt.

He's changing gears now.  Could I take three minutes?

Can we have a three-minute break?

THE COURT:  Sure.

Let's take a few minutes.  You can step down if you like.

(Recess.)

BY MR. MCALPIN:

Q.   Captain Keijer, there was a suggestion early on that an AB seaman is the second lowest ranking on the ship.

Do you recall that?

A.   I do recall that, yes.

Q.   You understand, of course, better than me, that AB seamen have to work their way up from being an ordinary seaman.

Correct?

A.   Correct.

Q.   They have to demonstrate some proficiency and have some experience in sailing and professional seamanship before they are promoted to be an AB seaman.  Correct?

A.   They are certain requirements that they need to -- and skills they need to have before they can become an AB, yes.

Q.   I don't think there is a written test, is there?

A.   I am not familiar with the exact requirements.

Q.   Okay.  But you would expect the bosun or the supervisor to say, okay, you met some proficiencies, you've been around a while, you've experience, you've got your sea legs, we are going to promote you to AB?

A.   Yeah, the bosun.

Q.   The bosun is like the supervisor of the sailors.  I call them sailors, the seaman?

A.   Yes.

Q.   So in this case, you are not suggesting that Mr. Buerano who as an AB seaman is not a skilled, experienced seafarer, are you?

A.   Skilled with respect to what I have seen on the CCTV is questionable to me.  As a tender operator, I don't believe he was very skilled, but as an AB he met the requirements for becoming an AB and fulfilling the function.

Q.   And he also had the requirements of being a certified tender operator?

A.   Certified tender operator, yes, according to the certificate.

Q.   According to the certification he had he worked in that capacity for a full two seasons.  Correct?

A.   Yes.

Q.   So you're not saying just because he is an AB seaman, he's a bum, he's not qualified to operate a tender boat or carry

guests?

You're not suggesting that, are you, Captain?

A.  I did not address that in my report that he was unqualified.  I did address in my report that certain training requirements weren't met, and that he lacked, from what I've observed, not only from on the CCTV, but also all the documentation that I've reviewed, he lacked the knowledge and competence to operate that tender.

Q.  Let's go to the CCTV.

We're going to have to change gears and talk about the actual operation, the actual incident now, and I hesitate to say operation because I don't want this to devolve into an operational discussion, although we are going to talk about operations to a certain extent because, at least in my view, that's not what this case is about, boat operation, per se.

Can we put up the CCTV?  It's Exhibit 29.

What I want to show you right now is the tender boat. We've seen this before.  This is the tender boat coming alongside the Epic.  Correct?

A.  It's the tender boat coming approaching the side of the Epic, yes.

Q.  I also want you to take note of the timestamp on the bottom left-hand corner?

A.  Yes.

Q.  That's 5:57 p.m. GMT?

A.   I see that.

Q.   All right.  Stop it there.

Go back to the shorter version because I want to be using that.  It's much easier to use.

Did I correctly hear you say that the Norwegian Epic was underway at the time of this incident?

A.   This incident occurred at, approximately, 6:01.  That's when the collision occurred.  Anchor was up, according to the logbooks, so they were underway, yes.

Q.   Well, sir, you've seen the logbook.

Can we put up Exhibit 14.052?

You have seen the logbooks in this case?

A.   I have, yes.

Q.   Did you look at the entries for the Epic on the time and date in question?

A.   I did.

Q.   So, can we put up 14.052, please?

We see the very first entry is, "Pilot aboard 1803."

Do you see that?

A.   No, I don't.

Yes, I do.  Yes, there it is.

Q.   That would indicate that the pilot, the guy who was going to steer the ship, never got on board until 6:03.  Right?

A.   Yes.

Q.   So that would have been after the incident.  Right?

A.   Correct.

Q.   So the Norwegian Epic would not be navigating without a pilot.  Correct?

A.   That's correct.

Q.   Okay.  Then if we go down to see the next one after, "bridge manning, anchors start to heave up," you see there again, "anchors heave up."  That means when they are beginning to hoist the anchor off the sea floor.

Heave up is an nautical term.  Right?

A.   Yes, 5:30 that occurred.

Q.   Do you see on the right hand it says 1803?

A.   I do.

Q.   That would indicate the anchors heave up at 1803?

A.   No, when I look at the time on left, 1738, 5:38 that's when it started to heave up the anchor.

Q.   What does the 1803 then refer to, sir?

A.   It is out of sequence.

The time before that, which would have been the time that was entered, according to you, before the 1803 entry, was made over an hour later, 7:10.  That makes no sense.

The correct time of sequence of entries in the logbook can be seen on the left.  1738 is when they started to heave anchor.

Q.   Okay.  Sir, according to the right-hand column of the logbook, the anchors only started to heave up after this

incident occurring.  Correct?

A.  No, incorrect.

Q.  You are saying that at 1738 the anchors were heaving up?

A.  That's when they started to heave anchor, 1738, correct.

Q.  Just because the anchors are starting to heave up does not mean that the ship is navigating.  Isn't that true?

A.  The vessel is officially underway when it makes no contact either through mooring lines on the shore or with an anchor at the seabed.

As soon as that anchor has been heaved off the bottom, that vessel is officially, according to the rules of the road, the call regs, underway.

MR. MCALPIN:  Let's call up the video, please.

THE COURT:  Excuse me, what exhibit is this?

You mentioned a number that does not correspond to the exhibit list.

MR. MCALPIN:  I mentioned 14.052.

THE COURT:  It's a part of Exhibit 14?

MR. MCALPIN:  Yes, each page is sequentially numbered because some exhibits have hundreds of page so each page is sequentially numbered.  So 14.052, part of Exhibit 14.

BY MR. MCALPIN:

Q.  This again is the CCTV.

You mentioned that there were three things that you say the operator did incorrectly.  That was his speed, his starboard

turn, and his attempt or his abrupt slowing down.

Correct?

A.  Yes, correct.

Q.  And the -- let's go ahead and play the video, and I want you to tell us where we see on the video that abrupt slowing down.  Just say stop.

A.  Stop.

Q.  Stopping right there?

A.  Yes.

Q.  Nine seconds into the video?

A.  Yes.

Q.  So the left-hand side, go ahead and back it up and tell us again.

What I want you to tell us, Captain, is when you say that this video shows the operator abruptly slowing down.

Okay.  Go ahead and say it again.  Play the video.

(Video played.)

A.  It's playing.

Can we go back, sorry.  I missed the start of it.

BY MR. MCALPIN:

Q.  Go ahead.  No problem.

A.  Stop.

Q.  You stopped it at 06 this time.  So, why do you say that?

What in the CCTV demonstrates to you that the operator has abruptly slowed the boat?

A.   The visual that I see on the CCTV indicates to me that right here the tender has slowed down or is slowing down, in the process of slowing down.

Q.   What visual?

A.   What I am seeing on the camera.

Q.   What are you seeing, just the movement of the boat slowing or the bow dropping down or raising up?

A.   No, I see the movement from the boat slowing down.  It's moving from right to left at a certain speed, and then a little bit later that vessel slows down.

Q.   Okay.  Let's play it all the way through.

Wait, let me finish at least the first ten seconds of it, and you're telling us that when we watch that at about second six that boat abruptly slows.

Is that what you're telling us?

A.   Can you play it back?

Let's do it again.

Q.   Okay.

(Video played.)

A.   Stop.

BY MR. MCALPIN:

Q.   So now you put it at seven seconds.

Okay.  You're in the area.

Let's go ahead and play it through for at least ten seconds, and just to be clear, your testimony is, Captain

Keijer, is that at about second six or second seven the boat abruptly slows down, and you can tell that just by looking at the movement of the object across the screen.  Correct?

A.   Movement from right to left at second seven is slower than the movement that I saw in the prior seconds, yes.

Q.   And you conclude from that that the vessel abruptly slowed, inappropriately so?

A.   Yes.

MR. MCALPIN:  Okay.  Let's go ahead and play it.

(Video played.)

BY MR. MCALPIN:

Q.   Okay.  You can stop it.

Did that demonstrate what you were talking about, Captain?

A.   Yes.

Q.   Now, in order to make an appropriate approach, you have to slow down.  Right?

A.   Advisable, yes, to slow down at some stage, sure.

Q.   You are not criticizing the operator for the speed that he was making prior to him slowing, are you?

A.   Six knots is excessive that close to the vessel and the tender pier.  I would have expected a reasonable tender operator to make that approach slower in order to not have to excessively slow down to come down to three or four knots.

Q.   Okay.  So you think that the speed he was going initially before there was this abrupt slowdown was excessive?

A.   Yes, this close to the ship, this close to the tender platform.  As you mentioned, you have to slow down at some stage, that stage was passed.  By the time that tender comes into view he is still doing six knots.  He is doing seven miles an hour.  That's fast.

Q.   That's too fast because Captain Keijer says it's too fast.
     Right?

A.   Based on my experience, 23 years on cruise ships, including in tenders.  It's similar to approaching a traffic light in your car, at a certain moment in time you know when you need to start pressing on those brakes in order to be stopping on time at a reasonable rate of deceleration.
     It's exactly the same with tenders.

Q.   You have no guideline, you have no rule, you have no regulation that says he was going too fast at that point where you say he abruptly slowed down.  Correct?

A.   It's based on my experience, skill, training and knowledge, yes.

Q.   Can you answer the question?
     You have no guideline, rule, regulation or law that requires a certain speed in that circumstance.  Isn't that true?

A.   That's true.

Q.   So, it's too fast, because I, Keijer, say it's too fast.
     Right?

A.   Yeah, correct.

Q.   Thank you.

Let's talk about wake.

You say that the wake overtook the tender and bounced up the hull and bounced back into the tender.  Did I summarize that correctly?

A.   Yes, you did.

Q.   Let's back up and I want you to show me the wake that is being created by this tender boat.

Tell me when to stop.  We can stop and we can point to it, Captain.

(Video played.)

A.   Stop.

BY MR. MCALPIN:

Q.   Stop it there.

We have the beauty of a touchscreen.  You can use your finger or I can give you a little pen and you can show me the wake.

A.   (Indicating.)  There, right there, right there, that's the wake.

Q.   Okay.  That's the wake coming off the tender boat.

Let's just continue.

(Video played.)

A.   Stop.

BY MR. MCALPIN:

Q.   Okay.

A.   Right here, wake wave, oops, a little bit up there.

Now it's starting to fan out.  Now it's starting to overtake his tender.

Q.   You contend that wave, that wake is now in front of the stern of the tender?

A.   No, it's still behind the tender.

Q.   So it's not overtaking the tender, is it?

A.   Not yet.

Q.   And we know, Captain Keijer, that wakes, the wave created as the ship pushes through the water and displaces water, that creates a wake or wave.  Right?

A.   Yes, it does.

Q.   And we know that that wake uniformly comes out from the stern of an object, whether it be a duck or a ship or anything else at about 19 degrees.  Right?

A.   That's correct, yes, sir.

Q.   So that wake comes out like in a V pattern from both sides of the stern of the boat.  Right?

A.   Yes.

Q.   And it goes out in back of the boat as the boat transits through the water.  Isn't that true?

A.   That's correct.

Q.   So the wake is behind the boat.  Isn't that right?

A.   The wake travels with the boat at a certain speed.  When

that vessel is doing six knots, the wake or those waves travel at a certain speed, which is, you know, relative to the speed of the vessel.

When that vessel slows down, that wake is still traveling at that higher speed and is going to overtake the vessel that just abruptly slowed down.

Q.   And the wake is also slowing down, isn't it?

A.   Sorry?

Q.   If the vessel is slowing, the wake is also slowing.  Isn't that true?

A.   The wake that was created when the vessel was doing six knots is still traveling at a higher speed.

The wake that is created at the moment that vessel does three knots is slower than the wake that is catching up with the tender.

Q.   Right.  And ultimately the wake dissipates.  The wake slows down.  That's why there's those references to wake if you're slowing down too fast waiting for the wake to dissipate, go away.  Right?

The wakes slow down.  They don't keep going forever across the ocean?

A.   They dissipate, yes.

Whether they slow down or not, I never touched on that. They continue to travel at a certain speed, but they do fade out and they display less amplitude or less height as time goes

on.

MR. MCALPIN:  Correct.

Let's go ahead and continue now with the video.

(Video played.)

BY MR. MCALPIN:

Q.   Now we see the operator starting to make his approach onto the tender, make his approach onto the tender platform.

Correct?

A.   Correct.

Q.   We know he has to turn to the right.  Otherwise, he is going to crash into the platform.  Right?

A.   Which he did, yes.

Q.   And we know at this point, according to you, he is traveling about three knots?

A.   Right here is about four knots, yes.

Q.   We will get to how you calculate that in just a minute.  Is that still too fast for you in your view?

A.   That's fast, yes.

MR. MCALPIN:  Go ahead and continue.

(Video played.)

BY MR. MCALPIN:

Q.   Now we see the boat.  You can see it pitch.  You see the bow come --the pitching is forward and aft like my hands?

A.   It's rolling is what I'm seeing.  I'm seeing a roll.

MR. MCALPIN:  Back it up a little bit, just a little

bit, Stephanie.

(Video played.)

BY MR. MCALPIN:

Q.   You see the bow start to lift up a little bit.

Go ahead and play.

(Video played.)

BY MR. MCALPIN:

Q.   Right there, is it pitching up some?

A.   That's rolling from left to right.

Q.   Well, okay, if you say so.  I see a pitch.

A.   I do not.

(Video played.)

BY MR. MCALPIN:

Q.   Now we see a roll side to side.  Correct?

A.   I saw a roll before, but I see it now too, just more excessive.

(Video played.)

BY MR. MCALPIN:

Q.   Stop it there, and now we see clearly waves coming from the bow of the tender toward the stern of the tender.  Correct?

A.   Incorrect, I do not see that.

That's his wake that he created that reverberates or re bounces back from the ship.

MR. MCALPIN:  Let's back it up a little bit and see if we can see that.

Let me clear --

(Video played.)

THE COURT:  You want the markings clear?

MR. MCALPIN:  Yes.

Go ahead and back it up to about 33 seconds, tender boat.  Stop it right there.

BY MR. MCALPIN:

Q.   The wake is here.

Sir, the wake is here and the wake is here.  Correct?

A.   Yes.

MR. MCALPIN:  Okay.  Continue.

How do I clear it?

(Video played.)

BY MR. MCALPIN:

Q.   Sir, we see wave action here and wave action here unrelated to the wake of the tender?

A.   We see wave action there, interference from the wake that was created by this tender, combined with the reverberating or re bouncing of that wake against that huge surface area of the cruise ship.  That creates confused seas, as I call them.

Q.   So your contention is that the rolling was caused by the vessel's own wake.  Right?

A.   Yes.

Q.   Which was the result of improper vessel operation. Correct?

A.   That was created by improper training.  This tender driver was not familiar with the effects of an abrupt slowdown from high speed to slow speed.

Q.   Because of that, he didn't drive the boat right?

A.   He didn't have the knowledge, that's correct.  He did not operate the boat correctly.

Q.   We see then -- just to continue, we see the contact and then the rolling which you measured after the fact.  Correct?

A.   Yes.

        MR. MCALPIN:  Continue there.

        (Video played.)

BY MR. MCALPIN:

Q.   Right there we see some contact.  Right?

A.   Well, some contact.  I would call it a collision, yes.

        (Video played.)

BY MR. MCALPIN:

Q.   And right now is when you are measuring the rolling. Correct?

A.   Yeah, thereabouts.

Q.   Stop it there.

        What's causing the tender to roll, again, is this wave action here.  Correct?

A.   No, incorrect.

Q.   What about this, Captain Keijer, what's that in front of the tender?

A.   Right here we have wave action.  Right here we have wave action there.  It's confused seas at this moment.  The wave caught up with that tender, bounced off the ship's side, returned back on the various angles, and that created confused seas, wave action.  And that's what I'm seeing here.

There is clearly a disturbance in the vicinity of where this tender was supposed to come alongside the tender platform that was not present way prior or during the approach of that tender when he was way out.

This occurs right now as he is right in the middle of his own wake.

Q.   Do you agree that there is wave action in front of the tender, in front of the bow of the tender?

A.   I do.  And I also have seen a stern thruster being operated prior to this.  The Norwegian Epic is -- as I mentioned, they have tendered up.  They're underway.  They're sitting in that location using their propulsion systems, one of which is the stern thruster, which can be seen producing a water flow from time to time.  That also has an effect on the wave action that we see on this camera.

Q.   Back to my question.  Would the tender operator's own wake be in front of the bow of the ship up in this area?

A.   It will be in the front.  It will be to the side, both sides.  It will be behind him.  It will be in the vicinity around this tender as we can see clearly on this CCTV footage.

Q.   Okay.  Let me move on, Captain.

You talked about speed and the way you measured the speed is by measuring how long it took the vessel to cross 56 feet, its own length.  Right?

A.   That's right.

Q.   You measured how long.  So if my finger is the camera, then if my pen is the tender, once you start -- you marked a certain spot and then you measured how much time it took for the vessel to cross in that frame.  Correct?

A.   Yes.

Q.   Okay.  And you know, of course, that that assumes that the camera is at a 90-degree angle to the object you're trying to measure.  Correct?

A.   Yes.

Q.   Because if it's at an angle -- for example, if I'm looking straight at the tender, I see a very small object, right?

It's going to pass through the field very quickly.  Right?

A.   Right.

Q.   If it's at an angle like this, like my pen is as opposed to a perfectly 90-degree angle -- the angle being like that, the 90-degree angle will be like that.  If it's at an angle, it's going to pass through your measured distance quicker, making the speed faster.  Isn't that true?

A.   I have taken those error calculations into consideration, as I explained.

Q.   Is what I said accurate?  Is what I said accurate?

A.   Repeat the question.

Q.   Sure.  You are assuming that when you're calculating the speed that object is at a 90-degree angle to the camera because you're measuring the time it takes for that object to pass through a certain distance.  Right?

A.   Right.

Q.   So, if the object is at an angle to the camera, not at a 90-degree perpendicular angle, it's going to appear to pass through that distance in a shorter period of time because you're looking at it from a side angle, and when it's a shorter period of time, it's going to make your calculations equate to a faster speed?

A.   I have taken the angle --

Q.   Is that true or not?  Then you can explain.

A.   No, I have taken the angle of approach into consideration in my calculations.

Q.   Is what I said --

A.   I know it's not a 90-degree --

Q.   Is what I said accurate?

A.   I know it's not --

THE COURT:  Hold on.  Let him finish his answer before you ask the next question.

THE WITNESS:  I have taken that approach angle into consideration.  I know that a tender or that camera is up

higher, that it's not exactly at 90 degrees, that the actual length of that tender that we see is not 56 feet, as I have explained during my Daubert.

I have calculated the maximum acceptable approach angle of the tender and that was 18.4 degrees.  This tender approached at a lesser angle than 18 degrees, which resulted in an error margin of, approximately, five percent, which was more than acceptable.

As you can see, my initial calculations to the tender speed are taken when that tender is more or less perpendicular to the camera.  As you can see, I have not taken any speed calculations as it turns to starboard even further, and that angle or the length of the tender becomes even less visible.

I've not done those calculations because my approach angle of 18 degrees was exceeded; therefore, my error margin became unacceptable.

BY MR. MCALPIN:

Q.   Are you finished?

A.   I am.

Q.   Thank you.

So you don't know the angle of the camera, vis-à-vis, the object, i.e., the tender.  Right?

You don't know if it was 90 degrees.  You don't know if it was 80 degrees.  You don't know if it was 70 degrees, and because you don't know the angle that that object was passing

in front of the camera, it's impossible for you to accurately calculate the speed the way you have done it, because, again, you are measuring an object as it's passing through a fixed point of view, a field of view, and if it's angled it's going to appear to pass through that point of view quicker, less time, which calculates into a higher speed.

Doesn't that basically make sense, Captain?

A.   Not to me, no.

Q.   Okay.  Thank you.

I will move on.

Now, the roll that you calculated was after the contact. Correct?

A.   Yes, correct.

Q.   Your understanding in this case is that the injury occurred because of the contact.  Correct?

A.   Contact/roll, a combination of both.  I'd say mainly the roll.  We have testimony from plaintiff that she slid from one side to the next and had to hold on to something and brace herself.

Q.   Right.

A.   So that indicates or that is -- that matches the rolling motion that we see on the CCTV that caused her to slide to one side.

Q.   And your indication, you've said it several times in your direct testimony, is that the operator should have warned and

that he had 25 seconds to warn.  Right?

A.  Correct.

Q.  So let's talk about that for a minute.  Let's go back to the beginning of the video.  I want to do the same thing, Captain.

Tell me when you're calculating the 25 seconds to start, and what in your mind triggers the start of the timer, that the boat is somehow out of control, that he knows there is going to be a crash, that he knows that something is awry?

What triggers, in your mind, the beginning of that 25 seconds within that framework where he should give the warning?

A.  That was a lot of questions in one go.  Can you provide me with one question?

Q.  Sure.  All I'm trying to ascertain is when do you start the timing, and why?

A.  I started at 25 seconds, was established by looking at the CCTV footage and noticing this roll that started in the tender. And had this gentleman been provided with the right training, boat handling, seamanship skills and knowledge, he would have been able to identify that in these sea conditions, which were flat, calm, that that would have been due to the wake that was catching up with his tender.

He knew that he was approaching the ship's side.  He should have known that the wake that was catching up with his tender

as he slowed down would have reverberated off the side of the ship and resulted in potentially even more roll.

Then he turned to starboard, so he created an even worse situation that exacerbated that roll even more, because with the reverberation of a lot of services, sea walls, cruise ships, the amplitude of a wave can actually be double from what it is originally.

Q.   So, just to put it simply, in your mind you begin the 25 seconds when you say there is a roll, and at that beginning the operator says, "Oh, my gosh, I'm going to crash, I need to give a warning."  Right?

A.   That is the first indication for the tender operator that wake is following up with his tender, catching up with his tender, and had he been trained properly, he could have predicted what was going to happen next.

Q.   Tell me when you begin running your clock because of this excessive roll that triggers -- that should have triggered in the captain's mind --

A.   25 seconds away from the collision.  Just play it back.

Q.   Tell me when it starts.  Make sure the timer is up on the screen.

Here we go, tell me when to stop.

(Video played.)

A.   Stop.

BY MR. MCALPIN:

Q.   I think you called it out at about 23 or 24 seconds.
Correct?

A.   (No verbal response.)

Q.   So right there, in your view, the operator knows he is in
trouble and the operator should have given a warning?

A.   He is not in trouble yet, but he should know what is coming
next, yes.

Q.   Because of the excessive roll?

A.   That is the result of the wake that is catching up with his
tender, yes.  Had he been properly trained, if he had the
proper knowledge, skills, he could have predicted what was
going to be occurring in close vicinity to the platform.

Q.   So at 25 seconds into this snippet, he should be on the
hailer, yelling, crash, crash, crash, something is going to
happen.  Right?

A.   He could.  He could slow down.  He could let the wake pass.
He could abort the maneuver.

     In this case, he decided to continue the maneuver.  Based
on his knowledge, which he should have had, he could have,
indeed, taken the PA system and made an announcement to the
guests.

Q.   Okay.  So let's just back it up to about ten seconds and
play it through, keeping in mind our notion of about 25 seconds
is when he should have started the warning in Captain Keijer's
view.

MR. HICKEY:  I'm sorry, what's the question?

MR. MCALPIN:  I want to show the video and then I will ask the question.

(Video played.)

BY MR. MCALPIN:

Q.  Clearly, at 43, 42 we see the roll much more pronounced.

So your view is that between 25 and 43 seconds here he should have given the warning.  Correct?

A.  That's correct, yes.

Q.  And what warning could have been given which would have been effective in this case?

A.  Brace yourselves.  Hold on to your seats.  There is going to be rolling.  It may be excessive rolling or we are about to collide with the platform.

Q.  Well, she already knew, based upon the other warnings, that there could be unexpected movement in a small boat like this. We went over that in some details.  Right?

A.  Yes, but if it actually occurs, it is very reasonable for an operator to repeat that message.  Just like an on airplane when you encounter turbulence that message is repeated at the time of the occurrence.

Q.  Well, you admit that she had already been warned of a possibility of an unexpected vessel movement?

You agree with that because we went over that before?

A.  Yes, I do.

Q.   And you saw Ms. Ruggeri's testimony that there were no handholds nearby.

Do you remember that in her testimony?

A.   I do.

Q.   What warning would have been effective if her testimony was accurate that there was nothing to hold on to?

A.   There were things to hold on to.  You could hold on to the bottom of your seat with both hands.  You can grab those.

You can hold onto your partner.  They provide some form of stability and balance.  You can hold on to your partner.  There are ways of being prepared for a roll on a tender.

Q.   And according to the plaintiffs, there were no handholds. Right?

A.   Handholds as in regular handholds, no, they were not available, but there were edges on seats that she could have held on to.  There were back rests that one could have put their hands on.  There were partners, there were friends that one could have held on to.

One could have firmly planted their feet on the ground to provide traction.  There are ways to stabilize yourself and counter a roll in a tender.

Q.   Yes, sir.  And you know, based upon her testimony, Ms. Ruggeri's testimony, that she did brace herself against that seat that ran along the perimeter of the tender.  Right?

You saw that in her testimony where she said she put out

her arm and braced herself?

A.   I do.

Q.   In fact, that's what she is arguing caused the injury, that bracing.  So, she, in fact, did brace herself according to her testimony?

A.   She did when she was already sliding on the seat, but in order to prevent that sliding motion, she could have, had she been provided with warning, taken different action to prevent her from sliding.

Q.   And in order to give an effective warning, the captain would have had to toggle that switch, lift up, get the microphone down, get the warning and by doing that, take his eyes off of maneuvering the vessel.  Right?

A.   He could have pulled that switch five minutes prior.  After he departed the dock from Cannes, he could have toggled that switch from aux to the talk mode in order to be ready for an eventuality.

That's what a prudent operator does, that in the case of an emergency he doesn't need to take all these steps of toggling a switch to the PA system setting.  That PA system is there to provide warnings to guest and should be ready to go.  It should be in an operational mode.

So no, he should not toggle that switch when the actual emergency occurs.  That should be done before.

Q.   And that's because, again, Keijer says so.  Right?

A.    No, that's not because Keijer says so.  That's because the reasonable requirement is to be prepared for emergencies and to minimize the risk of injury.  In emergencies, generally, time can be of the essence.  In order to create time, one needs to reduce the steps that need to be taken to operate a PA system in this instance.

It's not because Keijer says so.  That's regular marine practice based on my education, training and things that we are taught and things that Mr. Jomar should have been taught.

Q.    Captain Keijer, the warnings that you say should have been given in this interval that you've calculated to be 25 seconds, those are the warnings that we are talking about in this case that Norwegian failed to do, in your view.  Correct?

In that 25 second interval; Correct?

A.    That's correct, and those 25 seconds could have been changed to 50 seconds had he slowed down or aborted the entire maneuver.

Q.    Well, Captain, just taking that by extension, if he said brace for a crash when he left the pier in Cannes, you know, you could make the same argument.  It all comes down to when was there an opportunity to warn, and if so, would it have been effective in these circumstances.  Right?

A.    That opportunity became necessary when that vessel started to roll, which was approximately 25 seconds before the collision with the platform.

Q.   You're not faulting Norwegian's warnings that were given prior to that interval, whatever time, you know, the Court thinks that that interval should start to run.

You are not faulting their warnings given before that time. Correct?

A.   No, I am not.

Q.   Just in that specific moment, if you will?

A.   The moment before the collision and before the excessive roll warranted a warning or notification from the crew to Ms. Ruggeri that collision was imminent and that excessive roll is imminent?

MR. MCALPIN:  Your Honor, may I have just one moment? I think I'm finished.

THE COURT:  Okay.

MR. MCALPIN:  Thank you, sir.  I appreciate your patience with me.  I have nothing else.

THE WITNESS:  Thank you.

THE COURT:  All right.  Mr. Hickey.

(Excerpt was concluded at 4:56 p.m.)

C E R T I F I C A T E


        I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.




November 21, 2023          /s/Patricia Diaz
DATE                       PATRICIA DIAZ, FCRR, RPR, FPR
                           Official Court Reporter
                           United States District Court
                           400 North Miami Avenue, 11th Floor
                           Miami, Florida 33128
                           (305) 523-5178

1

**$**

**$455** [1] - 3:24
**$475** [1] - 5:7

**/**

**/s/Patricia** [1] - 89:9

**0**

**001** [1] - 35:16
**06** [1] - 65:23

**1**

**1** [1] - 1:9
**10** [2] - 8:21, 14:16
**11th** [2] - 2:4, 89:11
**12** [1] - 15:7
**13** [2] - 8:21, 15:13
**14** [2] - 64:18, 64:21
**14.052** [4] - 62:11, 62:17, 64:17, 64:21
**1400** [1] - 1:16
**1417** [3] - 36:14, 40:19, 41:3
**17** [4] - 10:3, 10:6, 46:17, 49:5
**1738** [4] - 63:14, 63:22, 64:3, 64:4
**18** [2] - 79:6, 79:15
**18.4** [1] - 79:5
**1803** [5] - 62:18, 63:11, 63:13, 63:16, 63:19
**19** [1] - 70:16

**2**

**20-CV-21961-DPG** [1] - 1:2
**2013** [3] - 33:15, 33:17, 33:23
**2018** [5] - 6:6, 41:24, 43:20, 43:23, 44:12
**2019** [2] - 44:3, 44:12
**2023** [2] - 1:5, 89:9
**21** [2] - 6:2, 89:9
**22** [1] - 16:10
**23** [2] - 68:8, 83:1
**230** [1] - 58:14
**24** [2] - 35:16, 83:1
**24.001** [2] - 36:9, 37:7
**25** [13] - 81:1, 81:6, 81:11, 81:17, 82:9, 82:19, 83:13, 83:23, 84:7, 87:11, 87:14, 87:15, 87:24

**25th** [2] - 44:3, 59:3
**260** [1] - 58:17
**2805** [1] - 1:19
**29** [1] - 61:16
**2:33** [1] - 1:6

**3**

**3** [1] - 2:12
**305** [2] - 2:5, 89:12
**32** [11] - 16:9, 19:16, 19:20, 19:22, 19:23, 19:25, 20:3, 20:10, 20:19, 21:14
**3200** [1] - 53:18
**32A** [9] - 21:8, 21:11, 21:12, 21:17, 21:20, 21:22, 21:25, 29:22, 32:8
**33** [1] - 74:5
**33128** [2] - 2:4, 89:12
**33130** [1] - 1:20
**33131** [1] - 1:16
**39A** [1] - 29:22

**4**

**4** [1] - 52:21
**40** [1] - 32:8
**400** [3] - 2:3, 45:14, 89:11
**42** [1] - 84:6
**43** [2] - 84:6, 84:7
**455** [1] - 4:6
**475** [4] - 4:3, 4:5, 4:6, 4:8
**4:56** [2] - 1:6, 88:19

**5**

**5** [1] - 52:21
**5.1** [4] - 10:7, 10:11, 10:16, 11:8
**5.10** [5] - 10:7, 10:11, 10:17, 15:22, 15:24
**5.11** [3] - 10:8, 15:1, 16:5
**5.12** [1] - 16:5
**5.13** [2] - 10:8, 16:6
**5.2** [3] - 10:10, 10:18, 11:4
**5.3** [1] - 11:21
**5.4** [1] - 12:9
**5.6** [1] - 13:3
**5.7** [1] - 13:19
**5.9** [1] - 14:1
**50** [3] - 45:7, 45:10, 87:16
**510** [1] - 1:16
**523-5178** [2] - 2:5,

89:12
**56** [2] - 77:3, 79:2
**5:30** [1] - 63:10
**5:38** [1] - 63:14
**5:57** [1] - 61:25

**6**

**6** [1] - 1:5
**6:01** [1] - 62:7
**6:03** [1] - 62:23

**7**

**7** [1] - 43:20
**70** [2] - 54:4, 79:24
**79** [1] - 6:2
**7:10** [1] - 63:20
**7th** [1] - 41:23

**8**

**8** [1] - 1:19
**80** [4] - 1:19, 53:17, 54:4, 79:24
**800** [1] - 52:21

**9**

**90** [2] - 79:1, 79:23
**90-degree** [6] - 77:12, 77:20, 77:21, 78:4, 78:9, 78:19
**911** [2] - 18:2, 18:7

**A**

**AB** [10] - 35:8, 59:12, 59:16, 59:22, 59:24, 60:5, 60:11, 60:15, 60:16, 60:24
**abandon** [2] - 34:18, 35:11
**abandoning** [1] - 34:21
**ability** [4] - 11:15, 11:16, 18:8, 50:8
**able** [4] - 11:24, 24:24, 46:9, 81:21
**aboard** [2] - 8:24, 62:18
**abort** [1] - 83:17
**aborted** [1] - 87:16
**above-entitled** [1] - 89:5
**above-named** [1] - 36:10
**abrupt** [4] - 65:1, 65:5, 67:25, 75:2
**abruptly** [7] - 65:15,

65:25, 66:14, 67:2, 67:6, 68:16, 71:6
**ABs** [1] - 35:7
**acceptable** [2] - 79:4, 79:8
**Acceptance** [1] - 36:15
**accident** [2] - 26:13, 44:20
**accompanied** [1] - 23:1
**accordance** [5] - 35:25, 36:10, 37:20, 41:3, 41:8
**according** [21] - 30:2, 38:4, 39:7, 40:3, 40:10, 40:12, 40:13, 40:19, 41:10, 56:19, 56:21, 57:8, 60:19, 60:21, 62:8, 63:19, 63:24, 64:11, 72:13, 85:12, 86:4
**accounting** [1] - 4:23
**accuracy** [2] - 40:14, 40:22
**accurate** [9] - 21:1, 21:2, 53:25, 57:24, 78:1, 78:20, 85:6, 89:4
**accurately** [1] - 80:1
**acted** [1] - 7:25
**acting** [1] - 9:15
**action** [15] - 11:1, 11:9, 12:7, 23:7, 25:3, 74:15, 74:17, 75:22, 76:1, 76:2, 76:5, 76:12, 76:19, 86:8
**actions** [1] - 9:5
**actual** [10] - 20:19, 34:19, 35:8, 50:18, 54:25, 59:2, 61:11, 79:1, 86:23
**addition** [2] - 27:1, 27:11
**additional** [3] - 27:13, 28:18, 29:19
**address** [2] - 61:3, 61:4
**adhere** [1] - 53:13
**administer** [1] - 38:25
**admit** [1] - 84:22
**advisable** [2] - 49:11, 67:17
**advised** [1] - 18:6
**advising** [1] - 18:1
**affects** [1] - 13:17
**aft** [1] - 72:23
**afternoon** [3] - 3:6, 3:7, 12:18

**ago** [3] - 16:22, 20:25, 21:4
**agree** [37] - 6:12, 7:3, 7:5, 7:6, 7:7, 15:19, 18:5, 18:13, 18:15, 18:20, 19:1, 22:21, 22:22, 23:5, 23:8, 24:15, 25:16, 26:11, 27:23, 29:1, 29:2, 29:3, 29:24, 30:22, 30:23, 31:7, 31:12, 32:1, 32:2, 32:4, 32:24, 39:14, 52:14, 58:24, 76:12, 84:24
**ahead** [12] - 42:6, 49:23, 65:4, 65:12, 65:16, 65:21, 66:24, 67:9, 72:3, 72:19, 73:5, 74:5
**airplane** [2] - 7:4, 84:19
**alleged** [1] - 37:22
**allow** [1] - 24:1
**allowed** [2] - 36:20, 40:18
**allowing** [1] - 25:14
**alongside** [7] - 6:20, 6:21, 7:1, 30:18, 31:1, 61:19, 76:7
**alternate** [1] - 55:2
**amplitude** [2] - 71:25, 82:6
**analysis** [1] - 56:21
**anchor** [7] - 62:8, 63:8, 63:15, 63:23, 64:4, 64:8, 64:10
**anchorage** [1] - 54:10
**anchors** [6] - 63:6, 63:7, 63:13, 63:25, 64:3, 64:5
**angle** [20] - 77:12, 77:15, 77:19, 77:20, 77:21, 78:4, 78:8, 78:9, 78:11, 78:14, 78:16, 78:24, 79:4, 79:6, 79:13, 79:15, 79:21, 79:25
**angled** [1] - 80:4
**angles** [1] - 76:4
**announcement** [8] - 48:15, 50:9, 50:11, 50:17, 50:21, 51:20, 52:10, 83:20
**answer** [9] - 30:14, 30:15, 33:3, 43:9, 43:10, 43:16, 45:20, 68:19, 78:22
**apart** [1] - 5:18
**appear** [2] - 78:9,

2

80:5

**APPEARANCES**[1] - 1:13

**append** [1] - 20:18

**applicable** [1] - 29:8

**apply** [2] - 17:3, 26:24

**appreciate** [3] - 21:6, 30:16, 88:15

**approach** [12] - 8:5, 13:21, 67:15, 67:22, 72:6, 72:7, 76:8, 78:16, 78:24, 79:4, 79:14

**approached** [1] - 79:6

**approaching** [6] - 22:17, 22:22, 30:20, 61:20, 68:9, 81:24

**appropriate** [9] - 25:17, 25:19, 47:15, 48:12, 48:16, 48:18, 49:8, 55:9, 67:15

**appropriateness** [1] - 47:13

**approval** [2] - 38:7, 38:12

**approve** [2] - 39:20, 39:23

**approved** [12] - 38:6, 38:10, 39:8, 39:15, 40:7, 40:8, 40:10, 40:11, 41:20, 42:1, 42:4, 43:18

**Approved** [1] - 38:15

**approves** [1] - 40:25

**area** [8] - 54:10, 55:16, 55:19, 57:1, 57:4, 66:23, 74:19, 76:22

**areas** [1] - 55:14

**arena** [1] - 5:21

**arguably** [1] - 10:8

**arguing** [1] - 86:3

**argument** [1] - 87:20

**arises** [1] - 24:21

**arm** [1] - 86:1

**arrange** [1] - 4:25

**arrival** [2] - 51:16, 51:25

**arrive** [1] - 57:10

**arrives** [1] - 26:7

**arrow** [2] - 50:25, 55:3

**ascertain** [1] - 81:15

**ashore** [1] - 19:7

**aspects** [3] - 12:19, 40:18

**aspirations** [2] - 37:12, 37:15

**assist** [1] - 24:1

**Association** [1] - 36:13

**assume** [3] - 26:5, 28:5, 43:5

**assumes** [3] - 28:1, 28:17, 77:11

**assuming** [2] - 47:21, 78:3

**assumption** [1] - 26:11

**attempt** [2] - 31:5, 65:1

**attention** [3] - 52:3, 52:18, 52:20

**audio** [8] - 20:11, 20:12, 20:20, 21:22, 32:8, 32:9, 51:7

**Aug** [1] - 51:4

**Authority** [3] - 38:21, 38:24, 39:8

**automatically** [2] - 7:24, 8:6

**aux** [1] - 86:16

**AUX** [2] - 50:12, 51:18

**auxiliary** [5] - 50:12, 50:16, 51:4, 52:2, 52:15

**AV** [1] - 35:3

**available** [2] - 50:2, 85:15

**Avenue** [3] - 1:16, 2:3, 89:11

**avoided** [2] - 7:19, 7:21

**aware** [4] - 10:1, 12:6, 13:16, 32:22

**awry** [1] - 81:9

**B**

**background** [3] - 3:23, 36:4, 47:13

**backpack** [1] - 22:5

**backs** [1] - 28:25

**bad** [1] - 47:25

**Bahamas** [7] - 1:7, 38:10, 38:21, 38:24, 39:3, 39:5, 39:8

**Bahamian** [1] - 38:25

**balance** [1] - 85:10

**based** [9] - 7:6, 26:11, 51:6, 68:8, 68:17, 83:18, 84:15, 85:22, 87:8

**basis** [1] - 34:1

**bathroom** [1] - 16:15

**beauty** [1] - 69:16

**became** [2] - 79:16,

87:23

**become** [2] - 35:13, 59:24

**becomes** [1] - 79:13

**becoming** [1] - 60:16

**BEFORE** [1] - 1:11

**began** [1] - 33:21

**begin** [2] - 82:8, 82:16

**beginning** [6] - 22:15, 25:11, 63:7, 81:4, 81:10, 82:9

**begins** [4] - 22:4, 22:24, 32:9, 55:10

**begun** [2] - 26:6, 47:4

**behalf** [3] - 3:9, 5:9, 5:22

**behind** [3] - 70:7, 70:24, 76:24

**belief** [1] - 9:14

**benefit** [1] - 34:22

**BERMAN** [1] - 1:21

**best** [1] - 50:21

**better** [2] - 33:25, 59:16

**between** [2] - 47:7, 84:7

**big** [4] - 23:16, 23:21, 24:11, 57:11

**billing** [14] - 4:11, 4:12, 4:14, 4:15, 4:16, 4:20, 4:21, 4:22, 4:24, 16:20, 16:21, 16:24, 17:1, 17:2

**bit** [6] - 66:10, 70:2, 72:25, 73:1, 73:4, 73:24

**blue** [1] - 55:3

**BMA** [6] - 38:15, 38:21, 40:1, 40:10, 40:25, 42:1

**board** [12] - 9:12, 17:13, 18:6, 18:8, 18:22, 23:15, 23:20, 34:9, 49:25, 50:6, 52:19, 62:23

**boarding** [3] - 22:6, 22:17, 22:22

**boat** [60] - 9:13, 9:22, 9:23, 10:1, 11:16, 11:18, 19:4, 23:6, 25:12, 27:1, 27:6, 28:11, 33:22, 34:1, 34:19, 35:19, 36:12, 44:16, 45:9, 45:10, 45:18, 46:1, 46:5, 48:4, 48:7, 57:23, 58:2, 58:3, 58:4, 58:5, 58:6, 58:9, 58:14,

58:19, 60:25, 61:15, 61:17, 61:18, 61:20, 65:25, 66:6, 66:8, 66:14, 67:1, 69:9, 69:21, 70:19, 70:21, 70:24, 70:25, 72:22, 74:6, 75:4, 75:6, 81:8, 81:20, 84:16

**boat's** [1] - 26:17

**boats** [13] - 23:21, 23:22, 27:10, 33:15, 33:22, 34:13, 34:23, 35:12, 55:14, 57:14, 57:19

**boats/tenders** [1] - 34:6

**body** [1] - 38:25

**bosun** [4] - 47:8, 60:2, 60:6, 60:7

**bottom** [3] - 61:22, 64:10, 85:8

**bounced** [3] - 69:4, 69:5, 76:3

**bounces** [1] - 73:23

**bouncing** [1] - 74:19

**bow** [6] - 66:7, 72:23, 73:4, 73:20, 76:13, 76:22

**brace** [6] - 15:3, 80:18, 84:12, 85:23, 86:4, 87:19

**braced** [1] - 86:1

**bracing** [1] - 86:4

**brakes** [1] - 68:11

**break** [2] - 16:15, 59:6

**breakwater** [3] - 53:3, 53:4, 53:8

**BRETT** [1] - 1:21

**Brickell** [1] - 1:16

**bridge** [2] - 49:15, 63:6

**brought** [1] - 4:12

**Buerano** [12] - 33:10, 35:20, 38:3, 41:25, 43:2, 43:12, 43:15, 43:18, 45:17, 45:25, 47:3, 60:10

**Buerano's** [2] - 44:9, 46:5

**bullet** [1] - 53:16

**bum** [1] - 60:25

**burden** [1] - 41:13

**buses** [1] - 57:10

**business** [1] - 1:7

**BY** [28] - 2:1, 2:12, 3:5, 5:4, 17:10, 21:15, 39:18, 49:6, 59:11, 64:22, 65:20, 66:21, 67:11, 69:14, 69:25,

72:5, 72:21, 73:3, 73:7, 73:13, 73:18, 74:7, 74:14, 75:12, 75:16, 79:17, 82:25, 84:5

**C**

**cabins** [2] - 17:17, 26:10

**calculate** [2] - 72:16, 80:2

**calculated** [3] - 79:4, 80:11, 87:11

**calculates** [1] - 80:6

**calculating** [2] - 78:3, 81:6

**calculations** [6] - 77:24, 78:12, 78:17, 79:9, 79:12, 79:14

**calm** [3] - 18:10, 18:17, 81:22

**calmest** [1] - 31:23

**camera** [10] - 66:5, 76:20, 77:6, 77:12, 78:4, 78:8, 78:25, 79:11, 79:21, 80:1

**Cannes** [7] - 44:16, 46:15, 52:8, 55:16, 57:5, 86:15, 87:19

**cannot** [1] - 12:7

**capacity** [2] - 58:13, 60:22

**captain** [5] - 5:1, 17:11, 21:23, 40:13, 86:10

**Captain** [28] - 3:6, 10:11, 10:12, 12:17, 16:21, 26:4, 29:16, 31:7, 33:7, 35:17, 47:24, 53:1, 59:2, 59:12, 61:2, 65:14, 66:25, 67:13, 68:6, 69:11, 70:10, 75:24, 77:1, 80:7, 81:5, 83:24, 87:10, 87:18

**captain's** [1] - 82:18

**car** [1] - 68:10

**care** [2] - 7:15, 28:24

**career** [1] - 35:22

**careful** [4] - 23:22, 25:7, 31:22, 33:1

**Caribbean** [1] - 44:23

**carry** [1] - 60:25

**case** [32] - 4:9, 5:14, 5:16, 8:12, 8:15, 9:2, 17:4, 17:19, 17:25, 18:2, 24:6, 25:15, 26:14, 27:22, 28:8,

31:3, 35:11, 38:9, 47:18, 54:5, 55:2, 56:20, 57:18, 58:19, 60:10, 61:15, 62:12, 80:14, 83:18, 84:11, 86:18, 87:12

**CASE** [1] - 1:2

**cases** [2] - 6:2, 6:3

**catching** [5] - 71:14, 81:23, 81:25, 82:13, 83:9

**category** [3] - 13:12, 13:14, 13:18

**caught** [1] - 76:3

**caused** [3] - 74:21, 80:22, 86:3

**causing** [2] - 25:13, 75:21

**caution** [1] - 22:17

**cautious** [1] - 23:15

**CCTV** [10] - 60:13, 61:6, 61:9, 61:16, 64:23, 65:24, 66:1, 76:25, 80:22, 81:18

**CD** [7] - 50:11, 51:12, 51:14, 51:15, 51:25, 52:7, 52:8

**Center** [1] - 38:15

**center** [8] - 39:9, 39:16, 39:24, 40:7, 40:11, 41:1, 41:21, 50:24

**certain** [21] - 12:19, 33:9, 34:11, 40:18, 42:8, 42:15, 42:16, 47:23, 53:13, 54:11, 59:23, 61:4, 61:14, 66:9, 68:10, 68:21, 70:25, 71:2, 71:24, 77:7, 78:6

**certificate** [16] - 35:19, 36:1, 36:7, 36:9, 36:12, 37:17, 37:22, 38:4, 39:7, 40:12, 40:13, 40:15, 40:23, 41:23, 42:3, 60:20

**certificated** [1] - 37:19

**certificates** [2] - 35:22, 36:2

**certification** [1] - 60:21

**certifications** [1] - 36:24

**certified** [5] - 39:9, 43:22, 44:5, 60:17, 60:19

**certify** [1] - 89:3

**certifying** [2] - 37:18,

41:2

**chance** [1] - 33:12

**change** [7] - 18:12, 33:7, 46:12, 52:2, 52:16, 59:2, 61:10

**changed** [1] - 87:16

**changing** [1] - 59:5

**charge** [3] - 4:4, 5:5

**charges** [1] - 4:4

**charging** [1] - 3:24

**checked** [2] - 48:24, 48:25

**checklist** [4] - 48:1, 49:13, 49:16, 49:19

**circular** [6] - 36:19, 36:20, 37:20, 41:8, 41:10, 42:16

**Circular** [2] - 40:19, 41:3

**circumstance** [2] - 52:6, 68:21

**circumstances** [4] - 8:10, 8:11, 35:2, 87:22

**clean** [1] - 43:10

**clear** [8] - 14:10, 20:2, 22:9, 39:19, 66:25, 74:1, 74:3, 74:12

**cleared** [1] - 53:8

**clearly** [4] - 73:19, 76:6, 76:25, 84:6

**CLIA** [1] - 36:14

**clock** [1] - 82:16

**close** [4] - 67:20, 68:1, 83:12

**closer** [1] - 19:10

**collect** [1] - 49:16

**collide** [1] - 84:14

**collision** [10] - 14:2, 14:9, 15:8, 15:24, 62:8, 75:14, 82:19, 87:25, 88:8, 88:10

**column** [1] - 63:24

**combination** [1] - 80:16

**combined** [1] - 74:18

**coming** [9] - 3:21, 4:9, 30:18, 30:25, 61:18, 61:20, 69:21, 73:19, 83:6

**commencing** [1] - 46:22

**comment** [1] - 36:20

**common** [1] - 45:1

**communication** [1] - 49:25

**company** [6] - 4:4, 5:5, 50:4, 53:11, 53:21, 55:20

**company-imposed** [1] - 55:20

**compared** [1] - 32:23

**competence** [1] - 61:8

**competency** [2] - 34:14, 37:15

**complained** [1] - 46:5

**complaints** [1] - 46:10

**compliance** [1] - 41:24

**Composite** [2] - 21:12, 21:20

**composite** [3] - 20:2, 21:13, 21:22

**computers** [1] - 41:17

**conclude** [1] - 67:6

**concluded** [1] - 88:19

**conclusion** [1] - 37:5

**condition** [10] - 11:22, 12:5, 12:6, 13:4, 14:17, 14:19, 14:21, 16:2, 16:4

**conditions** [9] - 8:5, 14:16, 15:23, 23:10, 35:1, 35:6, 54:3, 81:21

**confused** [3] - 74:20, 76:2, 76:4

**conjunction** [3] - 17:18, 46:20, 47:22

**connection** [1] - 25:3

**consideration** [3] - 77:24, 78:16, 78:25

**contact** [13] - 4:23, 6:13, 6:15, 6:17, 7:12, 18:2, 30:12, 64:7, 75:7, 75:13, 75:14, 80:11, 80:15

**contact/roll** [1] - 80:16

**contained** [1] - 43:14

**containing** [1] - 42:8

**contend** [1] - 70:5

**contention** [1] - 74:21

**continue** [10] - 14:8, 52:24, 69:22, 71:24, 72:3, 72:19, 74:11, 75:7, 75:10, 83:18

**continued** [1] - 16:5

**continuously** [2] - 26:8, 26:9

**continuum** [1] - 7:10

**contracts** [1] - 44:11

**contradict** [1] -

32:18

**contribute** [1] - 10:19

**control** [2] - 52:19, 81:8

**corner** [1] - 61:23

**Correct** [6] - 10:3, 11:12, 13:13, 24:4, 59:22, 87:14

**correct** [122] - 3:25, 4:8, 4:21, 5:9, 5:15, 5:16, 5:17, 5:20, 5:22, 5:23, 6:1, 6:7, 6:18, 6:19, 7:15, 9:1, 10:9, 10:17, 11:6, 11:13, 11:15, 11:18, 12:10, 12:11, 12:12, 13:6, 13:8, 13:25, 14:11, 14:13, 15:3, 15:4, 18:3, 19:12, 22:13, 22:24, 23:10, 23:13, 23:17, 24:22, 25:9, 25:10, 25:23, 26:24, 28:17, 30:2, 30:3, 31:1, 31:4, 33:2, 34:10, 35:20, 35:21, 37:13, 37:14, 37:15, 38:11, 39:25, 40:8, 40:12, 41:4, 41:17, 42:4, 43:10, 44:21, 48:7, 48:10, 51:11, 51:16, 53:7, 53:10, 55:7, 55:17, 56:1, 56:14, 57:15, 57:21, 57:24, 58:15, 58:17, 58:18, 58:21, 59:18, 59:19, 60:22, 61:19, 63:1, 63:3, 63:4, 63:21, 64:1, 64:4, 65:2, 65:3, 67:3, 68:16, 69:1, 70:17, 70:23, 72:2, 72:8, 72:9, 73:14, 73:20, 74:9, 74:25, 75:5, 75:8, 75:18, 75:22, 77:9, 77:13, 80:12, 80:13, 80:15, 81:2, 83:2, 84:8, 84:9, 87:13, 87:15, 88:5

**correctly** [4] - 14:23, 62:5, 69:6, 75:6

**correspond** [1] - 64:15

**corroborating** [2] - 30:4, 30:11

**COUNSEL** [1] - 1:21

**counter** [1] - 85:21

**country** [1] - 49:10

**couple** [3] - 20:25, 21:4, 30:17

**course** [15] - 12:14, 14:12, 15:14, 28:1, 28:17, 33:25, 37:19, 38:6, 38:8, 40:17, 42:25, 53:1, 54:20, 59:16, 77:11

**course-specific** [1] - 42:25

**court** [2] - 4:10, 5:6

**Court** [6] - 2:2, 2:3, 20:16, 88:2, 89:10, 89:11

**COURT** [22] - 1:1, 3:2, 5:3, 16:10, 16:16, 17:7, 20:2, 20:7, 20:13, 20:21, 21:7, 21:12, 39:12, 39:17, 49:4, 59:7, 64:14, 64:18, 74:3, 78:22, 88:14, 88:18

**covered** [4] - 38:1, 40:17, 41:9, 42:16

**craft** [2] - 52:4, 57:22

**crash** [7] - 72:11, 81:9, 82:10, 83:14, 87:19

**create** [5] - 11:25, 12:5, 12:6, 55:13, 87:4

**created** [12] - 14:17, 14:22, 15:23, 69:9, 70:10, 71:11, 71:13, 73:22, 74:18, 75:1, 76:4, 82:3

**creates** [3] - 26:15, 70:12, 74:20

**creating** [1] - 13:3

**crew** [22] - 10:23, 23:14, 24:1, 25:13, 25:20, 26:16, 27:5, 27:11, 28:12, 28:14, 29:12, 30:7, 31:16, 35:5, 35:10, 35:14, 41:1, 41:2, 50:3, 58:24, 88:9

**critical** [1] - 42:10

**criticizing** [1] - 67:18

**Cross** [1] - 2:9

**cross** [3] - 3:2, 77:3, 77:9

**CROSS** [1] - 3:4

**CROSS-EXAMINATION** [1] - 3:4

**CRUISE** [2] - 1:7, 1:22

**Cruise** [10] - 3:9, 5:10, 5:13, 11:8, 11:21, 33:17, 36:13, 41:7, 41:16, 43:1

**cruise** [16] - 5:9, 5:18, 5:25, 6:13, 6:15, 6:16, 7:24, 10:18, 37:3, 44:25, 54:19, 55:21, 68:8, 74:20, 82:5
**cycle** [1] - 45:1

## D

**dangerous** [10] - 11:22, 11:25, 12:5, 12:6, 14:17, 14:19, 14:21, 15:23, 16:2, 16:4
**DARRIN** [1] - 1:11
**DATE** [1] - 89:10
**date** [3] - 41:23, 44:3, 62:15
**dates** [1] - 44:13
**Daubert** [1] - 79:3
**days** [4] - 16:22, 20:25, 21:4, 26:9
**deal** [2] - 10:2, 13:10
**dealing** [1] - 19:7
**debarkation** [2] - 26:19, 26:22
**deceleration** [1] - 68:12
**decided** [1] - 83:18
**decision** [2] - 14:1, 14:8
**deck** [3] - 47:7, 49:16, 57:11
**defendant** [2] - 1:9, 16:21
**DEFENDANT** [1] - 1:18
**defense** [1] - 6:3
**deficiencies** [1] - 49:15
**deficiency** [1] - 49:1
**definitely** [1] - 47:25
**degrees** [8] - 70:16, 79:1, 79:5, 79:6, 79:15, 79:23, 79:24
**delaying** [1] - 13:21
**delivery** [1] - 3:18
**demonstrate** [2] - 59:20, 67:13
**demonstrates** [1] - 65:24
**departed** [2] - 52:8, 86:15
**departs** [1] - 51:11
**departure** [4] - 51:9, 51:16, 51:25, 52:7
**deposition** [3] - 5:12, 33:12, 33:14
**deprived** [1] - 15:2

**design** [1] - 57:18
**designed** [1] - 57:19
**despite** [2] - 14:8, 26:25
**detail** [1] - 36:21
**details** [4] - 8:4, 37:24, 44:17, 84:17
**developed** [1] - 26:13
**developing** [1] - 24:24
**develops** [2] - 24:14, 24:22
**devolve** [1] - 61:12
**devoted** [1] - 4:9
**diagram** [3] - 53:4, 54:18, 56:23
**DIAZ** [2] - 2:2, 89:10
**Diaz** [1] - 89:9
**different** [5] - 34:25, 35:5, 36:23, 55:6, 86:8
**dinghies** [1] - 35:15
**direct** [1] - 80:25
**Direct** [1] - 2:9
**direction** [1] - 18:12
**disagree** [1] - 28:3
**discretion** [3] - 54:2, 54:6, 54:15
**discussion** [1] - 61:13
**disembark** [2] - 31:16, 32:21
**disembarkation** [2] - 24:5, 26:3
**disembarking** [1] - 32:21
**disembarks** [1] - 35:14
**displaces** [1] - 70:11
**display** [2] - 49:12, 71:25
**dispute** [6] - 37:23, 38:2, 38:5, 40:14, 40:22, 41:6
**disputes** [1] - 30:6
**dissipate** [2] - 71:18, 71:22
**dissipates** [1] - 71:16
**distance** [3] - 77:22, 78:6, 78:10
**distinguish** [1] - 21:9
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [2] - 2:3, 89:11
**disturbance** [2] - 25:5, 76:6
**divert** [1] - 52:18

**diverting** [1] - 52:20
**DIVISION** [1] - 1:2
**dock** [12] - 9:10, 9:12, 14:1, 14:8, 18:22, 30:20, 31:24, 34:8, 54:21, 55:1, 86:15
**dockage** [1] - 54:10
**docked** [3] - 18:11, 18:15, 18:17
**docking** [1] - 11:10
**docks** [1] - 55:14
**document** [7] - 35:17, 37:7, 40:1, 40:3, 41:9, 41:17, 53:5
**documentation** [9] - 32:16, 37:25, 38:2, 38:5, 38:14, 40:16, 40:20, 53:12, 61:7
**done** [8] - 34:12, 40:1, 47:17, 51:24, 52:21, 79:14, 80:2, 86:24
**dory** [1] - 34:2
**double** [1] - 82:6
**down** [47] - 9:12, 10:14, 12:10, 13:21, 16:17, 24:10, 25:11, 25:14, 25:21, 26:17, 27:6, 27:12, 28:15, 28:22, 29:13, 30:17, 31:22, 59:8, 63:5, 65:1, 65:6, 65:15, 66:2, 66:3, 66:7, 66:8, 66:10, 67:2, 67:16, 67:17, 67:23, 68:2, 68:16, 71:4, 71:6, 71:7, 71:17, 71:18, 71:20, 71:23, 82:1, 83:16, 86:12, 87:16, 87:20
**downstairs** [1] - 23:24
**drill** [2] - 35:5, 35:11
**drills** [9] - 33:22, 34:1, 34:4, 34:5, 34:11, 34:14, 34:16, 34:21
**drive** [1] - 75:4
**driver** [3] - 50:3, 52:3, 75:1
**driving** [3] - 34:23, 45:10, 52:19
**dropping** [1] - 66:7
**drove** [2] - 44:15, 45:8
**dual** [2] - 57:18, 58:7
**duck** [1] - 70:15
**due** [3] - 7:18, 31:24,

81:22
**during** [17] - 11:9, 24:5, 26:1, 26:8, 26:22, 27:6, 27:7, 34:13, 34:21, 35:5, 44:10, 44:12, 45:7, 46:1, 46:7, 76:8, 79:3

## E

**early** [1] - 59:12
**ease** [1] - 20:15
**easier** [1] - 62:4
**easily** [1] - 51:24
**edges** [1] - 85:15
**educated** [1] - 42:12
**education** [1] - 87:8
**effect** [1] - 76:19
**effective** [6] - 28:3, 28:19, 84:11, 85:5, 86:10, 87:22
**effects** [3] - 9:13, 11:9, 75:2
**eight** [1] - 45:12
**eighty** [2] - 53:25, 54:1
**either** [5] - 11:23, 41:6, 51:13, 51:17, 64:8
**elevator** [1] - 55:2
**embark** [1] - 25:14
**embarkation** [8] - 24:5, 26:1, 26:2, 26:15, 26:19, 26:22, 27:6, 27:7
**embarking** [1] - 29:4
**emergencies** [3] - 52:12, 87:2, 87:3
**emergency** [10] - 14:6, 17:25, 18:2, 18:6, 34:3, 35:13, 54:5, 58:16, 86:19, 86:24
**encompassed** [1] - 10:16
**encounter** [1] - 84:20
**encountering** [1] - 34:25
**end** [4] - 44:21, 45:4, 57:9, 57:15
**engine** [1] - 53:22
**entered** [1] - 63:19
**entire** [2] - 26:8, 87:16
**entitled** [1] - 89:5
**entries** [2] - 62:14, 63:21
**entry** [2] - 62:18, 63:19

**Epic** [28] - 18:14, 18:19, 19:3, 23:3, 23:7, 23:9, 37:18, 38:15, 39:9, 39:15, 40:6, 40:11, 41:1, 41:20, 43:21, 44:10, 44:11, 44:23, 53:9, 53:14, 56:7, 61:19, 61:21, 62:5, 62:14, 63:2, 76:15
**equate** [2] - 8:6, 78:12
**equipment** [6] - 48:10, 48:13, 49:1, 49:25, 50:5, 52:13
**error** [3] - 77:24, 79:7, 79:15
**especially** [3] - 23:14, 24:13, 24:21
**ESQ** [4] - 1:14, 1:18, 1:18, 1:21
**essence** [1] - 87:4
**essentially** [1] - 26:20
**establish** [1] - 6:11
**established** [1] - 81:17
**estimate** [1] - 4:19
**etiquette** [1] - 49:8
**evaluate** [3] - 11:8, 11:11, 11:13
**evaluation** [1] - 15:13
**events** [3] - 48:22, 49:3, 59:3
**eventuality** [2] - 52:5, 86:17
**evidence** [5] - 31:8, 37:25, 45:17, 47:18, 57:8
**exacerbated** [1] - 82:4
**exact** [3] - 33:16, 44:13, 60:1
**exactly** [4] - 20:8, 54:21, 68:13, 79:1
**EXAMINATION** [1] - 3:4
**example** [1] - 77:15
**exceeded** [1] - 79:15
**except** [1] - 35:3
**EXCERPT** [2] - 1:11, 3:1
**Excerpt** [1] - 88:19
**excessive** [10] - 14:2, 55:15, 67:20, 67:25, 73:16, 82:17, 83:8, 84:13, 88:8, 88:10
**excessively** [1] -

67:23
**excuse** [1] - 64:14
**exercise** [1] - 7:14
**exhibit** [6] - 19:6, 19:18, 46:18, 49:4, 64:14, 64:16
**Exhibit** [20] - 16:9, 16:10, 19:16, 19:23, 20:3, 20:19, 21:17, 21:19, 21:21, 21:25, 29:22, 36:9, 37:7, 46:17, 49:5, 61:16, 62:11, 64:18, 64:21
**exhibits** [1] - 64:20
**expect** [4] - 12:7, 16:3, 27:10, 60:2
**expectation** [1] - 26:16
**expected** [4] - 13:11, 29:10, 41:9, 67:21
**experience** [7] - 42:20, 44:8, 47:13, 59:21, 60:4, 68:8, 68:17
**experienced** [3] - 27:7, 27:11, 60:11
**expert** [1] - 5:21
**experts** [2] - 16:20, 17:3
**explain** [1] - 78:15
**explained** [2] - 77:25, 79:3
**exposed** [1] - 14:18
**exposing** [1] - 16:3
**Exposure** [1] - 14:16
**exposure** [1] - 15:22
**extension** [1] - 87:18
**extent** [2] - 21:7, 61:14
**extra** [1] - 22:16
**extract** [1] - 43:7
**eyes** [1] - 86:13

## F

**fact** [7] - 16:22, 23:12, 38:5, 47:19, 75:8, 86:3, 86:4
**factors** [1] - 7:6
**facts** [7] - 16:20, 26:13, 27:21, 31:3, 40:16, 45:21
**fade** [1] - 71:24
**failed** [4] - 7:14, 10:15, 87:13
**failing** [1] - 12:9
**failure** [9] - 11:8, 11:11, 12:20, 13:19, 15:10, 15:19, 15:20, 15:21, 15:25

**Failure** [3] - 13:3, 15:7, 15:13
**fair** [1] - 11:4
**fairly** [1] - 54:1
**falls** [2] - 13:12, 13:18
**familiar** [10] - 34:8, 36:2, 36:4, 37:6, 37:9, 46:18, 46:23, 46:24, 60:1, 75:2
**fan** [1] - 70:3
**far** [2] - 37:1, 56:7
**fast** [12] - 18:22, 53:21, 55:25, 68:5, 68:6, 68:15, 68:24, 71:18, 72:17, 72:18
**faster** [3] - 54:5, 77:23, 78:13
**fault** [3] - 7:18, 7:25, 9:23
**faulting** [2] - 88:1, 88:4
**FCRR** [2] - 2:2, 89:10
**February** [3] - 41:23, 43:20, 43:23
**fee** [3] - 4:4, 4:6, 5:7
**fees** [1] - 3:23
**feet** [3] - 77:3, 79:2, 85:19
**few** [5] - 6:11, 17:23, 24:10, 31:22, 59:8
**field** [2] - 77:17, 80:4
**figure** [2] - 4:21, 34:8
**filling** [1] - 48:19
**final** [2] - 43:7, 58:23
**finally** [4] - 15:1, 19:6, 21:21, 32:8
**findings** [2] - 10:12, 16:5
**fine** [2] - 21:5, 34:2
**Fine** [1] - 11:7
**finger** [2] - 69:17, 77:6
**finish** [2] - 66:12, 78:22
**finished** [3] - 5:1, 79:18, 88:13
**FIRM** [1] - 1:15
**firm** [1] - 4:23
**firmly** [1] - 85:19
**first** [18] - 3:22, 10:6, 19:21, 22:1, 22:7, 27:15, 28:10, 29:1, 29:22, 30:22, 32:1, 40:25, 56:17, 56:19, 58:23, 62:18, 66:12, 82:12
**five** [11] - 6:8, 14:16, 15:23, 16:2, 19:7, 44:11, 45:18, 46:7,

58:2, 79:7, 86:14
**five's** [1] - 13:3
**fixed** [1] - 80:3
**flag** [13] - 38:6, 38:7, 38:9, 39:3, 39:5, 39:8, 39:15, 39:20, 39:23, 43:18, 43:22, 49:8
**Flag** [1] - 36:14
**flags** [1] - 49:12
**flat** [1] - 81:22
**flick** [1] - 52:22
**flight** [1] - 40:10
**flipped** [1] - 52:9
**floor** [1] - 63:8
**Floor** [2] - 2:4, 89:11
**FLORIDA** [1] - 1:1
**Florida** [5] - 1:4, 1:16, 1:20, 2:4, 89:12
**flow** [1] - 76:18
**focus** [2] - 27:15, 34:17
**follow** [11] - 7:24, 12:24, 25:15, 27:3, 28:1, 28:8, 31:7, 31:8, 37:3, 40:21, 42:19
**followed** [6] - 10:18, 10:22, 10:23, 29:25, 31:6, 37:2
**following** [3] - 9:13, 24:7, 82:13
**footage** [2] - 76:25, 81:18
**FOR** [3] - 1:14, 1:18, 2:10
**foregoing** [1] - 89:3
**Forensic** [1] - 4:4
**Forensics** [1] - 5:24
**forever** [1] - 71:20
**form** [1] - 85:9
**forth** [5] - 34:9, 36:6, 36:23, 37:10, 37:11
**forward** [1] - 72:23
**four** [6] - 16:22, 18:9, 18:10, 67:23, 72:15
**FPR** [2] - 2:2, 89:10
**frame** [1] - 77:9
**framework** [1] - 81:11
**free** [2] - 22:5, 31:25
**Friday** [3] - 44:16, 45:6, 45:9
**friends** [1] - 85:17
**front** [9] - 10:4, 17:21, 70:5, 75:24, 76:12, 76:13, 76:22, 76:23, 80:1
**fulfilling** [1] - 60:16
**full** [5] - 6:5, 41:9, 58:20, 60:22
**full-time** [1] - 6:5

**function** [4] - 9:14, 58:8, 60:16

## G

**gangway** [1] - 23:25
**GAYLES** [1] - 1:11
**geared** [2] - 30:24, 34:16
**gears** [5] - 33:7, 46:12, 59:2, 59:5, 61:10
**general** [7] - 7:22, 8:2, 8:4, 23:5, 27:19, 49:7
**generally** [3] - 35:8, 42:23, 87:3
**gentleman** [1] - 81:19
**given** [11] - 17:12, 25:22, 25:25, 26:1, 26:25, 83:5, 84:8, 84:10, 87:11, 88:1, 88:4
**GMT** [1] - 61:25
**GOODMAN** [1] - 1:15
**Goodman** [1] - 16:23
**gosh** [1] - 82:10
**government** [1] - 38:25
**grab** [1] - 85:8
**great** [1] - 22:5
**ground** [1] - 85:19
**guess** [4] - 4:5, 21:2, 23:17, 25:16
**guest** [10] - 6:12, 18:1, 18:5, 19:9, 22:9, 24:3, 29:9, 46:4, 52:6, 86:21
**guests** [16] - 17:13, 18:5, 23:12, 23:14, 24:18, 25:7, 25:18, 25:22, 29:4, 29:5, 29:11, 50:9, 57:5, 58:14, 61:1, 83:21
**guideline** [2] - 68:14, 68:20
**guidelines** [6] - 36:5, 36:22, 37:2, 37:5, 37:11
**guy** [5] - 10:1, 35:4, 42:12, 52:21, 62:22

## H

**hailer** [1] - 83:14
**hailing** [1] - 50:17
**half** [2] - 44:2, 44:5
**Halloween** [2] - 44:4, 44:21

**hand** [5] - 24:1, 61:23, 63:11, 63:24, 65:12
**handholds** [4] - 85:2, 85:12, 85:14
**handle** [8] - 9:7, 9:9, 9:12, 9:18, 9:19, 10:1, 11:19, 16:2
**handling** [6] - 9:22, 9:23, 10:8, 10:13, 11:16, 81:20
**handrails** [4] - 22:6, 24:1, 24:4, 28:25
**hands** [7] - 22:5, 22:9, 31:25, 57:10, 72:23, 85:8, 85:17
**harbor** [1] - 31:23
**hard** [6] - 7:13, 7:17, 7:19, 7:20, 7:23, 8:6
**harder** [1] - 7:6
**hazardous** [4] - 13:4, 14:16, 14:18, 15:22
**head** [1] - 23:25
**hear** [2] - 33:3, 62:5
**heard** [1] - 30:13
**heart** [1] - 50:6
**heave** [9] - 63:6, 63:7, 63:9, 63:13, 63:15, 63:22, 63:25, 64:4, 64:5
**heaved** [1] - 64:10
**heaving** [1] - 64:3
**height** [1] - 71:25
**held** [6] - 34:4, 46:21, 47:17, 47:19, 85:16, 85:18
**helping** [1] - 34:8
**hence** [2] - 14:7, 42:17
**HENDRIK** [1] - 2:12
**Hendrik** [1] - 10:12
**hereby** [2] - 27:9, 89:3
**herself** [5] - 15:3, 80:19, 85:23, 86:1, 86:4
**hesitate** [1] - 61:11
**HEYWARD** [1] - 1:14
**Hickey** [2] - 20:16, 88:18
**HICKEY** [12] - 1:14, 1:15, 16:13, 16:19, 17:9, 19:18, 19:21, 19:23, 20:25, 21:11, 59:4, 84:1
**high** [1] - 75:3
**higher** [4] - 71:5, 71:12, 79:1, 80:6
**highlight** [1] - 17:24
**highlighted** [2] -

29:17, 38:18
**hoist** [1] - 63:8
**hold** [13] - 22:5, 22:10, 23:25, 24:3, 28:24, 78:22, 80:18, 84:12, 85:6, 85:7, 85:9, 85:10
**home** [2] - 18:7
**Honor** [5] - 4:25, 17:2, 20:14, 49:5, 88:12
**HONORABLE** [1] - 1:11
**host** [1] - 49:10
**hour** [8] - 3:24, 4:3, 4:7, 5:7, 54:11, 56:11, 63:20, 68:5
**hours** [1] - 4:9
**HOUSE** [1] - 1:21
**huge** [1] - 74:19
**hull** [1] - 69:5
**hundreds** [2] - 35:14, 64:20
**hunky** [1] - 34:2
**hunky-dory** [1] - 34:2
**hypothetical** [1] - 31:12

**I**

**i.e** [1] - 79:22
**idea** [4] - 22:7, 24:17, 53:24, 55:24
**identify** [3] - 11:25, 24:25, 81:21
**ignored** [1] - 37:3
**imminent** [3] - 14:9, 88:10, 88:11
**IMO** [4] - 36:18, 37:20, 40:20, 41:3
**impending** [1] - 15:8
**importance** [1] - 34:20
**important** [1] - 49:17
**impose** [1] - 55:24
**imposed** [1] - 55:20
**impossible** [1] - 80:1
**improper** [2] - 74:24, 75:1
**IN** [1] - 1:21
**IN-HOUSE** [1] - 1:21
**inadequately** [1] - 9:15
**inappropriate** [2] - 57:23, 58:4
**inappropriately** [1] - 67:7
**incident** [10] - 8:3, 10:19, 11:10, 43:25,

44:3, 61:11, 62:6, 62:7, 62:25, 64:1
**incidents** [1] - 45:22
**include** [2] - 15:13, 35:7
**including** [5] - 16:1, 17:4, 36:23, 50:8, 68:8
**incorrect** [6] - 4:1, 58:4, 58:5, 64:2, 73:21, 75:23
**incorrectly** [1] - 64:25
**indeed** [1] - 83:20
**indent** [1] - 51:22
**independent** [2] - 30:4, 30:6
**indicate** [2] - 62:22, 63:13
**indicates** [4] - 33:14, 38:14, 66:1, 80:21
**Indicating** [1] - 69:19
**indicating** [2] - 33:21, 45:25
**indication** [3] - 32:11, 80:24, 82:12
**indicators** [1] - 14:8
**information** [19] - 5:2, 20:4, 26:17, 27:9, 27:13, 29:13, 32:18, 45:19, 45:25, 46:2, 46:4, 46:8, 48:6, 48:9, 48:19, 49:13, 49:24, 55:9, 57:8
**initial** [1] - 79:9
**injury** [7] - 7:20, 10:20, 12:8, 28:15, 80:14, 86:3, 87:3
**inside** [2] - 48:7, 53:2
**inspection** [2] - 50:14, 50:15
**instance** [2] - 8:1, 87:6
**instant** [1] - 25:20
**instruct** [1] - 22:9
**instruction** [4] - 10:19, 19:16, 21:25, 28:1
**instructions** [9] - 10:22, 10:23, 11:2, 24:7, 25:15, 28:9, 31:6, 31:8, 31:9
**intercom** [7] - 50:8, 50:11, 50:16, 50:20, 52:2, 52:9, 52:15
**Intercom** [1] - 51:23
**interesting** [1] - 48:21
**interference** [1] -

74:17
**International** [1] - 36:13
**interrupt** [1] - 59:4
**interval** [4] - 87:11, 87:14, 88:2, 88:3
**introduced** [1] - 19:8
**involved** [3] - 35:8, 36:3, 47:9
**irrelevant** [2] - 32:2, 43:7
**issuance** [1] - 41:23
**issue** [2] - 13:5, 17:8
**issued** [4] - 35:24, 35:25, 36:12, 40:19
**issues** [5] - 10:7, 10:13, 15:19, 15:20, 15:21

**J**

**jackets** [1] - 48:13
**jetty** [1] - 32:23
**JOHN** [1] - 1:14
**joined** [1] - 33:17
**Jomar** [9] - 33:10, 35:20, 38:2, 41:25, 43:1, 43:12, 43:15, 43:18, 87:9
**Judge** [3] - 16:14, 16:19, 59:4
**JUDGE** [1] - 1:12
**jump** [1] - 42:6
**JURY** [1] - 1:11

**K**

**keep** [6] - 12:23, 22:5, 22:9, 31:25, 40:13, 71:20
**keeping** [2] - 53:17, 83:23
**KEIJER** [1] - 2:12
**Keijer** [16] - 3:6, 10:12, 12:17, 16:22, 29:16, 47:24, 59:12, 67:1, 68:6, 68:24, 70:10, 75:24, 86:25, 87:1, 87:7, 87:10
**Keijer's** [1] - 83:24
**Kentucky** [1] - 23:20
**kind** [4] - 7:4, 13:22, 15:25, 48:1
**kinds** [1] - 35:1
**knots** [18] - 53:1, 53:2, 54:11, 55:13, 55:14, 55:21, 56:10, 56:15, 56:21, 56:22, 67:20, 67:23, 68:4, 71:1, 71:12, 71:14,

72:14, 72:15
**knowledge** [14] - 9:6, 9:18, 11:17, 11:24, 12:14, 13:9, 13:16, 55:12, 61:7, 68:17, 75:5, 81:20, 83:11, 83:19
**known** [2] - 11:22, 81:25
**knows** [4] - 52:22, 81:8, 81:9, 83:4

**L**

**lack** [7] - 9:4, 9:25, 12:4, 13:9, 14:23, 14:25
**lacked** [2] - 61:5, 61:7
**landing** [11] - 7:13, 7:14, 7:17, 7:19, 7:20, 7:23, 8:6, 55:2, 55:14, 55:16, 55:19
**landings** [5] - 7:5, 7:6, 7:7, 7:9
**language** [2] - 17:22, 29:19
**large** [1] - 18:18
**last** [4] - 3:17, 15:19, 48:21, 53:16
**law** [1] - 68:20
**LAW** [1] - 1:15
**lawyer** [1] - 16:22
**least** [6] - 7:4, 10:2, 31:9, 61:14, 66:12, 66:24
**leaves** [2] - 51:14, 51:15
**leaving** [3] - 22:6, 32:14
**left** [8] - 61:23, 63:14, 63:22, 65:12, 66:9, 67:4, 73:9, 87:19
**left-hand** [2] - 61:23, 65:12
**legal** [1] - 37:5
**legs** [1] - 60:4
**length** [3] - 77:4, 79:2, 79:13
**less** [7] - 34:20, 54:3, 71:25, 79:10, 79:13, 80:5
**lesser** [1] - 79:6
**Letter** [1] - 36:14
**life** [10] - 33:15, 33:22, 34:1, 34:5, 34:13, 35:15, 42:20, 48:13, 57:19, 58:3
**lifeboat** [3] - 35:5,

58:8, 58:16
**lifeboats** [3] - 35:9, 35:10
**lift** [2] - 73:4, 86:11
**light** [1] - 68:9
**likely** [1] - 24:13
**limit** [10] - 52:25, 53:2, 53:5, 53:8, 53:9, 53:11, 55:20, 55:21, 55:24
**line** [9] - 5:9, 5:18, 7:25, 17:23, 18:10, 38:18, 47:12, 54:19
**LINE** [2] - 1:8, 1:22
**Line** [8] - 5:10, 5:13, 11:21, 33:17, 36:13, 41:7, 41:16, 43:1
**lines** [9] - 5:25, 10:18, 18:24, 24:10, 25:11, 30:17, 31:22, 37:3, 64:8
**Lines** [2] - 3:9, 11:8
**LISA** [1] - 1:15
**list** [2] - 20:9, 64:16
**listen** [2] - 10:11, 45:24
**listing** [1] - 20:3
**living** [1] - 5:24
**load** [5] - 53:17, 53:22, 53:25, 54:1, 54:3
**loading** [1] - 57:4
**location** [1] - 76:17
**logbook** [5] - 48:19, 48:23, 62:10, 63:21, 63:25
**logbooks** [4] - 48:24, 49:1, 62:9, 62:12
**Look** [1] - 54:20
**look** [6] - 10:3, 38:18, 45:21, 50:22, 62:14, 63:14
**looking** [5] - 52:19, 67:2, 77:15, 78:11, 81:17
**lower** [1] - 35:12
**lowering** [3] - 34:5, 34:19, 35:9
**lowest** [1] - 59:13
**LTD** [1] - 1:7

**M**

**maneuver** [4] - 11:10, 83:17, 83:18, 87:17
**maneuvering** [5] - 9:21, 30:18, 30:25, 52:4, 86:13
**manning** [1] - 63:6

**manual** [2] - 50:18, 58:10

**margin** [2] - 79:7, 79:15

**marine** [1] - 87:7

**Maritime** [3] - 38:21, 38:24, 39:8

**maritime** [3] - 5:21, 5:25, 39:1

**mark** [2] - 21:5, 21:8

**marked** [1] - 77:7

**markings** [1] - 74:3

**marks** [1] - 42:18

**matches** [1] - 80:21

**material** [3] - 38:1, 38:13, 43:6

**materials** [11] - 33:9, 36:5, 38:10, 39:20, 41:21, 41:25, 43:1, 43:8, 43:11, 43:17

**math** [4] - 45:13, 45:14, 56:12

**matter** [1] - 89:5

**MATTHEW** [1] - 1:18

**maximum** [3] - 56:13, 58:13, 79:4

**mCALPIN** [1] - 66:21

**MCALPIN** [53] - 1:18, 2:12, 3:3, 3:5, 4:25, 5:4, 16:11, 17:10, 19:20, 19:22, 19:25, 20:6, 20:8, 20:12, 20:14, 21:10, 21:15, 39:18, 49:5, 49:6, 59:11, 64:13, 64:17, 64:19, 64:22, 65:20, 67:9, 67:11, 69:14, 69:25, 72:2, 72:5, 72:19, 72:21, 72:25, 73:3, 73:7, 73:13, 73:18, 73:24, 74:4, 74:7, 74:11, 74:14, 75:10, 75:12, 75:16, 79:17, 82:25, 84:2, 84:5, 88:12, 88:15

**McAlpin** [3] - 3:8, 21:1, 40:4

**mean** [7] - 7:13, 9:10, 14:17, 27:3, 46:9, 51:6, 64:6

**means** [7] - 11:13, 14:18, 27:9, 34:18, 36:18, 52:8, 63:7

**measure** [1] - 77:13

**measured** [5] - 75:8, 77:2, 77:6, 77:8, 77:22

**measuring** [4] - 75:17, 77:3, 78:5, 80:3

**meeting** [3] - 46:25, 47:14, 47:15

**meetings** [6] - 46:21, 47:4, 47:16, 47:17, 47:18, 47:22

**member** [2] - 41:1, 41:3

**members** [2] - 30:7, 35:5

**mentioned** [9] - 6:25, 8:18, 29:15, 52:25, 64:15, 64:17, 64:24, 68:2, 76:15

**message** [2] - 84:19, 84:20

**met** [4] - 3:10, 60:3, 60:15, 61:5

**MIAMI** [1] - 1:2

**Miami** [7] - 1:4, 1:16, 1:20, 2:3, 2:4, 89:11, 89:12

**microphone** [1] - 86:12

**middle** [1] - 76:10

**mile** [2] - 56:8, 56:9

**miles** [2] - 54:11, 68:4

**mind** [6] - 46:16, 81:7, 81:10, 82:8, 82:18, 83:23

**minimize** [4] - 7:20, 12:8, 52:12, 87:3

**minute** [10] - 8:3, 12:16, 15:18, 28:4, 50:23, 56:18, 58:21, 59:6, 72:16, 81:3

**minutes** [7] - 16:16, 56:11, 56:12, 56:14, 59:5, 59:8, 86:14

**missed** [1] - 65:19

**missing** [2] - 25:20, 40:18

**mode** [7] - 50:12, 50:16, 50:25, 51:3, 86:16, 86:22

**moment** [7] - 24:9, 68:10, 71:13, 76:2, 88:7, 88:8, 88:12

**monitor** [1] - 12:20

**moored** [2] - 32:21, 55:14

**mooring** [1] - 64:8

**morning** [1] - 46:21

**most** [1] - 44:25

**motion** [6] - 28:23, 29:10, 29:23, 32:22, 80:22, 86:7

**motoring** [1] - 34:6

**move** [19] - 16:7, 18:11, 18:14, 18:19, 18:23, 23:9, 23:15, 23:21, 24:13, 25:8, 25:9, 27:10, 28:11, 30:17, 31:23, 33:2, 51:21, 77:1, 80:10

**movement** [18] - 19:2, 19:4, 25:12, 26:18, 27:1, 27:7, 27:11, 29:14, 30:25, 33:5, 66:6, 66:8, 67:3, 67:4, 67:5, 84:16, 84:23

**moving** [15] - 19:15, 22:10, 22:16, 22:25, 23:2, 24:20, 25:2, 28:23, 29:5, 29:18, 31:24, 32:5, 32:10, 66:9

**MR** [64] - 2:12, 3:3, 3:5, 4:25, 5:4, 16:11, 16:13, 16:19, 17:9, 17:10, 19:18, 19:20, 19:21, 19:22, 19:23, 19:25, 20:6, 20:8, 20:11, 20:12, 20:14, 20:25, 21:10, 21:11, 21:15, 39:18, 49:5, 49:6, 59:4, 59:11, 64:13, 64:17, 64:19, 64:22, 65:20, 66:21, 67:9, 67:11, 69:14, 69:25, 72:2, 72:5, 72:19, 72:21, 72:25, 73:3, 73:7, 73:13, 73:18, 73:24, 74:4, 74:7, 74:11, 74:14, 75:10, 75:12, 75:16, 79:17, 82:25, 84:1, 84:2, 84:5, 88:12, 88:15

**MSC.1/Circ** [1] - 36:14

## N

**name** [1] - 3:8

**named** [1] - 36:10

**nautical** [1] - 63:9

**navigating** [2] - 63:2, 64:6

**NCL** [4] - 1:7, 9:7, 12:6, 14:25

**nearby** [1] - 85:2

**nearly** [1] - 58:20

**necessarily** [2] - 7:16, 35:3

**necessary** [2] - 24:2, 87:23

**necessity** [1] - 7:1

**need** [16] - 4:20, 4:23, 8:4, 37:2, 37:3, 37:24, 47:16, 50:11, 52:12, 53:12, 59:23, 59:24, 68:10, 82:10, 86:19, 87:5

**needs** [6] - 4:23, 7:19, 34:3, 42:4, 51:17, 87:4

**negligence** [2] - 9:24, 12:2

**negligent** [1] - 7:14

**never** [3] - 16:21, 62:23, 71:23

**Next** [1] - 55:5

**next** [24] - 19:15, 22:15, 23:24, 30:17, 38:18, 48:9, 48:19, 49:7, 49:12, 49:13, 49:24, 51:22, 54:18, 54:24, 55:16, 55:19, 57:1, 58:23, 63:5, 78:23, 80:18, 82:15, 83:7

**Nice** [1] - 3:21

**nice** [1] - 3:16

**nine** [1] - 65:10

**NO** [1] - 1:2

**no-go** [1] - 56:24

**none** [2] - 10:23, 30:7

**normal** [1] - 54:1

**North** [2] - 2:3, 89:11

**NORWEGIAN** [2] - 1:7, 1:22

**Norwegian** [29] - 3:9, 5:10, 5:13, 11:8, 11:21, 18:14, 18:19, 23:7, 33:17, 37:17, 38:15, 39:9, 39:15, 40:6, 40:11, 40:25, 41:7, 41:16, 41:20, 43:1, 43:21, 44:10, 48:4, 53:14, 56:7, 62:5, 63:2, 76:15, 87:13

**Norwegian's** [4] - 12:1, 46:13, 58:1, 88:1

**Norweigian's** [1] - 11:11

**notch** [1] - 51:22

**note** [1] - 61:22

**noted** [2] - 48:23, 49:1

**nothing** [7] - 10:25, 11:5, 11:23, 25:16, 41:6, 85:6, 88:16

**noticing** [1] - 81:18

**notification** [1] - 88:9

**notify** [2] - 49:15, 52:6

**notion** [1] - 83:23

**notions** [1] - 9:1

**November** [2] - 1:5, 89:9

**Number** [2] - 46:17, 49:5

**number** [10] - 12:9, 14:16, 15:7, 15:23, 16:2, 18:13, 46:7, 53:16, 58:2, 64:15

**numbered** [3] - 45:18, 64:19, 64:21

**numbers** [2] - 10:5, 19:18

## O

**oath** [1] - 30:13

**object** [10] - 67:3, 70:15, 77:12, 77:16, 78:4, 78:5, 78:8, 79:22, 79:25, 80:3

**objection** [3] - 16:12, 16:13, 20:16

**observed** [1] - 61:6

**occasion** [1] - 34:11

**occupation** [1] - 6:5

**occurred** [4] - 62:7, 62:8, 63:10, 80:14

**occurrence** [1] - 84:21

**occurring** [2] - 64:1, 83:12

**occurs** [3] - 76:10, 84:18, 86:24

**ocean** [1] - 71:21

**October** [2] - 44:3, 59:3

**OF** [3] - 1:1, 1:11, 3:1

**office** [2] - 16:23

**officers** [2] - 47:7

**official** [1] - 2:2

**Official** [1] - 89:10

**officially** [2] - 64:7, 64:11

**old** [1] - 4:6

**once** [4] - 35:12, 52:7, 53:2, 77:7

**one** [30] - 5:13, 6:23, 11:7, 16:2, 18:13, 19:21, 21:16, 22:2, 22:4, 25:17, 25:19, 26:6, 27:9, 29:16, 29:17, 34:3, 48:21, 63:5, 76:17, 80:17, 80:22, 81:13, 81:14, 85:16, 85:18, 85:19, 87:4, 88:12

**ones** [1] - 24:12
**oops** [1] - 70:2
**operate** [8] - 14:5, 35:6, 37:20, 52:13, 60:25, 61:8, 75:6, 87:5
**operated** [2] - 58:6, 76:14
**operates** [3] - 35:3, 35:4, 35:10
**operating** [8] - 9:16, 14:23, 33:15, 33:22, 34:13, 45:18, 46:1, 53:25
**operation** [24] - 8:7, 8:16, 8:22, 9:20, 12:12, 13:5, 13:8, 13:12, 13:15, 13:24, 14:3, 14:11, 14:13, 46:5, 47:9, 48:25, 49:17, 55:10, 59:3, 61:11, 61:12, 61:15, 74:24
**operational** [8] - 9:23, 10:7, 10:13, 10:17, 34:7, 61:13, 86:22
**operations** [4] - 11:1, 46:22, 47:4, 61:14
**operator** [45] - 7:14, 7:18, 7:24, 9:6, 9:15, 11:9, 11:12, 11:17, 12:5, 12:7, 12:14, 12:15, 13:10, 13:16, 13:20, 14:12, 16:1, 33:8, 35:19, 35:20, 36:12, 40:17, 48:5, 51:7, 51:21, 52:11, 54:3, 54:6, 54:15, 60:14, 60:18, 60:19, 64:25, 65:15, 65:24, 67:18, 67:22, 72:6, 80:25, 82:10, 82:12, 83:4, 83:5, 84:19, 86:18
**operator's** [5] - 11:15, 14:7, 14:22, 54:2, 76:21
**operators** [3] - 5:25, 16:1, 41:8
**opining** [1] - 11:4
**opinion** [2] - 12:1, 22:13
**opinions** [6] - 8:21, 10:2, 10:17, 12:18, 12:24, 15:20
**opportunity** [5] - 15:3, 21:6, 34:7, 87:21, 87:23

**opposed** [3] - 8:22, 12:19, 77:19
**option** [1] - 50:20
**order** [25] - 4:20, 6:12, 6:20, 6:21, 7:19, 9:7, 9:9, 36:6, 41:20, 47:22, 50:10, 50:16, 51:17, 51:20, 52:2, 52:14, 52:18, 67:15, 67:22, 68:11, 86:7, 86:10, 86:16, 87:4
**ordinary** [1] - 59:17
**originally** [1] - 82:7
**OS** [1] - 33:18
**OSs** [2] - 35:7, 35:8
**otherwise** [3] - 12:23, 42:3, 72:10
**overhead** [1] - 54:25
**overtake** [2] - 70:4, 71:5
**overtaking** [1] - 70:8
**overtook** [1] - 69:4
**overview** [1] - 57:1
**own** [6] - 15:21, 53:11, 74:22, 76:11, 76:21, 77:4
**owner** [1] - 58:10
**owner's** [1] - 50:18
**owners** [1] - 58:10

## P

**p.m** [4] - 1:6, 61:25, 88:19
**PA** [11] - 50:1, 50:2, 50:15, 50:17, 50:18, 50:19, 52:19, 83:20, 86:20, 87:5
**pack** [1] - 58:17
**page** [15] - 10:3, 10:6, 18:9, 18:10, 19:7, 22:1, 22:4, 22:15, 29:21, 35:16, 49:7, 64:19, 64:20
**Pages** [1] - 1:9
**part** [29] - 6:16, 7:18, 12:13, 13:9, 14:25, 19:25, 20:19, 21:17, 21:19, 21:21, 24:3, 27:25, 28:7, 28:10, 28:11, 28:14, 33:5, 34:5, 34:11, 34:14, 35:10, 35:13, 40:25, 41:1, 41:2, 43:6, 64:18, 64:21
**particular** [2] - 27:19, 33:19
**parting** [1] - 58:23
**partner** [2] - 85:9, 85:10

**partners** [1] - 85:17
**parts** [1] - 42:16
**pass** [11] - 10:15, 13:3, 13:11, 13:20, 55:13, 77:17, 77:22, 78:5, 78:9, 80:5, 83:16
**passed** [4] - 37:18, 38:3, 38:4, 68:3
**passenger** [2] - 16:4, 24:6
**passengers** [7] - 15:16, 24:24, 26:16, 27:1, 27:7, 27:10, 27:12
**passing** [3] - 25:12, 79:25, 80:3
**past** [1] - 5:9
**patience** [1] - 88:16
**patient** [3] - 25:15, 27:25, 28:8
**PATRICIA** [2] - 2:2, 89:10
**pattern** [1] - 70:18
**pen** [3] - 69:17, 77:7, 77:19
**people** [7] - 23:18, 34:9, 35:25, 47:8, 57:12, 58:3, 58:17
**per** [4] - 3:24, 4:7, 54:11, 61:15
**percent** [7] - 6:2, 53:17, 53:25, 54:1, 54:4, 79:7
**perfectly** [1] - 77:20
**perimeter** [1] - 85:24
**period** [2] - 78:10, 78:12
**periodic** [1] - 34:1
**perpendicular** [2] - 78:9, 79:10
**person** [1] - 36:10
**persona** [1] - 48:13
**personal** [1] - 48:9
**pertain** [1] - 24:6
**pertained** [1] - 26:2
**pertains** [4] - 8:25, 26:15, 53:2
**phenomena** [1] - 13:17
**phone** [1] - 18:7
**photograph** [1] - 23:1
**physical** [1] - 41:7
**pick** [1] - 23:19
**picture** [1] - 50:22
**pier** [10] - 32:14, 51:9, 51:11, 51:15, 54:10, 56:7, 57:5, 57:15, 67:21, 87:19

**Pilot** [1] - 62:18
**pilot** [2] - 62:22, 63:3
**piss** [1] - 49:10
**pitch** [2] - 72:22, 73:10
**pitching** [2] - 72:23, 73:8
**place** [1] - 51:12
**plaintiff** [7] - 5:22, 6:2, 11:1, 14:18, 14:20, 20:23, 80:17
**Plaintiff** [2] - 1:5, 10:18
**PLAINTIFF** [2] - 1:14, 2:10
**Plaintiff's** [2] - 15:22, 16:10
**plaintiffs** [2] - 15:2, 85:12
**planted** [1] - 85:19
**platform** [18] - 6:14, 6:15, 6:18, 6:20, 6:21, 6:23, 7:1, 7:12, 30:12, 32:23, 52:1, 68:2, 72:7, 72:11, 76:7, 83:12, 84:14, 87:25
**play** [11] - 50:10, 51:17, 65:4, 65:16, 66:11, 66:16, 66:24, 67:9, 73:5, 82:19, 83:23
**played** [27] - 17:17, 19:10, 26:6, 26:8, 26:9, 26:25, 27:2, 32:13, 48:15, 52:8, 65:17, 66:19, 67:10, 69:12, 69:23, 72:4, 72:20, 73:2, 73:6, 73:12, 73:17, 74:2, 74:13, 75:11, 75:15, 82:23, 84:4
**playing** [5] - 51:13, 51:14, 51:25, 52:7, 65:18
**plays** [1] - 51:7
**point** [10] - 22:2, 23:17, 28:7, 52:7, 53:16, 68:15, 69:10, 72:13, 80:4, 80:5
**poles** [1] - 28:25
**pontoon** [1] - 55:22
**pop** [1] - 18:24
**port** [9] - 18:11, 18:15, 18:17, 19:11, 26:7, 26:9, 46:15, 51:15, 52:8
**position** [2] - 11:25, 51:8
**possess** [2] - 9:6, 9:17

**possibility** [2] - 19:3, 84:23
**potential** [1] - 32:5
**potentially** [2] - 52:6, 82:2
**Power** [1] - 46:25
**PowerPoint** [3] - 46:15, 46:19, 47:21
**practical** [1] - 43:14
**practice** [4] - 29:15, 34:23, 34:25, 87:8
**predicted** [2] - 82:15, 83:11
**prepared** [6] - 34:3, 52:5, 52:9, 52:11, 85:11, 87:2
**present** [2] - 6:23, 76:8
**presentation** [6] - 3:16, 3:17, 46:15, 46:20, 47:1, 47:21
**presented** [4] - 14:6, 21:4, 40:17, 41:11
**pressing** [1] - 68:11
**presumably** [1] - 35:24
**presume** [1] - 41:12
**prevent** [3] - 28:15, 86:7, 86:8
**principles** [1] - 29:8
**problem** [6] - 17:3, 24:25, 38:20, 45:18, 46:1, 65:21
**proceed** [1] - 54:12
**proceedings** [1] - 89:4
**PROCEEDINGS** [1] - 3:1
**process** [1] - 66:3
**produce** [1] - 41:16
**producing** [1] - 76:18
**professional** [1] - 59:21
**proficiencies** [1] - 60:3
**proficiency** [3] - 34:14, 34:19, 59:20
**program** [1] - 19:8
**promise** [1] - 24:9
**promote** [1] - 60:5
**promoted** [1] - 59:22
**pronounced** [1] - 84:6
**proof** [1] - 41:13
**proper** [1] - 83:11
**properly** [8] - 9:10, 11:18, 16:21, 16:24, 55:11, 55:12, 82:14, 83:10

**propose** [1] - 20:18
**proposition** [1] - 7:22
**propulsion** [1] - 76:17
**protective** [1] - 48:9
**provide** [7] - 4:21, 26:16, 29:13, 81:13, 85:9, 85:20, 86:21
**provided** [27] - 5:12, 8:19, 8:23, 9:3, 9:4, 9:7, 12:15, 15:15, 16:8, 27:2, 27:3, 27:13, 37:25, 38:12, 38:13, 43:3, 43:6, 43:9, 43:13, 43:15, 43:16, 45:19, 45:22, 46:8, 55:12, 81:19, 86:8
**providing** [2] - 15:1, 27:9
**provisions** [2] - 36:11, 36:13
**prudent** [1] - 86:18
**pull** [1] - 4:23
**pulled** [1] - 86:14
**pulling** [1] - 46:16
**purely** [2] - 12:12, 12:13
**pushes** [1] - 70:11
**put** [10] - 16:9, 19:16, 24:17, 61:16, 62:11, 62:17, 66:22, 82:8, 85:16, 85:25
**putting** [1] - 45:8

## Q

**qualified** [1] - 60:25
**quarrel** [1] - 37:4
**questionable** [1] - 60:14
**questions** [3] - 22:3, 42:8, 81:13
**quicker** [2] - 77:22, 80:5
**quickly** [4] - 10:14, 10:16, 18:23, 77:17

## R

**radios** [1] - 48:6
**raft** [1] - 35:15
**raising** [1] - 66:7
**ran** [1] - 85:24
**randomly** [1] - 23:19
**ranking** [1] - 59:13
**rate** [1] - 68:12
**re** [2] - 73:22, 74:19
**reach** [1] - 51:21

**read** [2] - 33:16, 33:20
**ready** [2] - 86:16, 86:21
**real** [1] - 17:1
**really** [5] - 17:7, 25:16, 30:9, 49:11, 57:18
**reason** [3] - 4:5, 28:16, 37:23
**reasonable** [8] - 7:9, 7:15, 15:2, 52:11, 67:21, 68:12, 84:18, 87:2
**reasonably** [10] - 9:8, 9:12, 9:16, 9:17, 10:1, 11:19, 13:10, 13:20, 16:3, 56:4
**recap** [1] - 39:19
**received** [1] - 11:2
**recess** [3] - 16:17, 16:18, 59:10
**recommendations** [2] - 36:23, 36:24
**recommended** [1] - 36:11
**record** [4] - 4:22, 5:2, 21:16, 45:17
**recording** [2] - 20:4, 51:7
**recordings** [3] - 20:20, 20:24, 21:13
**records** [7] - 4:11, 4:12, 4:14, 4:15, 4:16, 4:20, 4:24
**Red** [1] - 2:9
**reduce** [1] - 87:5
**refer** [1] - 63:16
**reference** [3] - 18:1, 18:10, 25:2
**references** [2] - 24:20, 71:17
**referencing** [2] - 31:3, 33:9
**referred** [1] - 37:7
**referring** [6] - 10:5, 10:6, 18:18, 19:2, 21:25, 29:19
**refers** [1] - 19:9
**regard** [1] - 13:5
**regards** [4] - 24:24, 26:17, 27:10, 29:13
**regs** [1] - 64:12
**regular** [2] - 85:14, 87:7
**regulation** [4] - 53:20, 54:9, 68:15, 68:20
**regulations** [1] - 39:1

**regulatory** [1] - 38:24
**regurgitating** [1] - 12:23
**reiterating** [1] - 31:19
**related** [2] - 8:23, 15:25
**relative** [1] - 71:2
**relatively** [1] - 23:2
**relayed** [1] - 29:10
**rely** [1] - 27:8
**remain** [1] - 24:8
**Remain** [1] - 29:22
**remainder** [1] - 15:20
**remained** [1] - 10:22
**remaining** [2] - 31:10, 31:15
**Remember** [2] - 22:15, 22:24
**remember** [11] - 22:25, 24:10, 26:5, 28:23, 31:23, 31:25, 42:8, 44:4, 50:14, 51:13, 85:3
**remind** [5] - 47:22, 48:12, 49:17, 50:5, 58:24
**reminder** [3] - 32:20, 50:4, 50:10
**reminders** [2] - 48:15, 49:7
**reminding** [1] - 49:24
**repeat** [4] - 28:6, 57:25, 78:2, 84:19
**repeated** [1] - 84:20
**report** [4] - 10:3, 10:6, 61:3, 61:4
**REPORTED** [1] - 2:1
**Reporter** [2] - 2:2, 89:10
**represented** [1] - 17:5
**request** [1] - 4:18
**requested** [6] - 16:21, 16:24, 17:5, 17:6, 43:4, 43:5
**required** [4] - 16:25, 40:18, 41:16, 47:6
**requirement** [3] - 47:16, 54:12, 87:2
**requirements** [15] - 36:1, 36:14, 37:1, 37:3, 37:6, 37:10, 38:1, 38:3, 41:10, 42:15, 59:23, 60:1, 60:15, 60:17, 61:5
**requires** [2] - 42:16,

68:21
**resolved** [1] - 5:16
**respect** [8] - 11:14, 11:16, 13:23, 14:11, 19:6, 26:12, 26:13, 60:13
**respond** [1] - 14:5
**response** [3] - 11:2, 12:24, 83:3
**rests** [1] - 85:16
**result** [4] - 16:3, 55:15, 74:24, 83:9
**resulted** [3] - 9:5, 79:6, 82:2
**resulting** [1] - 14:1
**results** [1] - 11:24
**retained** [1] - 5:13
**retrieve** [1] - 35:12
**retrieving** [1] - 35:9
**returned** [1] - 76:4
**returning** [1] - 34:20
**reverberated** [1] - 82:1
**reverberates** [1] - 73:22
**reverberating** [1] - 74:18
**reverberation** [1] - 82:5
**review** [4] - 17:18, 33:12, 46:9, 50:18
**reviewed** [4] - 4:11, 40:16, 41:22, 61:7
**reviewing** [1] - 32:16
**RICHARD** [1] - 1:18
**Richard** [2] - 3:8, 40:4
**right-hand** [1] - 63:24
**rises** [1] - 24:13
**risk** [2] - 7:20, 87:3
**road** [1] - 64:11
**Robson** [2] - 4:4, 5:24
**roll** [19] - 14:2, 72:24, 73:14, 73:15, 75:21, 80:11, 80:17, 81:18, 82:2, 82:4, 82:9, 82:17, 83:8, 84:6, 85:11, 85:21, 87:24, 88:9, 88:10
**rolling** [9] - 15:8, 72:24, 73:9, 74:21, 75:8, 75:17, 80:21, 84:13
**roundtrips** [1] - 45:13
**rpm** [1] - 53:18
**RPR** [2] - 2:2, 89:10
**rubber** [1] - 35:15

**rucksack** [1] - 22:4
**RUGGERI** [1] - 1:4
**Ruggeri** [7] - 11:5, 15:7, 16:8, 30:1, 30:11, 41:13, 88:10
**Ruggeri's** [2] - 85:1, 85:23
**rule** [3] - 54:9, 68:14, 68:20
**rules** [1] - 64:11
**run** [7] - 11:18, 17:2, 21:3, 49:20, 49:22, 49:23, 88:3
**running** [1] - 82:16

## S

**safe** [10] - 24:11, 31:16, 54:12, 54:14, 54:16, 55:13, 55:15, 56:5
**safely** [2] - 32:21, 56:4
**safety** [9] - 11:2, 17:16, 19:15, 20:4, 21:25, 46:20, 46:25, 47:4, 58:23
**sailing** [2] - 55:21, 59:21
**sailor** [1] - 37:18
**sailors** [19] - 34:7, 34:22, 35:7, 35:13, 47:8, 47:22, 48:4, 48:12, 49:17, 49:24, 50:5, 53:21, 54:20, 55:1, 55:10, 55:25, 56:23, 60:7, 60:8
**samples** [1] - 49:19
**sanctioned** [1] - 38:25
**saw** [5] - 20:25, 67:5, 73:15, 85:1, 85:25
**scenario** [1] - 31:12
**schedule** [1] - 4:6
**screen** [3] - 19:17, 67:3, 82:21
**se** [1] - 61:15
**sea** [10] - 8:5, 24:13, 24:21, 24:24, 34:25, 54:2, 60:4, 63:8, 81:21, 82:5
**seabed** [1] - 64:9
**seafarer** [1] - 60:11
**SEALI** [3] - 3:14, 3:15, 3:17
**seaman** [6] - 59:13, 59:17, 59:22, 60:8, 60:11, 60:24
**seamanship** [2] - 59:21, 81:20

**seamen** [2] - 34:7, 59:16

**seas** [5] - 18:11, 18:17, 74:20, 76:2, 76:5

**season** [3] - 44:10, 44:21, 45:4

**seasons** [6] - 45:3, 45:7, 46:1, 46:7, 50:7, 60:22

**seat** [5] - 28:24, 28:25, 85:8, 85:24, 86:6

**seated** [10] - 10:22, 24:7, 24:8, 29:9, 29:22, 31:10, 31:16, 32:3, 32:10, 32:11

**seats** [4] - 29:6, 84:12, 85:15

**second** [15] - 18:10, 27:25, 28:7, 28:11, 28:14, 32:9, 41:1, 42:6, 45:4, 59:13, 66:13, 67:1, 67:4, 87:14

**secondary** [1] - 34:22

**seconds** [21] - 65:10, 66:12, 66:22, 66:25, 67:5, 74:5, 81:1, 81:6, 81:11, 81:17, 82:9, 82:19, 83:1, 83:13, 83:22, 83:23, 84:7, 87:11, 87:15, 87:16, 87:24

**section** [7] - 17:25, 19:6, 22:4, 22:15, 22:24, 23:24, 32:9

**see** [69] - 3:21, 4:20, 6:2, 6:11, 17:25, 18:4, 19:6, 20:10, 21:3, 22:19, 22:20, 23:4, 24:25, 30:8, 33:4, 33:14, 36:9, 36:16, 38:14, 38:15, 41:9, 42:17, 44:9, 50:10, 50:24, 51:1, 51:3, 51:5, 53:18, 54:18, 55:22, 56:17, 56:19, 57:9, 62:1, 62:18, 62:19, 63:5, 63:6, 63:11, 65:5, 66:1, 66:8, 72:6, 72:22, 73:4, 73:10, 73:14, 73:15, 73:19, 73:21, 73:24, 73:25, 74:15, 74:17, 75:7, 75:13, 76:20, 76:25, 77:16, 79:2, 79:9, 79:11, 80:22, 84:6

**seeing** [7] - 45:23, 50:2, 66:5, 66:6, 72:24, 76:5

**selector** [2] - 50:25, 51:3

**sense** [2] - 63:20, 80:7

**sentence** [3] - 27:15, 27:25, 29:22

**separate** [3] - 5:18, 19:9, 28:18

**sequence** [2] - 63:17, 63:21

**sequentially** [2] - 64:19, 64:21

**serious** [1] - 9:4

**services** [2] - 5:19, 82:5

**set** [2] - 36:6, 36:22

**sets** [2] - 37:10, 37:11

**setting** [2] - 52:2, 86:20

**settings** [1] - 52:16

**settle** [5] - 25:14, 25:21, 27:5, 27:12, 28:15

**settling** [2] - 26:17, 29:13

**seven** [6] - 53:16, 57:14, 66:22, 67:1, 67:4, 68:4

**several** [3] - 31:9, 31:19, 80:24

**shifts** [1] - 18:23

**ship** [47] - 6:13, 6:15, 6:16, 7:14, 17:13, 18:8, 18:11, 18:14, 18:17, 18:18, 19:2, 19:5, 19:10, 22:16, 22:25, 24:12, 24:21, 25:8, 26:7, 26:8, 30:20, 32:14, 34:17, 34:18, 34:21, 35:11, 39:5, 44:16, 45:6, 50:15, 51:14, 52:19, 53:8, 54:1, 55:21, 57:3, 57:11, 59:13, 62:23, 64:6, 68:1, 70:11, 70:15, 73:23, 74:20, 76:22, 82:2

**ship's** [5] - 7:18, 29:14, 50:17, 76:3, 81:24

**ships** [9] - 18:22, 18:23, 19:8, 23:16, 23:20, 33:25, 44:25, 68:8, 82:6

**shore** [5] - 32:15, 51:11, 51:14, 55:21,

64:8

**short** [2] - 16:15, 20:3

**shorter** [3] - 62:3, 78:10, 78:11

**show** [5] - 21:5, 61:17, 69:8, 69:17, 84:2

**showing** [1] - 56:23

**shows** [3] - 31:8, 53:5, 65:15

**side** [16] - 17:4, 32:15, 51:11, 56:3, 57:15, 61:20, 65:12, 73:14, 76:3, 76:23, 78:11, 80:18, 80:23, 81:24, 82:1

**sides** [3] - 6:23, 70:18, 76:24

**sign** [1] - 54:9

**similar** [2] - 27:21, 68:9

**Similar** [1] - 13:19

**simplify** [1] - 20:15

**simply** [3] - 20:18, 23:12, 82:8

**simulate** [1] - 34:18

**site** [1] - 55:2

**sitting** [3] - 30:7, 30:11, 76:16

**situation** [8] - 9:8, 9:9, 9:10, 9:18, 9:19, 27:21, 34:18, 82:4

**six** [10] - 56:11, 56:12, 56:21, 56:22, 66:14, 67:1, 67:20, 68:4, 71:1, 71:11

**skill** [1] - 68:17

**skilled** [3] - 60:11, 60:13, 60:15

**skills** [3] - 59:24, 81:20, 83:11

**skip** [1] - 11:21

**skipping** [2] - 18:9, 24:10

**slid** [1] - 80:17

**slide** [3] - 51:6, 52:24, 80:22

**slides** [1] - 48:3

**sliding** [3] - 86:6, 86:7, 86:9

**slow** [10] - 9:12, 56:2, 67:16, 67:17, 67:23, 68:2, 71:20, 71:23, 75:3, 83:16

**slowdown** [2] - 67:25, 75:2

**slowed** [8] - 10:14, 65:25, 66:2, 67:6, 68:16, 71:6, 82:1,

87:16

**slower** [5] - 54:3, 56:20, 67:4, 67:22, 71:14

**slowing** [13] - 13:20, 65:1, 65:5, 65:15, 66:2, 66:3, 66:6, 66:8, 67:19, 71:7, 71:9, 71:18

**slows** [5] - 66:10, 66:14, 67:2, 71:4, 71:16

**small** [4] - 23:21, 28:23, 77:16, 84:16

**smaller** [2] - 23:6, 24:12

**SMS** [1] - 43:7

**snippet** [1] - 83:13

**soft** [2] - 7:5, 7:9

**someone** [3] - 23:20, 50:16, 51:20

**sometime** [1] - 33:22

**sometimes** [1] - 58:2

**soon** [1] - 64:10

**sorry** [8] - 5:12, 18:16, 39:12, 49:4, 59:4, 65:19, 71:8, 84:1

**sort** [1] - 45:1

**sorts** [1] - 10:16

**sought** [1] - 5:18

**SOUTHERN** [1] - 1:1

**speakers** [1] - 32:13

**special** [2] - 48:22, 49:3

**specific** [9] - 9:20, 21:20, 25:2, 29:21, 41:2, 42:25, 44:17, 46:15, 88:7

**specifically** [5] - 19:3, 24:20, 27:20, 30:24, 31:3

**specifications** [1] - 58:10

**speed** [43] - 8:5, 52:25, 53:1, 53:5, 53:8, 53:9, 53:11, 53:13, 53:17, 54:9, 54:12, 54:14, 54:16, 55:13, 55:15, 55:20, 55:24, 56:5, 56:13, 64:25, 66:9, 67:18, 67:24, 68:21, 70:25, 71:2, 71:5, 71:12, 71:24, 75:3, 77:2, 77:23, 78:4, 78:13, 79:10, 79:11, 80:2, 80:6

**speeding** [1] - 55:25

**spot** [2] - 27:6, 77:8

**stability** [1] - 85:10

**stabilize** [1] - 85:20

**stage** [3] - 67:17, 68:3

**stand** [3] - 30:19, 31:5, 32:20

**standards** [2] - 36:6, 36:11

**standing** [1] - 30:8

**standpoint** [1] - 23:5

**starboard** [4] - 6:25, 64:25, 79:12, 82:3

**start** [10] - 46:14, 63:6, 65:19, 68:11, 73:4, 77:7, 81:6, 81:7, 81:15, 88:3

**started** [8] - 63:15, 63:22, 63:25, 64:4, 81:17, 81:18, 83:24, 87:23

**starting** [4] - 64:5, 70:3, 72:6

**starts** [2] - 53:6, 82:20

**state** [12] - 23:19, 38:6, 38:7, 38:9, 39:4, 39:8, 39:15, 39:20, 39:23, 40:10, 43:19, 43:22

**State** [1] - 36:14

**statement** [10] - 18:13, 22:21, 24:15, 24:17, 25:11, 29:1, 30:22, 30:23, 32:1, 32:24

**STATES** [2] - 1:1, 1:12

**States** [2] - 2:3, 89:11

**states** [5] - 10:18, 27:5, 36:10, 50:9, 53:12

**stating** [1] - 10:25

**stationary** [2] - 23:2, 23:3

**statute** [1] - 3:18

**stay** [1] - 32:11

**steer** [1] - 62:23

**steering** [1] - 9:20

**STENOGRAPHICA LLY** [1] - 2:1

**step** [3] - 16:17, 22:17, 59:8

**Stephanie** [2] - 51:2, 73:1

**steps** [3] - 52:12, 86:19, 87:5

**stern** [6] - 70:6, 70:15, 70:19, 73:20, 76:14, 76:18

**still** [8] - 27:2, 27:3, 31:23, 68:4, 70:7, 71:4, 71:12, 72:17
**stipulated** [1] - 36:1
**stop** [17] - 30:21, 62:2, 65:6, 65:7, 65:22, 66:20, 67:12, 69:10, 69:13, 69:15, 69:24, 73:19, 74:6, 75:20, 82:22, 82:24
**stopped** [2] - 52:7, 65:23
**stopping** [2] - 65:8, 68:11
**storm** [1] - 18:23
**story** [1] - 17:1
**straight** [1] - 77:16
**street** [1] - 40:4
**STREET** [2] - 1:18, 20:11
**Street** [1] - 1:19
**subject** [1] - 23:6
**sudden** [2] - 25:12, 30:20
**suddenly** [4] - 18:11, 18:14, 18:19, 32:5
**suggest** [4] - 53:7, 57:22, 58:1, 58:3
**suggested** [1] - 58:1
**suggesting** [4] - 20:14, 46:4, 60:10, 61:2
**suggestion** [1] - 59:12
**Suite** [2] - 1:16, 1:19
**summarize** [2] - 39:19, 69:5
**summary** [1] - 57:1
**summer** [1] - 44:10
**summers** [1] - 44:12
**supervise** [3] - 12:20, 48:4, 50:5
**supervised** [1] - 55:11
**supervision** [4] - 12:2, 46:12, 46:13, 53:20
**supervisor** [2] - 60:2, 60:7
**supplement** [1] - 5:1
**supposed** [1] - 76:7
**surface** [1] - 74:19
**surge** [1] - 57:12
**SW** [1] - 1:19
**swell** [7] - 24:14, 24:22, 24:24, 24:25, 25:4, 25:8, 26:21
**swells** [1] - 28:11
**switch** [11] - 51:3, 51:8, 51:22, 52:9,

52:22, 52:23, 86:11, 86:14, 86:16, 86:20, 86:23
**switched** [1] - 51:18
**system** [12] - 50:1, 50:2, 50:17, 50:19, 52:15, 52:19, 83:20, 86:20, 87:5
**systems** [1] - 76:17

## T

**talks** [1] - 53:16
**taught** [5] - 42:14, 42:21, 42:24, 87:9
**teams** [1] - 35:11
**technical** [1] - 49:21
**teeing** [1] - 16:14
**tempted** [1] - 30:19
**ten** [10] - 10:2, 10:7, 16:16, 55:21, 56:10, 56:14, 56:15, 66:12, 66:24, 83:22
**tender** [198] - 6:13, 6:14, 6:15, 6:17, 6:18, 6:20, 6:21, 6:23, 7:1, 7:12, 7:24, 8:16, 8:21, 9:5, 9:6, 9:10, 9:11, 9:14, 9:16, 9:20, 9:21, 10:8, 10:13, 11:9, 11:12, 11:17, 11:19, 12:5, 12:7, 12:14, 12:15, 13:3, 13:9, 13:11, 13:16, 13:17, 14:1, 14:5, 14:12, 14:13, 14:16, 14:22, 14:23, 15:23, 16:1, 19:11, 19:15, 20:11, 20:12, 21:20, 21:25, 22:6, 22:10, 22:11, 22:16, 22:18, 22:22, 22:25, 23:2, 23:6, 23:9, 23:15, 24:6, 24:7, 24:11, 24:20, 25:8, 25:23, 26:7, 26:9, 26:22, 28:22, 29:4, 29:5, 29:14, 29:18, 29:21, 29:23, 30:8, 30:12, 30:17, 30:19, 31:11, 31:23, 31:24, 32:5, 32:10, 32:14, 32:21, 32:22, 32:23, 35:4, 35:6, 35:19, 36:12, 37:20, 40:17, 41:8, 44:16, 45:9, 45:10, 45:18, 46:1, 46:5, 46:21, 48:4, 48:7, 48:16, 49:13, 49:16, 49:19, 50:3, 51:9, 51:11,

51:21, 51:25, 53:2, 54:1, 56:17, 56:19, 57:3, 57:4, 57:5, 57:14, 57:19, 57:23, 58:2, 58:4, 58:5, 58:6, 58:9, 58:14, 58:19, 60:14, 60:18, 60:19, 60:25, 61:8, 61:17, 61:18, 61:20, 66:2, 67:21, 68:1, 68:3, 69:4, 69:5, 69:9, 69:21, 70:4, 70:6, 70:7, 70:8, 71:15, 72:7, 73:20, 74:5, 74:16, 74:18, 75:1, 75:21, 75:25, 76:3, 76:7, 76:9, 76:13, 76:21, 76:25, 77:7, 77:16, 78:25, 79:2, 79:5, 79:9, 79:10, 79:13, 79:22, 81:18, 81:23, 81:25, 82:12, 82:13, 82:14, 83:10, 85:11, 85:21, 85:24
**tender-specific** [2] - 21:20, 29:21
**tendered** [1] - 76:16
**tendering** [8] - 19:9, 20:5, 20:6, 47:4, 47:9, 55:10
**Tendering** [1] - 20:4
**tenders** [13] - 23:15, 24:11, 25:2, 26:3, 33:2, 34:13, 48:24, 52:15, 53:12, 57:10, 57:17, 68:9, 68:13
**tenth** [1] - 56:11
**term** [1] - 63:9
**terms** [3] - 10:7, 36:5, 47:13
**test** [7] - 26:5, 42:7, 42:16, 42:17, 43:7, 59:25
**tested** [3] - 42:13, 42:21, 42:23
**testified** [4] - 5:8, 5:10, 30:7, 44:15
**testify** [1] - 5:11
**testifying** [1] - 5:25
**testimony** [29] - 5:6, 5:12, 5:21, 30:2, 30:4, 30:6, 30:10, 30:13, 33:20, 33:21, 42:8, 44:9, 44:19, 45:6, 45:8, 45:12, 47:3, 47:12, 58:19, 66:25, 80:17, 80:25, 85:1, 85:3, 85:5, 85:22, 85:23, 85:25, 86:5
**THE** [28] - 1:11, 1:14,

1:18, 2:10, 3:2, 5:3, 16:10, 16:16, 17:7, 20:2, 20:7, 20:13, 20:21, 21:7, 21:12, 39:12, 39:14, 39:17, 49:4, 59:7, 64:14, 64:18, 74:3, 78:22, 78:24, 88:14, 88:17, 88:18
**thereabouts** [1] - 75:19
**therefore** [1] - 79:15
**thinks** [1] - 88:3
**third** [1] - 29:21
**three** [12] - 15:19, 21:11, 53:1, 53:2, 55:12, 55:14, 59:5, 59:6, 64:24, 67:23, 71:14, 72:14
**three-minute** [1] - 59:6
**throttle** [1] - 12:9
**thruster** [2] - 76:14, 76:18
**timer** [2] - 81:7, 82:20
**timestamp** [1] - 61:22
**timing** [1] - 81:16
**today** [3] - 3:25, 4:10, 17:6
**together** [3] - 4:24, 35:14, 45:8
**toggle** [5] - 51:7, 51:18, 51:21, 86:11, 86:23
**toggled** [3] - 50:15, 51:4, 86:15
**toggling** [1] - 86:19
**took** [3] - 11:1, 77:3, 77:8
**top** [1] - 41:2
**topic** [2] - 19:7, 19:8
**touched** [1] - 71:23
**touchscreen** [1] - 69:16
**tour** [1] - 57:9
**toward** [2] - 30:24, 73:20
**towards** [2] - 29:5, 34:16
**traction** [1] - 85:20
**traffic** [2] - 31:24, 68:9
**train** [5] - 15:25, 41:25, 43:1, 43:12, 43:18
**trained** [10] - 9:15, 9:17, 14:6, 14:7, 35:25, 36:10, 41:3,

41:7, 82:14, 83:10
**trainer** [6] - 40:5, 40:6, 40:7, 40:8, 43:21, 43:22
**trainer/operator** [1] - 36:24
**training** [64] - 3:22, 8:17, 8:23, 8:25, 9:4, 9:25, 11:13, 11:14, 11:16, 12:2, 12:3, 12:4, 13:7, 13:14, 13:15, 13:18, 13:23, 14:10, 14:13, 14:23, 14:25, 15:14, 15:15, 16:11, 33:8, 33:10, 34:14, 36:2, 36:11, 37:11, 37:19, 38:1, 38:3, 38:6, 38:7, 38:10, 38:12, 39:9, 39:16, 39:21, 39:24, 40:11, 41:1, 41:7, 41:9, 41:21, 41:25, 42:25, 43:6, 43:8, 43:11, 43:14, 43:17, 44:8, 61:4, 68:17, 75:1, 81:19, 87:8
**Training** [1] - 38:15
**transcript** [8] - 16:9, 16:11, 17:21, 19:24, 20:1, 21:17, 21:20, 21:22
**transcription** [1] - 89:4
**transcripts** [4] - 20:15, 20:23, 21:8, 21:11
**transit** [2] - 56:13, 58:20
**transiting** [1] - 53:13
**transits** [2] - 45:15, 70:21
**travel** [2] - 71:1, 71:24
**traveling** [3] - 71:4, 71:12, 72:14
**travels** [1] - 70:25
**TRIAL** [1] - 1:11
**triggered** [1] - 82:17
**triggers** [3] - 81:7, 81:10, 82:17
**trouble** [2] - 83:5, 83:6
**true** [20] - 5:19, 7:23, 9:16, 14:24, 27:22, 28:19, 34:15, 42:14, 52:4, 54:7, 54:15, 55:11, 57:20, 64:6, 68:22, 68:23, 70:22, 71:10, 77:23, 78:15
**trying** [2] - 77:12,

81:15
**turbulence** [1] - 84:20
**turn** [4] - 6:22, 6:25, 65:1, 72:10
**turned** [2] - 10:15, 82:3
**turning** [1] - 29:21
**turns** [1] - 79:12
**two** [10] - 17:4, 22:15, 25:11, 26:9, 45:3, 45:7, 46:1, 46:7, 50:7, 60:22
**types** [1] - 36:2

## U

**UHF** [1] - 49:25
**ultimately** [2] - 8:15, 71:16
**unacceptable** [2] - 7:7, 79:16
**uncorrect** [1] - 7:16
**under** [5] - 13:12, 13:18, 17:25, 30:13, 36:13
**underlying** [1] - 37:7
**underway** [6] - 53:17, 62:6, 62:9, 64:7, 64:12, 76:16
**unexpected** [5] - 19:2, 19:4, 30:25, 84:16, 84:23
**unexpectedly** [4] - 18:12, 30:18, 33:2, 33:4
**uniformly** [1] - 70:14
**UNITED** [2] - 1:1, 1:12
**United** [1] - 89:11
**united** [1] - 2:3
**unqualified** [1] - 61:4
**unreasonable** [1] - 8:7
**unreasonably** [1] - 7:25
**unrelated** [1] - 74:15
**unsettles** [1] - 26:21
**up** [55] - 4:3, 16:9, 16:14, 16:19, 17:8, 18:23, 19:16, 23:19, 30:8, 30:19, 31:5, 32:20, 38:20, 46:16, 51:8, 51:21, 52:19, 54:6, 59:17, 61:16, 62:8, 62:11, 62:17, 63:6, 63:7, 63:9, 63:13, 63:15, 63:25, 64:3, 64:5, 64:13, 65:12, 66:7, 69:4,

69:8, 70:2, 71:14, 72:25, 73:4, 73:8, 73:24, 74:5, 76:3, 76:16, 76:22, 78:25, 81:23, 81:25, 82:13, 82:20, 83:9, 83:22, 86:11
**uses** [1] - 58:7

## V

**various** [4] - 7:6, 10:14, 49:25, 76:4
**verbal** [1] - 83:3
**verified** [1] - 21:1
**verify** [1] - 21:6
**version** [1] - 62:3
**vessel** [35] - 8:7, 8:24, 12:12, 13:5, 13:8, 13:12, 13:15, 13:23, 14:3, 14:8, 14:11, 18:18, 30:25, 34:20, 35:14, 57:22, 58:11, 64:7, 64:11, 66:10, 67:6, 67:20, 71:1, 71:3, 71:4, 71:5, 71:9, 71:11, 71:13, 74:24, 77:3, 77:8, 84:23, 86:13, 87:23
**vessel's** [2] - 13:20, 74:22
**VHF** [2] - 48:6, 49:25
**via** [2] - 11:2, 35:15
**vicinity** [3] - 76:6, 76:24, 83:12
**Video** [15] - 65:17, 69:12, 69:23, 72:4, 72:20, 73:2, 73:6, 73:12, 73:17, 74:2, 74:13, 75:11, 75:15, 82:23, 84:4
**video** [39] - 11:3, 16:9, 16:12, 17:17, 19:8, 19:10, 19:23, 20:3, 20:19, 21:18, 21:20, 23:1, 24:18, 26:2, 26:6, 26:9, 26:25, 27:2, 27:8, 27:9, 27:14, 29:15, 29:21, 56:18, 56:19, 64:13, 65:4, 65:5, 65:10, 65:15, 65:16, 66:19, 67:10, 72:3, 81:4, 84:2
**videos** [1] - 21:13
**view** [18] - 7:5, 8:16, 14:22, 55:1, 55:6, 55:16, 55:19, 56:19, 61:14, 68:4, 72:17, 80:4, 80:5, 83:4,

83:25, 84:7, 87:13
**violating** [1] - 31:9
**virtual** [1] - 50:14
**vis-à-vis** [2] - 23:2, 79:21
**visible** [1] - 79:13
**visual** [3] - 54:25, 66:1, 66:4
**VIVIAN** [1] - 1:4
**voice** [2] - 17:22, 21:13
**voiceover** [1] - 23:1
**vs** [1] - 1:6

## W

**wait** [7] - 25:13, 25:20, 27:5, 27:12, 28:14, 57:5, 66:12
**waiting** [2] - 57:1, 71:18
**wake** [53] - 9:13, 10:15, 11:9, 11:25, 12:4, 12:6, 13:3, 13:10, 13:20, 25:4, 25:13, 26:21, 55:13, 55:15, 69:3, 69:4, 69:8, 69:18, 69:20, 69:21, 70:2, 70:5, 70:12, 70:14, 70:18, 70:24, 70:25, 71:1, 71:4, 71:7, 71:9, 71:11, 71:13, 71:14, 71:16, 71:17, 71:18, 73:22, 74:8, 74:9, 74:16, 74:17, 74:19, 74:22, 76:11, 76:21, 81:22, 81:25, 82:13, 83:9, 83:16
**wakes** [3] - 11:22, 70:10, 71:20
**walks** [1] - 40:4
**walls** [1] - 82:5
**wants** [2] - 17:2, 21:5
**warm** [1] - 44:23
**warn** [7] - 15:7, 15:10, 15:16, 15:19, 15:20, 81:1, 87:21
**warned** [2] - 80:25, 84:22
**warning** [62] - 8:17, 8:18, 8:19, 9:1, 9:3, 10:10, 10:24, 11:24, 12:2, 15:11, 16:3, 19:1, 19:3, 19:15, 22:13, 23:12, 23:18, 24:18, 25:7, 25:17, 25:19, 25:22, 25:25, 26:1, 26:12, 26:24, 26:25, 27:2, 27:4,

27:16, 27:17, 27:19, 27:20, 28:2, 28:18, 29:3, 29:6, 29:24, 29:25, 30:24, 31:15, 31:17, 31:20, 32:5, 32:11, 33:1, 51:20, 81:12, 82:11, 83:5, 83:24, 84:8, 84:10, 85:5, 86:8, 86:10, 86:12, 88:9
**warnings** [23] - 8:12, 8:22, 8:25, 10:9, 11:23, 12:2, 12:3, 12:20, 12:21, 15:2, 15:5, 15:9, 16:8, 17:11, 17:12, 17:24, 31:10, 84:15, 86:21, 87:10, 87:12, 88:1, 88:4
**warranted** [1] - 88:9
**wash** [1] - 49:16
**watch** [3] - 22:17, 23:25, 66:13
**water** [6] - 25:5, 34:9, 70:11, 70:22, 76:18
**waters** [1] - 44:23
**wave** [18] - 23:7, 25:3, 28:23, 70:2, 70:5, 70:10, 70:12, 74:15, 74:17, 75:21, 76:1, 76:2, 76:5, 76:12, 76:19, 82:6
**waves** [3] - 28:11, 71:1, 73:19
**ways** [3] - 10:14, 85:11, 85:20
**week** [1] - 34:12
**weeks** [1] - 45:10
**wind** [7] - 18:12, 18:23, 24:13, 24:21, 24:23, 25:8, 35:1
**winter** [1] - 44:24
**witness** [4] - 17:8, 20:8, 30:4, 30:6
**WITNESS** [3] - 39:14, 78:24, 88:17
**WITNESSES** [1] - 2:10
**word** [3] - 44:13, 44:18, 44:19
**words** [3] - 20:15, 47:14, 58:23
**works** [2] - 57:2, 57:3
**worse** [1] - 82:3
**written** [1] - 59:25

## Y

**year** [4] - 33:16, 33:19, 44:2, 44:5
**years** [2] - 6:8, 68:8
**yelling** [1] - 83:14
**yourself** [1] - 85:20
**yourselves** [1] - 84:12

## Z

**zone** [1] - 56:24
**Zoom** [1] - 51:2