UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:20-CV-21961-GAYLES

VIVIAN RUGGERI,

      Plaintiff,

v.

NCL (BAHAMAS) LTD.,

      Defendant.

_____/

**DEFENDANT'S MOTION TO ALTER
OR AMEND JUDGMENT OR FOR A NEW TRIAL OR
FOR A REMITTITUR BASED UPON THE TICKET CONTRACT**

Defendant, NCL (BAHAMAS) LTD., (hereinafter "Norwegian"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 59, hereby moves this Court to alter the judgment and to enter judgment for Norwegian as a matter of law or, in the alternative, to enforce the limitations clause of the ticket contract and thus amend its findings to remit the award for pain and suffering and in support, states as follows:

**INTRODUCTION**

Plaintiff, Vivian Ruggeri, sued Norwegian for a failure to warn for an alleged injury she suffered while on a ship's tender. Ms. Ruggeri failed to support this claim, however, because the emergency for which Plaintiff based her claim was an unexpected wake or swell that occurred a mere 25 seconds before the accident. Ms. Ruggeri did not present any evidence that Norwegian had actual or constructive notice of the emergency condition; that Norwegian had adequate time to warn Ms. Ruggeri, or that the failure to warn caused or contributed to her injury. Ms. Ruggeri testified that she needed to 'mentally prepare' and to 'grab hold of the seat' – but if this warning

were given within the 25-second window prior to tendering, the evidence did not reflect that this would have provided sufficient time for Ms. Ruggeri to prepare for and avoid the unexpected movement of the tender.  Thus, the Court, as finder of fact, could only speculate that a warning would have prevented her injuries.

Nonetheless, despite Plaintiff's admission and testimony from Plaintiff's expert, Captain Keijer, that there was **only** 25 seconds for **Norwegian** to warn Ms. Ruggeri of the situation, the Court seemingly focused on all wakes or swells created by Cannes traffic generally as creating a "dangerous condition" for which Norwegian had a duty to warn.  Respectfully, this overlooked the evidence which established that Norwegian *repeatedly* warned Ms. Ruggeri and all passengers regarding the risk of falling while on the tender.  The specific danger at issue here – a sudden and unexpected wake and swell as the tender approached the dock – was outside the realm of typical ship movement.  Moreover, there is no record evidence that prior to the swell, the vessel traffic was out of the ordinary or dangerous.[1]  It is axiomatic that if Norwegian had no knowledge regarding the risks posed by the unexpected wake or, alternatively, had insufficient time to warn Ms. Ruggeri of the impending danger created by the specific wake that she claims caused her fall, then it was not negligent as a matter of law and, as a result, Norwegian is entitled to judgment in its favor.

---

[1] The Court also suggested that simply because an accident occurred, there must have been negligence:

> I think it's pretty clear, tenders shouldn't crash into
> docks and this one did. The parties dispute the reasons why it
> happened, but it did happen.

[Trial Excerpt Court Rulings and Findings of Fact, Dec. 7, 2023, p. 3, ll. 9-11].  But as this Court has ruled, negligence of the accident itself was not pled – Plaintiff cannot recover simply because the accident occurred.  Plaintiff can only recover because Norwegian failed to warn of a dangerous sea condition.  Moreover, reliance on *res ipsa loquitur* does not obviate the need for the notice requirement.  *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1183 (11th Cir. 2020).

Additionally, although the Court correctly limited Ms. Ruggeri to a claim based on failure to warn – a direct liability claim requiring notice to Norwegian – Ms. Ruggeri, through her expert, placed the blame squarely on the tender operator, Jomar Buerano, and his first mate for his conduct in piloting the tender, which is actually a negligent operations claim. Eleventh Circuit precedent and this Court's ruling precluded Ms. Ruggeri from recasting her direct liability failure to warn claim as a negligent operation claim. Ms. Ruggeri had the burden to prove that Norwegian, not its agent, was on notice and breached its duty to Ms. Ruggeri.

Finally, based on the ticket contract, the Athens Convention should have applied, and if the Court does not enter judgment for Norwegian as a matter of law, it should remit the award to a maximum of 400,000 special drawing rights. And the award of $800,000 past pain and suffering, when the Court found that Plaintiff exaggerated her pain and recovery is excessive and should be reduced.

**MEMORANDUM OF LAW**

I.     **MS. RUGGERI ONLY SUED NORWEGIAN FOR FAILURE TO WARN AND NOT FOR NEGLIGENT OPERATION; THEREFORE, SHE NEEDED TO PROVE THAT NORWEGIAN HAD NOTICE OF THE ALLEGEDLY DANGEROUS CONDITION**

It is well settled that "[d]irect liability and vicarious liability are very different concepts" and it is improper when both concepts are merged into a single theory of liability against a cruise line. *Holland v. Carnival Corp.*, 50 F.4th 1088, 1093-94 (11th Cir. 2022). Ms. Ruggeri proceeded solely on a failure to warn, which is a claim for direct liability — not vicarious liability. "Claims stemming from . . . failure to warn will be made out under a direct liability theory . . ." *Britt v. Carnival Corp.*, 580 F.Supp.3d 1211, 1216 (S.D. Fla. 2021) (citing *Yusko v. NCL (Bah.), Ltd.*, 4 F.4th 1164, 1170 (11th Cir. 2021); *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012); *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1990)).

A claim against a cruise line for the negligence of its employee is a vicarious liability claim. *See e.g. Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225 (11th Cir. 2014) (holding that maritime defendants may be liable for the negligence of their medical personnel based on vicarious liability); *Wohlford v. Carnival Corp.*, No. 1:17-CV-20703-UU, 2017 U.S. Dist. LEXIS 72901, 2017 WL 7731225, at *3 (S.D. Fla. May 11, 2017) (same); *Lannin v. NCL Bahamas Ltd.*, No. CV 17-23378-CIV, 2018 U.S. Dist. LEXIS 35276, 2018 WL 1175237, at *2 (S.D. Fla. Mar. 5,2018) (same).

On the other hand, a claim for failure to warn is a direct liability claim against the cruise line and, therefore, a crewmember's negligence cannot be legally imputed to a non-negligent cruise line. Rather, a plaintiff is required to prove that the entity itself had notice of a dangerous condition. *Compare Holland*, 50 F.4th at 1094. (Stating that when the tortfeasor is an employee, the principle of vicarious liability allows 'an otherwise non-faulty employer' to be held liable for the employee's negligence.) (Citing *Langfitt v. Fed. Marine Terminals, Inc.,* 647 F.3d 1116, 1121 (11th Cir. 2011); *Meyer v. Holley*, 537 U.S. 280, 285-86 (2003) ("The principal is liable for the acts and negligence of the agent in the course of his employment, although he did not authorize or did not know of the acts complained of.")).

This distinction is critical because, before trial, this Court construed Ms. Ruggeri's claim as a direct liability, failure to warn by Norwegian – not as a vicarious liability claim against Norwegian based upon the negligent operation of the tender by its operator. As the Court ruled:

> "[T]he Complaint only pleads these counts in the context of Defendant's failure to warn Plaintiff of dangerous sea conditions, failure to train its employees to warn of dangerous sea conditions, and failure to supervise its employees to ensure they are giving proper warnings about dangerous sea conditions. [ECF No. 1]. . . . Plaintiff may not proceed or recover on a negligent operation claim against Defendant. The ultimate inquiry is whether Defendant failed to warn Plaintiff of the dangerous conditions which caused her injury."

[*See* ECF No. 115].

It is well settled that "[a] plaintiff is the master of his or her complaint and may choose to proceed under a theory of direct liability, vicarious liability, or both." *Yusko v. NCL (Bah.), Ltd.*, 4 F.4th 1164, 1170 (11th Cir. 2021). Thus, as this Court found, Ms. Ruggeri did not pursue – and could not recover – on a negligent operation claim against Norwegian. Rather, Ms. Ruggeri was limited to advancing a failure to warn claim which necessarily required notice directly to Norwegian of the purportedly dangerous condition and a reasonable opportunity to warn.

## II.    NORWEGIAN DID NOT HAVE ACTUAL OR CONSTRUCTIVE NOTICE OF THE UNREASONABLY DANGEROUS CONDITION.

Cruise ship operators owe a duty to take corrective action to warn passengers <u>only</u> where they know or should know of the unreasonably dangerous condition. *See Smolnikar v. Royal Caribbean Cruises, Ltd.*, 787 F.Supp.2d 1308, 1322 (S.D. Fla. 2011) (cruise lines have a "duty to warn passengers of dangers the cruise line knows or reasonably should have known.") (citing *Carlisle v. Ulysses Line Ltd.*, 475 So. 2d 248, 251 (shipowners' duty to warn "encompasses only dangers of which the carrier knows, or reasonably should have known")); *see also Adams v. Carnival Corp.*, 2009 U.S. Dist. LEXIS 122822, at *9-10 (S.D. Fla. Sept. 29, 2009). The duty to warn only includes those dangers "which are not apparent and obvious to the passenger." *Smolnikar v. Royal Caribbean Cruises Ltd.*, 787 F.Supp.2d 1308, 1322-23 (S.D. Fla. 2011).

Ms. Ruggeri bears the burden to prove that Norwegian had actual or constructive notice for a sufficient period to allow corrective action. *Keefe*, 867 F.2d at 1322; *Monteleone*, 838 F.2d at 65-66. The fact that an accident occurred, by itself, does not give rise to a presumption of an unreasonably dangerous condition **<u>or</u>** notice. *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1237 (S.D. Fla. 2006).

Actual notice exists if Norwegian knew about the unreasonably dangerous condition. *Keefe* at 1322; *Guevara*, at 720. Constructive notice exists if Norwegian "ought to have known of the peril to its passengers, the hazard having been present for a period of time so lengthy as to invite corrective measures." *Keefe* at 1322. Ms. Ruggeri can prove constructive notice with evidence that the unreasonably dangerous condition "exist[ed] for a sufficient period of time to invite corrective measures" or with evidence of "substantially similar incident in which 'conditions substantially similar to the occurrence in question must have caused the prior accident.'" *Guevara*, at 720 (quoting *Monteleone* and *Jones v. Otis Elevator*).

The Court determined that Norwegian "was sufficiently on notice" based on the tender operator's testimony that "these conditions were common in this area." The Court clarified that its determination was not focused on wakes and swells in general, but the specific facts here; it determined that, on the date of the incident, "it would have been well known to [Norwegian] that there was lots of traffic occurring around the boat, . . . which caused swells. . . . And Norwegian was clearly aware of it because it actually warned passengers of that danger." Respectfully, the Court misconstrued the general conditions, for which Norwegian did warn, and the specific condition that purportedly caused harm, for which there was no evidence to support the conclusion that Norwegian had notice or opportunity to act on such notice. Indeed, as explained below, Ms. Ruggeri's expert found no fault with Norwegian's general warnings but, instead, focused specifically on the 25 seconds before the accident.

### a. Plaintiff's Expert Testified that the Purported Unreasonably Dangerous Condition was a Combination of Factors that Led to the Creation of 'Confused Seas' Which he Identified as the Unreasonably Dangerous Condition.

Despite testifying that the tender's rolling action was caused by the tender's own wake, Captain Keijer also testified that other factors caused the wake/swell/'confused seas:'

THE COURT:    I'm sorry, before we move on, I just want
to be clear.
You mentioned some errors before, the high speed
approach, the abrupt slowdown and the turn to starboard.
**Are you saying that that caused the wake or are you
saying that there was a wake from another vessel?**

THE WITNESS:    I'm saying that that was **part** of the wake
that was caused, was the wake that was following his own boat
due to the high speed and the resulting slowdown.

[Direct Examination of Captain Hen Keijer, "Keijer Direct," Nov. 6, 2023, p. 17, ll. 3-11].

Q.    **Did you see vessels, in fact, going by, yachts going by the
cruise ship** on this Friday afternoon in Cannes, France?
A.    **Yes, I did**.

[Keijer Direct, Nov. 6, 2023, p. 18, ll. 7-9].

Q.    Do you agree that there is wave action in front of the
tender, in front of the bow of the tender?
A.    I do. And I also have seen a stern thruster being operated
prior to this. The Norwegian Epic is -- as I mentioned, they
have tendered up. They're underway. They're sitting in that
location using their propulsion systems, one of which is the
stern thruster, which can be seen producing a water flow from
time to time. **That also has an effect on the wave action that
we see on this camera**.

[*See* ECF No. 144, Keijer Cross, Nov. 6, 2023, p. 76, ll. 12-20].

Q.    Sir, we see wave action here and wave action here unrelated
to the wake of the tender?
A.    We see wave action there, interference from the wake that
was created by this tender, combined with the reverberating or
re bouncing of that wake against that huge surface area of the
cruise ship. That creates **confused seas**, as I call them.

[*See* ECF No. 144, Keijer Cross, Nov. 6, 2023, p. 74, ll. 15-20, *see also* p. 76, ll. 1-5].

Moreover, Captain Keijer testified that even if another vessel contributed to the 'confused

seas' his opinion would remain unchanged.  [Re-Direct Examination of Captain Hen Keijer,

"Keijer Re-Direct," Nov. 6, 2023, p. 13, ll. 8-24].  There is no evidence that the purported

unreasonably dangerous condition was a predictable event.

> **b. Plaintiff's Expert Testified that the Claimed Dangerous Condition Existed for Only 25 Seconds.**

Plaintiff contends that the timeframe for the tender operator to warn Ms. Ruggeri is only

25 seconds.  Plaintiff's expert Captain Keijer testified that the first indication that the tender

operator was going to experience a dangerous condition was 25 seconds prior to contact with the

platform:

> Q.     So, just to put it simply, in your mind you begin the
> 25 seconds when you say there is a roll, and at that beginning
> **the operator says, "Oh, my gosh, I'm going to crash, I need to
> give a warning." Right**?
>
> A.     That is the **<u>first indication</u>** for the tender operator that
> wake is following up with his tender, catching up with his
> tender, and had he been trained properly, he could have
> predicted what was going to happen next.

[*See* ECF No. 144, Keijer Cross, Nov. 6, 2023, p. 82, ll. 8-15] (emphasis added).  Captain Keijer

further characterized those 25 seconds as an "emergency situation."  [Keijer Direct, Nov. 6, 2023,

p. 15, ll. 1-6].

There was no other evidence that a dangerous sea condition was even possible prior to the

25 seconds of contact with the tender platform given the weather conditions at the time of time of

the incident.

> **c. There is No Record Evidence that Norwegian had Actual Notice of the Unreasonably Dangerous Sea Condition in Those 25 Seconds.**

There is no record evidence that *Norwegian* had actual notice of the unreasonably

dangerous condition in the 25 seconds before the accident.  Plaintiff's expert characterized those

25 seconds as "unexpected," "unusual," and an "emergency situation."  [*See* ECF No. 144, Keijer

Cross, Nov. 6, 2023, p. 14, ll. 5-6; Keijer Direct, Nov. 6, 2023, p.63, ll. 18-20, (A. . . . if an emergency situation such as this occurs, it is prudent . . . to provide warning to your guest of an impe[n]ding unexpected situation . . ."); Keijer Direct, Nov. 6, 2023, p. 67, ll. 3-9; Keijer Re-Direct, Nov. 6, 2023, p. 8, l. 11, ("This was an emergency, . . .")].

Moreover, the premise of Plaintiff's expert's conclusion that the tender operator should have been aware 25 seconds prior to contact is that the operator is "feeling" the pitch of the boat – the only conclusion here is that the individuals on the tender vessel were the only ones who would have known of the unreasonably dangerous condition.  [Keijer Direct, Nov. 6, 2023, p. 33, ll. 2-8].  He does not contend that anyone outside of the tender vessel could have warned the passengers of the claimed unreasonably dangerous condition.

Finally, even if Plaintiff could establish that Norwegian was aware of the condition, there is no record evidence that the crewmembers onboard the tender vessel knew that the condition was unreasonably dangerous.  *Malley v. Royal Caribbean Cruises Ltd.*, 713 F.App'x 905, 908 (11th Cir. 2017) ("Knowledge that the condition exists is not sufficient, [cruise line operator] must also know that the condition is dangerous. **We cannot automatically impute awareness** of the danger . . .") (emphasis added).

> **d. There is No Record Evidence that the 25 Seconds of the Unreasonably Dangerous Condition was a Sufficient Period of Time for *Norwegian* to Initiate Corrective Measures.**

As stated *supra*, Plaintiff's claims are not vicarious, so negligence by the tender operator cannot be imputed to Norwegian.  To show that there was sufficient time to initiate corrective action, ***Norwegian*** itself must have had actual or constructive notice of the unreasonably dangerous condition and then negligently failed to warn the passengers onboard the tender of that danger.

Captain Keijer testified that the **tender operator** could have flipped the switch and gotten on the PA or shouted a warning.  [Keijer Direct, Nov. 6, 2023, p. 14, l. 23 – p. 15, l. 6, "A.  He did not warn the guest. . . [the tender operator] had ample time to grab the PA system . . . to notify his guests that they should take preventative measures to minimize their injuries that could potentially occur or to deal with this emergency situation."].  But this argument rests on the premise that Mr. Buerano was the tortfeasor, not Norwegian.  There is no record evidence that *Norwegian* could have warned the passengers of the sea condition in those 25 seconds.  To hold Norwegian liable for its crewmembers' negligence is only possible under a theory of vicarious liability.

> **e.  There is No Record Evidence of Substantially Similar Incidents That Would Put Norwegian on Constructive Notice.**

Ms. Rugerri refers to a single, prior incident referred to as the "Richiutti incident."  [Joint Exhibit 34.004].  However, the "Richiutti incident" was *caused* by rough seas, a different tender operator, and the impact was to the ship itself (not the platform).  Critically, here, Plaintiff alleges that the tender operator *caused* unreasonably dangerous conditions, not 'visibly rough seas,' and that the tender's own wake caused the tender to roll which led to Ms. Ruggeri's injuries.  Moreover, the "Richiutti Incident" does not address the failure to warn as the cause of the plaintiff's injuries.

## III.  THE RECORD ESTABLISHED THAT NORWEGIAN PROVIDED FAIR AND ADEQUATE WARNINGS TO MS. RUGGERI BEFORE SHE FELL.

Notwithstanding the lack of any notice to Norwegian regarding the purportedly dangerous condition in the 25 seconds before the fall, the evidence established that Norwegian warned Ms. Ruggeri regarding general risks, and this should be deemed adequate as a matter of law.  [Jt. Ex. 32A, 32-1, 32-3, 32-4].  Norwegian played two safety videos – one upon embarkation at port and the other the day before and during tendering at a tender port – and a third audio warning on the tender itself.  Some of the following relevant warnings include:

- "**Remember the tender may be moving much more than the ship**."  [Jt. Ex. 32-3].

- "Always remember we will only tender when it is safe to do so and **tenders**, even the big ones, are much smaller than the ship and **will be much more likely to move around, especially if the wind rises or the sea develops a swell.**"  [Jt. Ex. 32-3].

- "**If there is a sudden movement**, **like a boat passing by and causing a wake**, then crew may ask you to wait until things settle down before allowing you to embark."  [Jt. Ex. 32-3].

- "Although the tender may not be moving, **remember that motion could only be a small wave away**, so always take care when going to your seat and be sure to hold on to the handrails, poles or seat backs."  [Jt. Ex. 32-3].

Plaintiff's expert Keijer admitted that he did not fault Norwegian's safety warnings given to Ruggeri:

> Q.    You're not faulting Norwegian's warnings that were given prior to that interval, whatever time, you know, the Court thinks that that interval should start to run.
> You are not faulting their warnings given before that time. Correct?
>
> A.    No, I am not.

[*See* ECF No. 144, Cross Examination of Captain Hen Keijer, "Keijer Cross," Nov. 6, 2023, p. 88, ll. 1-6].

Captain Keijer admitted that Ms. Ruggeri had already been warned of the possibility of unexpected vessel movement:

> Q.    Well, you admit that she had already been warned of a possibility of an unexpected vessel movement?
> You agree with that because we went over that before?
>
> A.    Yes, I do.

[*See* ECF No. 144, Keijer Cross, Nov. 6, 2023, p. 84, ll. 22-25].

Mr. Keijer's testimony, and the only evidence in the record, is that the ***tender operator*** should have warned Ms. Ruggeri in a span of 25 seconds:

> Q.     And your indication, you've said it several times in your
>        direct testimony, is that the operator should have warned and
>        that he had 25 seconds to warn. Right?
>
> A.     Correct.

[*See* ECF No. 144, Keijer Cross, Nov. 6, 2023, p. 80, l. 24 – p. 81, l. 2].

The sufficiency of the general warnings provided by Norwegian has not been challenged and there is nothing in the record to suggest that Norwegian did not provide sufficient and proper warnings to Ruggeri.  [*See* Jt. Composite Exhibit 32A, ECF No. 132].  The evidence does not support the conclusion that Norwegian directly knew about the sudden danger or that it could have provided a separate warning regarding that event.  But Norwegian *did* warn Ms. Ruggeri repeatedly both before she boarded the tender and while she was on the tender to use caution.  The Court should reconsider its ruling because these general warnings adequately discharged Norwegian's duty to warn.  The Court should enter judgment for Norwegian as a matter of law.

## IV.     THE COURT SHOULD REMIT THE VERDICT AMOUNT BASED UPON THE ATHENS CONVENTION, WHICH LIMITS RECOVERY PURSUANT TO THE GUEST TICKET CONTRACT.

If the Court does not alter or amend the judgment and enter judgment for Norwegian, the Court should impose the limitation clause of the Guest Ticket Contract.  The ticket contract contains an 'Athens Convention' clause which expressly limits the amount of recovery of 400,000

Special Drawing Rights ("SDR")[2] pursuant to EU Regulation 392/2009[3] for international cruises which neither embark, disembark, nor call at any U.S. port and where the guest embarks or disembarks at an EU country.  Plaintiff's western Mediterranean cruise embarked and disembarked at Civitavecchia, Italy.  [*See* Joint Ex. 50.002, ECF No. 86-20, p. 2].  The cruise had port calls at Livorno, Cannes, Palma Majorca, Barcelona, and Naples.  [*See id.*].  It is undisputed that the cruise did not embark, disembark, nor call any U.S. port and it embarked and disembarked in Italy, an EU country.

"Maritime contracts must be construed like any other contracts:  by their terms and consistent with the intent of the parties." *Davis v. Balsamis, Inc.*, 752 F.App'x 688, 691-92 (11th Cir. Aug. 30, 2018) (internal quotations omitted) ("Plaintiffs' ticket constitutes a maritime contract because its primary objective is to accomplish the transportation of passengers by sea.").  A non-negotiated contractual limitation of damages provision, such as the Athens Convention and EU 392/2009, is binding where:  (i) the cruise ship embarks from and disembarks in a foreign port with an entirely foreign itinerary; and (ii) the contract reasonably communicates to the passenger the existence therein of important terms and conditions which affects legal rights.   *Shankles v. Costa Armatori, S.P.A.*, 722 F.2d 861, 864 (1st Cir. 1983) (citations omitted); *Berman  v. Royal Cruise Line, Ltd.*, 1995 A.M.C. 1926, 1927, 1928-29 (Cal. 1995).

Whether a cruise line reasonably communicated such a limitation to the passenger is a question of law.  *See Nash v. Kloster Cruise A/S*, 901 F.2d 1565, 1567 (11th Cir. 1990); *Shankles*,

---

[2] SDR is an international reserve asset created by the International Monetary Fund to supplement its member countries' official reserves  SDR is not a currency, but a potential claim on freely usable currencies of member countries, thus providing a country with liquidity.  *See* https://www.imf.org/en/Topics/special-drawing-right

[3] Regulation (EC) No 392/2009 of the European Parliament and of the Council of 23 April 2009 on the Liability of Carriers of Passengers by Sea in the Event of Accidents ("EU 392/2009").

722 F.2d at 867.  To determine whether a cruise line contract reasonably communicated to the passenger the existence of important terms and conditions that affect legal rights, a court must consider two prongs:  (i) the physical characteristics of the contract, and (ii) any extrinsic factors indicating the passenger's ability to become meaningfully informed of the contractual terms at issue. *Shankles*, 722 F.2d at 864, 866.  "The reasonable communicativeness test does not impose on the cruise line the duty to design the 'best' ticket, or to give an 'ideal warning." *Euland v. M/V Dolphin IV*, 685 F.Supp. 942, 946 (D.S.C. 1988).

Norwegian was obligated to provide a ticket which "reasonably communicated" with adequate cautionary language that there were limiting terms in the contract.  *Marek v. Marpan Two, Inc.*, 817 F.2d 245, 246 (3d Cir. 1987).  The numerous warnings throughout Norwegian's Guest Ticket Contract sufficed as a matter of law.  *Id*.  *See also Nash v. Kloster*, 901 F. 2d 1565 (11th Cir. 1990); *Wilkin v. Carnival Cruise Lines, Inc.*, 661 So. 2d 1308 (Fla. 3d DCA 1995).  In other cases involving substantially similar ticket contracts issued by Norwegian, courts have found the limitation terms of the ticket contract to satisfy both prongs and concluded they were reasonably communicated to passengers.  *Hunter v. NCL (Bah.) Ltd.*, 2021 U.S. Dist. LEXIS 64890, at *13-19 (M.D. Fla. Feb. 15, 2021) (finding the physical characteristics and meaningfully informed prongs were satisfied); *Caron v. NCL (Bah.) Ltd.*, 910 F.3d 1359, 1367-68 (11th Cir. 2018) (enforcing the time limitations of a Norwegian ticket contract after reasonable communicativeness analysis); *Hadlock v. Norwegian Cruise Line, Ltd.*, 2010 A.M.C. 1167, 1173-75 (C.D. Cal. 2010) (enforcing arbitration clause because the limitation clause met the reasonable communicativeness test).

### a. Physical Characteristics Prong

To satisfy the physical characteristics prong, "it is enough that the [clause] was clearly set out and contained clear language." *Lebedinsky v. MSC Cruises, S.A.*, 789 F.App'x 196, 200 (11th Cir. 2019) (enforcing forum-selection clause that met the reasonable communicativeness test).

Here, the Court compared this ticket contract to the ticket contract in *Wajnstat*. In *Wajnstat*, Judge Cooke found that the ticket contract's limitation of liability provision ***was*** sufficiently conspicuous. *Wajnstat v. Oceania Cruises, Inc.*, 2011 U.S. Dist. LEXIS 157871, at *13 (S.D. Fla. July 12, 2011). Judge Cooke found that the first page contained, in bold, "Important Notice" which alerts the passenger to the existence of liability limiting provisions. Next, she found that, even though the limitation was on the third page, the provision was clearly labeled in bold and that the provision was distinct from the rest of the contract and clearly defined the section as pertaining to the cruise line's liability. Finally, she found that because the size and type of font was exactly the same as the every other provision in the contract, the passenger's argument about text size was inapplicable.

Conversely, this Court ruled that the ticket contract differed from the one examined by Judge Cooke in *Wajnstat*. The Court found that this ticket contract was ten pages, single spaced, the limitation on damages is not specified in bold print or in all caps, falls under a bolded heading for limitations of liability and nothing to make it stand out. [Trial Excerpt Court Rulings and Findings of Fact, Dec. 7, 2023, p. 10, ll. 4-20]. But these findings support the conclusion that the physical characteristics were adequate, even by Judge Cooke's analysis in *Wajnstat*. The limitation on damages and each subsection **is in bold** print, same as *Wajnstat*. [Jt. Ex. 13.003]. The limitation clause was found on page three, same as *Wajnstat*. The limitation clause was distinct from the rest of the clauses, same as *Wajnstat*. The text was single space, same as *Wajnstat*.

The font remained the same throughout the ticket contract, same as in *Wajnstat*.  The first page

contained, in bold, "Important Notice" alerting the passengers to liability limiting provisions, same

as *Wajnstat*.  As a matter of law, the ticket contract satisfies the physical characteristics test, even

as analyzed by Judge Cooke in *Wajnstat*.

### b.  Extrinsic or Meaningfully Informed Prong

To satisfy the second prong, the "test asks whether a plaintiff had the ability to 'become

meaningfully informed of the clause and reject its terms.'"  *Lebedinsky*, 789 F.App'x at 201

(quoting *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009)); *see also Paul*

*v. Holland Am. Line, Inc.*¸ 463 F.Supp.2d 1203, 1208 (W.D. Wash. 2006) (finding that there was

"nothing confusing about the [ticket] contract's reference to the Athens Convention" and therefore

the provision was enforceable as a matter of law.).   "[T]he circumstances surrounding the

passenger's purchase and subsequent retention of the ticket/contract [must] permit[] the passenger

to become meaningfully informed of the contractual terms at stake."  *Wajnstat*, 2011 U.S. Dist.

LEXIS, at *13.   (Internal quotations and citations omitted).   The court must consider the

passenger's familiarity with the ticket, time and incentive to study the provision of the ticket and

any other notice that the passenger received.  *Id*.  These are subjective.  *Id*. At *13-14.

In *Wajnstat*, the case this Court relied upon, Judge Cooke found that the Athens Convention

limitation clause did not 'meaningfully inform' the passenger because of one dispositive reason:

the clause did not meaningfully inform the passenger of what law applies in what circumstances.

*Id*. At *16.  Specifically, Judge Cooke identifies that the Athens Convention limits the cruise lines

liability and the next sentence informs the passenger that the Convention on Limitation of Liability

for Maritime Claims will further limit the cruise lines liability.  *Id*. At *18. Judge Cooke found

that to understand that provision, the passenger would have look up multiple laws and review an

entire treaty to identify further limitations, thus disincentivizing passenger to understand the contract. *Id*. At \*19.

Here, there was no finding that there was multiple foreign laws or that there was a separate foreign treaty that disincentivized Ms. Ruggeri from understanding the limitations, and there is none. The limitation clause only references EU Regulation 392/2009, which even includes a hyperlink to the regulation. The clause approximates the value of 400,000 special drawing rights ($608,000). The only reference to any other regulation is in the last sentence – which provides for *affirmative rights* to the passengers, not *limitation of rights*.

The analysis in *Wajnstat* is distinguishable because the dispositive reason behind the clause's failure to meaningfully inform the passenger is absent from Ms. Ruggeri's ticket contract.

## V. THE PAST PAIN AND SUFFERING AWARD IS NOT COMMENSURATE WITH THE COURT'S FACTUAL FINDINGS THAT MS. RUGGERI'S TESTIMONY WAS "INCREDIBLE" AND THAT SHE WAS OVERSTATING THE SEVERITY OF HER PAIN AND RECOVERY.

During the Court's oral recitation of its findings, the Court stated that Ms. Ruggeri "appears to be overstating her injury, pain and post-surgery recovery." Continuing, the Court found that Ms. Ruggeri's testimony about her pain "doesn't make sense in light of her other actions" and that because "there are so many contradictions between her testimony and people who have no incentive to lie," Ms. Ruggeri's testimony "seemed incredible to me." Finally, the Court concluded that it questions the severity of Ms. Ruggeri's "pain and some of the other claims she has made regarding her recovery." [Trial Excerpt Court Rulings and Findings of Fact, Dec. 7, 2023, p. 7, l. 17 - p. 8, l. 25].

Specifically, the Court noted that Ms. Ruggeri maintained her tenuous testimony even in the face of evidence to the contrary. The Court referenced her testimony regarding the tender and the configuration of he tender seats; what she told her own doctors and therapists regarding her

recovery and pain levels; ability to do her own hair, which conflicts with therapist notes; failure to

recall excursions in Naples.  Others are listed below:

| Ms. Ruggeri's Testimony | Contradictory Evidence |
|---|---|
| Permanent Residence in Toms River.  [Trial Testimony]. | Lives in a rental somewhere. |
| Her pain was a 10/10 on February 20, 2020. [Jt. Ex. 88.073]. | She went on a cruise starting February 22, 2020.  [Jt. Ex. 74.018]. |
| The tender was abruptly slowing down. [Trial Testimony]. | During deposition, she did not recall slowing down; at trial, tender abruptly slowed down, then later changed to just "slowed down." |
| She gained 40 lbs since the incident. [Trial Testimony]. | She lost 4 lbs from date of incident until July 14, 2022.  [Jt. Ex. 88.482]. |
| There was yelling, <u>Blood Curdling Screaming</u>, and mayhem inside the tender.  [Trial Testimony]. | The video of tender passengers disembarking is unremarkable. [Jt. Ex. 29-09; Jt. Ex. 29-10]. |
| She can't unlatch necklace anymore. [Trial Testimony]. | She has been able to put her necklace on since September 2, 2021.  [Jt. Ex. 88.394] |
| She can't do her hair anymore.     [Trial Testimony]. | She was able to do her hair since August 16, 2021.  [Jt. Ex. 88.375]. |
| She testified that the first doctor she saw after disembarkation, Dr. Law, told her to get a lawyer. [Trial Testimony]. | Dr. Law medical record states Ms. Ruggeri "feels fairly confident she will be involved in litigation . . . She has already contacted a lawyer" [Jt. Ex. 92.001]. |
| Tender #5 did not have a seatback/layout was not what was depicted in the pictures. [Trial Testimony]. | There is zero evidence that the inside of the tender was anything different than the photographs of the interior.  [Jt. Ex. 71.001-.002, Jt. Ex. 9.011]. |
| Range of Motions | When Defendant's expert examined Ms. Ruggeri, her range of motion was drastically lower than when her expert and treater examined her the day before and two months later, respectively |

The Court continued:

> I mean, if it had been one or two of these things, I
> mean, I probably wouldn't find them to be significant, but
> there are so many contradictions between her testimony and
> people who have no incentive to lie. And I understand, you
> know, when things are reported people are writing things down
> but the cumulative effect of that, it does make me question the
> severity of the plaintiff's pain and some of the other claims

she has made regarding her recovery.

[Trial Excerpt Court Rulings and Findings of Fact, Dec. 7, 2023, p. 8, ll. 18-25].

Despite those findings, the Court *still* awarded Ms. Ruggeri a staggering sum of $800,000.00 for past pain and suffering.  As basis for the monumental award, the Court cited to two surgeries performed (both of which were outpatient and did not require Ms. Ruggeri to be admitted) and 99 physical therapy sessions attended.  [Trial Excerpt Court Rulings and Findings of Fact, Dec. 7, 2023, p. 9, ll. 1-7].  The Court did not provide any basis for its calculations –so there was no finding as to what value the Court placed on the surgeries and physical therapy sessions.  That evidence simply cannot support such an excessive amount.

As a general rule, a remittitur order reducing an award "to the outer limit of the proof is the appropriate remedy where the [] damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008) (internal citation omitted).  "A verdict must be set aside if it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the trier of fact may properly operate." *Johnson v. United States*, 780 F.2d 902, 908 (11th Cir. 1986).  Excessiveness may be tested by comparing the verdict to those damage awards determined not to be excessive in similar cases.  *Id*.

Undersigned has been unable to find any reported case in Florida or maritime with an award of $800,000 for past pain and suffering for similar damages (torn rotator cuff and surgeries), especially involving a plaintiff whom the factfinder disbelieved and/or exaggerated her pain and recovery.

In *Higgs v. Costa Crociere S.p.A.*, the plaintiff suffered a more severe injury.  There, the plaintiff suffered a displaced proximal humerus fracture, dislocated humerus head, torn left rotator cuff, and torn left bicep tendon when she tripped and fell on a cleaning bucket onboard a cruise

ship.  Plaintiff underwent open reduction internal fixation surgery with plate and 12 screws implanted, arthroscopic surgery to repair her rotator cuff, and had sutures to repair her torn bicep tendons.  She additionally underwent six months of physical therapy, twice a week and received three cortisone injections in her shoulder.  This case was tried twice, once in 2016 and another in 2018, and the **jury awarded past pain and suffering of only $500,000 and $650,000**, respectively.  *See Higgs v. Costa Crociere S.p.A. Co.*, Case No. 15-cv-60280-JIC, 2016 Jury Verdicts LEXIS 1518 (S.D. Fla. Mar. 4, 2016) ("Higgs I"); *Higgs v. Costa Crociere S.p.A. Co.*, Case No. 15-cv-60280-JIC, 2018 Jury Verdicts LEXIS 35323 (S.D. Fla. Sept. 27, 2018) ("Higgs II").  Moreover, and critically important here, <u>**there was no finding that the plaintiff was exacerbating the severity of her pain and recovery**</u>.  *See also Maynor et al. v. GEICO Gen. Ins. Co.*, Case No. 15-ca-001265, 2018 Jury Verdicts LEXIS 16199 (Fla. 20th Cir. Ct. May 17, 2018) (jury awarded $125,000 of past pain and suffering to a plaintiff who underwent arthroscopic surgery on shoulder and suffered from wrist, back, and neurological pain and complications); *Huhndorf v. Allstate Fire and Cas. Ins. Co.*, 11-2018-ca-000340-0001-XX, 2019 Jury Verdicts LEXIS 140516 (Fla. 20th Cir. Ct. Aug. 27, 2019) (plaintiff underwent two shoulder surgeries, including a repair of torn rotator cuff, and five months of physical therapy as a result of a car accident; after trial, jury found that the plaintiff did not sustain a permanent injury and only awarded past medical expenses); *Montero et al, v. Corzo et al.*, 2017-000104-ca-01, 2019 Jury Verdicts LEXIS 84599 (Fla. 11th Cir. Ct. Aug. 30, 2019) (a jury awarded plaintiff $30,000 in past pain and suffering as a result of a car accident that caused bilateral knee and shoulder injuries; plaintiff underwent arthroscopic knee surgery and suffered a torn rotator cuff of right shoulder).

Finally, the Court acknowledged that Ms. Ruggeri's continuous smoking could affect her recovery, however, there is no indication that the Court considered the detrimental healing effects

in awarding past pain and suffering.  Essentially, the competent evidence supports a drastic reduction in pain and suffering or a percentage of comparative fault to be assigned to Ms. Ruggeri.

The $800,000 award for past pain and suffering for someone whom the factfinder found to drastically embellish her pain and recovery is unconscionable and should be reduced to $50,000 as suggested during trial.

## CONCLUSION

Ms. Ruggeri's failure to warn theory is predicated solely on the tender operator's liability, which Norwegian can only be held liable with a vicarious liability claim.  Ms. Ruggeri's failure to warn claim fails because, first, there is no evidence that Norwegian's general warnings were insufficient, and second, there is no evidence that Norwegian knew that an unreasonably dangerous condition existed about which to warn.  Even assuming Plaintiff's contention that an unreasonably dangerous condition existed, Plaintiff contends that the only tortfeasor here was the tender operator who failed to warn Ms. Ruggeri in the span of 25 seconds.  Going even further, Plaintiff contends that the tender operator should have recognized the unreasonably dangerous condition and given the warning – but these facts are not properly applied to a direct liability failure to warn claim. Norwegian cannot be held directly liable for the tort committed by its employee.

Second, as a matter of law, the Athens Convention clause in the ticket contract should apply.  The Court misapplied the *Wajnstat* court's analysis when reviewing the physical characteristics and extrinsic or meaningfully informed tests to the ticket contract itself.

Finally, the award of $800,000 for past pain and suffering for a plaintiff who was found to be exaggerating her pain and recovery is unconscionable and should be reduced.

WHEREFORE, Defendant Norwegian respectfully requests this Court to enter judgment for Norwegian on Count I, or, in the alternative, amend its findings to reduce the award for pain

Case No.: 1:20-CV-21961-GAYLES
Page No.: 22

and suffering and enforce the limitations clause of the ticket contract, and any other relief this

Court deems just and proper.

Dated: January 16, 2024

Respectfully submitted,

/s/ Matthew Street
Matthew Street, Esq.
Florida Bar No.: 1013945
Richard J. McAlpin, Esq.
Florida Bar No.: 438420
Daniel S. Marcotte, Esq.
Florida Bar No.: 52314
**McALPIN MARCOTTE**
Brickell City Tower
80 S.W. 8th Street, Suite 2805
Miami, Florida 33130
Telephone: (305) 810-5400
Facsimile: (305) 810-5401
dmarcotte@mtm-legal.com
rmcalpin@mtm-legal.com
mstreet@mtm-legal.com

/s/ Jack R. Reiter
Jack R. Reiter, Esq.
Florida Bar Number: 0028304
**GRAYROBINSON, P.A.**
333 Southeast Second Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
jack.reiter@gray-robinson.com

## **SERVICE LIST**

HICKEY LAW FIRM P.A.
John H. Hickey, Esq.
Lisa C. Goodman, Esq.
Hickey Law Firm, P.A.
1401 Brickell Ave., Suite 510
Miami, Florida 33131
(305) 371-8000 (T)
(305) 371-3542 (F)
hickey@hickeylawfirm.com
federalcourtfilings@hickeylawfirm.com
lgoodman@hickeylawfirm.com
dmartinez@hickeylawfirm.com