```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                     CASE NO. 20-CV-21961-DPG
3

4     VIVIAN RUGGERI,                      Miami, Florida

5          Plaintiff,                      December 6, 2023

6             vs.                          11:00 a.m. to 2:19 p.m.

7     NCL (Bahamas) LTD, doing
      business as NORWEGIAN CRUISE
8     LINE,

9          Defendant.                      Pages 1 to 100
      _____
10

11                     EXCERPT OF JURY TRIAL
                       TESTIMONY OF HARESTAD
12            BEFORE THE HONORABLE DARRIN P. GAYLES
                    UNITED STATES DISTRICT JUDGE
13
      APPEARANCES:
14

15    FOR THE PLAINTIFF:       JOHN HEYWARD HICKEY, ESQ.
                               LISA C. GOODMAN
16                             HICKEY LAW FIRM
                               1400 Brickell Avenue, Suite 510
17                             Miami, Florida 33131

18
      FOR THE DEFENDANT:       RICHARD J. MCALPIN, ESQ.
19                             MATTHEW STREET, ESQ.
                               80 SW 8 Street
20                             Suite 2805
                               Miami, Florida 33130
21                                   -and-
                               BRETT BERMAN, ESQ.
22                             IN-HOUSE COUNSEL
                               NORWEGIAN CRUISE LINE
23

24

25
```

```
 1   STENOGRAPHICALLY REPORTED BY:

 2                             PATRICIA DIAZ, FCRR, RPR, FPR
                              Official Court Reporter
 3                            United States District Court
                              400 North Miami Avenue
 4                            11th Floor
                              Miami, Florida 33128
 5                            (305) 523-5178

 6


 7                         I N D E X

 8

 9                                Direct   Cross    Redirect

10   WITNESSES FOR THE PLAINTIFF:

11

12   JOHN B. HARESTAD
     (BY MR. STREET)
13   (BY MR. HICKEY)                        3

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (EXCERPT OF PROCEEDINGS)

 2                        CROSS-EXAMINATION

 3   BY MR. HICKEY:

 4   Q.  Good morning.

 5       First of all, yesterday I think you were asked about how

 6   much you were paid.  You said your company receives $375 an

 7   hour for your time.  Is that correct?

 8   A.  Correct.

 9   Q.  And you were out here a month ago and spent some time and

10   you said you did not charge for your travel time but you did

11   charge for your time here.  Correct?

12   A.  No, I don't believe that's correct.

13   Q.  Oh, you did not charge?

14       You gave that to the cruise line for free?

15   A.  No, I am here for a period of time and Starboard Ten bills

16   whomever is using my services for travel time and depositions.

17   Q.  Now I'm confused.

18       When you came out here a month ago, did your company bill

19   for your travel time, yes or no?

20   A.  Yes.

21   Q.  And when you came out here a month ago did your company

22   bill for the time that you are actually here waiting to be --

23   waiting to go on the stand?

24   A.  That I can't say for sure.

25   Q.  Okay.  Well, what is the travel time, and it would be
```

1  Vancouver-Miami.  Correct?

2  A.  Victoria.

3  Q.  Okay.  Fair enough.

4      Victoria is an island off of Vancouver, a beautiful island,

5  and Vancouver is a beautiful city, and you have to take a

6  ferry.  Is there still only a ferry from Victoria Island to

7  Vancouver?

8  A.  Yes, Victoria is on Vancouver Island, so Vancouver is on

9  the main land, so that's confusing.

10  Q.  Right, right.  Got it.

11  A.  But I fly.  I fly from Victoria to Vancouver and Vancouver,

12  through various connections, to Miami.

13  Q.  It's an all-day affair.

14      The travel time would be 12, 15 hours?

15  A.  Altogether, but the company that I work for settles on a --

16  how should I say, eight hours I believe is the maximum that

17  they charge for travel only.

18  Q.  Okay.  So travel only, that's eight hours out here and

19  eight hours back for that trip?

20  A.  Eight hours a day that I'm away from home.

21  Q.  Okay.  Eight hours out here and eight hours back.  That's

22  two travel days.  Right?

23  A.  Eight hours per travel day.

24  Q.  Yes, sir.  You have to go back, so that's another travel

25  day.  There are two travel days, that's the simple proposition

1    I'm trying to establish.

2    A.   I'm sorry, I am very, very physically exhausted, so numbers

3    are not work in my head very well.

4    Q.   I can relate to exhaustion at this point.  I think all

5    counsel can.

6         Okay.  So that's two travel days.  That's 16 hours.

7         How long were you actually here during that period a month

8    ago?

9    A.   A month ago I was here for three days.

10   Q.   Okay.  So that's three, and that's eight hours a day -- if

11   your company did bill it, that's eight hours for each day.

12        Correct?

13   A.   Correct.

14   Q.   Okay.  So now we have five days, 5 times 8 is 40.  Is my

15   arithmetic correct on that?

16   A.   I hope so.

17   Q.   Okay.  There you go.  So, 5 times 8 is 40.  So that's

18   40 hours times $375.  I'm sure that someone at my table has now

19   pulled out the calculator to do that calculation.  So that's

20   that.

21        Okay.  So we fast forward to now, how many -- when did you

22   come out here for this aspect of the trial?

23   A.   I arrived on -- I flew Saturday, arrived Saturday --

24   Q.   Okay.

25   A.   -- of last week.

1   Q.   Okay.  So that's eight hours.  Correct?

2   A.   Uh-huh.

3   Q.   Yes?

4   A.   Yes.

5   Q.   Then did you bill for Sunday?

6   A.   That will be eight hours each day that I am here.

7   Q.   Okay.  So this would be the fourth day that you are here?

8   A.   Correct.

9   Q.   So that's -- on this trip that's five days so far, and then

10   tomorrow if you go back tomorrow, I assume you will, that's

11   eight hours.  Correct?

12   A.   Correct.

13   Q.   Okay.  So that's four, five.  So that's five days this

14   time, and 5 times 8 is 40, so another 40 hours times $375.

15   Correct?

16   A.   Yep.

17   Q.   Okay.  How much time have you billed before that, before

18   the first aspect of the trial?  How much time did you bill for

19   review of file and preparation of report, etcetera?

20   A.   Twenty-two hours.

21   Q.   Twenty-two.

22        Did you bill any time between the first trial days in

23   November and now in December, have you billed any time?

24   A.   Not yet.

25   Q.   Well, fine, but will you bill time?

1   A.   Yes, we will.

2   Q.   And how much time?

3        What I'm saying is not in trial, not in Miami, but I'm

4   asking, you know, for preparation, for telephone calls to the

5   lawyers, things like that?

6   A.   Yes.

7   Q.   How many hours and I am only --

8   A.   Sir, I cannot answer that.  I am having trouble

9   understanding the point of all of this.

10        Just being a consultant, I don't understand the purpose of

11   it, and I am not in the position to be a human calculator at

12   the moment.

13   Q.   Well, I don't want to argue with you, sir, but I am just

14   asking a question about the amount of --

15   A.   I am just -- as I am saying, I am not able at this moment

16   to calculate 22 times this, and I'm going to bill one hour here

17   and that was spent -- you know, I am just not capable of doing

18   that.  I apologize.

19   Q.   I am not asking you to perform multiplication on the stand.

20   We will.  I am asking you for the approximate number of hours

21   you spent on this case between the November trial setting and

22   the December trial setting?

23        What's the approximate number of hours you spent on this

24   case in that period of time?

25   A.   It's no more than the travel time, so five days times eight

 1   hours, approximately.

 2   Q.  Did you spend any preparation time between the two trial

 3   settings?

 4   A.  One hour before I came down this time on the phone.

 5   Q.  Okay.  So, do we have a rough estimate?

 6        MS. GOODMAN:  Approximately $40,000.

 7   BY MR. HICKEY:

 8   Q.  If our arithmetic is correct, so far your company -- I know

 9   you say it's your company -- has billed $40,000 for your time

10   in this case.

11        Does that sound accurate?

12   A.  It sounds a bit high to me.  I would have thought it would

13   be more like 30 but, you know.

14   Q.  We will present the arithmetic to the Court.  Thank you.

15   A.  Certainly.

16   Q.  Now, you said, you mentioned that two years ago you were

17   retained by my firm.

18        Do you remember that?

19   A.  I do.

20   Q.  That was on -- that was once two years ago and you created

21   a report.  Is that correct?

22   A.  Yes.

23   Q.  And you were retained in regard to two Carnival ships,

24   cruise ships, which collided with each other off the coast of

25   Mexico.  Do you remember that?

1    A.   I do.

2    Q.   And you remember that one ship was at dock.  Correct?

3    A.   I do.

4    Q.   And one ship pulled up to behind aft, if you will, A-F-T

5    aft or behind the other ship and collided with it.  Correct?

6    A.   Correct.

7    Q.   One of the main aspects of that situation, and in any

8    collision, usually, when one ship is, one vessel is motionless

9    and the other is moving, one of the principal causes of that

10   was excessive speed.  Correct?

11   A.   Yes, but there was more involved in that case than the

12   initial -- how should we say it?  The excessive speed was prior

13   to the collision.

14   Q.   Yeah, it always is.

15   A.   No, I mean prior, toward the end they were slowed down or

16   slowing down.

17   Q.   Right.  But it was too late?

18   A.   Yes.

19   Q.   And here it was too late.  There was a collision or you

20   call it a hard stop or a hard landing, but there was a

21   collision between this tender vessel and that platform.

22        Correct?

23   A.   There was a hard landing, absolutely.

24   Q.   You would agree that's a collision?

25   A.   I don't know.  I am not in a position to define collision

1   but, yes.

2   Q.   And you would agree that their speed, the speed controlled

3   by the operator of the vessel, the speed was, you say,

4   six knots.

5        I think the testimony of Captain Keijer was six to

6   seven knots.

7        Correct?

8   A.   I believe he said six, sir, in that neighborhood.

9   Q.   Okay.  And there was, in fact, a slowdown to three?

10  A.   Correct.

11  Q.   And apparently, for whatever reason, it was too late?

12  A.   I don't agree with too late.  You know, the guy pulled in.

13  He came into the tender landing and made fast, and he had a

14  hard landing while he was doing that.

15  Q.   As you said about the other case, a little bit more to it

16  than that, isn't there?

17       As a matter of fact, let me ask you this:  After that hard

18  landing or collision, after that collision -- by the way, the

19  collision was with the platform on the cruise ship.  Right?

20  A.   It was a hard landing on the platform of the Epic, yes.

21  Okay.

22  Q.   Yes, that's a part of the cruise ship.  That platform is a

23  part of the ship?

24  A.   Absolutely, no question.

25  Q.   So there is a collision between one vessel and another,

1   isn't there, here?

2   A.   As I say, you are predicating on having us understand what

3   a collision is.  If you define it as such, then yes.

4   Q.   You define a collision when two vessels meet.  Right?

5   A.   Yes.

6   Q.   So you had testified about warnings, and I thought I marked

7   the notes of this.  Let's see if we can agree to some basic

8   concepts because actually we have agreed to several already.

9        Let's see if we can agree to some basic concepts regarding

10  warnings and operation of the tender vessel.

11       I think you sat in when the deposition testimony of

12  Mr. Buerano was played.  Part of it was played on the TV.

13  Correct?

14  A.   Yes.

15  Q.   And part of it was read by me and my law partner.

16       Correct?

17  A.   Correct.

18  Q.   And you saw and heard and you read the deposition before

19  where Mr. Buerano said these collisions occur, smashing of the

20  tender boats into docks?

21  A.   I don't recall that phraseology.

22  Q.   Oh, you don't.

23       So you read the entire deposition?

24  A.   Say again, sir.

25  Q.   You read the entire deposition of Mr. Buerano, the operator

1   of the tender?

2   A.  Yes, I did.

3   Q.  And you watched the video, I'm guessing?

4   A.  I did.

5   Q.  And on page -- did you find significant the questions

6   starting on page 82, line 20?

7       "Question:  Are you aware of other NCL ships that have

8   crashed into docks?"

9       The witness:  "Yes, I'm aware."

10      "Question:  Are you aware of other NCL tender boats that

11  have crashed into docks?"

12      "Answer:  Yes, I'm always aware of these situations."

13  A.  Okay.

14  Q.  You found that significant that he knew about other tender

15  boats crashing into docks?

16  A.  I would expect he would be aware of them, yes.

17  Q.  So, of course, the company is aware of it through him

18  because you know and he testified he, Buerano, is and has been

19  an employee of NCL.  Correct?

20  A.  Correct.

21      MR. STREET:  Objection.  Calls for speculation.

22      THE COURT:  And it assumes a legal conclusion, so I

23  will sustain.

24  BY MR. HICKEY:

25  Q.  The testimony is clear, and you know that Mr. Buerano was

1    at the time he operated this vessel an employee of NCL.

2         You know that?

3    A.  Yes, I know that.

4    Q.  And you know that he has been an employee, a loyal employee

5    of the cruise line for several years before it.

6         I'm not going to remember the number of years, but it's

7    like several years before, like eight, I think, but you know

8    that from the testimony.  Correct?

9    A.  Correct.

10   Q.  And you heard in this courtroom testimony about a

11   strikingly similar incident at this particular port involving

12   this particular ship, the Epic.

13        Did you remember when in the beginning of the trial, I

14   don't know if you were here, I read an interrogatory answer

15   describing that incident?

16   A.  I believe so.

17   Q.  And Norwegian Cruise Line knows -- you've seen the

18   testimony from the corporate representative.  Correct?

19   A.  I've seen the testimony, yes.

20   Q.  Yes.  And the cruise line knows that if you don't, that

21   they have a duty to warn passengers of impending situations

22   that could cause injury?

23        MR. STREET:  Objection.  Speculation.  Conclusion.

24        THE COURT:  Sustained to the form of the question.

25   BY MR. HICKEY:

1   Q.   There is testimony in this case, as a matter of fact, from,

2   one, Mr. Buerano, that the cruise line has a duty to warn its

3   passengers about dangerous situations.   Correct?

4   A.   Yes.

5          MR. STREET:   Objection.   Mischaracterizes.

6          THE COURT:   Overruled.

7   BY MR. HICKEY:

8   Q.   You read the deposition of the corporate representative and

9   he testified about the duties of the cruise line.

10         Correct?

11  A.   Correct.

12  Q.   And the cruise line he testified has a duty to warn its

13  passengers of dangerous situations?

14  A.   Yes.

15  Q.   There is only one person that was in charge of this tender

16  at the time, and that was this Mr. Buerano.   Correct?

17  A.   Correct.

18  Q.   And he is the one who was in charge of the speed of the

19  vessel.   Right?

20  A.   Correct.

21  Q.   And he is the one who is in charge of the direction of the

22  vessel.

23  A.   Correct.

24  Q.   And he is the one who for that one mile from the Cannes or

25  Cannes -- I learned yesterday it's Cannes not Cannes, but who

1    knew.

2        He is the one -- Mr. Buerano is the one who -- from the

3    pier were where the 200 passengers loaded onto the tender, he

4    is the one, Mr. Buerano, who can see the cruise ship a mile

5    away in the Port of Cannes.  Right?

6    A.  Yes.

7    Q.  And he is the one who is responsible for knowing where his

8    wake is going to go.  Correct?

9    A.  Yes.

10   Q.  And he, Mr. Buerano, is the one who was responsible for

11   knowing how you can't or should not pull up to a cruise ship or

12   any massive vertical surface and you should not do that

13   immediately or in a fashion that creates wake and the

14   reverberation of wake.  Correct?

15   A.  He is responsible for dealing with any kind of challenges

16   that he would face coming up to the tender platform.

17   Q.  And those challenges include creating his own wake

18   situation.  Correct?

19   A.  It could.

20   Q.  Yes, he is responsible for knowing about that?

21   A.  He is responsible for knowing about everything that he

22   could possibly, reasonably surmise under the circumstances,

23   yes.  And these would include that.

24   Q.  And it's basic seamanship of this kind of vessel, you have

25   to reasonably surmise that your vessel is going to create wake?

1   A.   Well, he knows that.   He knows his boat creates a wake.

2   Q.   Thank you.

3        And that's basic seamanship; isn't it?

4   A.   Well, it's -- yes, it's, how should you say it, nautical

5   competence, if you will.

6   Q.   It's what competence?

7   A.   Nautical.

8   Q.   Nautical competence.

9        Thank you.

10       And he, Mr. Buerano, he, Mr. Buerano has to be aware, has

11  to have situational awareness of wake from other boats.

12       Correct?

13  A.   Well, he has to have situational awareness of that among a

14  host of other things, yes.

15  Q.   And he, Mr. Buerano, has to be aware of swells in addition

16  to that.   Correct?

17  A.   He has to be aware of the environmental conditions that

18  exist at the time or he should be able to.   He has to do the

19  best he can.

20  Q.   We talked a little bit or you did about swells.   Swells can

21  be created hundreds of miles away.   Correct?

22  A.   Yes.

23  Q.   Swells travel over great distances over the oceans.

24  Correct?

25  A.   Yes.

1   Q.   Swells are not something that come up all of a sudden and

2   surprise you, are they?

3   A.   Well, again, we are getting back to defining swells.

4        You know, yes, if you -- I'm not going to say no to that.

5   I can't, really.

6   Q.   Thank you.

7        And you know that Mr. Buerano -- so swells are something

8   that travel over hundreds of miles or can, and Mr. Buerano

9   testified that he knew that other boats around create swells.

10       He testified to that.  I think he meant wake, but he said

11   swells.  Right?

12   A.   Yes.

13   Q.   And you know from Mr. Buerano's testimony he also said when

14   asked about -- when asked about boats in Cannes, France, in

15   that area he said, and I quote, "Yes, of course, there is

16   always a boat around."

17       Do you remember that testimony?

18   A.   Always a boat around, yeah, probably he was meaning plural,

19   "boats around."

20   Q.   And he also said, quote, "So if there is always a boat,

21   there is always a swell.  Right?"

22       And that was actually the question, and he said, "Yes, of

23   course," end quote.

24       Right?

25   A.   Yes.

1   Q.   That's the testimony?

2   A.   Right.

3   Q.   So, he knew in Cannes, France that boats are always around

4   and they are creating -- he said swells.  It's probably more

5   appropriate to say wake.  Correct?

6   A.   Yes, the boats create wakes, yes.

7   Q.   Yeah, understood.

8        In fact, you have seen -- in fact, you have seen the video,

9   the extended video of the, of that day out at Cannes, France.

10       You have seen that, haven't you?

11  A.   Yes.

12  Q.   And you agree, you agree that this incident took place --

13  it's about 5:30 or so, 5:45 p.m.  Right?

14  A.   Yes.

15  Q.   They are late?  They are running late?

16  A.   I don't know if they are running late.

17       I believe their departure is at 6 o'clock, 1800 hours.

18  Q.   Excuse me?

19  A.   1800 hours, I believe, is their departure time.  I am not

20  entirely sure, but that's what I remember from the deck log.

21  Q.   1800 hours is departure time.

22       Do you remember also that the last tender is supposed to

23  leave Cannes at 5:00 p.m.?  You remember that?

24  A.   I am not going to say a hundred percent that I remember

25  that.  It sounds reasonable.

1   Q.   Do I have to bring up the document?

2        I will bring up the document that shows that.  It's at the

3   top of the Cannes, France.

4   A.   Okay.  Five o'clock, fine.

5   Q.   But you remember that, don't you?  That's the departure

6   time?

7   A.   Okay.  Will do.

8   Q.   Okay.  So I am not going to bring up that document.  We

9   agree on that, thank you.

10       And this tender left the dock in Cannes at 5:30.  Right?

11  A.   Okay.

12  Q.   So he is half an hour late just leaving -- he is half an

13  hour late just leaving the dock?

14  A.   No, I don't agree with that.  I may have been mistaken

15  about the timing involved.  My understanding of the timing that

16  I reviewed that he was not late.  He was the last tender to

17  come back from Cannes but late, I don't remember that.

18  Q.   You don't?

19  A.   I don't remember that the ship was, you know, chomping at

20  the bit to leave or any of that, no.

21  Q.   Oh, you don't.

22       Well, first of all, you agree that the document says the

23  last tender is supposed to leave Cannes at 5:00 p.m.?

24       I mean, if you don't --

25  A.   Okay.  5:00 p.m.

1   Q.   Let's just put it --

2        THE COURT:  Hold on.  You are both talking at the same

3   time.

4        Why don't you finish your question and then let him

5   answer.

6   BY MR. HICKEY:

7   Q.   Here is my question.

8        We will do it the long way.  We will go ahead and put up

9   the document.  Go ahead and put up the document with a

10  5 o'clock at the top.

11       You see this is in evidence as Joint Exhibit 004.001.

12       Do you see where it says at the top, "Last tender

13  5:00 p.m."   Do you see that?

14  A.   Yes, I do.

15  Q.   You have seen me refer to that in this trial, haven't you?

16  A.   I do.

17  Q.   And you remember that.  Okay.

18       And you know for a fact this tender left the Port of Cannes

19  at about 5:30 on that day?

20  A.   Yes.

21  Q.   Thank you.

22       You know for a fact that that cruise ship log says that at

23  the time -- by the time they got to the cruise ship, the cruise

24  ship actually had pulled anchor.  You know that?

25  A.   That's standard procedure.  What I don't understand is how

1   are they late if the departure time is not in jeopardy?  This

2   is what I don't understand the point of this.

3       If they were destined -- if they were supposed -- if the

4   ship, itself, were scheduled to leave at 5:30 and he arrived at

5   5:30, I can see them being late but it all to me is -- you

6   know, when is the ship supposed to leave?

7   Q.  You've served various capacities on cruise ships.

8       Correct?

9   A.  Yes.

10  Q.  And you have never served as a captain of a cruise ship.

11  Correct?

12  A.  No, that's incorrect.

13  Q.  Oh, you have served as captain?

14  A.  I have, on three different occasions.

15  Q.  Oh, on a temporary basis?

16  A.  A temporary basis, yes.

17  Q.  You have you never served as a permanent appointed captain

18  of a cruise ship.  Correct?

19  A.  No, permanently, no.

20  Q.  Thank you.  But you know these basics.  You know that there

21  is a lot to do in order for a cruise ship to leave a port.

22      Right?

23  A.  Yes.

24  Q.  And you know schedule on cruises is everything.  Right?

25  A.  Uh-huh.

1    Q.   Yes?

2    A.   It's important.

3    Q.   It's important.  It's important because -- and they tell

4    you, and you get messages from the headquarters if you don't

5    keep the schedule because it means loss of revenue.

6         Right?

7    A.   Well, it certainly throws a wrench in the gears, and

8    everyone wants to avoid, how should we say it, deviations in

9    the schedule.

10   Q.   Because one of the sources of loss of revenue is if you

11   have to speed up to make schedule, that causes consumption of

12   more fuel.  Correct?

13   A.   Yes, but, again, I don't see the point in all of this

14   because the ship has plenty of time to get to the next

15   destination.  They're not in a rush, so far as I can understand

16   by, you know, having looked at the itinerary.

17   Q.   You don't know whether the ship was in a rush or not in a

18   rush.  You weren't on the bridge at the time.  All you do know

19   is that this ship had pulled anchor by the time that the tender

20   reached the ship?

21   A.   It's standard procedure to pull the anchor in advance.

22   They know it's the last tender.  They start picking up the

23   anchor so by the time the tender operation is pretty much over,

24   they are also about ready to stow the anchor and make way for

25   the next port.

1   Q.   Uh-huh.   The tender operator here is late?

2   A.   I don't agree with the tender operator is late.

3        I haven't seen any evidence to suggest that the tender

4   operator was late.   All that I know is that he was the last

5   tender of the day, but that does not equate to being late.

6   Q.   I agree with you that being last doesn't equate to being

7   late, but when it says last tender 5:00 p.m. and he takes off

8   at 5:30, that's half an hour late.   Right?

9   A.   Okay.   I can't say one way or another because I don't have

10  the picture -- I don't have the knowledge that I need to say at

11  this point in time whether the tender was late or not.

12  Q.   If I told you that the evidence is that he left Cannes at

13  5:30, you would agree that he was late?

14  A.   Yes, if you give me those figures, he's late.

15  Q.   Now, he, Mr. Buerano knows that, he knows that other

16  tenders have crashed into docks.

17       He knows about -- I mean, he certainly should know -- if he

18  is trained properly, he should know about and this is getting

19  back to the basics here, should know about boats creating wake.

20       Right?

21  A.   Yes.

22  Q.   And you agree that -- and now that we are at kind of basic

23  seamanship, you -- by the way, you criticized some of the --

24  I'm going to get back to this failure to warn business.

25       We're going to talk about Chapman's because you said -- and

1   you mentioned Chapman's because you know that Captain Keijer

2   specifically cited to Chapman's in his report.  Correct?

3   A.  Yes, that's how it came up.

4   Q.  And you said, oh, Chapman's, it's limited to some other

5   kind of vessels.  Right?

6   A.  I don't know if that's how I phrased it, but I'm saying

7   that the audience for that particular publication is generally

8   recreational users.  That was my -- how should I say it, my

9   summary of that particular publication.

10  Q.  You agree, and by the way, Chapman's does not say anywhere

11  that it's not for the merchant mariner.  Correct?

12  A.  No, I don't see why it would.

13  Q.  So that's just you saying that?

14  A.  Yes, that's me saying that.

15  Q.  Okay.  But you do agree with some of the, maybe all of the

16  basic tenets of navigation that Chapman's --

17  A.  No, how shall I say it, I acknowledge it as having those

18  guidelines, yes.

19  Q.  And you agree with those guidelines.  They are good?

20  A.  I agree, yes.

21  Q.  And Chapman's, by the way -- you agree Chapman's has been

22  used by the U.S. Navy and the United States Coast Guard?

23  A.  I have no idea.  I have never been in the U.S. Navy, have

24  nothing to do with them.

25  Q.  Do you know that Captain Keijer did testify about that?

1   A.   Could be.

2   Q.   Were you here -- you were here for Captain Keijer's

3   testimony?

4   A.   I wasn't here for his testimony.  However, I read some of

5   the information about that.

6   Q.   The report?

7   A.   Yeah.

8   Q.   In his report he said Chapman is used by the United States

9   Navy and the U.S. Coast Guard.  Correct?

10  A.   Yes.

11  Q.   And you have nothing to refute that.  Correct?

12  A.   No, I don't.

13  Q.   And in Chapman's it says, quote -- and I want to know if

14  you agree or disagree with this -- "monitor your boat's wake as

15  you make your way to your berth.  It can affect your boat as

16  well as other craft nearby," end quote.

17       Do you agree or disagree with that general proposition of

18  handling a boat?

19  A.   I do.

20  Q.   Thank you.

21       Do you agree with the next one, quote, "Don't come in at a

22  high speed with a grand flourish.  Depending on conditions,

23  throttle down gradually to keep the boat under control," end

24  quote.  Do you agree with that?

25  A.   I do, but I would also predicate that by saying the use of

1    a grand flourish and the high speed and all of that is, in my

2    view, evidence of the intended audience of this publication.

3    It's designed for people who drive fast speed boats like in

4    Miami ship channel, and they create a wake and they need to be

5    really careful when they slow down because they can roll their

6    own craft over by doing that.

7        This is why I have -- this is why I take issue with the use

8    of that publication.

9    Q.   But you agree with its -- I know you went off on a choice

10   of words there, but you agree with the proposition, don't come

11   in at a high speed.  Depending upon the conditions, throttle

12   down gradually to keep the boat under control.

13       You agree with that?

14   A.   I do.

15   Q.   That's a basic principle of seamanship; isn't it?

16   A.   It is.

17   Q.   Finally, you agree where Chapman says, quote, "If you had

18   been running at any speed, hold off briefly and let your own

19   wake pass by your boat," end quote.

20       You agree with that?

21   A.   Well, it depends on the situation.  It depends on the

22   situation and the type of craft you're operating with that

23   particular statement.

24   Q.   Okay.  You agree generally that that's an accurate

25   statement for good seamanship?

1   A.   As a rule of principle, yes.

2   Q.   And you agree that -- we talked about collision now and you

3   agree with that.

4        Do you agree that -- you mentioned before the IMO.  Right?

5   A.   Yes.

6   Q.   And the IMO has what's called the COLREGs.

7        You have heard of those?

8   A.   The collision regulations.

9   Q.   You are very familiar with those too; aren't you?

10  A.   Yes.

11  Q.   And the collision regulations, these are regulations which

12  would apply to NCL and the operation of this tender.  Correct?

13  A.   They apply to any craft, yes.

14  Q.   And the collision regulations, they actually incorporate

15  all of the inland and international rules of navigation, the

16  rules of the road?

17  A.   The collision regulations apply to international waters.

18  Q.   Okay.  That's another question but, yes, they apply in

19  international waters.  Correct?

20  A.   Yes.

21  Q.   But they also, what they have done in the COLREGs, which do

22  apply here, they have incorporated -- the IMO has incorporated

23  the international rules of navigation.

24       They are also called rules of the road.  You know the rules

25  of the road?

1    A.  Yes, I do.

2    Q.  And they have incorporated that into the COLREGs.  Correct?

3    A.  No, the rules of the road are the rules of the road.  There

4    is not two publications.  There is only one.  So COLREGs are --

5    the collision regulations are the international regulations for

6    the prevention of collisions at sea.

7    Q.  Right.  And you know about the rules of the road, though;

8    don't you?

9    A.  Yes, the rules, yes, I do.

10   Q.  And I can either put this on the board or show it on the

11   ELMO?

12       I will go ahead and show it on the ELMO.  If I have to

13   write it on the board, I will.

14       COLREGs has rule five, and rule five -- and you know what

15   rule five is.  It's maintain a proper lookout.  Right?

16   A.  Correct.

17   Q.  And you know that because rule five is the same in the

18   COLREGs as it is in the international rules of the regulations.

19   Is that right?

20   A.  I will correct you.  The COLREGs and the international

21   collision regulations are the same thing.  They are not

22   separate.

23   Q.  There you go.  I will not quibble with you on that.

24       The rules of the road --

25           MS. GOODMAN:  Do you want to show it, Plaintiff's

1    Exhibit 234?

2              MR. HICKEY:  Plaintiff's Exhibit 234.

3    BY MR. HICKEY:

4    Q.   In any event, let me show you, rule five.  Rule four is

5    application, any condition of visibility.  Okay.

6              So rule five, do you see it there, sir, in front of you?

7    A.   Sorry, come again.

8    Q.   Can you hear me well?

9    A.   Yes, I can hear you now.

10   Q.   Okay.  Rule five, do you see it there on the screen?

11   A.   Yes, rule five.

12   Q.   And it says, "lookout"?

13   A.   Correct.

14   Q.   It says, "Every vessel shall at all times maintain a proper

15   lookout by sight, as well as by hearing, as well as by all

16   available means appropriate in the prevailing circumstances and

17   conditions so as to make a full appraisal of the situation and

18   of the risk of collision."

19             Did I read that correctly?

20   A.   Yes.

21   Q.   That rule applies to Mr. Buerano as he is approaching this

22   cruise ship.  Correct?

23   A.   That's correct.  However, the risk of collision that they

24   are referring to here is, as a rule, they are talking about

25   other traffic, other vessels in the vicinity.

1        That's not to exclude the possibility of, you know,

2    something in front of him or whatever, but generally speaking,

3    that's what they are referring to here, avoiding collision

4    between two, between other vessels.

5    Q.   Yeah, like the tender and the cruise ship.  Those are two

6    different vessels; aren't they?

7    A.   Yes, by definition, yes.

8             THE COURT:  I'm sorry, what exhibit are we looking at?

9             MS. GOODMAN:  Plaintiff's Exhibit 234, but Mr. Hickey

10   is referring to his notes at the moment.

11            MR. HICKEY:  Yeah.  Oh, what's 234?

12            MS. GOODMAN:  The International Navigational Rules and

13   Regulations, the rules of the road.

14            MR. HICKEY:  Anyway, this is just because we

15   established -- I established --

16            THE COURT:  I just want to know what I am looking at on

17   the screen.

18            MR. HICKEY:  These are the COLREGs.  I guess they are

19   not an exhibit.

20            MR. MCALPIN:  They are not in evidence.

21            MR. HICKEY:  Right, they are not in evidence.  I can go

22   through it with him.  He knows that these are the rules that

23   applied to Buerano at the time.

24            THE COURT:  Why are they being displayed if they are

25   not in evidence?

 1          MR. HICKEY:  I can take it down.  You know, I can take

 2     it down.  I can write the wording on the board and have him

 3     agree that that's rule five, rule six, etcetera.

 4          THE COURT:  So you are using this as a demonstrative?

 5          MR. HICKEY:  I am using it to -- yes.  Well, I guess,

 6     yes.

 7          THE COURT:  This is just something you wrote out?

 8          MR. HICKEY:  No.  No.  No.  No.  These are the IMO, the

 9     International --

10          THE COURT:  I get that part.  What's on the screen?

11          I can't -- these aren't the actual rules here.

12          MR. HICKEY:  They are.  They are.  Yes, sir.

13          THE COURT:  Can you zoom back out?

14          MR. HICKEY:  Oh, yeah.  Like this?  Yep.

15          These are part of the IMO COLREGs.

16          If you go online, this is what -- and he has agreed to

17     it.  These are actually -- they're called COLREGs.  It's C-O-L

18     for collision regulations.

19          THE COURT:  And these are exhibit what?

20          MS. GOODMAN:  Exhibit 234, page seven, has rule 4, 5, 6

21     and on page eight it continues.

22          THE COURT:  What's the defense position?

23          MR. MCALPIN:  They could be used a demonstrative aid.

24     I mean, this is effectively regulations, international

25     regulations on navigation, so I think the captain can be fairly

1   questioned about them but to come into evidence, law doesn't

2   come into evidence so it shouldn't come into evidence.

3          THE COURT:  Okay.  There is no objection to them using

4   it as a demonstrative?

5          MR. MCALPIN:  No, that's why I didn't object before.

6          THE COURT:  Again, I always want to be clear about

7   what's being shown.

8          MR. MCALPIN:  Of course.

9          THE COURT:  All right.

10          MR. HICKEY:  Thank you.

11   BY MR. HICKEY:

12   Q.   Then let's go on to safe speed because I have a question

13   about lookout and safe speed together.

14          Rule six of these COLREGs is safe speed.  Correct?

15          Do you see it there?

16   A.   Yes, I can see that.

17   Q.   I'm sorry, let me zoom in a little bit, move it up.

18          Zoom in more.  Okay.  There you go.

19          So six says, "Safe Speed.  Every vessel shall at all times

20   proceed at a safe speed so that she can take proper and

21   effective action to avoid collision and be stopped within a

22   distance appropriate to the prevailing circumstances and

23   conditions."

24          Correct?

25   A.   Correct.

1    Q.   "In determining a safe speed, the following factors shall

2    be among those taken into account:

3         "A, by all vessels," it says, and we flip it over, and it

4    says at the top, there you go, the state of visibility.  Right?

5         Then it says, "ii, the traffic density, including

6    concentrations of fishing vessels or any other vessels."

7         Do you see that?

8    A.   I see that.

9    Q.   Just on that for a minute, in Cannes, France, this was a

10   Friday afternoon that this incident happened.  Right?

11   A.   Yes.

12   Q.   And this was at 5:30, 5:45 at the time this happened.

13   Correct?

14   A.   Yes.

15   Q.   And you would expect -- just as Mr. Buerano said he

16   expected other vessels around, you would expect, also, other

17   vessels to be in the vicinity of this cruise ship?

18   A.   Correct.

19   Q.   And, in fact, you saw the long video, did you, the entire

20   video supplied by the cruise line on this?

21   A.   I believe so.

22   Q.   On that video did you see the two vessels, even -- you can

23   actually even see a couple of pleasure boats passing by the

24   cruise ship at two points in time on that video.

25        Do you remember that?

1   A.   Yes, there is other traffic in the vicinity.

2   Q.   There is other traffic in the vicinity, and this other

3   traffic in the vicinity is exactly the kind of thing that

4   someone operating a tender with 200 people on board should take

5   into account.   Right?

6   A.   Correct.

7   Q.   And it goes on listing the factors for safe speed at the

8   top of this page, the manageability of the vessel with special

9   reference to stopping distance and turning ability in the

10  prevailing conditions.

11       Do you see that?

12       MR. MCALPIN:   Excuse me, Your Honor.   I think at this

13  point I do have to object to the extensive use of the

14  international rules of the road.   That's what these are, the

15  international rules of the road, extensive use of that on

16  cross-examination when we are not trying a negligent operation

17  case, we are trying a failure to warn case by the Court's

18  expressed order.

19       The Court indicated it would allow testimony about

20  tender operation but now we are morphing into violations of

21  international rules of the road, which is not plead and the

22  details and minutia of safe operation of the tender, which is

23  not the case we are here trying.

24       I know that we've had some testimony about operation,

25  and the Court's order, Docket Entry 15, allowed that, but we

1    are way over that now.

2            THE COURT:  The objection is overruled.

3            These overlap to some degree but, again, there is no

4    claim for which the plaintiff could recover for negligent

5    operation because it wasn't a claim in the complaint.

6            MR. HICKEY:  I understand.  This is all about

7    warning --

8            THE COURT:  I don't need any more argument, Mr. Hickey.

9            Just keep going.

10   BY MR. HICKEY:

11   Q.  So the manageability of the -- so talking about the

12   manageability of the vessel, this says, "the manageability of

13   the vessel with special reference to stopping distance and

14   turning ability in the prevailing conditions."

15           Correct?

16   A.  Yes.

17   Q.  So, when counsel, on direct examination, asked you about,

18   well, this is a shallow draft boat; right?

19   A.  Yes.

20   Q.  That's the amount of water that is required that a boat

21   takes up.  That's a horrible way to describe it, but is that

22   roughly correct?

23   A.  Yeah.  I am just having trouble figuring out what the point

24   of this is.  The draft being something he should be aware of or

25   how does that work?

```
 1    Q.   Here is how it works here.  I can only ask you one
 2    question.  So, do you remember when counsel asked you about the
 3    draft of the boat?
 4    A.   I do remember that.
 5    Q.   Thank you.
 6         When counsel asked you about how the length and beam, used
 7    the word beam or width of the boat, how that affects the boat,
 8    you said oh, it's going to rock or move more.  You said that.
 9    Right?
10    A.   Yes, I remember that.
11    Q.   And under this rule and any basic rule of seamanship, the
12    operator of the boat needs to know that and has to take that
13    into account when he is operating the vessel and approaching a
14    cruise ship.  Correct?
15    A.   Oh, yes.
16    Q.   He needs to know about the maneuverability of his own
17    vessel.  Correct?
18    A.   He does.
19    Q.   Then it says, again, under six, having to do with the
20    factors of speed, "You take into account the state of the wind,
21    sea and current, and the proximity of navigational hazards."
22         Correct?
23    A.   Yes.
24    Q.   And so, that's another factor Mr. Buerano needs to take
25    into account when determining what's a proper speed.  Right?
```

1   A.   Yes, it gives us a very good idea of how many different

2   things he need to be manipulating in any given moment.

3   Q.   You talked about his limited -- Buerano's limited

4   visibility.   Right?

5   A.   Well, I tried to explain what, how -- I guess tried to give

6   the Court an idea of what he would be able to see from that

7   position, yes.

8   Q.   And if -- are you saying his visibility is somewhat limited

9   in that vessel?   Is that what you are trying to tell us?

10  A.   Well, the point of it being the ability to see anything --

11  like if I am sitting here and this is the tender, I am not able

12  to see much right close to me, right in front of me, and right

13  beside me.   I can see because of the positions of the windows.

14  I guess I was just trying to make that point.

15  Q.   Well, I think the point I am trying to make, you would

16  agree, that he, the operator of this vessel, needs to be aware

17  of wake in the vicinity.   Right?

18  A.   Yes, wakes and anything else in the vicinity.

19  Q.   And swells in the vicinity.   Right?

20  A.   Yes, wave action, sea, wake, any kind of disturbance in the

21  water.

22  Q.   Yeah, and he needs to be aware of it.   And of his

23  visibility.   If Mr. Buerano's visibility in that vessel, in

24  that windshield, that wrap-around windshield as it is, if his

25  visibility is limited, he needs to take that into account when

1   approaching the cruise ship.  Right?

2   A.  Well, he would.  You know, he would have, you know, take --

3   all of the, how shall I say it, design features of the tender,

4   would be something that one would, over exposure, become used

5   to.

6   Q.  Can we put up on the screen, please, the video of the

7   incident we'll call it, at the point where the vessel -- I

8   think it's a timestamp that's been called out.  It's 15

9   something or other.  If you could go back where the vessel does

10  the slowdown.  There we go.

11      That's number five coming in?

12      MS. GOODMAN:  Yes.

13  BY MR. HICKEY:

14  Q.  You agree that Mr. Buerano, he is operating this vessel we

15  see in this video.

16      Was that, by the way -- the vessel we just saw, was that a

17  tender vessel or was that another boat?

18      MS. GOODMAN:  Another boat.

19  BY MR. HICKEY:

20  Q.  Did you see in the video we just played -- can you go back

21  to that, please?

22      And we need to identify the timestamp of that, please.

23      MS. GOODMAN:  11:27.

24  BY MR. HICKEY:

25  Q.  At 11:27, are we seeing another non tender vessel passing

1   by?

2   A.   Come again, what was the question?

3   Q.   We are looking at the video.  Now we are at 11:44.  Do you

4   see that other vessel on the front of the screen?

5   A.   I see something under the hull of the tender, yes.

6   Q.   That appears to be a vessel cruising by the cruise ship at

7   or near the Port of Cannes?

8   A.   Yes, it looks like it.

9   Q.   And that's the kind of thing that Mr. Buerano should have

10   been aware of?

11   A.   Sure.

12   Q.   Let's just let that roll.  Let's see that vessel.  That

13   looks to be a pleasure boat, probably that vessel -- I don't

14   know, what is that, 50 feet long, 60 feet long?

15   A.   Yeah, I would say about 40, somewhere in there.  It looks

16   to be like a harbor patrol boat, something like that, harbor

17   police, harbor authority, that kind of thing.

18        It's hard to tell.  It's pretty grainy on the video.

19   Q.   Fair enough.  40 feet, not unusual.  Anybody navigating

20   those waters has to take that into account.  Right?

21   A.   Yes.

22   Q.   Right?

23   A.   Yes.

24   Q.   And that's something that Mr. Buerano should have seen.

25   Right?

1   A.   Who is to say that he didn't?

2        I mean, he is paying attention or trying to pay attention

3   to the other traffic in the vicinity, yes.

4   Q.   You don't know what he was doing.  You are not here to

5   testify what Mr. Buerano did or didn't do, I am just asking.

6   Is that correct?

7        You don't know; you were not on that boat?

8   A.   No, I wasn't, sir.

9   Q.   There is no video from inside the cockpit of that boat, is

10  there?

11  A.   No.

12  Q.   Thank you.

13       And that's what he should have seen then.  Correct?

14       That vessel -- for example, that vessel, that 40-foot plus

15  vessel we just saw cruise by, that's something he should have

16  seen.  Right?

17  A.   He should have been paying attention to the traffic in the

18  vicinity of his boat.

19  Q.   And you can't blame him not taking the wake from that or

20  any other vessel into account?  You can't blame his visibility

21  of the tender, can you?

22  A.   I don't recall doing that.

23  Q.   Okay.  Let's go ahead and go on to the point at which

24  number five, the tender they say is number five, apparently it

25  is, pulls up and slows down.

1      How many minutes was that between when that 40-foot

2   vessel -- is this number five that we are seeing on the video?

3   Does that look like number five, sir?

4   A.   Yes, it's a tender.   There are no numbers available, but it

5   looks like the tender.

6   Q.   Fair enough.   Is this the incident here?

7           MS. GOODMAN:   Yes.

8           MR. HICKEY:   Can we go back, please?

9   BY MR. HICKEY:

10  Q.   Now, assuming that this is the subject tender and the

11  subject incident -- can you stop it there, please?

12      Thank you.

13      First of all, this takes place only minutes after that

14  40-foot vessel goes by.   Right?

15  A.   Yes.

16  Q.   And there is a situation or there is a speed drop down.

17  Right?   There's a slowing?

18  A.   Yes, the tender is slowing in order to make the arrival,

19  correct.

20  Q.   And Captain Keijer characterizes it as an abrupt slowdown.

21      You say it's not.   Right?

22  A.   I am saying that I don't see any anything unusual about his

23  slowdown.   He has to slow down.   He is getting closer to the

24  tender.   He's got to slow down so he can make the approach to

25  the platform.

1  Q.  Oh, we know he has to slow down.  I think one person says

2  it's abrupt.  You say it's not.  Is that a fair statement?

3  A.  It's fair to say that I don't believe it's a rough

4  slowdown.

5  Q.  But you do agree that you have to adjust your speed, and

6  we've seen that in the IMO COLREGs; you have to adjust your

7  speed according to the situation in front of you, taking into

8  account whether you create wake.  Correct?

9  A.  It's one element of the things you would be required to

10  assimilate, yes.

11  Q.  And in your report, at the top of page ten, you say that in

12  my opinion, quote -- I am quoting you.

13      Do you have a copy of your report there, sir?

14  A.  I don't have it here, no.

15  Q.  I have a clean copy.

16      Would you like me to show you what I am referring to?

17  A.  No, I don't require that.

18      MR. HICKEY:  Let me put it on to show the Court what

19  we're talking about.

20      THE COURT:  This is the witness's report?

21      MR. HICKEY:  Yes, sir.

22      THE COURT:  Okay.

23      MR. HICKEY:  Oh, I see.  Oh, I have a bunch of

24  handwriting.  I don't seem to have a clean copy of that.  Let

25  me just -- do you have it there?

1        It's the August 19th, 2022, report.

2        Let me put these up here and zoom out.

3        There you go.

4    BY MR. HICKEY:

5    Q.   It says here at the top.

6        This appears to be the top of page text message of your

7    report, August 19, 2022.

8    A.   Correct.

9    Q.   It says, "In my opinion, based on my experience with

10   respect to tender operations, the wave action encountered by

11   the tender could have been caused by a variety of circumstances

12   such as vessel traffic in the vicinity."  Right?

13   A.   Correct.

14   Q.   "Or the platform area being occasionally exposed to the sea

15   conditions to seaward of the ship."

16   A.   Correct.

17   Q.   You agree that one of the causes of this -- you disagree

18   that it's Buerano's own wake or do you agree it could be a

19   factor, that Buerano's own wake could have been involved in the

20   turbulent area?

21   A.   It could contribute to the turbulence in the area.  A

22   component of that has to be the wake.  There is no -- how shall

23   I say it?

24       The vessel creates a wake; however, the wake attenuates

25   over time and with speed.  The slower the speed, the less, how

1   should we say it, effect, or the less virulent the wake is

2   going to be.

3   Q.   Write that down.

4        So, you agree that his own wake could be a factor.  Right?

5   A.   It contributes to the state of the sea at the platform.

6   Q.   Yep.  And you agree that vessel traffic in the vicinity

7   could be a factor?

8   A.   It could be.

9   Q.   And you agree that the sea conditions, whether that's

10  swells or wake it could be and actually was a factor.  Right?

11  A.   Yes.

12  Q.   Right?

13  A.   I agree.

14  Q.   As far as the swells, that's something that he, Buerano,

15  has a duty to be aware of.  Right?

16  A.   Yes.

17  Q.   As far as vessel traffic, he, Buerano, had a duty to be

18  aware of.  Right?

19  A.   Yes.

20  Q.   As far as sea conditions to seaward of the ship, he,

21  Buerano, had a duty to be aware of.  Right?

22  A.   Yes.

23  Q.   So, you've heard of that -- you've heard counsel talk to

24  you about 25 seconds.

25       He only had 25 seconds of notice or that's the allegation.

1        You heard that in direct examination?

2   A.   I heard the use or the number 25 minutes, yes.

3            MR. STREET:  Objection.

4            THE COURT:  I'm sorry, just a moment.  What's the

5   objection?

6            MR. STREET:  Mischaracterizes testimony.

7            THE COURT:  Overruled.  The witness, if he disagrees,

8   he can say so.

9            MR. HICKEY:  Thank you.

10           THE WITNESS:  Sorry, I lost that.  Can you give it to

11  me again, please?

12  BY MR. HICKEY:

13  Q.   You've heard counsel asked you about 25 seconds?

14  A.   I've heard the 25 seconds, yes.

15  Q.   And he said that there is -- well, you know that Captain

16  Keijer testified that the tender boat was in the wake starting

17  to pitch because when a boat goes forward and backward, we call

18  that pitching, or up and down, I'm sorry.  Up and down, we call

19  that pitching.  Correct?

20  A.   Yes.

21  Q.   And when it goes side to side we call that rolling.  Right?

22  A.   True.

23  Q.   Okay.  And the pitching from Buerano's own wake started

24  25 seconds and, approximately, 84 feet away from the platform

25  of the cruise ship.  Right?

1   A.   The vessel is slowing down.   The tender is slowing down as

2   he approaches.   The wake is going to cause -- what happens is

3   the wake is going to push on the stern of the tender, so it

4   will tilt the bow down is what's going to happen.   That's what

5   is happening on the video and this occurs gradually as he slows

6   down.

7   Q.   Yeah.   That's something that Buerano has to be aware of as

8   the operator of the vessel?

9   A.   Yes.

10   Q.   And you are not saying that the passengers have to be aware

11   of that, that they have to look out and they have to know

12   what's going on and be able to control the vessel.   You're not

13   saying that, are you?

14   A.   I don't recall ever having said that, no, nor would I.

15   Q.   Right.   If Buerano was aware -- but he, Buerano -- so

16   25 seconds.

17       If the wake -- if the pitching from Buerano's own wake

18   starts 25 seconds out, you agree, certainly, Buerano should

19   have known that something is happening with regard to his wake

20   coming up to that cruise ship platform.

21       Correct?

22   A.   Yes, he is aware of it because it happens every single time

23   he operates the tender under any circumstances, anywhere,

24   anyplace.

25   Q.   To some degree or another.   Right?

1    A.   To some degree or another.

2    Q.   But depending on speed and the amount you slow down will

3    affect the amplitude or height of the wake that you create?

4    A.   It will.

5    Q.   Right.

6         And it's Buerano who knows that 25 seconds out, he knows

7    that the boat starts pitching with the wake.  Right?

8    A.   He does.

9    Q.   And when you -- and even before the 25 seconds, though,

10   even before the 25 seconds, he, Buerano, knows he is going at a

11   certain speed, six, seven knots, I think we all agree to that,

12   and then he slows down.  Right?

13   A.   Yes.

14   Q.   So he knew before 25 seconds out, he knew that the point at

15   which he was going to slow down.  Right?

16        In other words, he knew his own speed.  We can conclude

17   that, can't we?

18   A.   Well, yes, he -- yes, he knows the speed.

19   Q.   He knows the speed.  And he knows he has to slow down at

20   some point.  Right?

21   A.   That's what he is doing.  He is slowing down, yes.

22   Q.   He even knows before that 25 seconds that he's got to slow

23   down.  Right?

24   A.   Well, yeah, he knows he has to slow down because he knows

25   he has to slow down to dock the tender.

1   Q.   You agree with me that if Mr. Buerano had 25 seconds and 84

2   feet, 84 feet, that he knew something or should have known that

3   there was going to be either a collision or some turbulence,

4   you agree with me he should have, excuse me, he had the

5   opportunity to pick up the PA and to give a warning to the

6   passenger?

7   A.   No.  No, I don't agree with that.

8   Q.   You don't agree?

9   A.   I don't agree with that, and I don't agree with the

10  business of him having this dangerous situation that he needs

11  to do something about.  He is not in a dangerous situation.  He

12  is coming in.  He is slowing down.  There are -- how shall I

13  say it, there is disturbed sea conditions at the platform.  He

14  is turning hard to starboard, which he has to do.  This was

15  something that was pointed out by docking platform Captain

16  Keijer, by the way, whom I have great respect for him.  I think

17  he is a mariner.  However, to my way of thinking, the Buerano,

18  the tender operator, is doing what's required to get the tender

19  alongside and, you know, he has a hard landing and that

20  happens.  That's why there is fenders on the tenders.

21  Q.   I think in that answer you probably hit every opinion that

22  you have ever given on this case but that's not my question.

23          MR. STREET:  Objection.  Argumentative.

24          THE COURT:  Sustained.

25  BY MR. HICKEY:

1   Q.  My question is simply this, sir.  My question is, do you

2   agree that if, if Mr. Buerano had 25 seconds to give a warning

3   that certainly that is enough opportunity to pick up the mic

4   and go over the PA and give a warning?

5   A.  He could do that.  It's possible, but having -- I guess

6   what I am having a hard time with is the fact that his whole

7   focus is on the controls of the tender and his vision toward

8   the -- but, again, if I'm going on the wrong track and you need

9   to tell me or ask me a different question, then go ahead.

10  Q.  I am just asking you, is that enough time?

11  A.  Twenty-five seconds is enough time, yes.

12  Q.  Yeah, it's enough time to give the warning to passengers by

13  picking up the PA system.  Right?

14  A.  It's enough time.

15  Q.  And in fact, there is a PA system with access to the

16  operator of the vessel.  Correct?

17  A.  There is one there.

18  Q.  In fact, the other person whose name is Ligue, I think,

19  Ligue, L-I-Q-U-E, I think he referred to him as a mate.  He

20  also would have had access to the PA system at points in time.

21  Correct?

22  A.  Impractical, but if he wanted to step all over the driver

23  and get in his way and get trapped from his ability to make the

24  maneuver, he could do it, yeah.

25  Q.  Let's put up the photo of the cockpit with the microphone

 1    for the PA system.

 2          Do you have a bigger view of that, please?

 3          That's a closeup.  I want to see where that is.  Actually,

 4    there might be two mics.  I realize now there are two mics.

 5          THE COURT:  All right.  I am going to let you take some

 6    time to find what you need.  There is a court event that I am

 7    now a little bit late for.

 8          We will break for lunch now or resume back here at 1:15

 9    and see where we are.  All right.

10          MR. HICKEY:  We got it.  We will cover it.

11          THE COURT:  All right.  We will be in recess until

12    1:15.

13          MR. HICKEY:  All right.  Thank you.

14          (Recess.)

15          THE COURT:  Please be seated.

16          You can come back up to the witness stand.

17          MR. HICKEY:  May it please the Court.

18          THE COURT:  Okay.

19    BY MR. HICKEY:

20    Q.  Captain Harestad, a collision between two vessels can be a

21    dangerous situation.  Correct?

22    A.  Correct.

23    Q.  You want to avoid collisions.  Correct?

24    A.  Correct.

25    Q.  Seamen are obligated to avoid collisions.  Correct?

1   A.   Correct.

2   Q.   The situation we see on this video with the collision of

3   the tender and the platform and then the rolling back and

4   forth, that's not a good situation for the 200 passengers on

5   board.  Would you agree with that?

6   A.   I can't agree with that in the sense that I don't see it --

7   I see it as a hard landing.

8        I don't see it as a situation which -- I am having a hard

9   time expressing myself, but I don't agree with your statement.

10  Q.   Do you agree that that kind of hard landing, as you say

11  collision you agreed to before, that that kind of collision is

12  something you want to avoid?

13  A.   It's not something you want.

14  Q.   It's not something you want.

15       And it's not something you want because people can get

16  injured when a vessel collides and then rolls.  Correct?

17  A.   It's possible.

18  Q.   And people can get injured -- when you are determining

19  whether you should warn the passengers, you should take into

20  account the circumstances of your passengers.  Right?

21  A.   Yeah, the circumstances of everyone, passengers, crew,

22  everyone on board.

23  Q.   And something that Mr. Buerano was obligated to take into

24  account and should have been trained for is to take into

25  account whether the passengers are 20-year-old soldiers or

1   whether they are 200 people that were older.  Correct?

2   A.  I am not sure that distinction is something that they would

3   learn.

4   Q.  Well, that's certainly something that they should take into

5   account, isn't it?

6   A.  Again, the difference between 20 years old or elderly

7   people or whatever you are postulating at this moment, I'm not

8   sure that that distinction is something that they, something a

9   tender driver would have learned.

10  Q.  I am not asking you if he would have learned it, not yet,

11  because we are going to get into what he would have learned or

12  should have learned.

13      I am asking you right now, do you agree that a tender

14  operator like Buerano should take into account circumstances

15  such as the overall age and number of passengers he has on

16  board.

17  A.  He takes into account the fact that he has passengers on

18  board, end of story.

19  Q.  Okay.  And he takes -- he should take into account that the

20  passengers --

21  A.  There are passengers of all kinds, children, youngsters,

22  adults, elderly people.

23  Q.  And he should be aware of that.  Correct?

24  A.  Aware that he has passengers on board, correct.

25  Q.  And whether to give a warning, he, Buerano, should also

```
 1    take into account whether the passengers are fully secured, as
 2    you would be in an airplane or whether they are on a bench seat
 3    without security.  Correct?
 4    A.  He is aware that he has guests on board, and he is -- you
 5    know, the instructions as to how to board and how to conduct
 6    themselves on the tender has been given.  So, as the operator,
 7    as the master, as he is approaching the landing, he is assuming
 8    that the guests are following these directions.
 9        If someone gets up and starts to walk around, I would
10    assume that the deck hand would, you know, say, hey, you got to
11    sit down or, you know, you can't take a picture, which often
12    happens, that kind of thing.
13        That's my appreciation of what's normal under those
14    circumstances.
15            MR. HICKEY:  Can you read back the question please?
16            I forgot it now.
17            (Question read back as above recorded.)
18            THE WITNESS:  I get lost in that question.
19    BY MR. HICKEY:
20    Q.  I will rephrase it then.
21    A.  Okay.  Thank you.
22    Q.  Do you agree with me that Buerano should take into account
23    in determining whether to give a warning, whether the
24    passengers are on bench seats without rails to hold onto and
25    without armrests or that they are -- strike that.
```

1         Let me start over.

2         You know that the passengers on board this particular

3    tender, they are on bench seats.  Correct?

4    A.  Yes, correct.

5    Q.  And they do not have armrests on those seats.  Correct?

6    A.  No.

7    Q.  And there are no rails to hold onto?

8    A.  Only on very specific parts of the tender.  There's

9    uprights near the entrances.

10   Q.  But not where the bulk of the passengers, including

11   Ms. Ruggeri were sitting.  Correct?

12   A.  Correct.

13   Q.  And you agree with me that one of the, by the way, that one

14   of the reasons why this is not a good situation and people

15   could get hurt in this kind of rolling is because they can get

16   thrown from side to side as they are sitting there.

17        Correct?

18   A.  It's possible.

19   Q.  Okay.  So the fact that they can get thrown from side to

20   side and that they do not have something like a rail to hold

21   onto, isn't that something that Buerano should take into

22   account in deciding whether to give a warning?

23   A.  I just don't feel comfortable projecting myself in that

24   situation.  I don't know how this is going to come about.  He

25   understands -- the driver, Buerano, or any other tender

1    operator understands the configuration of the tender.  He

2    understands that it has -- what's available there.

3        With respect to giving a warning, I am just not clear on

4    how I'm supposed to respond to that.

5    Q.  Well, let me ask you a question I think you can respond to

6    and that is, you agree with me that tender operators should

7    give warnings of an impending situation that might cause injury

8    to passengers?

9    A.  He has an obligation to, if he could, to give a warning to

10   something he perceives to be a threat of the safety of the

11   people on board.

12   Q.  Right.

13       And Buerano should perceive that the rolling could cause

14   injury to people on board.  Correct?

15   A.  If he feels that -- if he is interpreting that situation as

16   some kind of emergency or something that requires him to do so,

17   that is -- that's a supposition that's being made.

18   Q.  It's not just whatever goes, whatever he feels like?

19   A.  No, I am saying, if he feels that there is an emergency

20   situation or some kind of calamity that would affect him or his

21   guests, he has an obligation to do his best to let people know.

22   Q.  He has an obligation to do his best to warn him.  Correct?

23   A.  Sorry, I didn't get that.

24   Q.  He has an obligation to do his best to warn the passengers.

25       Right?

1   A.   If there is something to warn them of, yes.

2   Q.   Yes.   If there is something to warn him of.

3        In fact, the passengers are told by the cruise line -- let

4   me put on the ELMO, and if I could have that on the screen,

5   thank you.

6        Thank you, Patty.

7        This is -- I am putting on the screen from Exhibit 32A.8.

8   This is a part of the transcript we were presented with right

9   before this trial, the transcript, the videos.   You recognize

10  this, you've read it; haven't you?

11  A.   Yes.

12  Q.   And the cruise line tells the passengers, the cruise lines

13  tells the passengers what I have highlighted there, right, "If

14  there is a sudden movement, like a boat passing by or causing a

15  wake, then the crew may ask you to wait until things settle

16  down before allowing you to embark.   If this is the case,

17  please be patient and follow the instructions," end quote.

18       Don't you agree that the cruise line right there is telling

19  you, hey, if there is a wake, the operator of the tender might

20  tell you about it, might warn you about it?

21  A.   Might, yes.

22  Q.   And there is another warning or another -- within the

23  videos, there is another statement by the cruise line, and it

24  said they will tender only when it is safe to do so.

25       Do you remember that?

1   A.   Yes.

2   Q.   So isn't that a message to the passengers that if they are

3   tendering it's going to be safe?

4   A.   Sorry, repeat that again.

5   Q.   Isn't that a message to the passengers that if they are

6   tendering it's going to be safe?

7   A.   It's going to be safe to the best of their ability,

8   certainly.

9   Q.   And that's what the cruise lines tell the passengers in the

10  videos they are so proud of.  Right?

11  A.   Correct.

12  Q.   Now, we left off with microphones.  We are still on

13  warnings, and then we are going to finish up with training.

14       Can we bring up the photograph we were talking about before

15  lunch about the PA system?

16       So you see that -- showing exhibit -- I can't see the

17  exhibit number.  It's a joint Exhibit 71.001.

18       Do you see that on the screen, sir?

19  A.   Yes.

20  Q.   Do you see there is a PA system up on the upper right

21  hand -- I think it's the right-hand corner or left.

22       I don't know which one it is.  It's the left, the person

23  controlling the arrow is telling me.

24       Do you agree with that?

25  A.   It's not a very good view.  It looks to be the VHF to me.

1   It has a coily cord on it, so, yeah, it looks like that.

2   That's the VHF.

3   Q.   That's the VHF no PA?

4   A.   Some VHFs have PA functions but the tenders normally have

5   an independent PA.

6   Q.   Okay.  Is it shown there?

7   A.   That looks to be the VHF.

8   Q.   You know that this boat does have a PA system?

9        There is testimony about that?

10   A.   Yeah, yeah.  It does.  I believe so.

11   Q.   So that's not it.  Can we take that -- at least the captain

12   is not sure of that.

13        Can we take that down then, go to the other one?

14   A.   It says PA right on it, so, you know, perhaps it has the

15   function of a PA but it looks to be a VHF.  I am not sure if

16   that's what they are using for the PA.  It may be so.

17   Q.   It looks to me like on the portside of the helm?

18   A.   Yeah.  Yeah.

19   Q.   Okay.  That's -- can we go back to the cockpit view,

20   please?

21        I don't see it there because it's cut off.  If we go back

22   to what says PA, do you agree that that would be accessible to

23   the operator of this vessel?

24   A.   That would be acceptable for --

25   Q.   Do you agree that this PA system would be accessible?

1   A.   Oh, accessible, yes.

2   Q.   To the operator of the vessel?

3   A.   Yes.

4   Q.   Do you agree that that PA system would be accessible to the

5   other crew member on board?

6   A.   Yes.  However, again, just to be fair to the situation, I

7   mean, if the tender is maneuvering a tender trying to come

8   alongside, the last thing he wants is somebody crawling over

9   him and getting in the way of the controls, his vision of his

10  approach to the tender platform.  That would not be conducive

11  to his evolution.

12  Q.   Yeah, that's when he is right up against --

13  A.   Coming in.  Coming in.  It would be like you are coming in,

14  you are going to exit off the freeway and the passenger starts

15  crawling around in the driver's seat.  It wouldn't be good.

16  Q.   This is not in the driver's seat, this microphone.  This is

17  behind the --

18  A.   Well, it's close to --

19       THE COURT:  Hold on.  You have to wait for the

20  question.

21       THE WITNESS:  Oh, sorry.  Okay.

22  BY MR. HICKEY:

23  Q.   This is behind the cockpit seat; isn't it?

24       This PA system microphone is behind the cockpit seat.  We

25  can see that the microphone is in line with the rear of that

1   front window.  Do you see that?

2   A.  Uh-huh.

3   Q.  Yes?

4   A.  Yes, I see that.

5   Q.  It's behind the seat then.  Correct?

6   A.  I believe it's forward of the seat.  However, that's what I

7   see.

8   Q.  Can we go back to the whole cockpit view, please?

9       As a matter of fact, there is the seat.  Do you see the

10  seat?

11  A.  Yeah.

12  Q.  You can't even see the PA system because it's -- if we look

13  at the lower photograph, the PA system is behind it, is it to

14  the latter part of the -- it's over here behind this window.

15  Correct?

16  A.  The seat is, yeah.

17      Why are we referring to the left side of the photo?

18  Q.  Because the PA system was shown on, I think, the left side.

19  You just agreed that it was on the left side and you just

20  agreed it was on the back of this window.

21      Here is the side window for the operator and so the PA

22  system is actually on the rear of that window.  Correct?

23  A.  I don't see it that way.

24      I see the PA -- I see it forward and above on the left side

25  of the driver's seat.

1   Q.   Let's go back.

2   A.   You can see the steering wheel, the throttle control and

3   the PA is above that.

4   Q.   Okay.  You said before, though, when I showed you that

5   photo, you said you didn't know where the PA was.  Now you are

6   saying you do see it on the other one.

7        If this is the PA, this Exhibit 31.017, if this is the PA,

8   it says PA 302 on it, if it is, it is toward the back of that

9   window.  Correct?

10        Do you see the window there, this window?

11  A.   Yeah.

12  Q.   Yeah.

13  A.   Okay.  I am not going to disagree.

14  Q.   Okay.  So you agree if this is the PA it's accessible

15  behind the cockpit seat of the driver?

16  A.   It's accessible.

17  Q.   Thank you.

18        You know that warnings to passengers are so important that

19  the IMO Circular 1417 even talks about communications to

20  passengers in transit.  Correct?

21  A.   Yes.

22  Q.   And that that is one of the things that Buerano should have

23  been trained on.  Correct?

24  A.   Correct.

25  Q.   And the circular is referred to in that certificate, and I

1   am going to get back to that certificate, that little document

2   that NCL created, that Exhibit 24.  We are going to get back to

3   that, but one of the -- one of the things -- that circular

4   defines what the -- that defines the parameters of training for

5   tender boat drivers.  Correct?

6   A.   Yes.

7   Q.   And that circular which is referred to in Exhibit 24, the

8   circular, IMO Circular 1417, these are international standards

9   for training.  Correct?

10  A.   Correct.

11  Q.   And the areas -- and the training, the training has to do

12  with -- it's supposed to be on knowledge and ability.  Right?

13  A.   Knowledge and practical application.

14  Q.   Right.

15       And you said, oh, it should be about 80/20.  Right?

16  A.   Twenty percent, yes, generally, as a general rule.

17  Q.   And this general rule, you created this; didn't you?

18       You created this general rule, didn't you, because there is

19  nothing in the Circular IMO 1714 that says anything about the

20  percentages of training in the classroom versus practical?

21            MR. STREET:  Objection.  Mischaracterizes --

22            THE COURT:  Just a moment.

23            MR. STREET:  Objection.  This mischaracterizes the

24  previous testimony.

25            THE COURT:  Overruled.  The witness can clarify.

1    BY MR. HICKEY:

2    Q.  Go ahead, sir.

3    A.  I have never seen it defined.  I am only giving you what is

4    my personal experience with it.

5    Q.  This is your take.  There is nothing in writing saying

6    this.  Correct?

7    A.  I've never seen it --

8    Q.  Thank you.

9    A.  -- in this context.

10   Q.  One of the -- and the test -- well, let me go on to the

11   areas of knowledge under IMO Circular 1417.

12       One of the areas of competence, both knowledge and ability

13   -- I say ability.  You said something else, which I forgot, but

14   anyway, one of the areas they are supposed to train on is

15   taking charge of the tender.  Correct?

16   A.  Taking charge of the tender, yes.

17   Q.  Another area they are supposed to train on is knowing the

18   handling characteristics of the tender.  Correct?

19   A.  Correct.

20   Q.  And one of the other areas they are supposed to train on is

21   managing the passengers during tender operations.  Correct?

22       MR. STREET:  Objection, Your Honor.  This is the 117.

23   It's not in evidence.  He is talking about the specifics.

24   Beyond the scope.

25       THE COURT:  Well, it's not in evidence but, I mean, I

1    will allow him to refer to it.  That's fine.

2    BY MR. HICKEY:

3    Q.  Another area -- let me just rephrase.  Another area that

4    the Circular 1417, which is referred to in Exhibit 24, the very

5    first exhibit referred to by the defense lawyer, one of the

6    areas is managing the passengers during tender operations.

7    Correct?

8    A.  Yes.

9    Q.  And a part of managing the passengers is letting them know

10   of impending danger.  Right?

11   A.  I believe we have established that already, yes.

12   Q.  And another area that the cruise lines is obligated to

13   train the operator in is assisting passengers during transit.

14   Correct?

15   A.  During transit it's assumed -- this is, again, going on my

16   personal experience, in transit the guests are supposed to be

17   sitting down and they are supposed to be doing, you know, their

18   thing.

19       I mean, the guys in transit, it's already assumed that they

20   are sitting down.  They have been assisted to board, and they

21   will be assisted to debark the tender during transit.

22       It's assumed that they are paying attention to the safety

23   announcements, which state that they are to remain seated until

24   the tender comes in to the berth.

25   Q.  Do you agree that the circular -- you are very familiar

1   with the circular, are you not?

2   A.   I am not -- I haven't seen it for quite a long time.   I

3   have read it over, yes.

4   Q.   You have read it over before this case and you have read it

5   over in connection with this case.   Correct?

6   A.   Well, I have read it in the past for other reasons too.

7   Q.   Okay.   Because this circular defines how tender operators

8   should be trained.   Right?

9   A.   It gives the guidelines, yes.

10  Q.   You want me to show you -- may I show the witness, Judge,

11  the particular passage that he said he didn't recall that in?

12          THE COURT:   Well, to refresh his recollection, that's

13  fine.

14  BY MR. HICKEY:

15  Q.   Let me show you in Circular 1417, do you see on the top

16  right-hand corner see where it says MS --

17  A.   Yes, I see that.

18  Q.   You see that, Circular 1417?

19  A.   I do.

20  Q.   It looks like the grid in the circular?

21  A.   Yes.

22  Q.   One says assisting passengers during embarkation.

23          That's getting on.   Right?

24  A.   Yes.

25  Q.   Disembarkation, that's getting off.   Right?

1   A.   Yes.

2   Q.   And transit operations.  Right?

3   A.   Okay.  There it is.

4   Q.   And then you agree with me that one of the areas also --

5   and I will just ask you, and if I have to refresh your

6   recollection, that's okay too.

7        One of the areas is that they are obligated to train

8   Mr. Buerano on is to give clear and correct safety instructions

9   to passengers to be followed during, again, embarkation,

10  disembarkation and in transit.  Correct?

11  A.   Yes.

12  Q.   And you would include -- you would agree with me that that

13  would include warnings to passengers of an impending danger.

14  Right?

15  A.   Yes.

16  Q.   One of the reasons why captain -- Captain, one of the

17  reasons why it's good to warn passengers of an impending danger

18  like rolling is so that the passengers can brace themselves

19  physically and psychologically.  Right?

20  A.   I would presume so.

21  Q.   And if they brace themselves, it can prevent injuries.

22       Correct?

23  A.   I assume so.  I am not -- that's not my, how shall I say

24  it, I am not an expert on that, but I would assume so, yes.

25  Q.   One of the things that -- and we had talked about -- let me

1    shift a little bit.

2         We had talked about the COLREGs, the collision regulations,

3    and the -- right, you remember that?

4    A.  I do.

5    Q.  Before we finish here.

6         And you said -- well, we were going through the

7    regulations, I just want to take you through the remainder of

8    them regarding this relevance to this case.

9         You know about rule seven, the risk of collision.  Right?

10   A.  Correct.

11   Q.  And you agree with me that rule seven says, "Every vessel

12   shall use all available means appropriate to the prevailing

13   circumstances and conditions to determine if risk of collision

14   exists.  If there is any doubt such risk shall be deemed to

15   exist."

16        Do you agree that that's an accurate reading of that?

17   A.  I do.  However, the context also needs to be clarified.

18   What they are speaking of with respect to that rule is the

19   eminent possibility of collision with other vessels underway.

20   That's the intent behind that rule.

21   Q.  The tender is a vessel.  Right?

22   A.  It is.

23   Q.  The cruise ship is a vessel.  Right?

24        If the cruise ship is pulling anchor --

25   A.  It's not away.  She is at anchor.

1   Q.   If she has pulled her anchor, she is underway by

2   definition.   Right?

3   A.   By definition, yes, still not moving but --

4   Q.   Right.   We will get to that.

5        Certainly, the cruise ship is the least maneuverable

6   vessel?

7   A.   The less maneuverable vessel, correct.

8   Q.   And the vessel which is more maneuverable, the tender, has

9   to give way to the less maneuverable.   That's the rule.   Right?

10   A.   True.   Although the rule is not intended to apply to tender

11   operations, be that as it may.

12   Q.   All of these rules apply to tender operations, don't they?

13   A.   In theory, yes.

14   Q.   In theory, they apply.   You don't want collisions of

15   vessels with cruise ships.   Right?

16   A.   No.

17   Q.   Because that can cause injury?

18   A.   You don't want collisions, period.

19   Q.   And one of the reasons why you don't want collisions is it

20   can cause injuries to passengers on board.   Right?

21   A.   It's possible.

22   Q.   Rule eight, you are familiar with rule eight of the

23   COLREGs?

24   A.   I would be.   I can't --

25   Q.   Let me give you the title.

1    A.   Let me respond to it.

2    Q.   Let me give you the title, "Action to Avoid Collision."

3         You are familiar with that one?

4    A.   Correct.

5    Q.   "Any action to avoid collision shall be taken in accordance

6    with the rules of this part and shall, if the circumstances of

7    the case admit, be positive, made in ample time and with due

8    regard to the observance of good seamanship."

9         Does that sound accurate?

10   A.   Yes.

11   Q.   And then it says under C of that same rule -- I'm skipping

12   over one that's irrelevant, but I have no objection to anybody

13   reading it at any time.  But C says, "If there is sufficient

14   sea room, alteration of course alone may be the most effective

15   action to avoid a close quarters situation, provided that it be

16   made in good time, is substantial and does not result in

17   another close quarters situation."

18        Does that sound accurate?

19   A.   Yes, that's accurate and that's has to do most definitely

20   targeted at vessels avoiding colliding with one another.

21   Q.   Yeah.  Yeah.

22        In fact, Captain Keijer, you're familiar, that he said one

23   of the actions that should have been taken was, A, to either

24   abort, to use the word abort, and to come back around.  That's

25   what the tender should have done.  Right?

1   A.   I don't agree that's what the tender should have done, no.

2   Q.   I am not asking you whether you agree.  I am asking you

3   whether that was one of the options that Captain Keijer whose

4   report you commented on --

5   A.   Oh, yes, he included that as an option in his report, yes.

6   Q.   And another option is to hold off until the wake subsides.

7   Right?

8   A.   Right.

9   Q.   Okay.  Let's go to -- let's kind of switch gears a little

10   bit and go to training, crew or training here.

11        The defense started their examination of you with

12   Exhibit 26.  Let's go ahead and put Exhibit 24 on the screen,

13   please.

14        Now, we are looking at this certificate, and let's take a

15   look at this for a minute.  This is Exhibit 24 on the screen in

16   evidence.  It's on the Norwegian Cruise Line letterhead.

17        Do you see that?

18   A.   Yes.

19   Q.   We know it's on the letterhead because it says Norwegian

20   Cruise Line, Oceania Cruises and Regent Cruises on top.

21   Correct?

22   A.   Correct.

23   Q.   And on the bottom, very bottom, it says, NCL, Bahamas

24   Limited, 7650 Corporate Center Drive, Miami, Florida, 33166,

25   USA, and then there is an e-mail address.

1      Do you see that?

2   A.   Yes.

3   Q.   So, this is a form of the cruise line.  Right?

4   A.   Yes.

5   Q.   And it's signed by -- let's see.  It's signed off by an

6   officer of the Epic.  Right?

7   A.   Uh-huh.

8   Q.   Correct?

9   A.   Yes.

10   Q.   And it's signed off also by Buerano.  Right?

11   A.   Yes.

12   Q.   And it says what he supposedly did.  He passed the

13   examination, and he was trained in accordance with certain

14   things, including the Circular 1417.  Right?

15   A.   Yes.

16   Q.   It's a fact that no one from the Bahamas Maritime Authority

17   signed this.  Right?

18   A.   No.

19   Q.   And it's a fact that no one from the Bahamas Maritime

20   Authority came on board the Epic and gave a course on how to

21   handle the tender or how to communicate with passengers.

22      Correct?

23   A.   I don't believe so.

24   Q.   It's a fact that no one from the Bahamas Maritime Authority

25   came on board and tested Buerano on any subject, much less the

1    handling of the tender and communicating with the passengers.

2         Correct?

3    A.   Correct.

4    Q.   And it's a fact that Buerano, as far as you know, did not

5    go to the Bahamas or any office of the Bahamas Maritime

6    Authority and take any course?

7    A.   No, no seafarer would.

8    Q.   And it's a fact that -- well, actually, I can go right over

9    here to Fort Lauderdale and go take a course on how to get my

10   master's license, can I?  Yes or no?

11   A.   At the Bahamas Maritime Authority?

12   Q.   Sir, can't I go to an office, not of the Bahamas Maritime

13   Authority but of a private company to take a course on how to

14   get my six-pack or my master's license, any of those Coast

15   Guard licenses?

16   A.   You could, provided that they are licensed to do so.

17            THE COURT:  I'm sorry.

18            MR. STREET:  Speculation.

19            THE COURT:  Overruled.  The witness has answered.

20            But I will say, if the other side objects, you should

21   wait.

22            THE WITNESS:  Sorry, I'm having a difficult time

23   processing information at the moment.

24   BY MR. HICKEY:

25   Q.   Any course or teaching was done by Epic personnel, the

1   cruise ship personnel on board the cruise ship.  Correct?

2   A.  Yes.

3   Q.  It says here -- before we get into that exactly, what

4   evidence there is of that, let's talk about the Bahamian

5   because the defense brought up this Bahamian Maritime

6   Authority.

7        You know the Epic is a cruise ship flagged in the Bahamas.

8   Right?

9   A.  Say again.

10  Q.  The Epic is flagged in the Bahamas?

11  A.  Correct.

12  Q.  When we say, "flagged," we mean registered?

13  A.  Correct.

14  Q.  And registration, you know that NCL is actually a Bermuda

15  corporation.  Correct?

16  A.  I know it's flagged to the Bahamas.  That's as much as I

17  know.

18  Q.  I'm not asking you about the ship.  Now I am asking you

19  about the company.  The company who retained you in this case,

20  they are a Bermuda corporation.

21       Do you know that?

22  A.  I didn't know that.

23  Q.  And they are based here in Miami, Florida.  They have a

24  headquarter building in Miami, Florida, with the address at the

25  bottom of this certificate.  At the bottom of this certificate

1    we see this document that they created, Exhibit 24.

2         Did you know that?

3    A.  I didn't.

4    Q.  We call this -- when these cruise lines, they incorporate

5    in one country; they're headquartered in another; and they flag

6    their vessels or register their vessels, those are called flags

7    of convenience.

8         Have you heard that?

9    A.  I am familiar with that term.

10   Q.  The reason that all of these -- and, by the way, the

11   Bahamas Maritime Authority was created in 1995.

12        Did you know that?

13   A.  No.

14   Q.  And since the 90s, you know that a lot of cruise ships have

15   registered in the Bahamas?

16        MR. STREET:  Objection, Your Honor, to this line of

17   questioning.  Outside the scope.

18        THE COURT:  Why is it relevant, Counsel?

19        MR. HICKEY:  They brought up this Bahamas Maritime

20   Authority and how it's in line with everything they say when

21   actually, Judge, this is something -- it's just a flag of

22   convenience where the Bahamas Maritime Authority lets the

23   cruise lines do whatever they want.

24        You know, there is no -- they don't supervise the

25   training.  You know, it's all the cruise line.  That's the

1   point, and the only thing, the cruise lines, the only reason

2   they go to whether it's there or the Cayman's, etcetera, is to

3   avoid two things.  One is taxation, and the other is regulation

4   and that's what he knows.

5       They brought it up.  They brought up the Bahamas

6   Maritime Authority.

7       THE COURT:  All right.  Anything else?

8       MR. STREET:  Yes, Your Honor, this line of questioning

9   is argumentative.  It's more meant for a closing argument.

10      THE COURT:  All right.  I will allow some questions on

11  it, but we are not in front of a jury.  I don't think I need to

12  spend a lot of time on this.

13      MR. HICKEY:  Understood.

14  BY MR. HICKEY:

15  Q.  The reasons why cruise lines go to a country like Bahamas

16  or the Bahamas Maritime Authority is to avoid taxation and

17  regulation.

18      You know that for a fact.  Right?

19  A.  I know that for a fact.  I know that this occurs, yes.

20  Q.  Did you know that 18 out of the 19 NCL ships are, in fact,

21  registered in the Bahamas?

22  A.  I didn't know that.

23  Q.  Now, let's move on to something else but still on training,

24  still on referring to this Exhibit 24.  Whatever materials

25  relevant to training you were provided, you were provided by

1   the lawyers for NCL.  Correct?

2   A.  Could you repeat that, please?

3   Q.  Whatever materials you reviewed in this case have been

4   provided by the lawyers from NCL?

5   A.  Yes.

6   Q.  You didn't get anything from outside sources?

7   A.  I couldn't -- I reviewed some things, yes.  For example, I

8   reviewed Chapman's and I reviewed other marine publications I

9   have in my personal library.

10  Q.  Let's talk about what you have not seen and what you have

11  not been provided by the lawyers.

12      You have not seen or reviewed any curriculum or summary of

13  the course that Buerano took, if any.  Right?

14  A.  No, only the test.

15  Q.  Only the test.  Have you not seen any manuals or books for

16  any course, if there is a course.  Right?

17  A.  Correct.

18  Q.  You have not seen any log or list of the time or day when

19  Buerano took any course.  Correct?

20  A.  Correct.

21  Q.  You have not seen the actual test that Buerano took with

22  his markings, his answers there.  You haven't seen any such

23  test, have you?

24  A.  No.

25  Q.  You don't know whether Buerano ever took a test other than

1   the fact that this piece of paper was given to him?

2   A.   That's correct.

3   Q.   And you don't know and you haven't seen any score that

4   Buerano scored on the test, as we say?

5   A.   Not that I can recall.

6   Q.   And you don't know whether he ever did pass the test.

7        Correct?

8   A.   I don't know.

9   Q.   And you agree that under the test guidelines in the

10  beginning, the test that's created by NCL, you agree that it

11  says, well, if you flunk it you can take it again.  Right?

12        MR. STREET:  Objection.  Argumentative.

13        THE COURT:  Sustained in how you described the

14  document.

15  BY MR. HICKEY:

16  Q.   Okay.  You know about the test.

17       Can we go ahead and bring up the test because the witness

18  has -- Judge, I guess they don't like the use of the word

19  flunk.  I guess that's what the objection --

20        THE COURT:  Yes, just use the accurate words.

21        MR. HICKEY:  Okay.  That's fair, I understand.

22  BY MR. HICKEY:

23  Q.   This is Exhibit 16.006.  This looks like the test you are

24  talking about.  Correct?

25  A.   Yes.

1   Q.   Go to the next page, please.

2        Do you see the test procedures?

3   A.   Yes.

4   Q.   It says, "If the student fails the test, allow them to

5   retake the exam once."

6        Do you see that?

7   A.   I see that.

8   Q.   Then, if a student fails a test twice, review the

9   information with a student verbally and determine competency.

10       Do you see that?

11  A.   I see it.

12  Q.   Do you know whether -- have you seen anything indicating

13  whether Buerano was one of the students who failed it?

14  A.   I haven't seen anything.

15  Q.   Do you know if he failed it twice?

16  A.   I don't know.

17  Q.   Do you know if anybody reviewed this information with him

18  to determine his competency?

19  A.   Do I know if anyone did that?

20  Q.   Yes, sir.

21  A.   I don't know.  I assume the officer who signed off on their

22  certificate would know that.  That's what I assume.

23  Q.   But you don't have any.  There is no document showing the

24  test he actually took.  Correct?

25  A.   I don't have a document.

1   Q.   No document indicating the score he got, if any.  Correct?

2   A.   Correct.

3   Q.   No document indicating what, if anything, that the person

4   administering the test reviewed with Buerano.

5        Correct?

6   A.   Correct.

7   Q.   Correct, there is no document?

8   A.   Correct.

9   Q.   You agree in this test that there is nothing about docking.

10  Correct?

11  A.   Well, I don't see anything.  As we -- as we have already

12  determined, the content of the course does not -- I haven't

13  been -- I haven't seen it, the content, the actual content.

14  Q.   Right.  But now -- we don't have any of the content of the

15  course.  Now -- so, you don't know anything about that.

16       Let's just -- let me just ask you about the test then.

17  There is nothing in the test which you've looked at, you've

18  reviewed, there is nothing in there specifically about docking,

19  is there?

20  A.   As far as I know, no.

21  Q.   And there is nothing in there specifically about

22  approaching a dock or approaching a ship.  Correct?

23  A.   Correct.

24       MR. HICKEY:  Thank you.  You can take that down.

25       Now let's talk about training and the ability part,

 1   right.  How did you say it?

 2        THE WITNESS:  Training.

 3   BY MR. HICKEY:

 4   Q.  I say knowledge and ability.  You say knowledge and

 5   something?

 6   A.  You are asking me to remember something I said.  It's not

 7   easy to do.

 8   Q.  It's okay, we understand each other.  There is knowledge

 9   and there is ability.  Yes?

10   A.  Yes, as we say within the context of the course there is

11   the scholastic part of it, if you will, the theory part of it

12   and then the practical application of seamanship skills, let's

13   call it that.

14   Q.  And there is -- you've seen nothing, and there is nothing,

15   no document indicating what the written curriculum for the

16   ability part is, for the training on the water part.  Correct?

17   A.  That's correct.  However, the fact of the matter is it's

18   not -- to my knowledge and experience, the practical part of

19   it, there is so much involved that it would be impossible to

20   record it and reapply it in a test situation.

21        It's an apprenticeship is what it really is.  The guys

22   start doing it and they are monitored by the officers in

23   charge, and if they're learning the way one would expect them

24   to learn, eventually they are given the certificate after

25   passing the theory part of it.

1   Q.   I am writing what you just said.

2        Okay.  But one of the things you said when your lawyer --

3   when the lawyer for the cruise line asked you questions, one of

4   the things you said was, "He would have been -- he would have

5   been asked to dock and over and over."  You said that.

6        Do you remember that?

7   A.   Oh, sure.  I mean, that's, I think, very clear, isn't it?

8        You know, I mean, if you are tasked with operating a

9   tender, you would have to do that.

10  Q.   So that's one of the activities that you would put on a

11  list of important activities to review with the student

12  operator.  Right?

13  A.   Well, again, no one -- the review part is the, you know,

14  the person is learning how to use the tender, and the officer

15  in charge of saying, okay, he's competent or, you know, we can

16  give him a certificate to do this.  It makes up part of that

17  training.

18  Q.   It's a real simple question, sir.

19  A.   I apologize if I didn't answer it.

20       THE COURT:  Gentlemen, I can't have you talk at the

21  same time.  It's hard for me to understand.  It's hard for the

22  court reporter to capture, so wait for the question again and

23  then you get a chance to answer.

24  BY MR. HICKEY:

25  Q.   Real simple question, sir.  Isn't docking one of the

1   things, if you did write up a list of activities to test

2   someone on in a practical way, that that would be on the list?

3   A.   Yes.

4   Q.   Thank you.

5        Also, turning the vessel.  Correct?

6   A.   Handling the vessel.

7   Q.   Yes.

8   A.   Yes.

9   Q.   Fine.

10       Handling the vessel.

11       Handling the vessel in rough waters?

12   A.   All waters, all waters they would be operating in.

13   Q.   Including wake.  Right?

14   A.   Yes.

15   Q.   Including swells?

16   A.   Yes.

17   Q.   And, in fact, docking is one of those tricky things we all

18   know is tricky when you are handling a boat.  Right?

19   A.   It is.

20   Q.   So it's possible to have a curriculum when you train

21   someone on the practicalities of handling a tender boat, isn't

22   it?

23   A.   It's possible.

24   Q.   And you have seen no such curriculum?

25   A.   No, I haven't.  As I say, in practical circumstances it

1    would be very difficult to enumerate all of the, all of the

2    conditions and circumstances that they might come up against

3    and itemize them and test them the way you would multiple

4    choice theory, say, if we are comparing the two components.

5    Q.   Okay.  And it's impossible to enumerate all of the

6    circumstances but when you drive a car, isn't it?

7    A.   Correct.

8    Q.   But they have tests and they have lists of what they are

9    going to test you on when you get your driver's license?

10   A.   They do.

11   Q.   And it's impossible to enumerate everything you are going

12   to encounter as a pilot of an airplane, isn't it?

13   A.   True.

14   Q.   But they have lists of the things they test you on,

15   specifically, taking off and landing when you are getting your

16   license to fly.  Correct?

17           MR. STREET:  Objection.  Speculation.  We are talking

18   about pilots.

19           THE COURT:  Well, I don't know that this witness knows

20   those things so you have to lay that predicate first.

21   BY MR. HICKEY:

22   Q.   Do you know about pilot's license?

23   A.   I am not a pilot, but I speculate on what it might be like.

24   Q.   You know that pilots do take tests?

25   A.   I do.

1  Q.  You know that they are -- you have heard and you have had

2  friends who are pilots, haven't you?

3  A.  I believe so.

4  Q.  You and I know that they go up and they do practical.  They

5  go into -- I am going to use your words.  They have an

6  apprenticeship or monitoring by someone who has a license and

7  ability to teach them.  Correct?

8  A.  Correct.

9  Q.  And they have a list of things they need to do over and

10  over.  Correct?

11  A.  I can't say they have that because I don't know.

12      I say assume they did do.

13  Q.  Fair enough, but you know that practically when you are a

14  pilot you take off and land.  You take off and land.  Those are

15  two of the things you practice all the time?

16  A.  Right.

17  Q.  And docking is something that you also should absolutely

18  learn how to do safely as a mariner.

19      Correct?

20  A.  Correct.

21  Q.  You also in teaching -- strike that.  I am trying to figure

22  out what my notes say.

23      There is nothing in writing from the cruise line as to how,

24  when and what to say to communicate with passengers if there is

25  turbulence or wake ahead.  Correct?

1   A.   I haven't seen anything, no.

2   Q.   And there is nothing in writing with the names of the

3   people who trained this man.   Correct?

4   A.   Other than the person who signed off on the certificate,

5   the first officer or chief officer or whoever he was.

6        No, aside from that I haven't seen anything.

7   Q.   You don't know if that officer participated in his training

8   or testing, do you?

9   A.   No, I don't.

10  Q.   And there is no record of the dates and times of his

11  training, his actual practical -- I think practical is the word

12  you use -- his practical training.   There is no record.   There

13  is no log of it.   Correct?

14  A.   I have not seen it.

15  Q.   There is no list of it?

16  A.   I don't know if there is a list or not.   All I know is I

17  haven't seen it.

18  Q.   There is no document indicating the date that he actually

19  was practically trained and who monitored it or who was his --

20  who was his, you know, person he served under as an apprentice.

21       Correct?

22  A.   Not that I know of.

23  Q.   In fact, the defense points to all these 400 crossings that

24  Mr. Buerano has made in a tender vessel, not -- is that -- do

25  you know whether that's 400 before this incident?

1    A.   Come again.

2    Q.   The defense, when asking you questions about training,

3    brought up that, well, Mr. Buerano, has been on these boats

4    some 400 times.

5         Do you remember the word?

6    A.   Yes, I remember the 400 part.

7    Q.   Do you know if all those 400 are before this incident?

8    A.   As far as I know he has made 400, approximately 400 transit

9    in the Port of Cannes, and that would have been, I'm assuming,

10   prior to the incident.

11   Q.   So, one thing you said was I always look out for the people

12   with prior boating experience.  Right?

13   A.   Sorry.  Could you repeat that?

14   Q.   One thing you testified to is when I determine if someone

15   is fit to be an operator of a tender I look for prior boating

16   experience, prior to when they got on?

17   A.   That's industry standard, yes, when we are choosing ABs to

18   train for tender operators.

19   Q.   Do you remember the testimony of Mr. Buerano when he said

20   he had no prior experience on boats before he joined the cruise

21   line?

22   A.   Right.

23   Q.   Okay.

24        Now, finally you mentioned the words apprentice ship and

25   monitoring by an officer.  Right?

1    A.   Yes.

2    Q.   I wrote those down.   I hastily wrote those words down.

3    When Mr. Buerano is operating this tender, on this day, anyway,

4    he is with -- what's his name Ligue?

5         MS. GOODMAN:   Michael Ligue.

6    BY MR. HICKEY:

7    Q.   He is with Ligue.   Correct?

8    A.   Correct.

9    Q.   And Mr. Buerano is, he is an AB and Ligue is also an AB.

10   Correct?

11   A.   No, Ligue is an OS.

12   Q.   Oh, he is below AB.   He is an ordinary seaman?

13   A.   That's right.

14   Q.   Okay.   Fair enough.   Thank you for pointing that out.

15        Ligue doesn't even have this Exhibit 24 paper by the cruise

16   line, the certificate to operate a tender.

17        Correct?

18   A.   So far as I know.

19   Q.   So, you agree with me that there is no apprenticeship if

20   there is no -- usually an -- well, strike that.

21        In apprenticeship or a monitoring by an -- well, strike

22   that.

23        You agree with me that in these voyages where there was not

24   an officer of the ship on board the tender monitoring, that

25   that is not a monitoring by an officer?

1    A.   When the tenders are making transits, often, as you say,

2    there isn't a licensed officer on board the tender.  What's

3    happening is they are being watched, particularly in the very

4    beginning, and they may have officers on board at that time.

5    They are watching the -- even prior to them driving tenders,

6    they're watching them maneuver the lifeboats to and from the

7    ship.  That's what they start off doing.

8         Then as they become more comfortable, they start the

9    tendering.  In that they monitor the docking and the undocking

10   procedure.  And there will be occasions where there are

11   licensed officers on board during transits, but nowhere near as

12   frequently as the embark and debark.

13   Q.   All you are telling is what should happen.  Right?

14   A.   Perhaps I am.

15   Q.   Yeah.  You're not telling us what did happen because you

16   don't know?

17   A.   I don't know.

18   Q.   Because the record doesn't know?

19   A.   I am going on my own experience with how it works.

20   Q.   And also no record indicating there was ever a monitoring

21   by an officer on board the tender at any of those 400 times or

22   100 times or 500 times that Mr. Buerano has been on boats?

23   A.   I don't have a record of it.  I haven't seen that.

24        MR. HICKEY:  Let me take a minute, Judge.

25   BY MR. HICKEY:

1   Q.   No one gave warnings on board that boat on October 25,

2   2019, that that boat was going to collide and then roll from

3   side to side, did they?

4   A.   There was no warning.

5          MR. HICKEY:  Nothing further, thank you.

6          (Excerpt concluded.)

7

8                        C E R T I F I C A T E

9

10

11          I hereby certify that the foregoing is an

    accurate transcription of the proceedings in the

12

    above-entitled matter.

13

14

15

16
    January 20, 2024          /s/Patricia Diaz_____
17  DATE                      PATRICIA DIAZ, FCRR, RPR, FPR
                              Official Court Reporter
18                            United States District Court
                              400 North Miami Avenue, 11th Floor
19                            Miami, Florida 33128
                              (305) 523-5178
20

21

22

23

24

25

## $

**$375** [3] - 3:6, 5:18, 6:14
**$40,000** [2] - 8:6, 8:9

## /

**/s/Patricia** [1] - 89:16

## 0

**004.001** [1] - 20:11

## 1

**1** [1] - 1:9
**100** [2] - 1:9, 88:22
**117** [1] - 63:22
**11:00** [1] - 1:6
**11:27** [2] - 38:23, 38:25
**11:44** [1] - 39:3
**11th** [2] - 2:4, 89:18
**12** [1] - 4:14
**1400** [1] - 1:16
**1417** [7] - 61:19, 62:8, 63:11, 64:4, 65:15, 65:18, 71:14
**15** [3] - 4:14, 34:25, 38:8
**16** [1] - 5:6
**16.006** [1] - 77:23
**1714** [1] - 62:19
**18** [1] - 75:20
**1800** [3] - 18:17, 18:19, 18:21
**19** [2] - 43:7, 75:20
**1995** [1] - 74:11
**19th** [1] - 43:1
**1:15** [2] - 50:8, 50:12

## 2

**20** [3] - 12:6, 52:6, 89:16
**20-CV-21961-DPG** [1] - 1:2
**20-year-old** [1] - 51:25
**200** [4] - 15:3, 34:4, 51:4, 52:1
**2019** [1] - 89:2
**2022** [2] - 43:1, 43:7
**2023** [1] - 1:5
**2024** [1] - 89:16
**22** [1] - 7:16
**234** [5] - 29:1, 29:2, 30:9, 30:11, 31:20
**24** [8] - 62:2, 62:7,

64:4, 70:12, 70:15, 74:1, 75:24, 87:15
**25** [16] - 44:24, 44:25, 45:2, 45:13, 45:14, 45:24, 46:16, 46:18, 47:6, 47:9, 47:10, 47:14, 47:22, 48:1, 49:2, 89:1
**26** [1] - 70:12
**2805** [1] - 1:20
**2:19** [1] - 1:6

## 3

**3** [1] - 2:13
**30** [1] - 8:13
**302** [1] - 61:8
**305** [2] - 2:5, 89:19
**31.017** [1] - 61:7
**32A.8** [1] - 56:7
**33128** [2] - 2:4, 89:19
**33130** [1] - 1:20
**33131** [1] - 1:17
**33166** [1] - 70:24

## 4

**4** [1] - 31:20
**40** [7] - 5:14, 5:17, 5:18, 6:14, 39:15, 39:19
**40-foot** [3] - 40:14, 41:1, 41:14
**400** [10] - 2:3, 85:23, 85:25, 86:4, 86:6, 86:7, 86:8, 88:21, 89:18

## 5

**5** [5] - 5:14, 5:17, 6:14, 20:10, 31:20
**50** [1] - 39:14
**500** [1] - 88:22
**510** [1] - 1:16
**523-5178** [2] - 2:5, 89:19
**5:00** [5] - 18:23, 19:23, 19:25, 20:13, 23:7
**5:30** [8] - 18:13, 19:10, 20:19, 21:4, 21:5, 23:8, 23:13, 33:12
**5:45** [2] - 18:13, 33:12

## 6

**6** [3] - 1:5, 18:17,

31:20
**60** [1] - 39:14

## 7

**71.001** [1] - 57:17
**7650** [1] - 70:24

## 8

**8** [4] - 1:19, 5:14, 5:17, 6:14
**80** [1] - 1:19
**80/20** [1] - 62:15
**82** [1] - 12:6
**84** [3] - 45:24, 48:1, 48:2

## 9

**90s** [1] - 74:14

## A

**a.m** [1] - 1:6
**AB** [3] - 87:9, 87:12
**ability** [13] - 34:9, 35:14, 37:10, 49:23, 57:7, 62:12, 63:12, 63:13, 79:25, 80:4, 80:9, 80:16, 84:7
**able** [5] - 7:15, 16:18, 37:6, 37:11, 46:12
**abort** [2] - 69:24
**above-entitled** [1] - 89:12
**abrupt** [2] - 41:20, 42:2
**ABs** [1] - 86:17
**absolutely** [3] - 9:23, 10:24, 84:17
**acceptable** [1] - 58:24
**access** [2] - 49:15, 49:20
**accessible** [6] - 58:22, 58:25, 59:1, 59:4, 61:14, 61:16
**accordance** [2] - 69:5, 71:13
**according** [1] - 42:7
**account** [19] - 33:2, 34:5, 36:13, 36:20, 36:25, 37:25, 39:20, 40:20, 42:8, 51:20, 51:24, 51:25, 52:5, 52:14, 52:17, 52:19, 53:1, 53:22, 54:22
**accurate** [8] - 8:11, 26:24, 67:16, 69:9,

69:18, 69:19, 77:20, 89:11
**acknowledge** [1] - 24:17
**Action** [1] - 69:2
**action** [5] - 32:21, 37:20, 43:10, 69:5, 69:15
**actions** [1] - 69:23
**activities** [3] - 81:10, 81:11, 82:1
**actual** [4] - 31:11, 76:21, 79:13, 85:11
**addition** [1] - 16:15
**address** [2] - 70:25, 73:24
**adjust** [2] - 42:5, 42:6
**administering** [1] - 79:4
**admit** [1] - 69:7
**adults** [1] - 52:22
**advance** [1] - 22:21
**affair** [1] - 4:13
**affect** [3] - 25:15, 47:3, 55:20
**affects** [1] - 36:7
**aft** [2] - 9:4, 9:5
**AFT** [1] - 9:4
**afternoon** [1] - 33:10
**age** [1] - 52:15
**ago** [7] - 3:9, 3:18, 3:21, 5:8, 5:9, 8:16, 8:20
**agree** [77] - 9:24, 10:2, 10:12, 11:7, 11:9, 18:12, 19:9, 19:14, 19:22, 23:2, 23:6, 23:13, 23:22, 24:10, 24:15, 24:19, 24:20, 24:21, 25:14, 25:17, 25:21, 25:24, 26:9, 26:10, 26:13, 26:17, 26:20, 26:24, 27:2, 27:3, 27:4, 31:3, 37:16, 38:14, 42:5, 43:17, 43:18, 44:4, 44:6, 44:9, 44:13, 46:18, 47:11, 48:1, 48:4, 48:7, 48:8, 48:9, 49:2, 51:5, 51:6, 51:9, 51:10, 52:13, 53:22, 54:13, 55:6, 56:18, 57:24, 58:22, 58:25, 59:4, 61:14, 64:25, 66:4, 66:12, 67:11, 67:16, 70:1, 70:2, 77:9, 77:10, 79:9, 87:19, 87:23
**agreed** [5] - 11:8,

69:18, 69:19, 77:20, 89:11

31:16, 51:11, 60:19, 60:20
**ahead** [9] - 20:8, 20:9, 28:12, 40:23, 49:9, 63:2, 70:12, 77:17, 84:25
**aid** [1] - 31:23
**airplane** [2] - 53:2, 83:12
**all-day** [1] - 4:13
**allegation** [1] - 44:25
**allow** [4] - 34:19, 64:1, 75:10, 78:4
**allowed** [1] - 34:25
**allowing** [1] - 56:16
**alone** [1] - 69:14
**alongside** [2] - 48:19, 59:8
**alteration** [1] - 69:14
**altogether** [1] - 4:15
**amount** [3] - 7:14, 35:20, 47:2
**ample** [1] - 69:7
**amplitude** [1] - 47:3
**anchor** [8] - 20:24, 22:19, 22:21, 22:23, 22:24, 67:24, 67:25, 68:1
**announcements** [1] - 64:23
**answer** [7] - 7:8, 12:12, 13:14, 20:5, 48:21, 81:19, 81:23
**answered** [1] - 72:19
**answers** [1] - 76:22
**anyplace** [1] - 46:24
**anyway** [3] - 30:14, 63:14, 87:3
**apologize** [2] - 7:18, 81:19
**APPEARANCES** [1] - 1:13
**application** [3] - 29:5, 62:13, 80:12
**applied** [1] - 30:23
**applies** [1] - 29:21
**apply** [8] - 27:12, 27:13, 27:17, 27:18, 27:22, 68:10, 68:12, 68:14
**appointed** [1] - 21:17
**appraisal** [1] - 29:17
**appreciation** [1] - 53:13
**apprentice** [2] - 85:20, 86:24
**apprenticeship** [4] - 80:21, 84:6, 87:19, 87:21
**approach** [2] - 41:24,

59:10
approaches [1] - 46:2
approaching [6] - 29:21, 36:13, 38:1, 53:7, 79:22
appropriate [4] - 18:5, 29:16, 32:22, 67:12
approximate [2] - 7:20, 7:23
area [8] - 17:15, 43:14, 43:20, 43:21, 63:17, 64:3, 64:12
areas [8] - 62:11, 63:11, 63:12, 63:14, 63:20, 64:6, 66:4, 66:7
argue [1] - 7:13
argument [2] - 35:8, 75:9
argumentative [3] - 48:23, 75:9, 77:12
arithmetic [3] - 5:15, 8:8, 8:14
armrests [2] - 53:25, 54:5
arrival [1] - 41:18
arrived [3] - 5:23, 21:4
arrow [1] - 57:23
aside [1] - 85:6
aspect [2] - 5:22, 6:18
aspects [1] - 9:7
assimilate [1] - 42:10
assisted [2] - 64:20, 64:21
assisting [2] - 64:13, 65:22
assume [7] - 6:10, 53:10, 66:23, 66:24, 78:21, 78:22, 84:12
assumed [3] - 64:15, 64:19, 64:22
assumes [1] - 12:22
assuming [3] - 41:10, 53:7, 86:9
attention [4] - 40:2, 40:17, 64:22
attenuates [1] - 43:24
audience [2] - 24:7, 26:2
August [2] - 43:1, 43:7
Authority [12] - 71:16, 71:20, 71:24, 72:6, 72:11, 72:13,

73:6, 74:11, 74:20, 74:22, 75:6, 75:16
authority [1] - 39:17
available [4] - 29:16, 41:4, 55:2, 67:12
Avenue [3] - 1:16, 2:3, 89:18
avoid [9] - 22:8, 32:21, 50:23, 50:25, 51:12, 69:5, 69:15, 75:3, 75:16
Avoid [1] - 69:2
avoiding [2] - 30:3, 69:20
aware [23] - 12:7, 12:9, 12:10, 12:12, 12:16, 12:17, 16:10, 16:15, 16:17, 35:24, 37:16, 37:22, 39:10, 44:15, 44:18, 44:21, 46:7, 46:10, 46:15, 46:22, 52:23, 52:24, 53:4
awareness [2] - 16:11, 16:13

## B

backward [1] - 45:17
Bahamas [20] - 1:7, 70:23, 71:16, 71:19, 71:24, 72:5, 72:11, 72:12, 73:7, 73:10, 73:16, 74:11, 74:15, 74:19, 74:22, 75:5, 75:15, 75:16, 75:21
Bahamian [2] - 73:4, 73:5
based [2] - 43:9, 73:23
basic [8] - 11:7, 11:9, 15:24, 16:3, 23:22, 24:16, 26:15, 36:11
basics [2] - 21:20, 23:19
basis [2] - 21:15, 21:16
beam [2] - 36:6, 36:7
beautiful [2] - 4:4, 4:5
become [2] - 38:4, 88:8
BEFORE [1] - 1:12
beginning [3] - 13:13, 77:10, 88:4
behind [10] - 9:4, 9:5, 59:17, 59:23, 59:24, 60:5, 60:13, 60:14, 61:15, 67:20
below [1] - 87:12

bench [3] - 53:2, 53:24, 54:3
BERMAN [1] - 1:21
Bermuda [2] - 73:14, 73:20
berth [2] - 25:15, 64:24
beside [1] - 37:13
best [5] - 16:19, 55:21, 55:22, 55:24, 57:7
between [10] - 6:22, 7:21, 8:2, 9:21, 10:25, 30:4, 41:1, 50:20, 52:6
beyond [1] - 63:24
bigger [1] - 50:2
bill [8] - 3:18, 3:22, 5:11, 6:5, 6:18, 6:22, 6:25, 7:16
billed [3] - 6:17, 6:23, 8:9
bills [1] - 3:15
bit [8] - 8:12, 10:15, 16:20, 19:20, 32:17, 50:7, 67:1, 70:10
blame [2] - 40:19, 40:20
board [26] - 28:10, 28:13, 31:2, 34:4, 51:5, 51:22, 52:16, 52:18, 52:24, 53:4, 53:5, 54:2, 55:11, 55:14, 59:5, 64:20, 68:20, 71:20, 71:25, 73:1, 87:24, 88:2, 88:4, 88:11, 88:21, 89:1
boat [32] - 16:1, 17:16, 17:18, 17:20, 25:15, 25:18, 25:23, 26:12, 26:19, 35:18, 35:20, 36:3, 36:7, 36:12, 38:17, 38:18, 39:13, 39:16, 40:7, 40:9, 40:18, 45:16, 45:17, 47:7, 56:14, 58:8, 62:5, 82:18, 82:21, 89:1, 89:2
boat's [1] - 25:14
boating [2] - 86:12, 86:15
boats [15] - 11:20, 12:10, 12:15, 16:11, 17:9, 17:14, 17:19, 18:3, 18:6, 23:19, 26:3, 33:23, 86:3, 86:20, 88:22
books [1] - 76:15
bottom [4] - 70:23,

73:25
bow [1] - 46:4
brace [2] - 66:18, 66:21
break [1] - 50:8
BRETT [1] - 1:21
Brickell [1] - 1:16
bridge [1] - 22:18
briefly [1] - 26:18
bring [5] - 19:1, 19:2, 19:8, 57:14, 77:17
brought [5] - 73:5, 74:19, 75:5, 86:3
Buerano [61] - 11:12, 11:19, 11:25, 12:18, 12:25, 14:2, 14:16, 15:2, 15:4, 15:10, 16:10, 16:15, 17:7, 17:8, 23:15, 29:21, 30:23, 33:15, 36:24, 38:14, 39:9, 39:24, 40:5, 44:14, 44:17, 44:21, 46:7, 46:15, 46:18, 47:6, 47:10, 48:1, 48:17, 49:2, 51:23, 52:14, 52:25, 53:22, 54:21, 54:25, 55:13, 61:22, 66:8, 71:10, 71:25, 72:4, 76:13, 76:19, 76:21, 76:25, 77:4, 78:13, 79:4, 85:24, 86:3, 86:19, 87:3, 87:9, 88:22
Buerano's [7] - 17:13, 37:3, 37:23, 43:18, 43:19, 45:23, 46:17
building [1] - 73:24
bulk [1] - 54:10
bunch [1] - 42:23
business [3] - 1:7, 23:24, 48:10
BY [34] - 2:1, 2:12, 2:13, 3:3, 8:7, 12:24, 13:25, 14:7, 20:6, 29:3, 32:11, 35:10, 38:13, 38:19, 38:24, 41:9, 43:4, 45:12, 48:25, 50:19, 53:19, 59:22, 63:1, 64:2, 65:14, 72:24, 75:14, 77:15, 77:22, 80:3, 81:24, 83:21, 87:6, 88:25

## C

calamity [1] - 55:20
calculate [1] - 7:16

calculation [1] - 5:19
calculator [2] - 5:19, 7:11
Cannes [18] - 14:24, 14:25, 15:5, 17:14, 18:3, 18:9, 18:23, 19:3, 19:10, 19:17, 19:23, 20:18, 23:12, 33:9, 39:7, 86:9
cannot [1] - 7:8
capable [1] - 7:17
capacities [1] - 21:7
Captain [11] - 10:5, 24:1, 24:25, 25:2, 41:20, 45:15, 48:15, 50:20, 66:16, 69:22, 70:3
captain [6] - 21:10, 21:13, 21:17, 31:25, 58:11, 66:16
capture [1] - 81:22
car [1] - 83:6
careful [1] - 26:5
Carnival [1] - 8:23
case [17] - 7:21, 7:24, 8:10, 9:11, 10:15, 14:1, 34:17, 34:23, 48:22, 56:16, 65:4, 65:5, 67:8, 69:7, 73:19, 76:3
CASE [1] - 1:2
caused [1] - 43:11
causes [3] - 9:9, 22:11, 43:17
causing [1] - 56:14
Cayman's [1] - 75:2
Center [1] - 70:24
certain [2] - 47:11, 71:13
certainly [8] - 8:15, 22:7, 23:17, 46:18, 49:3, 52:4, 57:8, 68:5
certificate [10] - 61:25, 62:1, 70:14, 73:25, 78:22, 80:24, 81:16, 85:4, 87:16
certify [1] - 89:10
challenges [2] - 15:15, 15:17
chance [1] - 81:23
channel [1] - 26:4
Chapman [2] - 25:8, 26:17
Chapman's [10] - 23:25, 24:1, 24:2, 24:4, 24:10, 24:16, 24:21, 25:13, 76:8
characteristics [1] - 63:18
characterizes [1] -

3

41:20
**charge** [11] - 3:10, 3:11, 3:13, 4:17, 14:15, 14:18, 14:21, 63:15, 63:16, 80:23, 81:15
**chief** [1] - 85:5
**children** [1] - 52:21
**choice** [2] - 26:9, 83:4
**chomping** [1] - 19:19
**choosing** [1] - 86:17
**Circular** [8] - 61:19, 62:8, 62:19, 63:11, 64:4, 65:15, 65:18, 71:14
**circular** [8] - 61:25, 62:3, 62:7, 62:8, 64:25, 65:1, 65:7, 65:20
**circumstances** [14] - 15:22, 29:16, 32:22, 43:11, 46:23, 51:20, 51:21, 52:14, 53:14, 67:13, 69:6, 82:25, 83:2, 83:6
**cited** [1] - 24:2
**city** [1] - 4:5
**claim** [2] - 35:4, 35:5
**clarified** [1] - 67:17
**clarify** [1] - 62:25
**classroom** [1] - 62:20
**clean** [2] - 42:15, 42:24
**clear** [5] - 12:25, 32:6, 55:3, 66:8, 81:7
**close** [4] - 37:12, 59:18, 69:15, 69:17
**closer** [1] - 41:23
**closeup** [1] - 50:3
**closing** [1] - 75:9
**coast** [1] - 8:24
**Coast** [3] - 24:22, 25:9, 72:14
**cockpit** [7] - 40:9, 49:25, 58:19, 59:23, 59:24, 60:8, 61:15
**coily** [1] - 58:1
**COL** [1] - 31:17
**collide** [1] - 89:2
**collided** [2] - 8:24, 9:5
**collides** [1] - 51:16
**colliding** [1] - 69:20
**Collision** [1] - 69:2
**collision** [34] - 9:8, 9:13, 9:19, 9:21, 9:24, 9:25, 10:18, 10:19, 10:25, 11:3, 11:4,

27:2, 27:8, 27:11, 27:14, 27:17, 28:5, 28:21, 29:18, 29:23, 30:3, 31:18, 32:21, 48:3, 50:20, 51:2, 51:11, 67:2, 67:9, 67:13, 67:19, 69:5
**collisions** [7] - 11:19, 28:6, 50:23, 50:25, 68:14, 68:18, 68:19
**COLREGs** [14] - 27:6, 27:21, 28:2, 28:4, 28:14, 28:18, 28:20, 30:18, 31:15, 31:17, 32:14, 42:6, 67:2, 68:23
**comfortable** [2] - 54:23, 88:8
**coming** [7] - 15:16, 38:11, 46:20, 48:12, 59:13
**commented** [1] - 70:4
**communicate** [2] - 71:21, 84:24
**communicating** [1] - 72:1
**communications** [1] - 61:19
**company** [11] - 3:6, 3:18, 3:21, 4:15, 5:11, 8:8, 8:9, 12:17, 72:13, 73:19
**comparing** [1] - 83:4
**competence** [4] - 16:5, 16:6, 16:8, 63:12
**competency** [2] - 78:9, 78:18
**competent** [1] - 81:15
**complaint** [1] - 35:5
**component** [1] - 43:22
**components** [1] - 83:4
**concentrations** [1] - 33:6
**concepts** [2] - 11:8, 11:9
**conclude** [1] - 47:16
**concluded** [1] - 89:6
**conclusion** [2] - 12:22, 13:23
**condition** [1] - 29:5
**conditions** [13] - 16:17, 25:22, 26:11, 29:17, 32:23, 34:10, 35:14, 43:15, 44:9,

44:20, 48:13, 67:13, 83:2
**conducive** [1] - 59:10
**conduct** [1] - 53:5
**configuration** [1] - 55:1
**confused** [1] - 3:17
**confusing** [1] - 4:9
**connection** [1] - 65:5
**connections** [1] - 4:12
**consultant** [1] - 7:10
**consumption** [1] - 22:11
**content** [4] - 79:12, 79:13, 79:14
**context** [3] - 63:9, 67:17, 80:10
**continues** [1] - 31:21
**contribute** [1] - 43:21
**contributes** [1] - 44:5
**control** [4] - 25:23, 26:12, 46:12, 61:2
**controlled** [1] - 10:2
**controlling** [1] - 57:23
**controls** [2] - 49:7, 59:9
**convenience** [2] - 74:7, 74:22
**copy** [3] - 42:13, 42:15, 42:24
**cord** [1] - 58:1
**corner** [2] - 57:21, 65:16
**corporate** [2] - 13:18, 14:8
**Corporate** [1] - 70:24
**corporation** [2] - 73:15, 73:20
**correct** [171] - 3:7, 3:8, 3:11, 3:12, 4:1, 5:12, 5:13, 5:15, 6:1, 6:8, 6:11, 6:12, 6:15, 8:8, 8:21, 9:2, 9:5, 9:6, 9:10, 9:22, 10:7, 10:10, 11:13, 11:16, 11:17, 12:19, 12:20, 13:8, 13:9, 13:18, 14:3, 14:10, 14:11, 14:16, 14:17, 14:20, 14:23, 15:8, 15:14, 15:18, 16:12, 16:16, 16:21, 16:24, 18:5, 21:8, 21:11, 21:18, 22:12, 24:2, 24:11, 25:9, 25:11, 27:12,

27:19, 28:2, 28:16, 28:20, 29:13, 29:22, 29:23, 32:14, 32:24, 32:25, 33:13, 33:18, 34:6, 35:15, 35:22, 36:14, 36:17, 36:22, 40:6, 40:13, 41:19, 42:8, 43:8, 43:13, 43:16, 45:19, 46:21, 49:16, 49:21, 50:21, 50:22, 50:23, 50:24, 50:25, 51:1, 51:16, 52:1, 52:23, 52:24, 53:3, 54:3, 54:4, 54:5, 54:11, 54:12, 54:17, 55:14, 55:22, 57:11, 60:5, 60:15, 60:22, 61:9, 61:20, 61:23, 61:24, 62:5, 62:9, 62:10, 63:6, 63:15, 63:18, 63:19, 63:21, 64:7, 64:14, 65:5, 66:8, 66:10, 66:22, 67:10, 68:7, 69:4, 70:21, 70:22, 71:8, 71:22, 72:2, 72:3, 73:1, 73:11, 73:13, 76:1, 76:17, 76:19, 76:20, 77:2, 77:7, 77:24, 78:24, 79:1, 79:2, 79:5, 79:6, 79:7, 79:8, 79:10, 79:22, 79:23, 80:16, 80:17, 82:5, 83:7, 83:16, 84:7, 84:8, 84:10, 84:19, 84:20, 84:25, 85:3, 85:13, 85:21, 87:7, 87:8, 87:10, 87:17
**Correct** [1] - 73:15
**correctly** [1] - 29:19
**COUNSEL** [1] - 1:22
**Counsel** [1] - 74:18
**counsel** [6] - 5:5, 35:17, 36:2, 36:6, 44:23, 45:13
**country** [2] - 74:5, 75:15
**couple** [1] - 33:23
**course** [17] - 12:17, 17:15, 17:23, 32:8, 69:14, 71:20, 72:6, 72:9, 72:13, 72:25, 76:13, 76:16, 76:19, 79:12, 79:15, 80:10
**court** [2] - 50:6, 81:22
**Court** [9] - 2:2, 2:3, 8:14, 34:19, 37:6, 42:18, 50:17, 89:17,

89:18
**COURT** [42] - 1:1, 12:22, 13:24, 14:6, 20:2, 30:8, 30:16, 30:24, 31:4, 31:7, 31:10, 31:13, 31:19, 31:22, 32:3, 32:6, 32:9, 35:2, 35:8, 42:20, 42:22, 45:4, 45:7, 48:24, 50:5, 50:11, 50:15, 50:18, 50:19, 62:22, 62:25, 63:25, 65:12, 72:17, 72:19, 74:18, 75:7, 75:10, 77:13, 77:20, 81:20, 83:19
**Court's** [2] - 34:17, 34:25
**courtroom** [1] - 13:10
**cover** [1] - 50:10
**craft** [4] - 25:16, 26:6, 26:22, 27:13
**crashed** [3] - 12:8, 12:11, 23:16
**crashing** [1] - 12:15
**crawling** [2] - 59:8, 59:15
**create** [6] - 15:25, 17:9, 18:6, 26:4, 42:8, 47:3
**created** [8] - 8:20, 16:21, 62:2, 62:17, 62:18, 74:1, 74:11, 77:10
**creates** [3] - 15:13, 16:1, 43:24
**creating** [3] - 15:17, 18:4, 23:19
**crew** [4] - 51:21, 56:15, 59:5, 70:10
**criticized** [1] - 23:23
**cross** [1] - 34:16
**Cross** [1] - 2:9
**CROSS** [1] - 3:2
**cross-examination** [1] - 34:16
**CROSS-EXAMINATION** [1] - 3:2
**crossings** [1] - 85:23
**Cruise** [3] - 13:17, 70:16, 70:20
**cruise** [54] - 3:14, 8:24, 10:19, 10:22, 13:5, 13:20, 14:2, 14:9, 14:12, 15:4, 15:11, 20:22, 20:23, 21:7, 21:10, 21:18, 21:21, 29:22, 30:5,

33:17, 33:20, 33:24,
36:14, 38:1, 39:6,
40:15, 45:25, 46:20,
56:3, 56:12, 56:18,
56:23, 57:9, 64:12,
67:23, 67:24, 68:5,
68:15, 71:3, 73:1,
73:7, 74:4, 74:14,
74:23, 74:25, 75:1,
75:15, 81:3, 84:23,
86:20, 87:15

**CRUISE** [2] - 1:7,
1:22

**cruises** [1] - 21:24

**Cruises** [2] - 70:20

**cruising** [1] - 39:6

**current** [1] - 36:21

**curriculum** [4] -
76:12, 80:15, 82:20,
82:24

**cut** [1] - 58:21

## D

**danger** [3] - 64:10,
66:13, 66:17

**dangerous** [5] -
14:3, 14:13, 48:10,
48:11, 50:21

**DARRIN** [1] - 1:12

**date** [1] - 85:18

**DATE** [1] - 89:17

**dates** [1] - 85:10

**days** [9] - 4:22, 4:25,
5:6, 5:9, 5:14, 6:9,
6:13, 6:22, 7:25

**dealing** [1] - 15:15

**debark** [2] - 64:21,
88:12

**December** [3] - 1:5,
6:23, 7:22

**deciding** [1] - 54:22

**deck** [2] - 18:20,
53:10

**deemed** [1] - 67:14

**defendant** [1] - 1:9

**DEFENDANT** [1] -
1:18

**defense** [6] - 31:22,
64:5, 70:11, 73:5,
85:23, 86:2

**define** [3] - 9:25,
11:3, 11:4

**defined** [1] - 63:3

**defines** [3] - 62:4,
65:7

**defining** [1] - 17:3

**definitely** [1] - 69:19

**definition** [3] - 30:7,
68:2, 68:3

**degree** [3] - 35:3,
46:25, 47:1

**demonstrative** [3] -
31:4, 31:23, 32:4

**density** [1] - 33:5

**departure** [5] -
18:17, 18:19, 18:21,
19:5, 21:1

**deposition** [5] -
11:11, 11:18, 11:23,
11:25, 14:8

**depositions** [1] -
3:16

**describe** [1] - 35:21

**described** [1] - 77:13

**describing** [1] -
13:15

**design** [1] - 38:3

**designed** [1] - 26:3

**destination** [1] -
22:15

**destined** [1] - 21:3

**details** [1] - 34:22

**determine** [4] -
67:13, 78:9, 78:18,
86:14

**determined** [1] -
79:12

**determining** [4] -
33:1, 36:25, 51:18,
53:23

**deviations** [1] - 22:8

**Diaz** [1] - 89:16

**DIAZ** [2] - 2:2, 89:17

**difference** [1] - 52:6

**different** [4] - 21:14,
30:6, 37:1, 49:9

**difficult** [2] - 72:22,
83:1

**direct** [2] - 35:17,
45:1

**Direct** [1] - 2:9

**direction** [1] - 14:21

**directions** [1] - 53:8

**disagree** [4] - 25:14,
25:17, 43:17, 61:13

**disagrees** [1] - 45:7

**disembarkation** [2] -
65:25, 66:10

**displayed** [1] - 30:24

**distance** [3] - 32:22,
34:9, 35:13

**distances** [1] - 16:23

**distinction** [2] - 52:2,
52:8

**DISTRICT** [3] - 1:1,
1:1, 1:12

**District** [2] - 2:3,
89:18

**disturbance** [1] -

37:20

**disturbed** [1] - 48:13

**DIVISION** [1] - 1:2

**dock** [6] - 9:2, 19:10,
19:13, 47:25, 79:22,
81:5

**Docket** [1] - 34:25

**docking** [7] - 48:15,
79:9, 79:18, 81:25,
82:17, 84:17, 88:9

**docks** [5] - 11:20,
12:8, 12:11, 12:15,
23:16

**document** [16] -
19:1, 19:2, 19:8,
19:22, 20:9, 62:1,
74:1, 77:14, 78:23,
78:25, 79:1, 79:3,
79:7, 80:15, 85:18

**done** [4] - 27:21,
69:25, 70:1, 72:25

**doubt** [1] - 67:14

**down** [37] - 8:4, 9:15,
9:16, 25:23, 26:5,
26:12, 31:1, 31:2,
40:25, 41:16, 41:23,
41:24, 42:1, 44:3,
45:18, 46:1, 46:4,
46:6, 47:2, 47:12,
47:15, 47:19, 47:21,
47:23, 47:24, 47:25,
48:12, 53:11, 56:16,
58:13, 64:17, 64:20,
79:24, 87:2

**draft** [3] - 35:18,
35:24, 36:3

**Drive** [1] - 70:24

**drive** [2] - 26:3, 83:6

**driver** [4] - 49:22,
52:9, 54:25, 61:15

**driver's** [4] - 59:15,
59:16, 60:25, 83:9

**drivers** [1] - 62:5

**driving** [1] - 88:5

**drop** [1] - 41:16

**due** [1] - 69:7

**during** [9] - 5:7,
63:21, 64:6, 64:13,
64:15, 64:21, 65:22,
66:9, 88:11

**duties** [1] - 14:9

**duty** [6] - 13:21,
14:2, 14:12, 44:15,
44:17, 44:21

## E

**e-mail** [1] - 70:25

**easy** [1] - 80:7

**effect** [1] - 44:1

**effective** [2] - 32:21,
69:14

**effectively** [1] -
31:24

**eight** [17] - 4:16,
4:18, 4:19, 4:20, 4:21,
4:23, 5:10, 5:11, 6:1,
6:6, 6:11, 7:25, 13:7,
31:21, 68:22

**either** [3] - 28:10,
48:3, 69:23

**elderly** [2] - 52:6,
52:22

**element** [1] - 42:9

**ELMO** [3] - 28:11,
28:12, 56:4

**embark** [2] - 56:16,
88:12

**embarkation** [2] -
65:22, 66:9

**emergency** [2] -
55:16, 55:19

**eminent** [1] - 67:19

**employee** [4] -
12:19, 13:1, 13:4

**encounter** [1] -
83:12

**encountered** [1] -
43:10

**end** [7] - 9:15, 17:23,
25:16, 25:23, 26:19,
52:18, 56:17

**entire** [3] - 11:23,
11:25, 33:19

**entirely** [1] - 18:20

**entitled** [1] - 89:12

**entrances** [1] - 54:9

**Entry** [1] - 34:25

**enumerate** [3] - 83:1,
83:5, 83:11

**environmental** [1] -
16:17

**Epic** [7] - 10:20,
13:12, 71:6, 71:20,
72:25, 73:7, 73:10

**equate** [2] - 23:5,
23:6

**ESQ** [4] - 1:15, 1:18,
1:19, 1:21

**establish** [1] - 5:1

**established** [3] -
30:15, 64:11

**estimate** [1] - 8:5

**etcetera** [3] - 6:19,
31:3, 75:2

**event** [2] - 29:4, 50:6

**eventually** [1] -
80:24

**evidence** [14] -
20:11, 23:3, 23:12,

26:2, 30:20, 30:21,
30:25, 32:1, 32:2,
63:23, 63:25, 70:16,
73:4

**evolution** [1] - 59:11

**exactly** [2] - 34:3,
73:3

**exam** [1] - 78:5

**EXAMINATION** [1] -
3:2

**examination** [5] -
34:16, 35:17, 45:1,
70:11, 71:13

**example** [2] - 40:14,
76:7

**Excerpt** [1] - 89:6

**EXCERPT** [2] - 1:11,
3:1

**excessive** [2] - 9:10,
9:12

**exclude** [1] - 30:1

**excuse** [3] - 18:18,
34:12, 48:4

**exhausted** [1] - 5:2

**exhaustion** [1] - 5:4

**exhibit** [6] - 30:8,
30:19, 31:19, 57:16,
57:17, 64:5

**Exhibit** [18] - 20:11,
29:1, 29:2, 30:9,
31:20, 56:7, 57:17,
61:7, 62:2, 62:7, 64:4,
70:12, 70:15, 74:1,
75:24, 77:23, 87:15

**exist** [2] - 16:18,
67:15

**exists** [1] - 67:14

**exit** [1] - 59:14

**expect** [4] - 12:16,
33:15, 33:16, 80:23

**expected** [1] - 33:16

**experience** [8] -
43:9, 63:4, 64:16,
80:18, 86:12, 86:16,
86:20, 88:19

**expert** [1] - 66:24

**explain** [1] - 37:5

**exposed** [1] - 43:14

**exposure** [1] - 38:4

**expressed** [1] -
34:18

**expressing** [1] - 51:9

**extended** [1] - 18:9

**extensive** [2] -
34:13, 34:15

## F

**face** [1] - 15:16

**fact** [28] - 10:9,

10:17, 14:1, 18:8, 20:18, 20:22, 33:19, 49:6, 49:15, 49:18, 52:17, 54:19, 56:3, 60:9, 69:22, 71:16, 71:19, 71:24, 72:4, 72:8, 75:18, 75:19, 75:20, 77:1, 80:17, 82:17, 85:23

**factor** [5] - 36:24, 43:19, 44:4, 44:7, 44:10

**factors** [3] - 33:1, 34:7, 36:20

**failed** [2] - 78:13, 78:15

**fails** [2] - 78:4, 78:8

**failure** [2] - 23:24, 34:17

**fair** [9] - 4:3, 39:19, 41:6, 42:2, 42:3, 59:6, 77:21, 84:13, 87:14

**fairly** [1] - 31:25

**familiar** [6] - 27:9, 64:25, 68:22, 69:3, 69:22, 74:9

**far** [10] - 6:9, 8:8, 22:15, 44:14, 44:17, 44:20, 72:4, 79:20, 86:8, 87:18

**fashion** [1] - 15:13

**fast** [3] - 5:21, 10:13, 26:3

**FCRR** [2] - 2:2, 89:17

**features** [1] - 38:3

**feet** [6] - 39:14, 39:19, 45:24, 48:2

**fenders** [1] - 48:20

**ferry** [2] - 4:6

**figure** [1] - 84:21

**figures** [1] - 23:14

**figuring** [1] - 35:23

**file** [1] - 6:19

**finally** [2] - 26:17, 86:24

**fine** [5] - 6:25, 19:4, 64:1, 65:13, 82:9

**finish** [2] - 20:4, 57:13, 67:5

**FIRM** [1] - 1:16

**firm** [1] - 8:17

**first** [8] - 3:5, 6:18, 6:22, 19:22, 41:13, 64:5, 83:20, 85:5

**fishing** [1] - 33:6

**fit** [1] - 86:15

**five** [21] - 5:14, 6:9, 6:13, 7:25, 19:4, 28:14, 28:15, 28:17, 29:4, 29:6, 29:10,

29:11, 31:3, 38:11, 40:24, 41:2, 41:3, 49:11

**flag** [2] - 74:5, 74:21

**flagged** [4] - 73:7, 73:10, 73:12, 73:16

**flags** [1] - 74:6

**flew** [1] - 5:23

**flip** [1] - 33:3

**Floor** [2] - 2:4, 89:18

**FLORIDA** [1] - 1:1

**Florida** [8] - 1:4, 1:17, 1:20, 2:4, 70:24, 73:23, 73:24, 89:19

**flourish** [1] - 25:22, 26:1

**flunk** [2] - 77:11, 77:19

**fly** [3] - 4:11, 83:16

**focus** [1] - 49:7

**follow** [1] - 56:17

**followed** [1] - 66:9

**following** [2] - 33:1, 53:8

**FOR** [3] - 1:15, 1:18, 2:10

**foregoing** [1] - 89:10

**forgot** [2] - 53:16, 63:13

**form** [2] - 13:24, 71:3

**Fort** [1] - 72:9

**forth** [1] - 51:4

**forward** [4] - 5:21, 45:17, 60:6, 60:24

**four** [2] - 6:13, 29:4

**fourth** [1] - 6:7

**FPR** [2] - 2:2, 89:17

**France** [5] - 17:14, 18:3, 18:9, 19:3, 33:9

**free** [1] - 3:14

**freeway** [1] - 59:14

**frequently** [1] - 88:12

**Friday** [1] - 33:10

**friends** [1] - 84:2

**front** [7] - 29:6, 30:2, 37:12, 39:4, 42:7, 60:1, 75:11

**fuel** [1] - 22:12

**full** [1] - 29:17

**fully** [1] - 53:1

**function** [1] - 58:15

**functions** [1] - 58:4

# G

**GAYLES** [1] - 1:12

**gears** [2] - 22:7, 70:9

**general** [4] - 25:17, 62:16, 62:17, 62:18

**generally** [4] - 24:7, 26:24, 30:2, 62:16

**gentlemen** [1] - 81:20

**given** [5] - 37:2, 48:22, 53:6, 77:1, 80:24

**GOODMAN** [11] - 1:15, 8:6, 28:25, 30:9, 30:12, 31:20, 38:12, 38:18, 38:23, 41:7, 87:5

**gradually** [2] - 25:23, 26:12, 46:5

**grainy** [1] - 39:18

**grand** [2] - 25:22, 26:1

**great** [2] - 16:23, 48:16

**grid** [1] - 65:20

**Guard** [3] - 24:22, 25:9, 72:15

**guess** [7] - 30:18, 31:5, 37:5, 37:14, 49:5, 77:18, 77:19

**guessing** [1] - 12:3

**guests** [4] - 53:4, 53:8, 55:21, 64:16

**guidelines** [4] - 24:18, 24:19, 65:9, 77:9

**guy** [1] - 10:12

**guys** [2] - 64:19, 80:21

# H

**half** [3] - 19:12, 23:8

**hand** [4] - 53:10, 57:21, 65:16

**handle** [1] - 71:21

**handling** [8] - 25:18, 63:18, 72:1, 82:6, 82:10, 82:11, 82:18, 82:21

**handwriting** [1] - 42:24

**harbor** [3] - 39:16, 39:17

**hard** [15] - 9:20, 9:23, 10:14, 10:17, 10:20, 39:18, 48:14, 48:19, 49:6, 51:7, 51:8, 51:10, 81:21

**Harestad** [1] - 50:20

**HARESTAD** [1] - 2:12

**hastily** [1] - 87:2

**hazards** [1] - 36:21

**head** [1] - 5:3

**headquarter** [1] - 73:24

**headquartered** [1] - 74:5

**headquarters** [1] - 22:4

**hear** [2] - 29:8, 29:9

**heard** [11] - 11:18, 13:10, 27:7, 44:23, 45:1, 45:2, 45:13, 45:14, 74:8, 84:1

**hearing** [1] - 29:15

**height** [1] - 47:3

**helm** [1] - 58:17

**hereby** [1] - 89:10

**HEYWARD** [1] - 1:15

**Hickey** [2] - 30:9, 35:8

**HICKEY** [61] - 1:15, 1:16, 2:13, 3:3, 8:7, 12:24, 13:25, 14:7, 20:6, 29:2, 29:3, 30:11, 30:14, 30:18, 30:21, 31:1, 31:5, 31:8, 31:12, 31:14, 32:10, 32:11, 35:6, 35:10, 38:13, 38:19, 38:24, 41:8, 41:9, 42:18, 42:21, 42:23, 43:4, 45:9, 45:12, 48:25, 50:10, 50:13, 50:17, 50:19, 53:15, 53:19, 59:22, 63:1, 64:2, 65:14, 72:24, 74:19, 75:13, 75:14, 77:15, 77:21, 77:22, 79:24, 80:3, 81:24, 83:21, 87:6, 88:24, 88:25, 89:5

**high** [4] - 8:12, 25:22, 26:1, 26:11

**highlighted** [1] - 56:13

**hit** [1] - 48:21

**hold** [7] - 20:2, 26:18, 53:24, 54:7, 54:20, 59:19, 70:6

**home** [1] - 4:20

**Honor** [4] - 34:12, 63:22, 74:16, 75:8

**HONORABLE** [1] - 1:12

**hope** [1] - 5:16

**horrible** [1] - 35:21

**host** [1] - 16:14

**hour** [6] - 3:7, 7:16, 8:4, 19:12, 19:13, 23:8

**hours** [24] - 4:14, 4:16, 4:18, 4:19, 4:20,

4:21, 4:23, 5:6, 5:10, 5:11, 5:18, 6:1, 6:6, 6:11, 6:14, 6:20, 7:7, 7:20, 7:23, 8:1, 18:17, 18:19, 18:21

**HOUSE** [1] - 1:22

**hull** [1] - 39:5

**human** [1] - 7:11

**hundred** [1] - 18:24

**hundreds** [2] - 16:21, 17:8

**hurt** [1] - 54:15

# I

**idea** [3] - 24:23, 37:1, 37:6

**identify** [1] - 38:22

**ii** [1] - 33:5

**immediately** [1] - 15:13

**IMO** [10] - 27:4, 27:6, 27:22, 31:8, 33:10, 42:6, 61:19, 62:8, 62:19, 63:11

**impending** [5] - 13:21, 55:7, 64:10, 66:13, 66:17

**important** [5] - 22:2, 22:3, 61:18, 81:11

**impossible** [3] - 80:19, 83:5, 83:11

**impractical** [1] - 49:22

**IN** [1] - 1:22

**IN-HOUSE** [1] - 1:22

**incident** [10] - 13:11, 13:15, 18:12, 33:10, 38:7, 41:6, 41:11, 85:25, 86:7, 86:10

**include** [4] - 15:17, 15:23, 66:12, 66:13

**included** [1] - 70:5

**including** [5] - 33:5, 54:10, 71:14, 82:13, 82:15

**incorporate** [2] - 27:14, 74:4

**incorporated** [3] - 27:22, 28:2

**incorrect** [1] - 21:12

**independent** [1] - 58:5

**indicated** [1] - 34:19

**indicating** [6] - 78:12, 79:1, 79:3, 80:15, 85:18, 88:20

**industry** [1] - 86:17

**information** [4] - 25:5, 72:23, 78:9,

78:17
**initial** [1] - 9:12
**injured** [1] - 51:16,
51:18
**injuries** [2] - 66:21,
68:20
**injury** [4] - 13:22,
55:7, 55:14, 68:17
**inland** [1] - 27:15
**inside** [1] - 40:9
**instructions** [3] -
53:5, 56:17, 66:8
**intended** [2] - 26:2,
68:10
**intent** [1] - 67:20
**international** [12] -
27:15, 27:17, 27:19,
27:23, 28:5, 28:18,
28:20, 31:24, 34:14,
34:15, 34:21, 62:8
**International** [2] -
30:12, 31:9
**interpreting** [1] -
55:15
**interrogatory** [1] -
13:14
**involved** [4] - 9:11,
19:15, 43:19, 80:19
**involving** [1] - 13:11
**irrelevant** [1] - 69:12
**island** [2] - 4:4
**Island** [2] - 4:6, 4:8
**issue** [1] - 26:7
**itemize** [1] - 83:3
**itinerary** [1] - 22:16
**itself** [1] - 21:4

## J

**January** [1] - 89:16
**jeopardy** [1] - 21:1
**JOHN** [2] - 1:15, 2:12
**joined** [1] - 86:20
**Joint** [1] - 20:11
**joint** [1] - 57:17
**Judge** [4] - 65:10,
74:21, 77:18, 88:24
**JUDGE** [1] - 1:12
**jury** [1] - 75:11
**JURY** [1] - 1:11

## K

**keep** [4] - 22:5,
25:23, 26:12, 35:9
**Keijer** [8] - 10:5,
24:1, 24:25, 41:20,
45:16, 48:16, 69:22,
70:3
**Keijer's** [1] - 25:2

**kind** [15] - 15:15,
15:24, 23:22, 24:5,
34:3, 37:20, 39:9,
39:17, 51:10, 51:11,
53:12, 54:15, 55:16,
55:20, 70:9
**kinds** [1] - 52:21
**knots** [3] - 10:4,
10:6, 47:11
**knowing** [5] - 15:7,
15:11, 15:20, 15:21,
63:17
**knowledge** [9] -
23:10, 62:12, 62:13,
63:11, 63:12, 80:4,
80:8, 80:18
**known** [2] - 46:19,
48:2
**knows** [19] - 13:17,
13:20, 16:1, 23:15,
23:17, 30:22, 47:6,
47:10, 47:18, 47:19,
47:22, 47:24, 75:4,
83:19

## L

**land** [3] - 4:9, 84:14
**landing** [11] - 9:20,
9:23, 10:13, 10:14,
10:18, 10:20, 48:19,
51:7, 51:10, 53:7,
83:15
**Last** [1] - 20:12
**last** [9] - 5:25, 18:22,
19:16, 19:23, 22:22,
23:4, 23:6, 23:7, 59:8
**late** [23] - 9:17, 9:19,
10:11, 10:12, 18:15,
18:16, 19:12, 19:13,
19:16, 19:17, 21:1,
21:5, 23:1, 23:2, 23:4,
23:5, 23:7, 23:8,
23:11, 23:13, 23:14,
50:7
**latter** [1] - 60:14
**Lauderdale** [1] - 72:9
**law** [2] - 11:15, 32:1
**LAW** [1] - 1:16
**lawyer** [3] - 64:5,
81:2, 81:3
**lawyers** [4] - 7:5,
76:1, 76:4, 76:11
**lay** [1] - 83:20
**learn** [3] - 52:3,
80:24, 84:18
**learned** [5] - 14:25,
52:9, 52:10, 52:11,
52:12
**learning** [2] - 80:23,

81:14
**least** [2] - 58:11, 68:5
**leave** [6] - 18:23,
19:20, 19:23, 21:4,
21:6, 21:21
**leaving** [2] - 19:12,
19:13
**left** [10] - 19:10,
20:18, 23:12, 57:12,
57:21, 57:22, 60:17,
60:18, 60:19, 60:24
**legal** [1] - 12:22
**length** [1] - 36:6
**less** [5] - 43:25, 44:1,
68:7, 68:9, 71:25
**letterhead** [2] -
70:16, 70:19
**letting** [1] - 64:9
**library** [1] - 76:9
**license** [6] - 72:10,
72:14, 83:9, 83:16,
83:22, 84:6
**licensed** [3] - 72:16,
88:2, 88:11
**licenses** [1] - 72:15
**lifeboats** [1] - 88:6
**Ligue** [8] - 49:18,
49:19, 87:4, 87:5,
87:7, 87:9, 87:11,
87:15
**limited** [5] - 24:4,
37:3, 37:8, 37:25
**Limited** [1] - 70:24
**Line** [3] - 13:17,
70:16, 70:20
**line** [22] - 3:14, 12:6,
13:5, 13:20, 14:2,
14:9, 14:12, 33:20,
56:3, 56:12, 56:18,
56:23, 59:25, 71:3,
74:16, 74:20, 74:25,
75:8, 81:3, 84:23,
86:21, 87:16
**LINE** [2] - 1:8, 1:22
**lines** [7] - 56:12,
57:9, 64:12, 74:4,
74:23, 75:1, 75:15
**LIQUE** [1] - 49:19
**LISA** [1] - 1:15
**list** [7] - 76:18, 81:11,
82:1, 82:2, 84:9,
85:15, 85:16
**listing** [1] - 34:7
**lists** [2] - 83:8, 83:14
**loaded** [1] - 15:3
**log** [4] - 18:20,
20:22, 76:18, 85:13
**look** [6] - 41:3,
46:11, 60:12, 70:15,
86:11, 86:15

**looked** [2] - 22:16,
79:17
**looking** [4] - 30:8,
30:16, 39:3, 70:14
**lookout** [4] - 28:15,
29:12, 29:15, 32:13
**looks** [11] - 39:8,
39:13, 39:15, 41:5,
57:25, 58:1, 58:7,
58:15, 58:17, 65:20,
77:23
**loss** [2] - 22:5, 22:10
**lost** [2] - 45:10,
53:18
**lower** [1] - 60:13
**loyal** [1] - 13:4
**LTD** [1] - 1:7
**lunch** [2] - 50:8,
57:15

## M

**mail** [1] - 70:25
**main** [2] - 4:9, 9:7
**maintain** [2] - 28:15,
29:14
**man** [1] - 85:3
**manageability** [4] -
34:8, 35:11, 35:12
**managing** [3] -
63:21, 64:6, 64:9
**maneuver** [2] -
49:24, 88:6
**maneuverability** [1] -
36:16
**maneuverable** [4] -
68:5, 68:7, 68:8, 68:9
**maneuvering** [1] -
59:7
**manipulating** [1] -
37:2
**manuals** [1] - 76:15
**marine** [1] - 76:8
**mariner** [3] - 24:11,
48:17, 84:18
**Maritime** [12] - 71:16,
71:19, 71:24, 72:5,
72:11, 72:12, 73:5,
74:11, 74:19, 74:22,
75:6, 75:16
**marked** [1] - 11:6
**markings** [1] - 76:22
**massive** [1] - 15:12
**master** [1] - 53:7
**master's** [2] - 72:10,
72:14
**mate** [1] - 49:19
**materials** [2] - 75:24,
76:3
**matter** [5] - 10:17,

14:1, 60:9, 80:17,
89:12
**MATTHEW** [1] - 1:19
**maximum** [1] - 4:16
**MCALPIN** [6] - 1:18,
30:20, 31:23, 32:5,
32:8, 34:12
**mean** [11] - 9:15,
19:24, 23:17, 31:24,
40:2, 59:7, 63:25,
64:19, 73:12, 81:7,
81:8
**meaning** [1] - 17:18
**means** [3] - 22:5,
29:16, 67:12
**meant** [2] - 17:10,
75:9
**meet** [1] - 11:4
**member** [1] - 59:5
**mentioned** [4] - 8:16,
24:1, 27:4, 86:24
**merchant** [1] - 24:11
**message** [3] - 43:6,
57:2, 57:5
**messages** [1] - 22:4
**Mexico** [1] - 8:25
**MIAMI** [1] - 1:2
**Miami** [14] - 1:4,
1:17, 1:20, 2:3, 2:4,
4:1, 4:12, 7:3, 26:4,
70:24, 73:23, 73:24,
89:18, 89:19
**mic** [1] - 49:3
**Michael** [1] - 87:5
**microphone** [4] -
49:25, 59:16, 59:24,
59:25
**microphones** [1] -
57:12
**mics** [2] - 50:4
**might** [7] - 50:4,
55:7, 56:19, 56:20,
56:21, 83:2, 83:23
**mile** [2] - 14:24, 15:4
**miles** [2] - 16:21,
17:8
**minute** [3] - 33:9,
70:15, 88:24
**minutes** [3] - 41:1,
41:13, 45:2
**minutia** [1] - 34:22
**mischaracterizes** [4]
- 14:5, 45:6, 62:21,
62:23
**mistaken** [1] - 19:14
**moment** [8] - 7:12,
7:15, 30:10, 37:2,
45:4, 52:7, 62:22,
72:23
**monitor** [2] - 25:14,

88:9
**monitored** [2] - 80:22, 85:19
**monitoring** [6] - 84:6, 86:25, 87:21, 87:24, 87:25, 88:20
**month** [5] - 3:9, 3:18, 3:21, 5:7, 5:9
**morning** [1] - 3:4
**morphing** [1] - 34:20
**most** [2] - 69:14, 69:19
**motionless** [1] - 9:8
**move** [3] - 32:17, 36:8, 75:23
**movement** [1] - 56:14
**moving** [2] - 9:9, 68:3
**MR** [79] - 2:12, 2:13, 3:3, 8:7, 12:21, 12:24, 13:23, 13:25, 14:5, 14:7, 20:6, 29:2, 29:3, 30:11, 30:14, 30:18, 30:20, 30:21, 31:1, 31:5, 31:8, 31:12, 31:14, 31:23, 32:5, 32:8, 32:10, 32:11, 34:12, 35:6, 35:10, 38:13, 38:19, 38:24, 41:8, 41:9, 42:18, 42:21, 42:23, 43:4, 45:3, 45:6, 45:9, 45:12, 48:23, 48:25, 50:10, 50:13, 50:17, 50:19, 53:15, 53:19, 59:22, 62:21, 62:23, 63:1, 63:22, 64:2, 65:14, 72:18, 72:24, 74:16, 74:19, 75:8, 75:13, 75:14, 77:12, 77:15, 77:21, 77:22, 79:24, 80:3, 81:24, 83:17, 83:21, 87:6, 88:24, 88:25, 89:5
**MS** [11] - 8:6, 28:25, 30:9, 30:12, 31:20, 38:12, 38:18, 38:23, 41:7, 65:16, 87:5
**multiple** [1] - 83:3
**multiplication** [1] - 7:19

## N

**name** [2] - 49:18, 87:4
**names** [1] - 85:2
**nautical** [3] - 16:4, 16:7, 16:8

**navigating** [1] - 39:19
**navigation** [4] - 24:16, 27:15, 27:23, 31:25
**Navigational** [1] - 30:12
**navigational** [1] - 36:21
**Navy** [3] - 24:22, 24:23, 25:9
**NCL** [13] - 1:7, 12:7, 12:10, 12:19, 13:1, 27:12, 62:2, 70:23, 73:14, 75:20, 76:1, 76:4, 77:10
**near** [3] - 39:7, 54:9, 88:11
**nearby** [1] - 25:16
**need** [9] - 23:10, 26:4, 35:8, 37:2, 38:22, 49:8, 50:6, 75:11, 84:9
**needs** [8] - 36:12, 36:16, 36:24, 37:16, 37:22, 37:25, 48:10, 67:17
**negligent** [2] - 34:16, 35:4
**neighborhood** [1] - 10:8
**never** [5] - 21:10, 21:17, 24:23, 63:3, 63:7
**next** [4] - 22:14, 22:25, 25:21, 78:1
**NO** [1] - 1:2
**non** [1] - 38:25
**normal** [1] - 53:13
**normally** [1] - 58:4
**North** [2] - 2:3, 89:18
**Norwegian** [3] - 13:17, 70:16, 70:19
**NORWEGIAN** [2] - 1:7, 1:22
**notes** [3] - 11:7, 30:10, 84:22
**nothing** [13] - 24:24, 25:11, 62:19, 63:5, 79:9, 79:17, 79:18, 79:21, 80:14, 84:23, 85:2, 89:5
**notice** [1] - 44:25
**November** [2] - 6:23, 7:21
**nowhere** [1] - 88:11
**number** [11] - 7:20, 7:23, 13:6, 38:11, 40:24, 41:2, 41:3, 45:2, 52:15, 57:17

**numbers** [2] - 5:2, 41:4

## O

**o'clock** [3] - 18:17, 19:4, 20:10
**object** [2] - 32:5, 34:13
**objection** [16] - 12:21, 13:23, 14:5, 32:3, 35:2, 45:3, 45:5, 48:23, 62:21, 62:23, 63:22, 69:12, 74:16, 77:12, 77:19, 83:17
**objects** [1] - 72:20
**obligated** [4] - 50:25, 51:23, 64:12, 66:7
**obligation** [4] - 55:9, 55:21, 55:22, 55:24
**observance** [1] - 69:8
**occasionally** [1] - 43:14
**occasions** [2] - 21:14, 88:10
**occur** [1] - 11:19
**occurs** [2] - 46:5, 75:19
**Oceania** [1] - 70:20
**oceans** [1] - 16:23
**October** [1] - 89:1
**OF** [4] - 1:1, 1:11, 1:11, 3:1
**office** [2] - 72:5, 72:12
**officer** [11] - 71:6, 78:21, 81:14, 85:5, 85:7, 86:25, 87:24, 87:25, 88:2, 88:21
**officers** [3] - 80:22, 88:4, 88:11
**official** [1] - 2:2
**Official** [1] - 89:17
**often** [2] - 53:11, 88:1
**old** [1] - 52:6
**older** [1] - 52:1
**once** [2] - 8:20, 78:5
**one** [71] - 7:16, 8:4, 9:2, 9:4, 9:7, 9:8, 9:9, 10:25, 14:2, 14:15, 14:18, 14:21, 14:24, 15:2, 15:4, 15:7, 15:10, 22:10, 23:9, 25:21, 28:4, 36:1, 38:4, 42:1, 42:9, 43:17, 49:17, 54:13, 57:22, 58:13, 61:6, 61:22, 62:3, 63:10,

63:12, 63:14, 63:20, 64:5, 65:22, 66:4, 66:7, 66:16, 66:25, 68:19, 69:3, 69:12, 69:20, 69:22, 70:3, 71:16, 71:19, 71:24, 74:5, 75:3, 78:13, 80:23, 81:2, 81:3, 81:10, 81:13, 81:25, 82:17, 86:11, 86:14, 89:1
**online** [1] - 31:16
**operate** [1] - 87:16
**operated** [1] - 13:1
**operates** [1] - 46:23
**operating** [7] - 26:22, 34:4, 36:13, 38:14, 81:8, 82:12, 87:3
**operation** [8] - 11:10, 22:23, 27:12, 34:16, 34:20, 34:22, 34:24, 35:5
**operations** [6] - 43:10, 63:21, 64:6, 66:2, 68:11, 68:12
**operator** [20] - 10:3, 11:25, 23:1, 23:2, 23:4, 36:12, 37:16, 46:8, 48:18, 49:16, 52:14, 53:6, 55:1, 56:19, 58:23, 59:2, 60:21, 64:13, 81:12, 86:15
**operators** [2] - 55:6, 65:7, 86:18
**opinion** [3] - 42:12, 43:9, 48:21
**opportunity** [2] - 48:5, 49:3
**option** [2] - 70:5, 70:6
**options** [1] - 70:3
**order** [4] - 21:21, 34:18, 34:25, 41:18
**ordinary** [1] - 87:12
**OS** [1] - 87:11
**outside** [2] - 74:17, 76:6
**overall** [1] - 52:15
**overlap** [1] - 35:3
**overruled** [5] - 14:6, 35:2, 45:7, 62:25, 72:19
**own** [11] - 15:17, 26:6, 26:18, 36:16, 43:18, 43:19, 44:4, 45:23, 46:17, 47:16, 88:19

## P

**p.m** [7] - 1:6, 18:13, 18:23, 19:23, 19:25, 20:13, 23:7
**PA** [30] - 48:5, 49:4, 49:13, 49:15, 49:20, 50:1, 57:15, 57:20, 58:3, 58:4, 58:5, 58:8, 58:14, 58:15, 58:16, 58:22, 58:25, 59:4, 59:24, 60:12, 60:13, 60:18, 60:21, 60:24, 61:3, 61:5, 61:7, 61:8, 61:14
**pack** [1] - 72:14
**page** [8] - 12:5, 12:6, 31:20, 31:21, 34:8, 42:11, 43:6, 78:1
**Pages** [1] - 1:9
**paid** [1] - 3:6
**paper** [2] - 77:1, 87:15
**parameters** [1] - 62:4
**part** [20] - 10:22, 10:23, 11:12, 11:15, 31:10, 31:15, 56:8, 60:14, 64:9, 69:6, 79:25, 80:11, 80:16, 80:18, 80:25, 81:13, 81:16, 86:6
**participated** [1] - 85:7
**particular** [7] - 13:11, 13:12, 24:7, 24:9, 26:23, 54:2, 65:11
**particularly** [1] - 88:3
**partner** [1] - 11:15
**parts** [1] - 54:8
**pass** [2] - 26:19, 77:6
**passage** [1] - 65:11
**passed** [1] - 71:12
**passenger** [2] - 48:6, 59:14
**passengers** [43] - 13:21, 14:3, 14:13, 15:3, 46:10, 49:12, 51:4, 51:19, 51:20, 51:21, 51:25, 52:15, 52:17, 52:20, 52:21, 52:24, 53:1, 53:24, 54:2, 54:10, 55:8, 55:24, 56:3, 56:12, 56:13, 57:2, 57:5, 57:9, 61:18, 61:20, 63:21, 64:6, 64:9, 64:13, 65:22, 66:9, 66:13, 66:17, 66:18,

68:20, 71:21, 72:1, 84:24

**passing** [4] - 33:23, 38:25, 56:14, 80:25
**past** [1] - 65:6
**patient** [1] - 56:17
**PATRICIA** [2] - 2:2, 89:17
**patrol** [1] - 39:16
**Patty** [1] - 56:6
**pay** [1] - 40:2
**paying** [3] - 40:2, 40:17, 64:22
**people** [13] - 26:3, 34:4, 51:15, 51:18, 52:1, 52:7, 52:22, 54:14, 55:11, 55:14, 55:21, 85:3, 86:11
**per** [1] - 4:23
**perceive** [1] - 55:13
**perceives** [1] - 55:10
**percent** [2] - 18:24, 62:16
**percentages** [1] - 62:20
**perform** [1] - 7:19
**perhaps** [2] - 58:14, 88:14
**period** [4] - 3:15, 5:7, 7:24, 68:18
**permanent** [1] - 21:17
**permanently** [1] - 21:19
**person** [8] - 14:15, 42:1, 49:18, 57:22, 79:3, 81:14, 85:4, 85:20
**personal** [3] - 63:4, 64:16, 76:9
**personnel** [2] - 72:25, 73:1
**phone** [1] - 8:4
**photo** [3] - 49:25, 60:17, 61:5
**photograph** [2] - 57:14, 60:13
**phrased** [1] - 24:6
**phraseology** [1] - 11:21
**physically** [2] - 5:2, 66:19
**pick** [2] - 48:5, 49:3
**picking** [2] - 22:22, 49:13
**picture** [2] - 23:10, 53:11
**piece** [1] - 77:1
**pier** [1] - 15:3
**pilot** [3] - 83:12,

83:23, 84:14
**pilot's** [1] - 83:22
**pilots** [3] - 83:18, 83:24, 84:2
**pitch** [1] - 45:17
**pitching** [5] - 45:18, 45:19, 45:23, 46:17, 47:7
**place** [2] - 18:12, 41:13
**Plaintiff** [1] - 1:5
**plaintiff** [1] - 35:4
**PLAINTIFF** [2] - 1:15, 2:10
**Plaintiff's** [3] - 28:25, 29:2, 30:9
**platform** [14] - 9:21, 10:19, 10:20, 10:22, 15:16, 41:25, 43:14, 44:5, 45:24, 46:20, 48:13, 48:15, 51:3, 59:10
**played** [3] - 11:12, 38:20
**plead** [1] - 34:21
**pleasure** [2] - 33:23, 39:13
**plenty** [1] - 22:14
**plural** [1] - 17:18
**plus** [1] - 40:14
**point** [15] - 5:4, 7:9, 21:2, 22:13, 23:11, 34:13, 35:23, 37:10, 37:14, 37:15, 38:7, 40:23, 47:14, 47:20, 75:1
**pointed** [1] - 48:15
**pointing** [1] - 87:14
**points** [3] - 33:24, 49:20, 85:23
**police** [1] - 39:17
**port** [3] - 13:11, 21:21, 22:25
**Port** [4] - 15:5, 20:18, 39:7, 86:9
**portside** [1] - 58:17
**position** [4] - 7:11, 9:25, 31:22, 37:7
**positions** [1] - 37:13
**positive** [1] - 69:7
**possibility** [2] - 30:1, 67:19
**possible** [6] - 49:5, 51:17, 54:18, 68:21, 82:20, 82:23
**possibly** [1] - 15:22
**postulating** [1] - 52:7
**practical** [10] - 62:13, 62:20, 80:12, 80:18,

82:2, 82:25, 84:4, 85:11, 85:12
**practicalities** [1] - 82:21
**practically** [2] - 84:13, 85:19
**practice** [1] - 84:15
**predicate** [2] - 25:25, 83:20
**predicating** [1] - 11:2
**preparation** [3] - 6:19, 7:4, 8:2
**present** [1] - 8:14
**presented** [1] - 56:8
**presume** [1] - 66:20
**pretty** [2] - 22:23, 39:18
**prevailing** [5] - 29:16, 32:22, 34:10, 35:14, 67:12
**prevent** [1] - 66:21
**prevention** [1] - 28:6
**previous** [1] - 62:24
**principal** [1] - 9:9
**principle** [2] - 26:15, 27:1
**private** [1] - 72:13
**procedure** [3] - 20:25, 22:21, 88:10
**procedures** [1] - 78:2
**proceed** [1] - 32:20
**PROCEEDINGS** [1] - 3:1
**proceedings** [1] - 89:11
**processing** [1] - 72:23
**projecting** [1] - 54:23
**proper** [4] - 28:15, 29:14, 32:20, 36:25
**properly** [1] - 23:18
**proposition** [3] - 4:25, 25:17, 26:10
**proud** [1] - 57:10
**provided** [6] - 69:15, 72:16, 75:25, 76:4, 76:11
**proximity** [1] - 36:21
**psychologically** [1] - 66:19
**publication** [4] - 24:7, 24:9, 26:2, 26:8
**publications** [2] - 28:4, 76:8
**pull** [2] - 15:11, 22:21
**pulled** [6] - 5:19, 9:4,

10:12, 20:24, 22:19, 68:1
**pulling** [1] - 67:24
**pulls** [1] - 40:25
**purpose** [1] - 7:10
**push** [1] - 46:3
**put** [11] - 20:1, 20:8, 20:9, 28:10, 38:6, 42:18, 43:2, 49:25, 56:4, 70:12, 81:10
**putting** [1] - 56:7

**Q**

**quarters** [2] - 69:15, 69:17
**questioned** [1] - 32:1
**questioning** [2] - 74:17, 75:8
**questions** [4] - 12:5, 75:10, 81:3, 86:2
**quibble** [1] - 28:23
**quite** [1] - 65:2
**quote** [11] - 17:15, 17:20, 17:23, 25:13, 25:16, 25:21, 25:24, 26:17, 26:19, 42:12, 56:17
**quoting** [1] - 42:12

**R**

**rail** [1] - 54:20
**rails** [2] - 53:24, 54:7
**reached** [1] - 22:20
**read** [15] - 11:15, 11:18, 11:23, 11:25, 13:14, 14:8, 25:4, 29:19, 53:15, 53:17, 56:10, 65:3, 65:4, 65:6
**reading** [2] - 67:16, 69:13
**ready** [1] - 22:24
**real** [2] - 81:18, 81:25
**realize** [1] - 50:4
**really** [3] - 17:5, 26:5, 80:21
**reapply** [1] - 80:20
**rear** [2] - 59:25, 60:22
**reason** [3] - 10:11, 74:10, 75:1
**reasonable** [1] - 18:25
**reasonably** [2] - 15:22, 15:25
**reasons** [6] - 54:14, 65:6, 66:16, 66:17,

68:19, 75:15
**receives** [1] - 3:6
**recess** [2] - 50:11, 50:14
**recognize** [1] - 56:9
**recollection** [2] - 65:12, 66:6
**record** [6] - 80:20, 85:10, 85:12, 88:18, 88:20, 88:23
**recorded** [1] - 53:17
**recover** [1] - 35:4
**recreational** [1] - 24:8
**Redirect** [1] - 2:9
**refer** [2] - 20:15, 64:1
**reference** [2] - 34:9, 35:13
**referred** [5] - 49:19, 61:25, 62:7, 64:4, 64:5
**referring** [6] - 29:24, 30:3, 30:10, 42:16, 60:17, 75:24
**refresh** [2] - 65:12, 66:5
**refute** [1] - 25:11
**regard** [3] - 8:23, 46:19, 69:8
**regarding** [2] - 11:9, 67:8
**Regent** [1] - 70:20
**register** [1] - 74:6
**registered** [3] - 73:12, 74:15, 75:21
**registration** [1] - 73:14
**regulation** [2] - 75:3, 75:17
**regulations** [14] - 27:8, 27:11, 27:14, 27:17, 28:5, 28:18, 28:21, 31:18, 31:24, 31:25, 67:2, 67:7
**Regulations** [1] - 30:13
**relate** [1] - 5:4
**relevance** [1] - 67:8
**relevant** [2] - 74:18, 75:25
**remain** [1] - 64:23
**remainder** [1] - 67:7
**remember** [25] - 8:18, 8:25, 9:2, 13:6, 13:13, 17:17, 18:20, 18:22, 18:23, 18:24, 19:5, 19:17, 19:19, 20:17, 33:25, 36:2, 36:4, 36:10, 56:25, 67:3, 80:6, 81:6, 86:5,

86:6, 86:19
**repeat** [3] - 57:4, 76:2, 86:13
**rephrase** [2] - 53:20, 64:3
**report** [12] - 6:19, 8:21, 24:2, 25:6, 25:8, 42:11, 42:13, 42:20, 43:1, 43:7, 70:4, 70:5
**REPORTED** [1] - 2:1
**reporter** [1] - 81:22
**Reporter** [2] - 2:2, 89:17
**representative** [2] - 13:18, 14:8
**require** [1] - 42:17
**required** [3] - 35:20, 42:9, 48:18
**requires** [1] - 55:16
**respect** [4] - 43:10, 48:16, 55:3, 67:18
**respond** [3] - 55:4, 55:5, 69:1
**responsible** [5] - 15:7, 15:10, 15:15, 15:20, 15:21
**result** [1] - 69:16
**resume** [1] - 50:8
**retained** [3] - 8:17, 8:23, 73:19
**retake** [1] - 78:5
**revenue** [2] - 22:5, 22:10
**reverberation** [1] - 15:14
**review** [4] - 6:19, 78:8, 81:11, 81:13
**reviewed** [9] - 19:16, 76:3, 76:7, 76:8, 76:12, 78:17, 79:4, 79:18
**RICHARD** [1] - 1:18
**right-hand** [2] - 57:21, 65:16
**risk** [5] - 29:18, 29:23, 67:9, 67:13, 67:14
**road** [11] - 27:16, 27:24, 27:25, 28:3, 28:7, 28:24, 30:13, 34:14, 34:15, 34:21
**rock** [1] - 36:8
**roll** [3] - 26:5, 39:12, 89:2
**rolling** [5] - 45:21, 51:3, 54:15, 55:13, 66:18
**rolls** [1] - 51:16
**room** [1] - 69:14
**rough** [3] - 8:5, 42:3,

82:11
**roughly** [1] - 35:22
**RPR** [2] - 2:2, 89:17
**Ruggeri** [1] - 54:11
**RUGGERI** [2] - 1:4, 1:11
**rule** [30] - 27:1, 28:14, 28:15, 28:17, 29:4, 29:6, 29:10, 29:11, 29:21, 29:24, 31:3, 31:20, 32:14, 36:11, 62:16, 62:17, 62:18, 67:9, 67:11, 67:18, 67:20, 68:9, 68:10, 68:22, 69:11
**rules** [19] - 27:15, 27:16, 27:23, 27:24, 28:3, 28:7, 28:9, 28:18, 28:24, 30:13, 30:22, 31:11, 34:14, 34:15, 34:21, 68:12, 69:6
**Rules** [1] - 30:12
**running** [3] - 18:15, 18:16, 26:18
**rush** [3] - 22:15, 22:17, 22:18

**S**

**safe** [11] - 32:12, 32:13, 32:14, 32:20, 33:1, 34:7, 34:22, 56:24, 57:3, 57:6, 57:7
**Safe** [1] - 32:19
**safely** [1] - 84:18
**safety** [2] - 55:10, 64:22, 66:8
**sat** [1] - 11:11
**Saturday** [2] - 5:23
**saw** [4] - 11:18, 33:19, 38:16, 40:15
**schedule** [4] - 21:24, 22:5, 22:9, 22:11
**scheduled** [1] - 21:4
**scholastic** [1] - 80:11
**scope** [2] - 63:24, 74:17
**score** [2] - 77:3, 79:1
**scored** [1] - 77:4
**screen** [10] - 29:10, 30:17, 31:10, 38:6, 39:4, 56:4, 56:7, 57:18, 70:12, 70:15
**sea** [9] - 28:6, 36:21, 37:20, 43:14, 44:5, 44:9, 44:20, 48:13, 69:14

**seafarer** [1] - 72:7
**seaman** [1] - 87:12
**seamanship** [8] - 15:24, 16:3, 23:23, 26:15, 26:25, 36:11, 69:8, 80:12
**seamen** [1] - 50:25
**seat** [12] - 53:2, 59:15, 59:16, 59:23, 59:24, 60:5, 60:6, 60:9, 60:10, 60:16, 60:25, 61:15
**seated** [2] - 50:15, 64:23
**seats** [3] - 53:24, 54:3, 54:5
**seaward** [2] - 43:15, 44:20
**seconds** [15] - 44:24, 44:25, 45:13, 45:14, 45:24, 46:16, 46:18, 47:6, 47:9, 47:10, 47:14, 47:22, 48:1, 49:2, 49:11
**secured** [1] - 53:1
**security** [1] - 53:3
**see** [66] - 11:7, 11:9, 15:4, 20:11, 20:12, 20:13, 21:5, 22:13, 24:12, 29:6, 29:10, 32:15, 32:16, 33:7, 33:8, 33:22, 33:23, 34:11, 37:6, 37:10, 37:12, 37:13, 38:15, 38:20, 39:4, 39:5, 39:12, 41:22, 42:23, 50:3, 50:9, 51:2, 51:6, 51:7, 51:8, 57:16, 57:18, 57:20, 58:21, 59:25, 60:1, 60:4, 60:7, 60:9, 60:12, 60:23, 60:24, 61:2, 61:6, 61:10, 65:15, 65:16, 65:17, 65:18, 70:17, 71:1, 71:5, 74:1, 78:2, 78:6, 78:7, 78:10, 78:11, 79:11
**seeing** [2] - 38:25, 41:2
**seem** [1] - 42:24
**sense** [1] - 51:6
**separate** [1] - 28:22
**served** [5] - 21:7, 21:10, 21:13, 21:17, 85:20
**services** [1] - 3:16
**setting** [2] - 7:21, 7:22
**settings** [1] - 8:3
**settle** [1] - 56:15

**settles** [1] - 4:15
**seven** [5] - 10:6, 31:20, 47:11, 67:9, 67:11
**several** [3] - 11:8, 13:5, 13:7
**shall** [12] - 24:17, 29:14, 32:19, 33:1, 38:3, 43:22, 48:12, 66:23, 67:12, 67:14, 69:5, 69:6
**shallow** [1] - 35:18
**shift** [1] - 67:1
**ship** [46] - 9:2, 9:4, 9:5, 9:8, 10:19, 10:22, 10:23, 13:12, 15:4, 15:11, 19:19, 20:22, 20:23, 20:24, 21:4, 21:6, 21:10, 21:18, 21:21, 22:14, 22:17, 22:19, 22:20, 26:4, 29:22, 30:5, 33:17, 33:24, 36:14, 38:1, 39:6, 43:15, 44:20, 45:25, 46:20, 67:23, 67:24, 68:5, 73:1, 73:7, 73:18, 79:22, 86:24, 87:24, 88:7
**ships** [7] - 8:23, 8:24, 12:7, 21:7, 68:15, 74:14, 75:20
**show** [9] - 28:10, 28:12, 28:25, 29:4, 42:16, 42:18, 65:10, 65:15
**showed** [1] - 61:4
**showing** [2] - 57:16, 78:23
**shown** [3] - 32:7, 58:6, 60:18
**shows** [1] - 19:2
**side** [14] - 45:21, 54:16, 54:19, 54:20, 60:17, 60:18, 60:19, 60:21, 60:24, 72:20, 89:3
**sight** [1] - 29:15
**signed** [6] - 71:5, 71:10, 71:17, 78:21, 85:4
**significant** [2] - 12:5, 12:14
**similar** [1] - 13:11
**simple** [3] - 4:25, 81:18, 81:25
**simply** [1] - 49:1
**single** [1] - 46:22
**sit** [1] - 53:11
**sitting** [5] - 37:11, 54:11, 54:16, 64:17,

64:20
**situation** [22] - 9:7, 15:18, 26:21, 26:22, 29:17, 41:16, 42:7, 48:10, 48:11, 50:21, 51:2, 51:4, 51:8, 54:14, 54:24, 55:7, 55:15, 55:20, 59:6, 69:15, 69:17, 80:20
**situational** [2] - 16:11, 16:13
**situations** [4] - 12:12, 13:21, 14:3, 14:13
**six** [9] - 10:4, 10:5, 10:8, 31:3, 32:14, 32:19, 36:19, 47:11, 72:14
**six-pack** [1] - 72:14
**skills** [1] - 80:12
**skipping** [1] - 69:11
**slow** [10] - 26:5, 41:23, 41:24, 42:1, 47:2, 47:15, 47:19, 47:22, 47:24, 47:25
**slowdown** [5] - 10:9, 38:10, 41:20, 41:23, 42:4
**slowed** [1] - 9:15
**slower** [1] - 43:25
**slowing** [7] - 9:16, 41:17, 41:18, 46:1, 47:21, 48:12
**slows** [3] - 40:25, 46:5, 47:12
**smashing** [1] - 11:19
**soldiers** [1] - 51:25
**someone** [7] - 5:18, 34:4, 53:9, 82:2, 82:21, 84:6, 86:14
**somewhat** [1] - 37:8
**somewhere** [1] - 39:15
**Sorry** [1] - 72:22
**sorry** [12] - 5:2, 29:7, 30:8, 32:17, 45:4, 45:10, 45:18, 55:23, 57:4, 59:21, 72:17, 86:13
**sound** [3] - 8:11, 69:9, 69:18
**sounds** [2] - 8:12, 18:25
**sources** [2] - 22:10, 76:6
**SOUTHERN** [1] - 1:1
**speaking** [2] - 30:2, 67:18
**special** [2] - 34:8, 35:13

**specific** [1] - 54:8
**specifically** [4] - 24:2, 79:18, 79:21, 83:15
**specifics** [1] - 63:23
**speculate** [1] - 83:23
**speculation** [4] - 12:21, 13:23, 72:18, 83:17
**Speed** [1] - 32:19
**speed** [30] - 9:10, 9:12, 10:2, 10:3, 14:18, 22:11, 25:22, 26:1, 26:3, 26:11, 26:18, 32:12, 32:13, 32:14, 32:20, 33:1, 34:7, 36:20, 36:25, 41:16, 42:5, 42:7, 43:25, 47:2, 47:11, 47:16, 47:18, 47:19
**spend** [2] - 8:2, 75:12
**spent** [4] - 3:9, 7:17, 7:21, 7:23
**stand** [3] - 3:23, 7:19, 50:16
**standard** [3] - 20:25, 22:21, 86:17
**standards** [1] - 62:8
**starboard** [1] - 48:14
**Starboard** [1] - 3:15
**start** [5] - 22:22, 54:1, 80:22, 88:7, 88:8
**started** [2] - 45:23, 70:11
**starting** [2] - 12:6, 45:16
**starts** [4] - 46:18, 47:7, 53:9, 59:14
**state** [4] - 33:4, 36:20, 44:5, 64:23
**statement** [5] - 26:23, 26:25, 42:2, 51:9, 56:23
**STATES** [2] - 1:1, 1:12
**States** [4] - 2:3, 24:22, 25:8, 89:18
**steering** [1] - 61:2
**STENOGRAPHICA LLY** [1] - 2:1
**step** [1] - 49:22
**stern** [1] - 46:3
**still** [5] - 4:6, 57:12, 68:3, 75:23, 75:24
**stop** [2] - 9:20, 41:11
**stopped** [1] - 32:21
**stopping** [2] - 34:9, 35:13

**story** [1] - 52:18
**stow** [1] - 22:24
**STREET** [16] - 1:19, 2:12, 12:21, 13:23, 14:5, 45:3, 45:6, 48:23, 62:21, 62:23, 63:22, 72:18, 74:16, 75:8, 77:12, 83:17
**Street** [1] - 1:19
**strike** [4] - 53:25, 84:21, 87:20, 87:21
**strikingly** [1] - 13:11
**student** [4] - 78:4, 78:8, 78:9, 81:11
**students** [1] - 78:13
**subject** [3] - 41:10, 41:11, 71:25
**subsides** [1] - 70:6
**substantial** [1] - 69:16
**sudden** [2] - 17:1, 56:14
**sufficient** [1] - 69:13
**suggest** [1] - 23:3
**Suite** [2] - 1:16, 1:20
**summary** [1] - 24:9, 76:12
**Sunday** [1] - 6:5
**supervise** [1] - 74:24
**supplied** [1] - 33:20
**supposed** [11] - 18:22, 19:23, 21:3, 21:6, 55:4, 62:12, 63:14, 63:17, 63:20, 64:16, 64:17
**supposedly** [1] - 71:12
**supposition** [1] - 55:17
**surface** [1] - 15:12
**surmise** [2] - 15:22, 15:25
**surprise** [1] - 17:2
**sustain** [1] - 12:23
**sustained** [3] - 13:24, 48:24, 77:13
**SW** [1] - 1:19
**swell** [1] - 17:21
**swells** [14] - 16:15, 16:20, 16:23, 17:1, 17:3, 17:7, 17:9, 17:11, 18:4, 37:19, 44:10, 44:14, 82:15
**switch** [1] - 70:9
**system** [14] - 49:13, 49:15, 49:20, 50:1, 57:15, 57:20, 58:8, 58:25, 59:4, 59:24, 60:12, 60:13, 60:18, 60:22

**table** [1] - 5:18
**talks** [1] - 61:19
**targeted** [1] - 69:20
**tasked** [1] - 81:8
**taxation** [2] - 75:3, 75:16
**teach** [1] - 84:7
**teaching** [2] - 72:25, 84:21
**telephone** [1] - 7:4
**temporary** [2] - 21:15, 21:16
**Ten** [1] - 3:15
**ten** [1] - 42:11
**tender** [94] - 9:21, 10:13, 11:10, 11:20, 12:1, 12:10, 12:14, 14:15, 15:3, 15:16, 18:22, 19:10, 19:16, 19:23, 20:12, 20:18, 22:19, 22:22, 22:23, 23:1, 23:2, 23:3, 23:5, 23:7, 23:11, 27:12, 30:5, 34:4, 34:20, 34:22, 37:11, 38:3, 38:17, 38:25, 39:5, 40:21, 40:24, 41:4, 41:5, 41:10, 41:18, 41:24, 43:10, 43:11, 45:16, 46:1, 46:3, 46:23, 47:25, 48:18, 49:7, 51:3, 52:9, 52:13, 53:6, 54:3, 54:8, 54:25, 55:1, 55:6, 56:19, 56:24, 59:7, 59:10, 62:5, 63:15, 63:16, 63:18, 63:21, 64:6, 64:21, 64:24, 65:7, 67:21, 68:8, 68:10, 68:12, 69:25, 70:1, 71:21, 72:1, 81:9, 81:14, 82:21, 85:24, 86:15, 86:18, 87:3, 87:16, 87:24, 88:2, 88:21
**tendering** [3] - 57:3, 57:6, 88:9
**tenders** [5] - 23:16, 48:20, 58:4, 88:1, 88:5
**tenets** [1] - 24:16
**term** [1] - 74:9
**test** [26] - 63:10, 76:14, 76:15, 76:21, 76:23, 76:25, 77:4, 77:6, 77:9, 77:10, 77:16, 77:17, 77:23, 78:2, 78:4, 78:8,

**tested** [1] - 71:25
**testified** [8] - 11:6, 12:18, 14:9, 14:12, 17:9, 17:10, 45:16, 86:14
**testify** [2] - 24:25, 40:5
**TESTIMONY** [1] - 1:11
**testimony** [19] - 10:5, 11:11, 12:25, 13:8, 13:10, 13:18, 13:19, 14:1, 17:13, 17:17, 18:1, 25:3, 25:4, 34:19, 34:24, 45:6, 58:9, 62:24, 86:19
**testing** [1] - 85:8
**tests** [2] - 83:8, 83:24
**text** [1] - 43:6
**THE** [50] - 1:12, 1:15, 1:18, 2:10, 12:22, 13:24, 14:6, 20:2, 30:8, 30:16, 30:24, 31:4, 31:7, 31:10, 31:13, 31:19, 31:22, 32:3, 32:6, 32:9, 35:2, 35:8, 42:20, 42:22, 45:4, 45:7, 45:10, 48:24, 50:5, 50:11, 50:15, 50:18, 53:18, 59:19, 59:21, 62:22, 62:25, 63:25, 65:12, 72:17, 72:19, 72:22, 74:18, 75:7, 75:10, 77:13, 77:20, 80:2, 81:20, 83:19
**themselves** [3] - 53:6, 66:18, 66:21
**theory** [5] - 68:13, 68:14, 80:11, 80:25, 83:4
**thinking** [1] - 48:17
**threat** [1] - 55:10
**three** [4] - 5:9, 5:10, 10:9, 21:14
**throttle** [3] - 25:23, 26:11, 61:2
**thrown** [2] - 54:16, 54:19
**throws** [1] - 22:7
**tilt** [1] - 46:4
**timestamp** [2] - 38:8, 38:22
**timing** [2] - 19:15

**title** [2] - 68:25, 69:2
**together** [1] - 32:13
**tomorrow** [2] - 6:10
**took** [6] - 18:12, 76:13, 76:19, 76:21, 76:25, 78:24
**top** [10] - 19:3, 20:10, 20:12, 33:4, 34:8, 42:11, 43:5, 43:6, 65:15, 70:20
**toward** [3] - 9:15, 49:7, 61:8
**track** [1] - 49:8
**traffic** [10] - 29:25, 33:5, 34:1, 34:2, 34:3, 40:3, 40:17, 43:12, 44:6, 44:17
**train** [7] - 63:14, 63:17, 63:20, 64:13, 66:7, 82:20, 86:18
**trained** [7] - 23:18, 51:24, 61:23, 65:8, 71:13, 85:3, 85:19
**training** [19] - 57:13, 62:4, 62:9, 62:11, 62:20, 70:10, 74:25, 75:23, 75:25, 79:25, 80:2, 80:16, 81:17, 85:7, 85:11, 85:12, 86:2
**transcript** [2] - 56:8, 56:9
**transcription** [1] - 89:11
**transit** [9] - 61:20, 64:13, 64:15, 64:16, 64:19, 64:21, 66:2, 66:10, 86:8
**transits** [2] - 88:1, 88:11
**trapped** [1] - 49:23
**travel** [15] - 3:10, 3:16, 3:19, 3:25, 4:14, 4:17, 4:18, 4:22, 4:23, 4:24, 4:25, 5:6, 7:25, 16:23, 17:8
**TRIAL** [1] - 1:11
**trial** [10] - 5:22, 6:18, 6:22, 7:3, 7:21, 7:22, 8:2, 13:13, 20:15, 56:9
**tricky** [2] - 82:17, 82:18
**tried** [2] - 37:5
**trip** [2] - 4:19, 6:9
**trouble** [2] - 7:8, 35:23
**true** [3] - 45:22, 68:10, 83:13
**trying** [10] - 5:1,

34:16, 34:17, 34:23,
37:9, 37:14, 37:15,
40:2, 59:7, 84:21
**turbulence** [3] -
43:21, 48:3, 84:25
**turbulent** [1] - 43:20
**turning** [4] - 34:9,
35:14, 48:14, 82:5
**TV** [1] - 11:12
**twenty** [4] - 6:20,
6:21, 49:11, 62:16
**twenty-five** [1] -
49:11
**twenty-two** [2] -
6:20, 6:21
**twice** [2] - 78:8,
78:15
**two** [21] - 4:22, 4:25,
5:6, 6:20, 6:21, 8:2,
8:16, 8:20, 8:23, 11:4,
28:4, 30:4, 30:5,
33:22, 33:24, 50:4,
50:20, 75:3, 83:4,
84:15
**type** [1] - 26:22

## U

**U.S** [3] - 24:22,
24:23, 25:9
**under** [12] - 15:22,
25:23, 26:12, 36:11,
36:19, 39:5, 46:23,
53:13, 63:11, 69:11,
77:9, 85:20
**understood** [2] -
18:7, 75:13
**underway** [2] -
67:19, 68:1
**undocking** [1] - 88:9
**UNITED** [2] - 1:1,
1:12
**united** [1] - 2:3
**United** [3] - 24:22,
25:8, 89:18
**unusual** [2] - 39:19,
41:22
**up** [40] - 9:4, 15:11,
15:16, 17:1, 19:1,
19:2, 19:8, 20:8, 20:9,
22:11, 22:22, 24:3,
32:17, 35:21, 38:6,
40:25, 43:2, 45:18,
46:20, 48:5, 49:3,
49:13, 49:25, 50:16,
53:9, 57:13, 57:14,
57:20, 59:12, 73:5,
74:19, 75:5, 77:17,
81:16, 82:1, 83:2,
84:4, 86:3

**upper** [1] - 57:20
**uprights** [1] - 54:9
**USA** [1] - 70:25
**users** [1] - 24:8

## V

**Vancouver** [8] - 4:1,
4:4, 4:5, 4:7, 4:8, 4:11
**Vancouver-Miami**
[1] - 4:1
**variety** [1] - 43:11
**various** [2] - 4:12,
21:7
**verbally** [1] - 78:9
**versus** [1] - 62:20
**vertical** [1] - 15:12
**vessel** [58] - 9:8,
9:21, 10:3, 10:25,
11:10, 13:1, 14:19,
14:22, 15:24, 15:25,
29:14, 32:19, 34:8,
35:12, 35:13, 36:13,
36:17, 37:9, 37:16,
37:23, 38:7, 38:9,
38:14, 38:16, 38:17,
38:25, 39:4, 39:6,
39:12, 39:13, 40:14,
40:15, 40:20, 41:2,
41:14, 43:12, 43:24,
44:6, 44:17, 46:1,
46:8, 46:12, 49:16,
51:16, 58:23, 59:2,
67:11, 67:21, 67:23,
68:6, 68:7, 68:8, 82:5,
82:6, 82:10, 82:11,
85:24
**vessels** [17] - 11:4,
24:5, 29:25, 30:4,
30:6, 33:3, 33:6,
33:16, 33:17, 33:22,
50:20, 67:19, 68:15,
69:20, 74:6
**VHF** [5] - 57:25, 58:2,
58:3, 58:7, 58:15
**VHFs** [1] - 58:4
**vicinity** [12] - 29:25,
33:17, 34:1, 34:2,
34:3, 37:17, 37:18,
37:19, 40:3, 40:18,
43:12, 44:6
**Victoria** [5] - 4:2, 4:4,
4:6, 4:8, 4:11
**video** [16] - 12:3,
18:8, 18:9, 33:19,
33:20, 33:22, 33:24,
38:6, 38:15, 38:20,
39:3, 39:18, 40:9,
41:2, 46:5, 51:2
**videos** [3] - 56:9,

56:23, 57:10
**view** [5] - 26:2, 50:2,
57:25, 58:19, 60:8
**violations** [1] - 34:20
**virulent** [1] - 44:1
**visibility** [8] - 29:5,
33:4, 37:4, 37:8,
37:23, 37:25, 40:20
**vision** [2] - 49:7,
59:9
**VIVIAN** [2] - 1:4, 1:11
**voyages** [1] - 87:23
**vs** [1] - 1:6

## W

**wait** [4] - 56:15,
59:19, 72:21, 81:22
**waiting** [2] - 3:22,
3:23
**wake** [39] - 15:8,
15:13, 15:14, 15:17,
15:25, 16:1, 16:11,
17:10, 18:5, 23:19,
25:14, 26:4, 26:19,
37:17, 37:20, 40:19,
42:8, 43:18, 43:19,
43:22, 43:24, 44:1,
44:4, 44:10, 45:16,
45:23, 46:2, 46:3,
46:17, 46:19, 47:3,
47:7, 56:15, 56:19,
70:6, 82:13, 84:25
**wakes** [2] - 18:6,
37:18
**walk** [1] - 53:9
**wants** [2] - 22:8, 59:8
**warn** [12] - 13:21,
14:2, 14:12, 23:24,
34:17, 51:19, 55:22,
55:24, 56:1, 56:2,
56:20, 66:17
**warning** [12] - 35:7,
48:5, 49:2, 49:4,
49:12, 52:25, 53:23,
54:22, 55:3, 55:9,
56:22, 89:4
**warnings** [7] - 11:6,
11:10, 55:7, 57:13,
61:18, 66:13, 89:1
**watched** [2] - 12:3,
88:3
**watching** [2] - 88:5,
88:6
**water** [1] - 35:20,
37:21, 80:16
**waters** [6] - 27:17,
27:19, 39:20, 82:11,
82:12
**wave** [2] - 37:20,

43:10
**week** [1] - 5:25
**wheel** [1] - 61:2
**whole** [2] - 49:6, 60:8
**width** [1] - 36:7
**wind** [1] - 36:20
**window** [8] - 60:1,
60:14, 60:20, 60:21,
60:22, 61:9, 61:10
**windows** [1] - 37:13
**windshield** [2] -
37:24
**witness** [8] - 12:9,
45:7, 50:16, 62:25,
65:10, 72:19, 77:17,
83:19
**WITNESS** [5] -
45:10, 53:18, 59:21,
72:22, 80:2
**witness's** [1] - 42:20
**WITNESSES** [1] -
2:10
**word** [5] - 36:7,
69:24, 77:18, 85:11,
86:5
**wording** [1] - 31:2
**words** [6] - 26:10,
47:16, 77:20, 84:5,
86:24, 87:2
**works** [2] - 36:1,
88:19
**wrap** [1] - 37:24
**wrap-around** [1] -
37:24
**wrench** [1] - 22:7
**write** [4] - 28:13,
31:2, 44:3, 82:1
**writing** [4] - 63:5,
81:1, 84:23, 85:2
**written** [1] - 80:15
**wrote** [3] - 31:7, 87:2

## Y

**years** [6] - 8:16, 8:20,
13:5, 13:6, 13:7, 52:6
**yesterday** [2] - 3:5,
14:25
**youngsters** [1] -
52:21

## Z

**zoom** [4] - 31:13,
32:17, 32:18, 43:2